UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**Hearing Date and Time**:
November 3, 2022 at 10:00 am

-----------------------------------------------------------X

In Re:                                                                  Chapter 11

EASTGATE WHITEHOUSE LLC,                        Case No.  22-22635 (SHL)

                                Debtor.

-----------------------------------------------------------X

# DECLARATION OF WILLIAM W. KOEPPEL IN RESPONSE TO WILMINGTON TRUST'S OBJECTION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL TO PAY OWNER'S SALARY, MANAGEMENT FEES, AND CERTAIN ATTORNEY'S FEES, SUBJECT TO ORDER APPROVING PAYMENT OF SUCH ATTORNEY FEES AND TO DEBTOR'S MOTION TO RETAIN LAW OFFICES OF CHRISTOPHER ALVARADO

William W. Koeppel, hereby declares, under penalty of perjury, as follows:

1.    I am the president and sole shareholder of Whitehouse Estates, Inc., sole member of Eastgate Whitehouse LLC, the debtor and debtor-in–possession herein (the "Debtor") and am fully familiar with the facts set forth herein.  This certification is submitted in response to the objection interposed by Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2018-C46, Commercial Mortgage Pass-Through Certificates, Series 2018-C46 ("Wilmington") to the Debtor's Motion For an Order Authorizing Debtor's Use Of Cash Collateral To Pay Owner's Salary, Management Fees, and Certain Attorney's Fees, Subject To Order Approving Payment Of Such Attorney Fees (the "Objection").

1

**Management Fees and Owners' Salary**

2. In the Objection, Wilmington objects, in part, to the payment of management fees to Koeppel & Koeppel Realty Management, Inc. ("Koeppel Management") and to pay my salary. Wilmington first asserts that paragraph 7 of the Conditional Assignment of Management Agreement (the "Assignment"), a copy of which is attached to the Objection as Exhibit 4, in and of itself, supports denial of those payments. However, during the entire period from the time of the alleged default to August 19, 2022, the date that the Debtor filed its Chapter 11 petition (the "Petition Date"), Wilmington did not object to the payment of either fees to Koeppel Management, my salary, and/or health benefits to me and my family. Only after the Petition Date and the negotiations for a cash stipulation began did Wilmington object to any of the above.

3. This language in the Assignment should not, by itself, be deemed grounds to deny payment of management fees to Koeppel Management since Wilmington waived its right to do so by permitting payments to Koeppel during the period of the alleged default. Moreover, the Debtor could seek to reject the Assignment in this case

4. In paragraph 26 of the Objection, Wilmington contends that the Debtor's cash collateral should not be used to payment Koeppel Management because:

> the 2022 Koeppel Management Agreement (defined below) duplicates many of the functions already required of Livingston in the Livingston Management Agreement, including: (i) entering into contracts for utilities, (ii) purchasing supplies, (iii) checking and paying bills, (iv) coordinating moving dates of tenants, (v) consider and attend to reasonable tenant complaints, (vi) prepare and file payroll forms for employees of the Property, (vii) cooperate with Debtor's accountant to prepare tax returns, and (viii) prepare and send out notices.

5. Wilmington's contention that the Debtor has no need for a secondary management

2

company is not correct. Koeppel Management and I are involved in critical work that goes far beyond the general management/booking type services rendered by Livingston Management Company. These services include:

> --**services needed as a result of the prepetition fire such as**: (a) construction management of the fire damage; (b) coordinating the Rebuilding of the burned out store; (c) replacing trash compactor; (d) repairing lobby, including installation of new floor, arranging for the wallpapering and redecoration of the lobby; (e) coordinating the repainting of the basement and stairwells; (f) coordinating the Repair of the elevators caused from water damage resulting from the fire; and (g) working with and meeting with the public adjuster.
>
> **-- services needed have the building remain in compliance with the Local Law 11 of 1998**[1] such as: (a) working with engineers; (b) coordinating the installation of bridging; and (c) bidding out and supervising the facade repair
>
> -**additional services include**: (a) overseeing efforts to rent the vacant ground floor space which is being renovated after the fire, as described in paragraph supra; (b) overseeing the renovation of apartments; (c) supervising building staff and hiring a new superintendent; (d) overseeing rent collections; and (e) negotiating with owner of neighboring building for access to do façade work.

6. Having Koeppel Management continue to render services for it is compensated with respect to the Property is economically in the best interest of the Debtor and its estate. For example, Apartment 4F has recently become vacant after being occupied for 58 years. Instead of having an outside management company supervise the renovation, Koeppel Management is carefully monitoring the work and using building employees where appropriate, thus saving approximately $30,000. Additionally, when apartments need to be painted Koeppel Management uses staff instead of outside contractors thus saving $2000.00 on a studio unit, $3000.00 on a one-bedroom unit, and

---

[1] Local Law 11 of 1998 is also known as the Façade Inspection Safety Program ("FISP"), which mandates the periodic inspection of the exterior walls and appurtenances (such as balconies) of buildings greater than six stories in height in New York City.

3

$5000.00 on a two-bedroom unit. Recently, there were two leaks into the commercial space from units 2k and 2H. Both times the ceiling and light had to be using building staff about $2000.00, as compared to $6000.00 if the work had been done with outside contractors.

7.   In addition to the above items, successful prosecution of this pending Chapter 11 case and the pending J51 litigation, which is the subject of the tenants' pending motion for modification of the automatic stay as well as the tenants' motion for a Rule 2004 examination, require the services of Koeppel Management and me. While we are ready, willing, and able to assist, it is unfair to expect us to render time consuming services without being compensated. Rather than discuss an agreeable number for our services, Wilmington has summarily refused to consent to allowing the Debtor to use any cash collateral to compensate Koeppel Management and I. While we believe the requested amounts are fair, it is submitted that this Court should approve some reasonable amount of compensation to Koeppel Management and me.

**Health Insurance for the Koeppel Family**

8.   Wilmington also objects to the Debtor's use of cash collateral to pay $4,002.18 a month for health insurance for the Koeppel Family. Since the policy requires a minimum amount of individuals to be covered thereunder, if the Debtor is not allowed to use cash collateral to pay this expense, then the building's superintendent and his family will also lose their health insurance coverage. In addition to me, my son, Harrison Koeppel, also works for Koeppel Management. Wilmington's refusal to permit the Debtor to use cash collateral to pay this relatively miniscule expenses is unfair and motivated by pettiness.

**Legal Fees for Law Offices of Christopher Alvarado and Rosenberg & Estis**

9.   Wilmington also objects to granting a carveout from the cash collateral for the

4

payment of allowed legal fees for Law Offices of Christopher Alvarado ("Alvarado") and Rosenberg & Estis, PC ("R&E")[2]. Wilmington also objects to the Debtor's retention of Alvarado in this case. This declaration is also being submitted in response to this objection. Alvarado has been representing the Debtor for many years, in essence, as an inhouse counsel. Its services are critical to this Chapter 11 case and Alvarado services are directed towards issues that are not related to the bankruptcy laws. Alvarado 's services are strictly related to landlord tenant law issues and real estate regulations that by bankruptcy counsel is not familiar with. It seems unfair to me that Wilmington is entitled to have two attorneys, Bruce J. Zabarauskas, Esq. Vivian M. Arias, Esq., represent it, but I am not entitled to have two attorneys, Joel Shafferman and Christopher Alvarado, represent the Debtor.

10.    Alvarado renders legal services daily for the benefit of the Debtor. These services include working with R&E in the J51 action which, as evidenced by the tenants' recent motions for modification of the automatic stay and an examination under Rule 2004, involves much more than preparing for the oral argument before the New York State Court of Appeals. Alvarado's services are integral to the success of the appeal and J51 litigation since Alvarado understands the relevant rent records and related documents, and has, and will continue to, work with Koeppel Management in prosecuting the appeal[3].

11.    The Debtor will also need Alvarado's services with respect to the complaint filed in

---

[2] In the interest of trying work with Wilmington to have a consensual resolution of these cash collateral issues, my general bankruptcy counsel, Shafferman & Feldman LLP, has graciously agreed not to seek a carveout for its fees at this time.

[3] The appeal is critical to the success of this case as it will directly impact the amount of the rent roll, and hence the value of the Debtor's leasehold interest in the building. The Debtor has worked hard to get to this point in the appeal and believes that the appeal will be successful. In fact, on September 15, 2022, Rent Stabilization Association of NYC, Inc. and Community Housing Improvement Program, Inc. filed an amicus curiae brief supporting the Debtor's position, a copy of which is attached hereto as **Exhibit "A"**.

5

the third-party action, a copy of which is attached hereto as **Exhibit "B"**, since the Debtor intends to remove the third-party action to this Court. Additionally, with respect to the New York State Surrogate's Court proceedings, Alvarado has filed a petition and motion in the New York County Surrogate's Court to remove the current trustees and appoint successor trustees who would honor the debts owed to the Debtor, which are in the amount of several millions of dollars.

12. Alvarado also renders valuable services with respect to collections actions against nonpaying tenants. For example, Alvarado is currently working on legal actions against two non-paying tenants that is decreasing the rent roll by $5000 to $6,000 per month which is the approximately the amount of the fees he will be seeking each month. Wilmington's objection is simply "penny wise and pound foolish". To the extent that Wilmington has concerns that Alvarado only be compensated for services that directly benefit the Debtor and nonlegal services, I have been advised that all his fees will be subject to the procedures set up by this Court to address these types of issues.

13. With respect to R&E's right to a carve-out, it appears that Wilmington and the Debtor are on the path towards resolving that aspect of the Objection, and that resolution will certainly have a positive effect on the Debtor and its estate.

Dated: Rye, New York
      October 31, 2022

                                       /S/ William W. Koeppel
                                       William W. Koeppel, as President and
                                       sole shareholder of Whitehouse Estates, Inc., the sole
                                       member of Eastgate Whitehouse LLC