HOLLAND & KNIGHT LLP
Bruce J. Zabarauskas, Esq.
Vivian M. Arias, Esq.
31 West 52nd Street
New York, New York 10019
(212) 751-3001
bruce.zabarauskas@hklaw.com
vivian.arias@hklaw.com
Attorneys for Barclays Bank PLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
In re                                  :        Chapter 11
                                       :
                                       :
EASTGATE WHITEHOUSE, LLC,              :        Case No. 22-22635-SHL
                                       :
                                       :
                        Debtor.        :
-----------------------------------------------------------------x
```

**BARCLAYS BANK PLC'S CHAPTER 11 LIQUIDATING PLAN FOR THE DEBTOR**

Barclays Bank PLC (the "Secured Lender") hereby proposes the following *Chapter 11 Liquidating Plan for Eastgate Whitehouse, LLC* pursuant to Section 1121(c) of the Bankruptcy Code.

## ARTICLE I

### Definitions

The following terms shall have the respective meanings set forth below. Unless otherwise indicated, the singular shall include the plural. Any term not defined herein which is defined by the Bankruptcy Code shall have the meaning ascribed to it in the Bankruptcy Code.

1.1    "Accounts Receivable" means any moneys owed to the Debtor from any source.

1.2    "Affiliate" means "affiliate" as such term is defined in Section 101(2) of the Bankruptcy Code.

1.3    "Allowed Administrative Claim" means a claim which is an Allowed Claim and not a Secured Claim, accruing from and after the Petition Date, including the fees and expenses of professional persons retained or to be compensated pursuant to the Bankruptcy Code, and any fees or charges assessed against the Debtor's estate under Chapter 123, title 28, of the United States Code.

1.4    "Allowed Claim" means a claim which is scheduled pursuant to Section 521(1) of the Bankruptcy Code, other than a claim scheduled as disputed, contingent or unliquidated, or a claim which has been filed pursuant to Section 501(a) of the Bankruptcy Code, and with respect to which no objection to the allowance thereof has been interposed within the period of limitation fixed by the Bankruptcy Court, or as to which any objection has been overruled (and to the extent so overruled) by the Bankruptcy Court; provided, however, that except as otherwise set forth in this Plan, interest accrued after the Petition Date shall not be part of any Allowed Claim.

1.5    "Allowed General Unsecured Claim" means an Allowed Claim which is not an Allowed Priority Claim, an Allowed Secured Claim, or an Allowed Administrative Claim, or is not a claim entitled to priority under Section 507(a) of the Bankruptcy Code and which is not secured by a valid, perfected security interest or lien, but including an Allowed Claim, if any, arising from the rejection of an executory contract.

1.6    "Allowed Non-Professional Administrative Claims" means those Allowed Administrative Claims which are neither Allowed Professional Administrative Claims, nor Allowed Administrative Claims held by the Office of the United States Trustee.

1.7    "Allowed Priority Claim" means the portion of an Allowed Claim entitled to priority under Section 507(a) of the Bankruptcy Code.

2

1.8    "Allowed Professional Administrative Claims" means those Allowed Administrative Claims held by Professionals.

1.9    "Allowed Secured Claim" means a Secured Claim to the extent it is an Allowed Claim.

1.10    "Assumed Unexpired Leases And Executory Contracts" shall have the meaning ascribed to such term in Section 8.7 of the Plan.

1.11    "Ballot" means the ballot provided to holders of Claims and Interests to, among other things, vote to accept or reject the Plan.

1.12    "Barclays" means Barclays Bank PLC and/or any assignee of the Secured Lender Allowed Secured Claim.

1.13    "Bankruptcy Case" shall mean the above-captioned Chapter 11 case commenced by the Debtor on the Petition Date before the Bankruptcy Court (Case No. 22-22635-SHL).

1.14    "Bankruptcy Code" means Title 11, United States Bankruptcy Code, 101 *et seq.,* commonly referred to as the Bankruptcy Code.

1.15    "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Southern District of New York.

1.16    "Broker Retention Order" means an order of the Bankruptcy Court authorizing the Plan Administrator to retain the Broker to sell the Sale Assets pursuant to the Plan.

1.17    "Broker" means the broker to be selected by the Secured Lender and retained by the Plan Administrator on behalf of the Debtor by order of the Bankruptcy Court as the broker to market and sell the Real Property pursuant to Article VII of the Plan.

1.18    "Business Day" means any day other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

3

1.19  "Cash Collateral" shall have the meaning ascribed to such term in 363 of the Bankruptcy Code.

1.20  "Cash Collateral Orders" means: (i) the *Order Authorizing Debtor's Use Of Cash Collateral, And Granting, Inter Alia, Replacement Liens As Adequate Protection to Secured Lender*, entered on December 1, 2022 (with replacement liens granted *nunc pro tunc* to the Petition Date) (the "Original Cash Collateral Order") [Dkt. No. 66]; (ii) the *Amended And Restated Stipulation and Order Authorizing the Debtor's Use of Cash Collateral And Granting Adequate Protection To Secured Lender*, which was approved by the Bankruptcy Court, along with any stipulation extending or modifying such orders Court on May 11, 2023 ("the "Amended And Restated Cash Collateral Order"),  [Dkt. No. 169], and all stipulations extending the Original Cash Collateral Order and Amended and Restated Cash Collateral Orders [Dkt. Nos. 65, 87, 95, 111, 128, 161, 162, 169].

1.21  "Causes of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit , obligation, liability, loan, debtor, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, or after, the Petition Date, in contract or in tort, in law or in equity or pursuant to any  other theory of law (including, without limitation, under any state or federal securities).  Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach  of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or

4

Chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury and any other defense set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.22    "Claim" means a claim against the Debtor as defined in Section 101(5) of the Bankruptcy Code.

1.23    "Claim Resolution Date" means the date which is after the deadline for filing objections to Claims under Article VI of the Plan, when all filed objections to Class 5 Claims General Unsecured Claims have been resolved by a Final Order.

1.24    "Claimant" means a holder of a Claim.

1.25    "Class" means a group of claims or interests, consisting of Claims or Interests which are substantially similar to each other, as classified pursuant to the Plan.

1.26    "Class 5 General Unsecured Claims Reserve" means $25,000 which shall be set aside by the Plan Administrator from either Cash Collateral or the proceeds of the Sale for purposes of ensuring a distribution to holders of Class 5 General Unsecured Claims.

1.27    "Class Action Claims Administrator" shall have the meaning ascribed to the term "Class Administrator" in the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.28    "Class Action Lawsuit" means the lawsuit currently pending before the Supreme Court for the State of New York, County of New York entitled *Kathryn, Casey, et al on behalf of themselves and all others similarly situated, plaintiffs v. Whitehouse Estates, Inc., et al, Defendants* (Index No. 111723/2011).

1.29    "Class Action Members" means the "Class Members" described in the Class Action Settlement Agreement, defined as: (i) all persons who occupied an apartment that was treated as

deregulated by Landlord while Landlord was receiving J-51 tax benefits (a "Covered Unit"), provided that such a person was an occupant of a Covered Unit on or after the Base Date but before June 30, 2014, or who took occupancy of a Covered Unit after June 30, 2014, and was treated as an unregulated tenant, but after performing the calculation described in the Class Action Settlement Agreement it is determined that their initial rent was below the threshold required for high rent vacancy deregulation. The Covered Units are those units described in <u>Exhibit A</u> to the Class Action Settlement Agreement. For purposes of this Plan only, the term Class Action Members also includes counsel for the Class Action Members in the Class Action Lawsuit. .

1.30    "Class Action Order and Final Judgment" means the order to be signed by the State Court in the Class Action Lawsuit granting final approval of the Class Action Settlement Agreement.

1.31    "Class Action Proof of Claim" means the contingent and unliquidated general unsecured proof of claim filed on behalf of the Class Action Members on November 10, 2022, in the Bankruptcy Case, as amended.

1.32    "Class Action Settlement Agreement" means that *Stipulation and Agreement of Settlement* annexed to this Plan as <u>Exhibit B</u>, executed by counsel to the plaintiffs in the Class Action Lawsuit, and which shall be executed no later than three (3) Business Days after the Confirmation Date by the Plan Administrator on behalf of the Debtor.

1.33    "Class Action Settlement Amount" means $2,200,000, which will be paid to the Class Action Claims Administrator pursuant to Sections 5.4 and 7.9 of the Plan following the Closing of the Sale or Transfer, and entry of the Class Action Order And Final Judgment from either (i) the proceeds of the Sale, or (ii) the Secured Lender in the event that the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of the Plan.

1.34    "Class Action Representatives" mean Kathryn Casey, Laurie Cagnassola, Gerald

Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica

Saks and Kirk Swanson, and their successors, heirs and assigns, the class representatives appointed

in connection with the Class Action Lawsuit to act on behalf of the Class Action Members.

1.35    "Closing Date" shall mean the date of the closing of the Sale or the Transfer

pursuant to (i) the Plan and (ii) the Sale Order or Transfer Order, as applicable.

1.36    "Closing Expenses" means those expenses that will be required to be paid by the

Debtor in connection with the Sale or Transfer pursuant to either: (i) the Purchase and Sale

Agreement that has been approved by the Bankruptcy Court; or (ii) order of the Bankruptcy Court.

1.37    "Confirmation Date" means the date of entry of the Confirmation Order.

1.38    "Confirmation Hearing" means the hearing to be held by the Bankruptcy Court to

consider confirmation of the Plan.

1.39    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan

under and pursuant to Section 1129 of the Bankruptcy Code and related sections thereof.

1.40    "Court" means the Bankruptcy Court.

1.41    "Covered Unit" shall have the meaning set forth in Section 1.29 of this Plan.

1.42    "Cure Claim" shall have the meaning ascribed to such term in Section 8.6 of the

Plan.

1.43    "Debtor" means, as applicable, prior to the Effective Date, Eastgate Whitehouse,

LLC, and after the Effective Date, means Eastgate Whitehouse, LLC (or any successor entity).

1.44    "Disbursing Agent" means the Plan Administrator.

1.45    "Disputed Claim" means any claim listed on the Debtor's Schedules as disputed or

as to which an objection to the allowance thereof has been interposed and not determined by a

Final Order pursuant to Article VI of this Plan.  The term Disputed Claim shall not include any Claim held by the Secured Lender.

1.46    "Effective Date" means the Confirmation Date.

1.47    "Entity" means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined on section 101(27) of the Bankruptcy Code), or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.48    "Estate Of William W. Koeppel Secured Claim" means the proof of claim filed in the Bankruptcy Case (Claim No. 4), which purports to be secured by the Debtor's interest in the Icon Note.

1.49    "Exculpated Party" means the Plan Administrator and the Secured Lender, and with respect to each of the forgoing, all Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided in the Plan.

1.50    "Extended Marketing Period" shall have the meaning ascribed to such term in Section 7.4 of the Plan.

1.51    "Final Order" means an order or a judgment which has not been reversed or stayed and as to which (i) the time to appeal or to seek review, rehearing or certiorari has expired pursuant to applicable law and (ii) no appeal or petition for review, rehearing or certiorari is pending.

1.52    "Ground Lease" means that ground lease between 939 First Avenue LLC, as ground lessor and the Debtor as ground tenant for the Real Property.

1.53    "HCR" means the New York State Homes and Community Renewal, formerly known as New York State Division of Housing and Community Renewal ("DHCR").

8

1.54    "Icon Note" means those agreements between the Debtor and Support Parking LLC dated between June 1, 2020 and March 8, 2021, concerning arrearages owed by Support Parking LLC to the Debtor for its lease of a garage at the Real Property.

1.55    "Impaired" when used with respect to any Claim, Interest or Class, has the same meaning as that contained in Section 1124 of the Bankruptcy Code.

1.56    "Impaired Class" means a class of Claims or Interests under the Plan pursuant which is not an Unimpaired Class.

1.57    "Indemnity Claim" means any claim that the Debtor has against: (i) Alexandra Koeppel, as Executors and Trustees of the Trust created under Article Fourth of the Last Will Of Robert A. Koeppel; (ii) Roberta Koeppel; and (iii) Koeppel Management Company, LLC.

1.58    "Insider" means "insider" as such term is defined in Section 101(31) of the Bankruptcy Code

1.59    "Insider and Affiliate Claims" means unsecured clams held by Insiders and Affiliates of the Debtor, as defined in Bankruptcy Code Section 101 to the extent that such claims are Allowed General Unsecured Claims, and include any claims held or filed by WWK 140 Bay Ridge, LLC and William Koeppel.

1.60    "Interests" means the rights of the equity security holders in the Debtor.

1.61    "Interim Rent Order" the order entered in the Class Action Lawsuit setting rents, on an interim basis, for apartments at the Real Property listed in such order, based upon the default formula.

1.62    "Landlord" means the Debtor and Whitehouse Estates, Inc., which is the Debtor's predecessor under the Ground Lease.

1.63    "Litigation Claims" shall have the meaning ascribed to such term in Section 11.1(a) of the Plan.

1.64    "Litigation Claims Carve-Out" shall have the meaning ascribed to such term in Section 11.2(b) of the Plan.

1.65    "Loan Documents" means the documents relating to the loan between the Debtor, as borrower and the Secured Lender, as lender, including without limitation the loan agreement, note, mortgage and assignment of leases and rents, copies of which are attached to the proof of claim held by the Secured Lender in the Bankruptcy Case.

1.66    "Marketing Period" shall have the meaning ascribed to such term in Section 7.4 of the Plan.

1.67    Managing Agent" means Trigild Property Management, LLC.

1.68    "Non-Professional Administrative Claims" means Administrative Claims which are not Professional Administrative Claims.

1.69    "Non-Professional Administrative Claim Bar Date" shall have the meaning ascribed to such term in Section 2.4 of the Plan.

1.70    "Notice of Claim Form" shall mean the "Claim Form" and "Notice of Claim Form" as such terms are defined in the Class Action Settlement Agreement and used in paragraph 34 of the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.71    "Notice And Balloting Agent" means Donlin Recano & Company, Inc.

1.72    "Opt-Out" shall have the meaning ascribed to such term in paragraph 46 of the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.73    "Personal Property" means all assets of the Debtor which are not Real Property, Accounts Receivable, cash, Cash Collateral or Litigation Claims.

10

1.74    "Petition Date" means August 19, 2022, the date on which the Debtor filed its Chapter 11 petition with the Bankruptcy Court.

1.75    "Plan" means this plan of reorganization, and all exhibits hereto, as the same may be modified or amended from time to time as and to the extent permitted herein or by the Bankruptcy Code.

1.76    "Plan Administrator" means David Wallace of Trigild Property Management as plan administrator pursuant to that Plan Administrator Agreement approved by order of the Bankruptcy Court, or such other Person appointed as Plan Administrator pursuant to the terms ofteh Plan Administrator Agreement.

1.77    "Plan Administrator Agreement" shall have the meaning ascribed to such term in Section 7.2 of the Plan.

1.78    "Professional" means a person or entity retained by order of the Court pursuant to Section 327 of the Bankruptcy Code and whose compensation is governed by Section 330 of the Bankruptcy Code.

1.79    "Professional Administrative Claim Bar Date" shall have the meaning ascribed to such term in Section 2.5 of the Plan.

1.80    "Protective Advance Orders" means the: (a) *Interim Order Granting Motion For An Order: (I) Authorizing Barclays Bank PLC, As Secured Lender, To Make Protective Advance; (II) Granting Liens And Superpriority Administrative Expense Claims In Connection Therewith And (III) Granting Interim Relief*, entered on July 12, 2023 [Dkt. No. 182]; and (b) *Final Order Granting Motion For An Order: (I) Authorizing Barclays Bank PLC, As Secured Lender To Make Protective Advance; (II) Granting Liens And Providing Superpriority Administrative Expense*

*Claim In Connection Therewith; And (III) Granting Related Relief*, entered on August 11, 2023 [Dkt. No. 188].

1.81    "Purchase and Sale Agreement" shall have the meaning ascribed to such term under Section 7.4(b) of the Plan.

1.82    "Purchaser" shall have the meaning ascribed to such term under Section 7.4(c) of the Plan.

1.83    "Rejection Claim" shall have the meaning ascribed to such term in Section 8.9 of the Plan.

1.84    "Real Property" means the Debtor's leasehold interest in the real property located at 939-943 First Avenue, a/k/a 344-350 East 52nd Street, New York, New York, and the Debtor's interest in the improvements located at such property, along with any leases entered into by the Debtor as landlord with tenants at the Property and assumed pursuant to the Plan.  The legal description of the Real Property is annexed hereto as Exhibit A.

1.85    "Related Parties" means with respect to any Entity, such Entity's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, all of their respective officers, directors, principals, stockholders, members, partners, employees, agents, trustees, advisors, administrators, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and such persons' respective heir, executors, estates and nominees, including without limitation, any future owner of the Debtor's interests in the Ground Lease and any future owner of the fee interests in the Real Property.

1.86    "Released Parties" means the Debtor, all defendants in the Class Action Lawsuit, the Secured Lender, the Ground Lessor, any and all purchasers of the Debtor's interest in the

Ground Lease, and all of the foregoing entities' present and former lenders, investors, affiliates, subsidiaries and parent companies, including without limitation, limited liability companies, partnerships and corporations (including those that are minority-owned), and their respective officers, attorneys, members, principals, shareholders, heirs, executors, administrators, directors, managers, partners, employees, agents, consultants, advisors, or representatives, and the successors and assigns of each of the foregoing, including without limitation, any future owner of the Debtor's interest in the Ground Lease, and any future owner of the fee interest in the Real Property.

1.87    "Releasing Class Member" means each Class Member who: (i) has not affirmatively opted out of the release set forth in Section 10.3(a) of the Plan by checking the box on the Ballot indicating that they opt not to grant such release; or (ii) does not timely and properly opt out of the Class Action Settlement Agreement, and their heirs, successors, trustees, executors, administrators and assigns.

1.88    "Releasing Landlord" means the Debtor, its Affiliates, and each of its predecessors in interest.

1.89    "Request for Payment of Administrative Claim" shall have the meaning ascribed to such term in Section 2.4 of the Plan.

1.90    "Sale" means the sale of the Sale Assets pursuant to Article VII the Plan.

1.91    "Sale Assets" means the Real Property, the Personal Property and those Assumed Unexpired Leases and Executory Contracts designated for assignment pursuant to: (i) the Purchase and Sale Agreement or the Sale Motion; or (ii) Transfer Motion.

1.92    "Sale Motion" shall have the meaning ascribed to such term in Section 7.4(c) of the Plan.

#233753295_v1

1.93    "Sale Order" shall have the meaning ascribed to such term in Section 7.4(c) of The Plan.

1.94    "Schedules" means the schedules of assets and liabilities in accordance with Bankruptcy Rule 1007(b), filed by the Debtor with the Bankruptcy Court (as they may be amended from time to time in accordance with Bankruptcy Rule 1009).

1.95    "Secured Claim" means a Claim which is secured by a valid, perfected and enforceable lien on property owned by the Debtor, to the extent of the value of the interest of the holder of such claim in such property as determined by the Bankruptcy Court pursuant to Section 506(a) of the Bankruptcy Code.

1.96    "Secured Lender Allowed Secured Claim" means the Allowed Secured Claim of Barclays and any assignee thereof.

1.97    "Secured Lender Allowed Superpriority Administrative Claim" means the superpriority Administrative Claim granted to Barclays pursuant to the Protective Advance Orders. [Dkt. Nos. 182 and 188].

1.98    "Secured Lender Reserves" shall mean any escrows or reserves held by the Secured Lender under the Loan Documents.

1.99    "Settled Plaintiffs' Claims" shall have the meaning ascribed to such term in paragraph 33 of the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.100    "State Court" means the Supreme Court of the State of New York for New York County in the Class Action Lawsuit.

1.101    "Subordinated General Unsecured Claims" means a General Unsecured Claim, which is an Allowed Claim that has been subordinated to other Allowed Claims pursuant to an order of the Bankruptcy Court.

#233753295_v1

1.102   "Substantial Consummation" shall have the meaning ascribed to such term under Section 12.1 of the Plan.

1.103   "Supplemental Notice of Assumed Rejected Unexpired Leases and Executory Contracts" shall have the meaning ascribed to such term in Section 8.5 of the Plan.

1.104   "Transfer" means a transfer of the Sale Assets to the Secured Lender or its designee under Section 7.5 of this Plan.

1.105   "Transfer Motion" shall have the meaning ascribed to such term in Section 7.5 of the Plan.

1.106   "Unimpaired Class" means a class of Claims or Interests under the Plan pursuant to which the Plan either (1) leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Bankruptcy Case, other than a default of a kind specified in Bankruptcy Code Section 365(b)(2) or of a kind that Bankruptcy Code Section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such Claim or Interest as such maturity existed before such default; (C) compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such Claim or such Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Bankruptcy Code Section 365(b)(1)(A), compensates the holder of such Claim or such Interest (other than the Debtor or an Insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E)

15

does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

1.107  "Voting Deadline" means the last day to vote to accept or reject the Plan as set forth on the Ballots provided to Claimants and holders of Interests for voting purposes.

### B.    Interpretation; Application of Definitions and Rules of Construction

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time as provided for in the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as otherwise required by the Plan; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. Nothing in this Plan shall alter, modify, supersede, or limit the consent provided or approval rights granted under any orders of

16

the Bankruptcy Court entered in this Bankruptcy Case, including the Cash Collateral Orders, and the Protective Advance Orders all of which remain in full force and effect. Notwithstanding anything to the contrary herein, the power and authority of the Plan Administrators shall be defined by, and subject in all respects to, the terms and conditions of the Plan Administrator Agreement

## ARTICLE II

### Treatment Of Administrative And Priority Claims

2.1   **Payment Of Secured Lender Allowed Superpriority Administrative Claim.** The Plan Administrator shall pay the Secured Lender Allowed Superpriority Administrative Claim in full from either Cash Collateral or from the proceeds of the Sale, no later than the Effective Date or such other date agreed to in writing by the Secured Lender.

2.2   **Payment Of Non-Professional Administrative Claims.**  The Plan Administrator shall pay Allowed Priority Claims and Allowed Non-Professional Administrative Claims which are due and owing, other than the Secured Lender Allowed Superpriority Administrative Claim, from Cash Collateral no later than the Effective Date.

2.3   **Payment Of Administrative Claims Of Professionals.**   With respect to Administrative Claims of Professionals, the Plan Administrator shall pay such Allowed Claims in full from either Cash Collateral or the proceeds of the Sale on the later of: (i) the Effective Date; or (ii) entry of an order of the Court approving the fees and expenses of such Professional.

2.4   **Payment Of Administrative Claims Of The Office Of The United States Trustee.**  The Plan Administrator shall pay the Allowed Administrative Claim of the United States Trustee which is due as of the Confirmation Date on the Effective Date of the Plan.  The Plan Administrator shall pay any Allowed Administrative Claim of the Office of the United States Trustee which accrues subsequent to the Effective Date on or before the date such payment is due and owing under 28 U.S.C. Section 1930.

17

2.5    **Deadline For Filing Requests For Payment Of Non-Professional Administrative Claims.**  All parties asserting a Non-Professional Administrative Claim shall file a request for payment of administrative claim (the "Request for Payment of Administrative Claim") no later than thirty (30) days after the date of service of notice of entry of the Confirmation Order unless such day is not a Business Day, then the deadline shall be the next Business Day (the "Non- Professional Administrative Claim Deadline"). Any Non-Professional Administrative Claim for which a Request for Payment of Administrative Claim is not filed by the Non-Professional Administrative Claim Deadline shall be disallowed and forever barred without the need for the filing of an objection to such Claim. Objections to Non-Professional Administrative Claims for which a Request for Payment of Administrative Claim has been filed shall be interposed by the filing of an objection to claim no later than thirty (30) days after the Non-Professional Administrative Claim Deadline unless such day is not a Business Day, then the deadline shall be the next Business Day.

2.6    **Deadline For Filing Of Fee Applications For Professional Administrative Claims.**  Any and all applications for the final allowance for Professional Administrative Claims for services rendered and expenses shall be filed with the Bankruptcy Court and served no later than thirty (30) days after service of notice of entry of the Confirmation Order, unless such day is not a Business Day, then the deadline is the next Business Day (the "Professional Administrative Claim Bar Date").   Any Professional Administrative Claim for which a fee application is not filed by the Professional Administrative Claim Bar Date shall be disallowed and forever barred without the need for the filing of an objection to such Claim.

2.7    **Post-Effective Date Administrative Claims Of Professionals Retained By The Plan Administrator.**  Notwithstanding Section 2.5 of this Plan, the Plan Administrator is

#233753295_v1

authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without need for Bankruptcy Court approval, including professional fees incurred by professionals retained by the Plan Administrator; provided however, that any fees and expenses incurred by the Plan Administrator in connection with the Litigation Claims or any administrative proceeding or tax grievance or certiorari proceeding concerning the Real Property, shall be subject to Court approval as reasonable.

## ARTICLE III

## Designation of Claims and Interests

3.1     **Classifications in General.**  A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.  No distribution on an Allowed Claim shall exceed one hundred percent (100%) of the amount of such Allowed Claim.

3.2     **Classification Of Claims And Interests Under The Plan.**  The following Classes of Claims and Interests are designated pursuant to and in accordance with Section 1123(a)(1) of the Bankruptcy Code:

(a)     "Class 1 Allowed Claim" shall consist of the Secured Lender Allowed Secured Claim.

(b)     "Class 2 Allowed Claim" consists of the Estate Of William W. Koeppel Secured Claim to the extent it is an Allowed Secured Claim.

(c)     "Class 3 Allowed Claims" consist of all Allowed Secured Claims that are not a Class 1 Claim or Class 2 Claim.

#233753295_v1

(d)    "Class 4 Allowed Claims" shall consist of the Class Action Members Unsecured Claims.

(e)    "Class 5 Allowed Claims" shall consist of the General Unsecured Claims against the Debtor, except for the Class Action Members Unsecured Claims and Subordinated General Unsecured Claims.

(f)    "Class 6 Claims" shall consist Subordinated General Unsecured Claims.

(g)    "Class 7 Interests" shall consist of the Interests in the Debtor.

3.3    **Special Provision Governing Unimpaired Claims.**    Except as otherwise provided in the Plan, nothing in the Plan shall affect the rights of the Debtor by its Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4    **Elimination Of Vacant Classes**. Any Class of Claims against the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim that is Allowed Claim in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.5    **Voting Classes; Presumed Acceptance By Non-Voting Classes.** If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Secured Lender shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

## ARTICLE IV

## Claims and Interests Impaired Under the Plan

4.1    Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, Class 6 Claims and Class 7 Interests are all impaired and entitled to vote on the Plan.

20

## ARTICLE V

### Treatment of and Methods of
### Distribution to Classes Under the Plan

5.1    **Class 1 Claim – Allowed Secured Lender Claim**. (a)   The Class 1 Allowed Claim is fixed as an Allowed Claim in an amount which is not less than $45,176,900.24, plus any and all accrued and unpaid post-petition interest (including default interest under the Loan Documents) to the extent that the value of the Secured Lender's collateral exceeds the amount of its claim, premiums, fees and expenses  pursuant to the Loan Documents and Protective Advance Orders, including without limitation attorneys' fees and expenses and special servicing fees.  The Class 1 Allowed Claim shall not be subject to any avoidance, reductions, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or other challenges under any applicable law or regulation by any Person.

(b)      If the Sale Assets are not transferred to the Secured Lender pursuant to Section 7.5 of the Plan, then, on the Closing Date, the Plan Administrator shall pay the Secured Lender, on account of the Class 1 Allowed Claim: (i) all Cash Collateral held by, or on behalf of the Debtor; plus (ii) all of the proceeds of the Sale remaining after the payment of the Closing Costs, the payments to be made to the holders of Allowed Administrative Claims and Allowed Priority Claims pursuant to Section  2.1, 2.2, 2.3 and 2.4 of this Plan, the Class Action Settlement Amount, and the amount to be deposited into the Class 5 General Unsecured Claims Reserve.

(c)      On the Closing Date, the Secured Lender shall also be authorized to set-off any funds in Secured Lender Reserves and apply such funds towards payment of the Class 1 Allowed Claim.  To the extent that the aforementioned payments to the holder of the Class 1 Allowed Claim are insufficient to pay 100% of such Allowed Claim: (i) the Plan Administrator shall pay to the

21

holder of the Class 1 Allowed Claim all Accounts Receivable and any other funds belonging to

the Debtor or its bankruptcy estate for the period prior to the Closing Date, but which are collected

by the Plan Administrator subsequent to the Closing Date within seven (7) days of receipt of such

funds; and (ii) the Plan Administrator shall pay the proceeds of the Litigation Claims and any

proceeds from any tax grievance or certiorari proceeding concerning the Property minus the Plan

Administrator's reasonable fees and expenses approved by the Court of asserting and litigating

those claims.

(d)      If the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of

the Plan, then, on the Closing Date, the Class 1 Allowed Claim shall be paid: (i) all Cash Collateral

held by, or on behalf of the Plan Administrator on the Closing Date (after the payments to be made

to the holders of Allowed Administrative Claims and Allowed Priority Claims pursuant to Sections

2.1, 2.2, 2.3 and 2.4 of this Plan, the Class Action Settlement Amount, and the amount to be

deposited into the Class 5 General Unsecured Claims Reserve), (ii) the amount of Secured Lender

Reserves set-off by the Secured Lender, (iii) the proceeds of Accounts Receivable, (iv) the

proceeds of the Litigation Claims paid to the Secured Lender by the Plan Administrator paid to the

Secured Lender pursuant to Section 5.1(b) of this Plan, plus (v) the amount of the credit bid made

by the Secured Lender for the Transfer of the Sale Assets pursuant to Section 7.5 of this Plan.

(e)      The payments to be made to the Secured Lender or the Transfer of the Sale Assets

to the Secured Lender under this Plan shall be conditioned upon the payment of the Settlement

Amount to the Class Action Claim Administrator by either the Plan Administrator or the Secured

Lender in the event that the Sale Assets are transferred to the Secured Lender under Section 7.5 of

this Plan..

(f)      To the extent that there are insufficient funds to pay the Class 1 Allowed Claim in full on the Closing Date, the unpaid portion of the Class 1 Allowed Claim shall be a Class 5 General Unsecured Claim against the Debtor.

(g)      The Secured Lender shall retain its duly perfected and first priority mortgage and security interests and liens in all of the Debtor's assets, including without limitation the Real Property, the Personal Property, the Litigation Claims, the Accounts Receivable, and the Cash Collateral until the Closing Date.  Effective as of the Closing Date, the mortgage, security interests and liens of the Class 1 Allowed Claim shall be transferred automatically to the proceeds of the Sale in the same order of priority without any need for the holder of the Class 1 Allowed Claim to take any act of perfection.

5.2      **Class 2 Claim - Estate of William W. Koeppel Secured Claim**. On the Closing Date, except to the extent that a holder of the Class 2 Allowed Claim agrees to a lesser treatment the Plan Administrator shall, at the Plan Administrator's election and in full and final satisfaction of the Class 2 Allowed Claim, either (i) pay one hundred percent of such Allowed Secured Claim or (ii) abandon the Debtor's interest in the collateral securing the Class 2 Allowed Claim to the holder of the Class 2 Allowed Claim, to the extent of such Allowed Secured Claim, as the indubitable equivalent of the Class 2 Allowed Claim.

5.3      **Class 3 Claims - All Secured Claims Against the Debtor that are not Class 1 or Class 2 Claims**. The Secured Lender is unaware of the existence of any Class 3 Allowed Claims. However, to the extent any such claims exist, on the Closing Date, except to the extent that a holder of Class 3 Allowed Claim agrees to a lesser treatment the Plan Administrator shall, at the Plan Administrator's election and in full and final satisfaction of the Class 3 Allowed Claim, either (i) pay one hundred percent of such holder's Allowed Secured Claim, or (ii) abandon the Debtor's

23

interest in the collateral securing the Class 3 Allowed Claim to the holder of the Class 3 Allowed

Claim as the indubitable equivalent of the Class 3 Allowed Claim.

5.4    **Class 4 Claims - Class Action Members Unsecured Claims**.  The claims of the

holders of the Class 4 Allowed Claims shall be treated pursuant to the terms of the Class Action

Settlement Agreement, a copy of which is annexed hereto as Exhibit B, and receive the

distributions provided under the Class Action Settlement Agreement from the Class Action Claims

Administrator, subject to entry of the Class Action Order And Final Judgment by the State Court

in the Class Action Lawsuit.  Notwithstanding anything to the contrary in the Plan: (i)  any holder

of a Class 4 Claim that Opt-Outs of the Class Action Settlement pursuant to the terms of the Class

Action Settlement will not receive a distribution under the Class Action Settlement Agreement and

will be treated as the holder of a Class 5 Claim, and the Plan Administrator shall retain all claims

and Causes of Action against the holder of such Claims; and (ii) any holder of a Class 4 Claim that

has voted to accept the Plan on its Ballot shall be deemed to have agreed not to Opt-Out of the

Class Action Settlement, provided that any vote cast by counsel for the Class Representatives on

behalf of a Class Action Member shall not waive the right of such Class Action Member to Opt-

Out of the Class Action Settlement Agreement.   The treatment provided in the Class Action

Settlement Agreement shall be in full and complete satisfaction of the Class Action Proof of Claim

and the Claims of the Class Action Members.

5.5    **Class 5 Claims - General Unsecured Claims, Except for the Class Action**

**Members Unsecured Claims and Subordinated General Unsecured Claims**.  No later than

thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class

Action Order and Final Judgment and (iii) the Closing Date, the Plan Administrator shall pay any

remaining proceeds from the Sale after payments are made in full  pursuant to Sections 2.1, 2.2,

2.3, 2.4, 5.1, 5.2, 5.3 and 5.4 of the Plan and the funding of the Class Action Settlement Amount pursuant to Class 4, to the holders of the Class 5 Allowed Claims on a *pro-rata* basis up to one hundred percent (100%) of their Allowed Claims; provided however, that if the amount of proceeds from the Sale are insufficient to pay the Class 5 Allowed Claims a distribution of at least five percent (5%) of Class 5 Allowed Claims or if the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of the Plan, then no later than no later than thirty (30) days after the later of the (A) Claims Resolution Date, (B) the date of entry of the Class Action Order And Final Judgment and (C) the Closing Date, the Plan Administrator shall pay the funds in the Class 5 General Unsecured Claim Reserve to the holders of the Class 5 Allowed Claims on a *pro-rata* basis.  The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claim is paid in full, to the holders of Class 5 Allowed Claims on a *pro-rata* basis.  Such payment(s) shall be made within thirty (30) days after the later of: (I) the date that the Allowed Class 1, Class 2 and Class 3 Claims are paid in full; (II) the Claims Resolution Date; (III) the date of entry of the Class Action Order and Final Judgment; (IV) the Closing Date; and (V) the date of the Plan Administrator's receipt of such proceeds of the Litigation Claims.  In no event shall the distribution to holders of Class 5 Allowed Claims exceed one hundred percent (100%) of their Allowed Claims.  As part of this Plan, and to the extent that the Secured Lender holds a Class 5 Claim, the Secured Lender has agreed to waive any distribution from the Class 5 Unsecured Claims Reserve on its Class 5 Claim, but retains its right to vote such claim in connection with this Plan.  The treatment provided herein shall be in full and complete satisfaction of all Claims held by the holders of Class 5 Claims.

5.6    **Class 6 Claims – Subordinated General Unsecured Claims**.  No later than thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class Action Order And Final Judgment, and (iii) the Closing Date, the Plan Administrator shall pay any remaining proceeds from the Sale after payments are made in full pursuant to Sections 2.1, 2.2, 2.3, 2.4, 5.1, 5.2, 5.3, 5.4 and 5.5 of the Plan to the holders of the Class 6 Allowed Claims on a *pro-rata* basis up to one hundred percent (100%) of their Allowed Claims.  The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claim and Class 5 Allowed Claims are paid in full, to the holders of Class 6 Allowed Claims on a *pro-rata* basis.  Such payment(s) shall be made within thirty (30) days after the later of: (A) the date that the Class 1 Allowed Claim and Class 5 Allowed Claims are paid in full; (B) the Claims Resolution Date; (C) the date of entry of the Class Action Order and Final Judgment; (D) the Closing Date; and (E) the date of the Plan Administrator's receipt of such proceeds of the Litigation Claims.  In no event shall the distribution to holders of Class 6 Allowed Claims exceed one hundred percent (100%) of their Allowed Claims.  The treatment provided herein shall be in full and complete satisfaction of all Claims held by the holders of Class 6 Claims.

5.7    **Class 7 Interests**.  No later than thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class Action Order And Final Judgment and (iii) the Closing Date, the Plan Administrator shall pay any remaining proceeds from the Sale after the payments are made pursuant to Sections 2.1, 2.2, 2.3, 2.4, 5.1, 5.2, 5.3, 5.5, 5.6 and 5.7 of the Plan and the funding of the Class Action Settlement Amount to the holder of the Class 7 Interests.  The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan

26

Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claim, Class 5 Allowed Claims, and Class 6 Allowed Claims  are paid in full, to the holder of the Class 7 Interests. Such payment(s) shall be made within thirty (30) days after the later of: (A) the date that the Class 1 Allowed Claim, Class 5 Allowed Claims, and Class 6 Allowed Claims are paid in full; (B) the Claims Resolution Date; (C) the date of entry of the Class Action Order and Final Judgment; (D) the Closing Date; and (E) the date of the Plan Administrator's receipt of such proceeds of the Litigation Claims. The Interests in the Debtor shall be cancelled upon entry of an order of the Court closing the Bankruptcy Case.

### ARTICLE VI

### Provisions as to Disputed Claims and Distributions

6.1.    **Disputed Claims In Class 2 and Class 3**. In connection with cash distributions to be made in respect of Allowed Claims in Class 2 and Class 3, there shall be reserved from any distribution to the holder of a Disputed Claim the amount of Cash which then otherwise would be paid in respect to such Disputed Claim if the full amount of such Claim were deemed to be an Allowed Claim or such lesser amount as the Bankruptcy Court may determine.  Notwithstanding anything in the Plan to the contrary, if any portion of a Class 2 Claim or Class 3 Claim is a Disputed Claim, the Plan Administrator shall not be required to make any payment or distribution provided in the Plan on account of the disputed portion of such Claim unless and until the disputed portion of such Claim becomes an Allowed Claim.  Upon such Claim becoming an Allowed Claim, any distribution then due to be made in respect of such claim shall be paid no later than ten (10) Business Days thereafter in accordance with the provisions hereof and of such order of the Bankruptcy Court. Any monies remaining on deposit with respect to any Disputed Claim of a Class 2 Claimant or Class 3 Claimant after its resolution or determination by the Bankruptcy Court shall be returned to the Disbursing Agent and distributed pursuant to the terms of the Plan.

27

6.2.    **Disputed Claims In Class 4**.  Any disputes as to the allowability or amount of any Class 4 Claims shall be determined by the State Court in the Class Action Lawsuit pursuant to the Class Action Settlement Agreement, except the Bankruptcy Court shall have the authority to determine the temporary allowance of any Class 4 Claims for voting purposes under the Plan.

6.3.    **Right To Seek Estimation Of Claims.**  Nothing in this Plan shall prohibit the Plan Administrator or Secured Lender from filing a motion to estimate any Claim for distribution purposes under Bankruptcy Code Section 502.

6.4.    **Deadline To File Claim Objections.**    Except for Rejection Claims and Administrative Claims, objections to Disputed Claims or motions to estimate a claim for distribution purposes shall be filed with the Court no later than one hundred twenty (120) days after the Effective Date unless such day is not a Business Day, then the deadline is the next Business Day.  Notwithstanding anything to the contrary herein, no objections may be filed to the Claim of the Secured Lender, which is fixed and allowed as provided in Section 5.1 of the Plan, and prior orders of the Bankruptcy Court.

## ARTICLE VII

### Means for Execution of the Plan

7.1    **Means for Implementation**. The means for implementation of the Plan consist of: (i) the appointment of the Plan Administrator to manage and operate the Debtor and to execute all documents in connection with the Class Action Settlement Agreement and the Sale and to pursue the Litigation Claims; (ii) the settlement of the Class Action Lawsuit pursuant to the Class Action Settlement Agreement; (iii) the Sale or Transfer, and the use of the proceeds from the Sale to make distributions to creditors under the Plan; (iv) the use of Cash Collateral to make distributions to creditors to the extent provided under this Plan; (v) the set-off of Secured Lender Reserves by the Secured Lender; (vi) the funding of a Class 5 Unsecured Creditors Reserve to ensure a distribution

28

on Class 5 General Unsecured Claims; (vii) any amounts required by the Plan to be funded by the Secured Lender in the event the Sale Assets are transferred to it under Section 7.5 of the Plan; and (viii) the proceeds of the Litigation Claims.

7.2    **Post-Confirmation Management Of The Debtor And Its Properties**.  Upon the Effective Date, the Debtor's manager, officers and directors shall be conclusively deemed to have resigned and Plan Administrator shall take over exclusive management and control of the Debtor. Upon the Effective Date, the Plan Administrator shall be exclusively authorized to take all actions and execute all documents and instruments on behalf of the Debtor including without limitation: (i) the retention of Trigild Management Group as management agent pursuant to the terms of a management agreement to be approved by the Court; (ii) the retention of the Broker on behalf of the Debtor, which shall be selected by the Plan Administrator and approved by the Secured Lender in writing, to sell the Sale Assets, which retention shall be subject to Bankruptcy Court approval; (iii) the execution of the Class Action Settlement Agreement; (iv) the retention of special counsel for the purpose of filing and prosecuting the motions before this Court and in the State Court, including without limitation motions seeking the approval of the Class Action Settlement Agreement and modification of the Interim Rents Order, which retention shall be subject to Court approval; (v) commencing adversary proceedings or lawsuits before this or any other Court, asserting the Litigation Claims and tax grievance and certiorari claims concerning the Real Property; and (vi) to enforce the provisions of the Plan and Confirmation Order.  The Plan Administrator's obligations and duties shall be governed by an agreement (the "Plan Administrator Agreement") to be filed with, and approved by, the Court by the Effective Date.  The Plan Administrator shall be authorized to use the Secured Lender's cash collateral to operate the Property through the Closing Date pursuant to the terms of the existing Cash Collateral Orders and

a budget either agreed upon by the Plan Administrator and Secured Lender, or approved by order of the Court, which budget shall include the Litigation Claims Carve-Out. The Plan Administrator shall also act as the Disbursing Agent for all payments under the Plan, except for payments to holders of Class 4 Claims, which shall be paid by the Class Action Claims Administrator. Upon the Effective Date, the Plan Administrator shall be named as an additional insured on all insurance policies for the Debtor and Property.

7.3     **The Class Action Settlement**.   No later than three (3) Business Days after the Effective Date, the Class Action Representatives and Plan Administrator shall file a joint motion in the State Court in the Class Action Lawsuit for entry of an order: (i) preliminarily approving the Class Action Settlement, (ii) scheduling a final hearing on approval of the Class Action Settlement; (iii) modifying the Interim Rent Order as provided in the Class Action Settlement Agreement; and (iv) approving the Class Action Order and Final Judgment.  **In addition to and not in substitution of the Releases set forth in Section 10.3 of the Plan, pursuant to the Class Action Settlement Agreement, upon entry of the Class Action Order and Final Judgment and payment of the Class Action Settlement Amount to the Class Action Claims Administrator, all claims of the Class Action Members (except for those who have validly opted-out of the Class Action Settlement pursuant to CPLR 908) against the Released Parties, Debtor, the Secured Lender and any purchaser or transferee of the Debtor's interest in the Real Property and any subsequent purchaser or assignee of the Debtor's interest in the Real Property, and all defendants in the Class Action Lawsuit shall be deemed released as set forth in paragraph 34 of the Class Action Settlement Agreement.**

7.4     **The Sale**.  (a)    Upon entry of the Confirmation Order and Broker Retention Order, the Broker shall market the Sale Assets for sale for a period of up to one hundred twenty (120)

days (the "Marketing Period"), which period may be extended for up to an additional one hundred twenty (120) days with the prior written consent of the holder of the Class 1 Allowed Claim (the "Extended Marketing Period").   It shall be the Broker's duty to seek to obtain the highest and best price for the Sale Assets, taking into account the ability of proposed purchasers to close on their offers to purchase the Sale Assets.

(b)      **Purchase and Sale Agreement.**  During the Marketing Period, the Plan Administrator on behalf of the Debtor shall have the authority to enter into a purchase and sale agreement to sell the Sale Assets (the "Purchase and Sale Agreement"), provided such agreement is subject to: (i) the Secured Lender's prior written consent; (ii) the submission of higher and better offers, including the Secured Lender' right to submit an offer through a credit bid pursuant to Bankruptcy Code Section 363(k); (iii) Bankruptcy Court approval; and (iv) the closing of such Sale occurring no later than thirty (30) days after the Bankruptcy Court's entry of the Sale Order, unless such date is extended with the prior written consent of the Secured Lender.

(c)      **Sale Motion.**  No later than three (3) Business Days after entry into a Purchase and Sale Agreement, the Plan Administrator shall file a motion (the "Sale Motion") with the Bankruptcy Court seeking entry of an order: (i) approving the Sale to the purchaser under the Purchase and Sale Agreement, subject to higher and better offers (the "Purchaser"); (ii) finding that the Purchaser is a good faith purchaser entitled to the protections of Bankruptcy Code Section 363(m); and (iii) scheduling a hearing to approve the Sale (the "Sale Hearing").

7.5      **Transfer of the Sale Assets to the Secured Lender In Lieu Of Sale**.  In the event that the Debtor, through the Plan Administrator, fails to both enter into a Purchase and Sale Agreement and file the Sale Motion within the thirty days of the end of the Marketing Period, or Extended Marketing Period as applicable, then at the Secured Lender's option either (i) the Plan

Administrator or Secured Lender shall file a motion with the Court setting forth bid procedures for an auction sale of the Sale Assets to occur on or before the Marketing Period, or Extended Marketing Period as applicable, or (ii) the Secured Lender shall submit a credit bid to the Plan Administrator pursuant to Bankruptcy Code Section 363(k), and the Plan Administrator shall accept such credit bid.  If the Secured Lender selects option (ii) of the previous sentence, then within three (3) Business Days of receiving such credit bid,  the Plan Administrator shall file a motion (the "Transfer Motion") with the Court for entry of an Order directing the Plan Administrator to transfer the Sale Assets to the Secured Lender or its designee free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code Section 363(k) along with such other distribution as is consistent with Section 5.1(b) of the Plan, and a determination that the Secured Lender is a good faith purchaser under Bankruptcy Code Section 363(m), and a transfer of the Secured Lender Reserves to the Secured Lender. Such Transfer to the Secured Lender shall not be subject to higher and better offers. In the event that the Sale Assets are transferred to the Secured Lender pursuant to this provision of the Plan, the Secured Lender shall, among other things, pay the Class Action Settlement Amount to the Class Action Claims Administrator pursuant to the Class Action Settlement Agreement.

7.6    **Free and Clear Sale or Transfer**.  The Sale Assets shall be sold or transferred free and clear of all liens, claims encumbrances, and interests pursuant to Bankruptcy Code Section 363(f), which liens, claims, encumbrances and interests shall upon the Closing Date attach to the proceeds of the Sale in the same order of priority that currently exist on the Sale Assets.

7.7    **Cancellation of Liens**.  Except as otherwise specifically provided herein, upon the payment in full in Cash of a Secured Claim, any Lien securing such Claim, shall be deemed released, and the holder of such Other Secured Claim shall be directed to release any collateral or

#233753295_v1

other property of the Debtor held by such holder and to take such actions as may be requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Plan Administrator on behalf of the Debtor.

7.8    **"As Is Where Is"**.  The Sale or Transfer as contemplated by this Plan shall be without representation or warranties of any kind, nature or description by the Debtor.  The Sale Assets shall be sold or transferred "as is," "where is" and "with all faults."  ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS EXPRESSLY DISCLAIMED AND THERE SHALL BE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF THE SALE ASSETS OR ANY PORTION THEREOF.  Any purchaser of the Sale Assets will be deemed to acknowledge and represent that it: (a) has had an opportunity to conduct due diligence regarding the Sale Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and inspection of any documents and/or the Sale Assets in making its bid; and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Assets, or the completeness of any information provided in connection with the Sale or the Auction.

7.9    **Funding of Class Action Settlement Amount**. The Plan Administrator, or the Secured Lender in the event of a Transfer under Section 7.5 of the Plan, shall distribute the Class Action Settlement Amount to the Class Action Claim Administrator under the Class Action Settlement  no later than: (i) the Closing Date; or (ii) three Business Days after entry of the Class

33

Action Order and Final Judgment by the State Court in the Class Action Lawsuit, whichever is later.

7.10    **Funding of Reserves**.  (a) On the Effective Date, the Plan Administrator shall reserve from Cash Collateral such funds as are necessary to pay all Allowed Administrative Claims and All Allowed Priority Claims which are due on the Effective Date.

(b) On the Effective Date, the Plan Administrator shall reserve $25,000 from Cash Collateral to establish the Class 5 Unsecured Creditors Reserve.

7.11    **Restoration of Tenant Security Deposits.**  On the Closing Date, the Purchaser of the Sale Assets or the Secured Lender in the event that the Sale Assets are transferred to it under Section 7.5 of the Plan, if not previously restored, shall establish a separate tenant security deposit account for security deposits received from tenants at the Property, and shall fund any insufficiency in tenant security deposits. On the Closing Date, the Plan Administrator shall assign to Purchaser or the Secured Lender any claim held by the Debtor against William W. Koeppel, Whitehouse Estates, Inc., Koeppel & Koeppel Realty Management. Livingston Management or any other Person or Entity for the conversion of tenant security deposits to the extent the Purchaser or Secured Lender was the party that restored the tenant security deposits..

7.12    **Return of Excess Reserve Funds**. The Plan Administrator shall pay to the Secured Lender all funds remaining in the Class 5 Unsecured Creditors Reserve remaining after the payment of all distributions under the Plan.

7.13    **Plan Administrator Compensation.**  The Plan Administrator shall be paid $10,000 per month from Cash Collateral for his services and shall be entitled to reimbursement of reasonable and documented expenses in the ordinary course and without the need for Bankruptcy Court approval pursuant to the Plan Administrator Agreement from the Effective Date through the

Closing Date, and thereafter his compensation shall be paid from the Litigation Claims Carve-Out or proceeds of the Litigation Claims through the date of closing of this Bankruptcy Case.

7.14   **Effectuating Documents; Further Transactions**.   Upon the Confirmation Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms hereof.   On or as soon as practicable after the Confirmation Date, the Plan Administrator may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including without limitation (i) the execution and delivery of appropriate agreements or other documents on behalf of the Debtor containing terms that are consistent with the terms of the Plan, (ii) the execution and delivery on behalf of the Debtor of appropriate instruments of transfer, assignment, assumption, or delegation of any Sale Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; and (iii) all other actions that the Plan Administrator determines to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

7.15   **Closing of Bankruptcy Case.** After the Debtor's bankruptcy estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Bankruptcy Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VIII

## Executory Contracts

8.1   **Ground Lease.**   The Debtor's Ground Lease with the Ground Lessor was assumed by order of the Bankruptcy Court dated March 24, 2023 [Dkt. No. 157].

#233753295_v1

8.2    **Unexpired Leases And Executory Contracts**.  The Debtor's unexpired leases with those tenants at the Real Property which are listed on <u>Exhibit C</u> to this Plan shall be assumed as of the Closing Date.  The Debtor's unexpired leases with Christopher Alvarado and Harrison Koeppel, and any lease with Admir Haxhiu, who is the Debtor's former superintendent at the Property (to the extent not terminated by the Effective Date), and its executory contract/unexpired lease with Big Man City Laundry Limited and any executory contract with Living NY (to the extent not previously terminated) shall be deemed rejected as of the Effective Date.

8.3    **Insurance Policies.**  On the Effective Date (i) all insurance policies issued or providing coverage to the Debtor shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtor pursuant to Bankruptcy Code Sections 365 and 1123 of the Bankruptcy Code, and the Debtor shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of the Debtor under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Expense Claim or objection to any Cure Amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer.

8.4    **Other Executory Contracts Being Assumed**.  The Debtor's executory contracts described on <u>Exhibit C</u> to this Plan shall be assumed as of the Closing Date.

8.5    **Right To Supplement List Of Executory Contracts Or Unexpired Leases Being Assumed Or Rejected**.  At any time prior to the Closing Date, the Plan Administrator, on behalf of the Debtor, with the Secured Lender's written consent, may file and serve on affected parties, an updated list of unexpired leases and executory contracts being assumed or rejected by the

36

Debtor under the Plan, along with a notice of the amount of any claim required by the Debtor to cure any defaults under such unexpired lease or executory contract (the "Supplemental Notice Of Assumed/Rejected Unexpired Leases And Executory Contracts").  Any party whose unexpired lease or executory contract is identified on any Supplemental Notice Of Assumed/Rejected Unexpired Leases And Executory Contracts shall have fourteen (14) days to file with the Bankruptcy Court an objection to such assumption or rejection or to such cure amount.  The failure to file a timely objection shall constitute consent to the proposed assumption or rejection of such unexpired lease or executory contract and consent to the amount of any cure claim set forth in the Supplemental Notice Of Assumed/Rejected Unexpired Leases And Executory Contracts.

8.6    **Cure Amounts.**  Annexed hereto as Exhibit D is the amount necessary to cure any defaults under unexpired leases and executory contracts being assumed under Sections 8.1, 8.2, 8.3, 8.4 and 8.5 of the Plan (each, a "Cure Claim"), provided that any amounts owed to Class Action Members pursuant to the Class Action Settlement Agreement shall constitute Class 4 Claims under this Plan and are not Cure Claims under such tenants' leases.  Any objection to such cure amount shall be filed no later than seven (7) seven days prior to the Confirmation Hearing on the Plan.   The failure to file a timely objection shall constitute consent to the proposed assumption or rejection of such unexpired lease or executory contract and consent to the amount of any cure claim set forth in the Supplemental Notice Of Assumed/Rejected Contracts.

8.7    **Assignment of Certain Assumed Unexpired Leases And Executory Contracts.**

Those unexpired leases and executory contracts which are being assumed pursuant to this Plan (the "Assumed Unexpired Leases And Executory Contracts") and which either are identified for assignment pursuant to the Sale Motion or the Transfer Motion shall be assigned as set forth therein, subject to the right of the non-debtor party to such unexpired lease or executory contract's

37

right to object to such assignment by filing an objection to either the Sale Motion or Transfer Motion no later than fourteen days before the hearing on such motion, which objection will be determined by the Bankruptcy Court.  Notwithstanding anything to the contrary contained in the Plan, in the event that the Secured Lender or an affiliate thereof is the Purchaser of the Sale Assets, or the Sale Assets are transferred to the Secured Lender or an affiliate thereof, then the Secured Lender or its affiliate shall be conclusively deemed to have established adequate assurance of future performance under such assigned unexpired lease or executory contract under Bankruptcy Code Section 365.  The assignment of any Assumed Unexpired Lease and Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed and assigned unexpired lease or executory contract at any time before the date that the Debtor assumes or assumes and assigns such unexpired lease or executory contract. In accordance with Bankruptcy Code Section 365(k), assumption and assignment of any Assumed Unexpired Lease and Executory Contract unexpired leases and executory contracts releases the Debtor from any liability for breach of such Assumed Unexpired Lease and Executory Contract occurring after the date of such assignment. Any proofs of Claim filed with respect to an Assumed Unexpired Lease and Executory Contract shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assignment of such Assumed Unexpired Lease and Executory Contract.

8.8    **Rejection Of Unexpired Leases And Executory Contracts That Are Not Being Assumed.**  Except as set forth in Sections 8.1, 8.2, 8.3, 8.4 and 8.5 of this Plan, any and all

executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Closing Date unless assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court.

8.9   **Claims Arising From The Rejection Of Unexpired Leases Or Executory Contracts (i.e., Rejection Claims).**   Any Entity whose Claim arises from rejection of an executory contract or unexpired lease (a "Rejection Claim") shall, to the extent such Claim becomes an Allowed Claim, have the rights of the holder of a Class 5 Claim.

8.10   **Deadline To File Rejection Claims And Objections Thereto.**   Any Entity who has a Claim against the Debtor by virtue of rejection of an executory contract or unexpired lease may file a Claim with the Clerk of the Court, and serve such claim upon the Plan Proponent, Plan Administrator, within twenty one days (21) days following service upon such Entity of notice of entry of the order confirming the Plan or order authorizing such rejection whichever is later. If such Claim is not filed within such specified time, it shall forever be barred from assertion against the Debtor's estate without further notice to or action, order or approval of the Bankruptcy Court. Notwithstanding anything to the contrary contained in this Plan, the Plan Administrator shall have until the later of (i) thirty (30) days after the filing of such Rejection Claim or the (ii) General Claim Objection Deadline, to file an objection to such claim, unless such day is not a Business Day, then the deadline shall be the next Business Day.

## ARTICLE IX

### Effective Date; Substantial Consummation; Right To Modify Plan

9.1   **The Effective Date.**   The Effective Date of the Plan shall be the Confirmation Date.

9.2   **Secured Lender's Right To Modify Plan.**   The Secured Lender reserves the right to modify the Plan prior to the Confirmation Date and it thereafter may modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code, provided that such modifications are

#233753295_v1

set forth in a writing signed by both the Plan Administrator on behalf of the Debtor and the Secured Lender.

9.3 **Substantial Consummation.** Substantial Consummation of the Plan shall occur on the last of the following to occur:

(a) The date the Confirmation Order becomes a Final Order;

(b) The date of entry of the Class Action Order And Final Judgment by the State Court in the Class Action Lawsuit;

(c) All actions, documents, and agreements necessary to implement and consummate the Plan (the "Plan Documents") shall have been effected or executed and binding on all parties thereto and to the extent required, filed with the applicable governmental units in accordance with applicable law;

(d) The Closing Date pursuant to the Plan; and

(e) The deadline for Class Action Members to Opt-Out of the Class Action Settlement has expired, and the number of Opt-Outs does not exceed 20% of Class Action Members (subject to the waiver of this condition by the Secured Lender in its sole discretion).

## ARTICLE X

## Injunctions, Exculpation And Limitation Of Liability And Releases Of Claims

10.1 **Injunctions. Upon the Effective Date, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Interest paid or treated pursuant to the Plan; provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan. Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, or as agreed to by the Plan Administrator and a holder of a Claim against or Interest in the Debtor, with the Secured**

Lender's written consent, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are paid or treated pursuant to the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, or the property of the Debtor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, or the property of Debtor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, or the property of any of the Debtor; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor or against property of the Debtor, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

10.2    __Exculpation__. To the maximum extent permitted by applicable law, each Exculpated Party is hereby released and exculpated from any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss and liability for any

#233753295_v1

conduct occurring on or after the Petition Date through the date of Substantial Consummation in connection with, or arising after the Petition Date in connection with, arising out of, or related to, the filing and administration of the Bankruptcy Case, including without limitation the formulation, negotiation, preparation, execution or implementation of this Plan or documents ancillary to the Plan, including the Class Action Settlement Agreement, the Disclosure Statement, the solicitation of votes for and pursuit of confirmation of the Plan, the property or funds to be sold or distributed pursuant to the Plan, the consummation of the Plan, the Cash Collateral Orders, the administration of the Plan, and all decisions, actions, inactions and alleged negligence relating to any of the foregoing, except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.

10.3    **Releases.**  (a)  Upon entry of the Class Action Order and Final Judgment: (i) each Releasing Class Member hereby forever waives, releases, and discharges all Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed to submit a Notice of Claim Form; (ii) each Releasing Class Member shall be permanently enjoined from commencing, prosecuting, or continuing any of the Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed to submit a Notice of Claim Form; and (iii) the Releasing Landlord hereby forever releases all Releasing Class Members from all statutory, regulatory, common law or other claims, Causes of Action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs, penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal, state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before entry of the Final Order & Judgment, that are based upon or related to, or

#233753295_v1

arise out of the Class Action Lawsuit except non-payment of back rent to the extent otherwise set forth in the Class Action Settlement Agreement and actions or proceedings pending on, or filed after, the date of the Class Action Settlement Agreement for unrelated claims for bodily injury or damage to personal property. Notwithstanding anything to the contrary contained in the Plan, upon entry of the Class Action Order and Final Judgment, each Releasing Class Member will be bound by the terms of the releases contained in the Class Action Settlement Agreement, regardless as to whether such Releasing Class Member indicated on its ballot for accepting or rejecting the Plan that it did not consent to being bound by the release contained in Section 10.3(b) of the Plan.

(b) Unless they have affirmatively opted out of the release set forth in this Section 10.3(b) by checking the box on the Ballot indicating that they opt not to grant the release, each Claimant or holder of Interest shall be deemed to have conclusively released and discharged each of the Released Parties from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively) based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Bankruptcy Case, the restructuring of the Claims and Interests before or during the Bankruptcy Case, the negotiation, formulation, preparation or consummation of the Plan, the Plan Documents, the Cash Collateral Orders, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all of the foregoing cases based on any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. Notwithstanding

43

anything to the contrary contained in the Plan, this Section 10.3(b) shall not be deemed to have released any claims or Causes of Action constituting Litigation Claims that the Plan Administrator is entitled to assert against any Person or Entity under Article XI or any other provision of the Plan.

(c) The Entities in (a) through (b) of this section shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.3 of this Plan against each of the Released Parties.

(d) Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan shall be construed to release the Released Parties from any gross negligence, willful misconduct, or actual fraud as determined by a Final Order of the Bankruptcy Court, or from any Litigation Claims, or to release any claims that the Secured Lender has against any Person or Entity.

## ARTICLE XI

## Litigation Claims

11.1    All claims and Causes of Action held by the Debtor or its bankruptcy estate, including all claims (he "Litigation Claims") under contract, tort, state law or Article 5 of any other provision of the Bankruptcy Code against the following entities shall be preserved and retained following the Effective Date, shall be carved out from the releases granted pursuant to Section 10.3 of the Plan and shall survive confirmation of the Plan, and the Plan Administrator, in his discretion, shall have the authority to commence, prosecute, settle or abandon any or all of such claims, including any claims or claims Causes of Action which are currently the subject of pending litigation involving the Debtor: (i) William W. Koeppel; (ii) Jean Koeppel; (iii) the Estate of William W. Koeppel; (iv) Whitehouse Estates, Inc.; (v) Koeppel & Koeppel Realty Management; (vi) WWK 140 Bay Ridge, LLC; (vii) Livingston Management; (viii) Living NY; (ix) Christopher

Alvarado; (x) Harrison Koeppel; (xi) Roberta L. Koeppel; (xii) Koeppel Management Company LLC; (xiii) Alexandra Koeppel; (xiv) Alexandra Koeppel as Executors and Trustees of the Trust created under Article Fourth of the Last Will and Testament of Robert A. Koeppel; (xv) Big Man City Laundry Limited; (xvi) any and all affiliates or insiders of the foregoing persons and entities; (xvii) any Insiders and Affiliates of the Debtor; and (xviii) any Class Action Members that Opt-Out of the Class Action Settlement.  Litigation Claims shall also include any and all administrative claims and proceedings and tax grievance and certiorari claims concerning the Property, which shall also be preserved and may be asserted by the Plan Administrator, whether or not pending as of the Effective Date.

11.2    There shall be carved out from the Secured Lender's cash collateral the sum of $100,000, to be used the purpose of paying reasonable expenses incurred by the Plan Administrator investigating and/or prosecuting the Litigation Claims, including the payment of reasonable professional fees incurred by the Plan Administrator in connection therewith (to the extent approved by the Court), and paying the Plan Administrator's monthly compensation (the "Litigation Claims Carve-Out").  Any amount of the Litigation Claims Carve-Out not expended by the Plan Administrator as of the date of the closing of the Debtor's Bankruptcy Case shall be paid to the Secured Lender to the extent that it has not been paid one hundred percent of its Class 1 Claim.

## ARTICLE XII

### Transfer Tax Exemption

12.1    The Sale or Transfer pursuant to the Plan including without limitation, the Real Property, shall be exempt from New York State and New York City transfer taxes and stamp taxes pursuant to Bankruptcy Code Section 1146.  Specifically, pursuant to Bankruptcy Code Section 1146: (a) the Sale or Transfer, including without limitation, the transfer of the Real Property to the

Purchaser or Secured Lender or its designee, and the making or delivery of any instrument of

transfer in connection or furtherance of the Plan, and any financing by the Purchaser, (b) the

issuance, transfer or exchange of any securities, instruments or documents pursuant to, in

implementation of or as contemplated in the Plan and the Purchase And Sale Agreement, (c) the

creation of any Lien, mortgage, deed of trust, or other security interest, (d) the making or

assignment of any lease or sublease or the making or delivery of any deed or other instrument of

transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without

limitation, any deeds, bills of sale, or assignments executed in connection with the Sale or Transfer,

and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the

making, delivery or recording of any deed or other instrument of transfer under, in furtherance of,

or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be

subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage

tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording

fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental

assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage

recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New

York Real Estate Transfer Tax imposed under Article 31 of the Tax Law of the State of New York,

(iii) the New York City Real Property Transfer Tax imposed by title 11, chapter 21 of the New

York City Administrative Code and, (iv) any similar tax on the recording of deeds, transfers or

property or ownership interests in property, recording of mortgages or other security instruments

imposed by the State of New York, or any political subdivision thereof. Consistent with the

foregoing, the recorder of deeds or similar official for any county, city, or governmental unit in

which any instrument hereunder is to be recorded including without limitation, the City Register's

Office shall, pursuant to the Confirmation Order and/or Sale Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax, as well as cancel and discharge of record all liens, judgments, encumbrances, claims, and other adverse interests in or against the Real Property. All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Property, or other Sale Assets, any taxes from which the transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of Bankruptcy Code Section 1146(a) and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto. The Office of the City Register is hereby authorized and directed to record any deed, mortgage of the Property and any modification, restatement, amendment or assignment of any mortgages and any other similar conveyance, indenture or other documents contemplated under the Plan without the payment of any of the aforementioned exempt taxes or any other stamp tax, transfer tax or similar tax, and without the presentation of affidavits, instruments or returns otherwise required for recording or filing pursuant to the provisions of Bankruptcy Code Section 1146(a).

## ARTICLE XIII

### Distributions

13.1    **Plan Administrator To Act As Disbursing Agent**. Except with respect to Class 4 Claims, the Plan Administrator shall act as Disbursing Agent under the Plan and shall make all distributions under the Plan to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.  The Disbursing Agent may utilize and rely upon the

Notice and Balloting Agent to mail distribution checks to holders of Claims and Interests under the Plan.

13.2    **Distribution Record Date**. As of the Voting Deadline, the various transfer registers for each of the Classes of Claims shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims. The Plan Administrator, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the Voting Date.

13.3    **Liability of Plan Administrator As Disbursing Agent**.   From and after the Effective Date, the Plan Administrator, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such the Plan Administrator by the Plan and Plan Administrator Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of the Plan Administrator. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Plan Administrator as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

13.4 **Unclaimed Property**. Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. The amount represented by such voided check shall be deemed undeliverable property and shall be paid by the Plan Administrator to the Secured Lender, provided the Allowed Class 1 Claim has not been paid in full under this Plan.

13.5 **Setoff and Recoupment**. The Debtor through its Plan Administrator may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and causes of action of any nature whatsoever that the Debtor may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; <u>provided</u>, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, or its successor, of any claims, rights, or causes of action  may possess against the holder of such Claim.

## ARTICLE XIV

## General Provisions

14.1 **Severability Of Plan Provisions**. If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable

49

pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Secured Lender, and (c) nonseverable and mutually dependent.

14.2    **Governing Law.**  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to the Debtor shall be governed by the laws of the state of its organization.

14.3    **Deemed Acts.**  Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

14.4    **Successors and Assigns.**  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

14.5    **Entire Agreement.**  On the Effective Date, the Plan and the exhibits thereto shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

14.6    **Debtor's Requirement To Maintain Insurance.**  The Debtor shall continue to maintain insurance on the Sale Assets and its business until the Closing Date.

## ARTICLE XV

## Retention of Jurisdiction

15.1    Except for those matters reserved to the jurisdiction of the State Court in the Class Action Lawsuit as set forth in this Plan or the Class Action Settlement Agreement, on and after the

Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under, and related to the Bankruptcy Case for, among other things, the following purposes:

(a)    To determine any and all objections to the allowance, disallowance or subordination of Claims or any controversy as to the classification of Claims;

(b)    To determine any and all applications for professional and similar fees and for the reimbursement of disbursements and expenses;

(c)    To liquidate any disputed, contingent, or unliquidated Claims;

(d)    To determine any and all pending motions and applications for assumption or rejection of executory contracts and leases and the allowance and classification of any Claims resulting from the rejection of executory contracts and leases;

(e)    To determine any and all motions, applications, adversary proceedings, contested and litigated matters or such other matters over which the Bankruptcy Court has jurisdiction, including the enforcement, prosecution, litigation, settlement and/or other disposition of claims of the Debtor;

(f)    To enforce the provisions of, and resolve any and all disputes under or pertaining to the Plan, or the Bankruptcy Case;

(g)    To modify the Plan or to correct any defect, cure any omission or reconcile any inconsistency in the Plan or in the order of the Bankruptcy Court confirming the Plan, or to enter such orders as may be necessary to effectuate the terms and conditions of the Plan to the extent authorized by the Bankruptcy Code as may be necessary to carry out the purpose and intent of the Plan, provided that the Secured Lender must consent in writing to any modification of the Plan;

(h)    To determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(i)    To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of this Court in the Bankruptcy Case;

(j)    To hear and determine any and all controversies and disputes arising under, or in connection with, the Plan or the order confirming the Plan;

(k)    To adjudicate all controversies concerning the classification of any Claim;

(l)    To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

#233753295_v1

(m)    To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(n)    To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken during the pendency of this Bankruptcy Case;

(o)    To adjudicate all matters concerning the assumption and the assumption and assignment of unexpired leases and executory contracts, including without limitation, disputes concerning Cure Claims;

(p)    To recover all assets and properties of the Debtor wherever located, including the prosecution and adjudication of all causes of action available to the Debtor as of the Confirmation Date;

(q)    To determine all questions and disputes regarding recovery of and entitlement to the Debtor's assets and determine all claims and disputes between the Debtor and any other Entity, whether or not subject to an action pending as of the Confirmation Date;

(r)    To enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary or appropriate;

(s)    To enter an order or final decree closing and terminating the Bankruptcy Case; and

(t)    To make such orders as are necessary or appropriate to carry out the provisions of this Plan, including but not limited to orders interpreting, clarifying or enforcing the provisions thereof and/or confirming the Plan.

Dated: November 17, 2023
New York, New York

HOLLAND & KNIGHT LLP
Attorneys for Barclays Bank PLC
31 West 52nd Street
New York, New York 10019
(212) 751-3001
bruce.zabarauskas@hklaw.com
vivian.arias@hklaw.com

By: /s/ Bruce J. Zabarauskas
          Bruce J. Zabarauskas (BZ-7085)

#233753295_v1

**Exhibit A to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

Title No. NCS-1124340-DC72

## SCHEDULE "A"

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF FIFTY-SECOND STREET AND THE WESTERLY SIDE OF FIRST AVENUE;

RUNNING THENCE SOUTHERLY, ALONG THE WESTERLY SIDE OF FIRST AVENUE, SEVENTY-SEVEN FEET, FIVE INCHES;

THENCE WESTERLY AND PARALLEL WITH THE SOUTHERLY SIDE OF FIFTY-SECOND STREET AND PART OF THE WAY THROUGH A PARTY WALL, ONE HUNDRED FEET;

THENCE AGAIN SOUTHERLY, AND PARALLEL WITH THE WESTERLY SIDE OF FIRST AVENUE, TWENTY-TWO FEET, THREE INCHES;

THENCE AGAIN WESTERLY, AND PARALLEL WITH THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, THIRTY FEET;

THENCE AGAIN SOUTHERLY, AND PARALLEL WITH THE WESTERLY SIDE OF FIRST AVENUE, NINE INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN FIFTY-FIRST AND FIFTY SECOND STREETS;

THENCE AGAIN WESTERLY, PARALLEL WITH THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, TWENTY FEET;

THENCE NORTHERLY, PARALLEL WITH THE WESTERLY SIDE OF FIRST AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, ONE HUNDRED FEET, FIVE INCHES TO THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, AND

THENCE EASTERLY, ALONG THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, ONE HUNDRED FIFTY FEET TO THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property**.**

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

**Exhibit B to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| KATHRYN CASEY, LAURIE CAGNASSOLA, GERALD COHEN, BETTY FURR, FRANCESCA GAGLIANO, CAROLYN KLEIN, JOSEPH MORGAN, RICHARD ROSE, JESSICA SAKS and KIRK SWANSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>WHITEHOUSE ESTATES, INC. KOEPPEL & KOEPPEL, INC., DUELL 5 MANAGEMENT LLC d/b/a DUELL MANAGEMENT SYSTEMS, WILLIAM W. KOEPPEL and EASTGATE WHITEHOUSE ESTATES, LLC,<br><br>Defendants. | Index No. 111723/2011<br><br>**STIPULATION AND AGREEMENT OF SETTLEMENT** |

      This stipulation and agreement of settlement (the "Settlement Agreement") is submitted pursuant to CPLR 908 in furtherance of the settlement of this Action.[1]  Subject to preliminary and final approval of the Court, the Settlement is entered into by Plaintiffs and Class Representatives Kathryn Casey, Laurie Cagnassola, Gerald Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica Saks and Kirk Swanson on behalf of themselves and all others similarly situated ("Plaintiffs"), and defendant Eastgate Whitehouse LLC, which is incorrectly referred to as Eastgate Whitehouse Estates, LLC in the caption ("Landlord"), by and through their respective attorneys.

---

[1]    Capitalized terms shall have the meanings ascribed to them below.  Except as otherwise set forth herein, all defined terms used in this Stipulation shall include the singular and plural form of the term defined.

The Settlement is intended by Plaintiffs and Landlord to fully and finally compromise, resolve, discharge and settle the Plaintiffs' claims in the Action including, but not limited to, securing a restoration of the future rights and liabilities of the parties pertaining to the issues raised by the Plaintiffs in the Complaint subject to the terms and conditions set forth below and the final approval of the Court.

WHEREAS, the Landlord is the ground lessee under a ground lease originally entered into with First and Fifty Second Corporation, as ground lessor, with respect to the real property located at 939 First Avenue (a/k/a 350 East 52nd Street), New York, New York 10022 (the "Property");

WHEREAS, Barclays Bank PLC ("Barclays") holds, *inter alia*, a duly recorded leasehold mortgage on the Landlord's ground lessee interest in the Property, and the leases and rents therefrom;

WHEREAS, 939 First Avenue LLC (the "Ground Lessor") is the current ground lessor under the Ground Lease;

WHEREAS, the Landlord leases residential units to tenants at the building (the "Building") on the Property;

WHEREAS, on October 14, 2011, Plaintiffs commenced the above-captioned action (the "Action"), before this court (the "Court") as a putative class action challenging Landlord's treatment of certain apartments at the Property as having been deregulated from rent stabilization;

WHEREAS, the Landlord was named as a defendant in the Action;

WHEREAS, Landlord received J-51 tax benefits for the Building between 1991 and 2014;

WHEREAS, the Complaint in the Action, as amended (the "Complaint"), alleges that certain apartment units had been impermissibly deregulated and/or treated as deregulated pursuant to the so-called "high rent vacancy deregulation" and "high rent/high income deregulation"

2

provisions of the Rent Stabilization Law (the "RSL") while the Building was participating in the

J-51 Program;

WHEREAS, the Complaint seeks as remedies:

(i)      a declaratory judgment declaring that the Plaintiffs' "apartments are subject to rent stabilization and that Defendants are required to offer renewal leases on forms approved by the DHCR and required by the RSL, at legal regulated rents, or to continue their existing tenancy pursuant to the RCL with legal maximum rents as established by the RCL, that past and future allowable rent be set in a manner consistent with the RSL and that Plaintiffs and putative class members receive compensation for Past Rent Claims and Future Rent Claims";

(ii)     an injunction enjoining the Landlord from: (a) "issuing any new lease or lease renewal that does not fully comply with the provision of the RSL and RSC"; (b) issuing "a J-51 rider to any existing tenant who was not require to sign a J-51 rider at the inception of his/her tenancy"; and (c) "imposing any rent increases or charges that do not fully comply with the provisions of the RSL and RSC";

(iii)    damages in the amount of rent overcharges relating to Plaintiffs' apartments; and

(iv)    an award of legal fees and expenses to Plaintiffs' counsel.

WHEREAS, on August 6, 2012, this Court entered a Decision and Order certifying the

Action as a class action with the class defined as: "All current, former, and future tenants of 350

East 52nd Street whose apartments have been, are currently being, or will be deregulated by or

subject to attempts to be deregulated by defendants, their predecessors in interest or their

successors in interest, pursuant to Luxury Decontrol, while defendants are or have been in receipt

of J-51 tax abatement benefits";

WHEREAS, on March 28, 2017 this Court entered a Decision and Order (the "Summary

Judgment Order") granting Plaintiffs partial summary judgment declaring that their legal regulated

3

rent should be calculated according to the RSC's "default formula", and referring the case to a referee for a calculation of damages;

WHEREAS, on April 13, 2021, this Court entered an order (the "Interim Rents Order") granting the motion of the Plaintiffs to reduce the amount of interim use and occupancy to be paid by the Plaintiffs with respect to their apartments during the pendency of this Action based upon the "default rent" formula set forth in the RSC;

WHEREAS, subsequent to entry of the Summary Judgment Order, the Landlord issued certain rental credits (the "Credits") to the Plaintiffs in satisfaction (in whole or part) of their damages in this Action;

WHEREAS, by order dated August 5, 2021, the Appellate Division, First Department (the "First Department") affirmed this Court's Summary Judgment Order (the "Appellate Division Order");

WHEREAS, on August 31, 2021, the Defendants filed a motion with the First Department seeking, *inter alia*, leave to appeal the First Department's order affirming the Summary Judgment Order to the New York Court of Appeals (the "Court of Appeals");

WHEREAS, on October 7, 2021, the First Department entered an order granting the Defendants' motion for leave to appeal the Summary Judgement Order to the Court of Appeals;

WHEREAS, on August 19, 2022 (the "Bankruptcy Petition Date"), the Landlord filed a voluntary Chapter 11 bankruptcy petition (Case No. 22-22635) with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which had the effect of staying the Action pursuant to Bankruptcy Code § 362 (the "Automatic Stay");

WHEREAS, on November 15, 2022, the Bankruptcy Court entered an order modifying the Automatic Stay to permit the Debtor to prosecute its appeal before the Court of Appeals.

4

WHEREAS, on April 16, 2023, the Court of Appeals entered an order reversing the Summary Judgment Order;

WHEREAS, the Court of Appeals held that: "Defendants' deregulation of the apartments was based on [a] "misinterpretation of law" involved in *Regina* and therefore that conduct did not constitute fraud."

WHEREAS, the Court of Appeals determined that: "for purposes of calculating overcharges, where it is possible to determine the rent 'actually charged on the base date' – here October 14. 2007 – that amount should be used and rent increases legally available to defendants pursuant to the RSL during the four-year period should be added" rather than the default formula provided for in the Summary Judgment Order;

WHEREAS, on February 13, 2023, the Bankruptcy Court entered an order approving a stipulation, which directed the Plaintiffs and Barclays, the two largest creditors in Landlord's bankruptcy case, to engage in a mediation before the Hon. Larry S. Schachner (Retired) "to seek a resolution of the Class Action Plaintiffs' Claims against the [Landlord] in connection with a potential Chapter 11 Plan to be filed jointly by [Barclays] and the [Plaintiffs]";

WHEREAS, Barclays will file a Chapter 11 plan (the "Plan") with the Bankruptcy Court in the Landlord's bankruptcy case pursuant to Bankruptcy Code § 1121;

WHEREAS, the Plaintiffs will execute a Plan Support Agreement in support of the Plan;

WHEREAS, the Plan provides for the treatment of all claims against the Landlord, including Plaintiffs' claims in the Action;

WHEREAS, the Plan provides that the Plaintiffs' claims against the Landlord shall be treated as provided in, and governed by, this Settlement Agreement, subject to this Court's approval pursuant to CPLR 907 and 908;

5

WHEREAS, the Plan provides for the sale (the "Sale") of the Landlord's ground lessee interest in the Property and the use of the proceeds from the Sale to, among other things, repay the amounts owed to Barclays on its mortgage, and to fund the Pool, which will provide for distributions to Plaintiffs pursuant to the terms of this Settlement Agreement following the Sale and following final approval of the Settlement Agreement by this Court;

WHEREAS, the Plan provides that upon confirmation of the Plan by order of the Bankruptcy Court (the "Confirmation Order") the Plan Administrator, as defined in the Plan, is authorized to execute this Settlement Agreement on behalf of the Landlord;

WHEREAS, pursuant to the Plan and to avoid the costs, distractions and uncertainties of litigation, Plaintiffs and Landlord have agreed to the resolution of all of the Plaintiffs' claims in this Action pursuant to the terms and conditions set forth below in this Settlement Agreement that shall be presented to the Court for preliminary approval pursuant to CPLR 907 and final approval pursuant to CPLR 908 after notice to the Class Members;

WHEREAS, on the basis of information available to them, including publicly available information and documentation made available by Landlord, Lead Counsel have determined that the settlement described herein is fair, reasonable, adequate, and in the best interests of the Plaintiffs and the Class.

THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by the undersigned counsel for the parties:

## **DEFINITIONS**

Terms not otherwise defined in this Settlement Agreement shall have the following meanings.

(a)      "Action" means the class action lawsuit titled *Casey, et al. v. Whitehouse Estates, Inc., et al.*, Sup. Ct. N.Y. Co., Index No. 111723/2011.

(b)     "Administration Costs" means all costs and expenses incurred by the Claims Administrator or any other entity relating to the administration of the Settlement, other than Notice Costs.

(c)     "Agreed Past Rent" shall have the meaning ascribed in paragraph 5 and shall be calculated pursuant to the Settlement Formula.

(d)     "Appeal" means an appeal or other judicial review seeking to modify or reverse an order or judgment of the order(s) of this Court approving the Settlement Agreement on an interim or final basis, by any person or entity with standing to do so including, without limitation, any petition or motion including petitions for rehearing or reargument, petitions for rehearing en banc, petitions for leave to appeal, and petitions for certiorari or any other form of review by a court of competent jurisdiction.

(e)     "Attorneys' Fee Award and Expenses" shall have the meaning ascribed in paragraph 41.

(f)     "Automatic Stay" shall have the meaning ascribed on page 4.

(g)     "Bankruptcy Court" shall have the meaning ascribed on page 4.

(h)     "Bankruptcy Petition Date" shall have the meaning ascribed on page 4.

(i)     "Barclays" shall have the meaning ascribed on page 2.

(j)     "Base Date" pursuant to RSC § 2520.6(f)(1) is the date four years prior to the commencement of this action.  This action commenced on October 14, 2011 with the filing of the Summons and Class Action Complaint. Therefore, the "Base Date" is October 14, 2007.

(k)     "Base Date Amount" means rent in effect as of October 14, 2007.

(l)     "Building" shall have the meaning ascribed on page 2.

(m)     "Cash Component" shall have the meaning ascribed in paragraph 19.

(n)     "Claim Form" means the document an Eligible Class Members shall use to file a Past Rent Claim, which shall be agreed upon by the Parties.

(o)     "Claims Administrator" shall have the meaning ascribed in paragraph 38.

(p)     "Class", "Class Members", "Rent Credits Class Members" and "Non-Rent Credit Class Members" shall have the meanings ascribed in paragraph 1.

7

(q)     "Class Period" is the period from October 14, 2007 through the date this Settlement Agreement is executed.  Except as otherwise set forth herein, any tenant of the Building paying or that paid a rent greater than the Base Date Amount and subsequent increases as set forth in paragraph 3, during the Class Period is a "Class Member."

(r)     "Class Representatives" mean Kathryn Casey, Laurie Cagnassola, Gerald Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica Saks and Kirk Swanson.

(s)     "Complaint" shall have the meaning ascribed on page 2.

(t)     "Confirmation Order" shall have the meaning ascribed on page 6.

(u)     "Covered Unit" shall have the meaning ascribed in paragraph 1.

(v)     "Court" shall have the meaning ascribed on page 2.

(w)     "Court of Appeals" shall have the meaning ascribed on page 4.

(x)     "Credits" shall have the meaning ascribed on page 4.

(y)     "Data" means the information set forth in Landlord's documentation of the rental history of the Units which was previously delivered to, and reviewed by, Plaintiffs Counsel.

(z)     "Defendants" means Whitehouse Estates, Inc., Koeppel & Koeppel, Inc., Duell 5 Management LLC d/b/a Duell Management Systems, William W. Koeppel and the Landlord, which is incorrectly referred to as Eastgate Whitehouse Estates, LLC in the caption of the Action.

(aa)    "Deregulated Units" shall have the meaning ascribed in paragraph 1.

(bb)    "Effective Date" means the earliest date that the Order and Final Judgment shall Become Effective.  The Order and Final Judgment shall "Become Effective" on the first day following the last of the following occurrences: (a) the last date to file an Appeal or seek permission to Appeal has expired with no Appeal having been taken or sought; or (b) if any Appeal is taken or sought, the date a remittitur or order is entered by a court (i) affirming the Order and Final Judgment or denying or dismissing any Appeal from the Order and Final Judgment, and any Appeal is finally dismissed or the Order and Final Judgment is finally affirmed with no possibility of subsequent Appeal therefrom, (ii) reversing or modifying the Order and Final Judgment in any non-material respect and (1) the time for any further Appeal has expired without such Appeal having been taken or sought or (2) any further Appeal is finally denied or dismissed or the Order and Final Judgment is

8

finally affirmed with no possibility of subsequent Appeal therefrom, and (iii) reversing or modifying the Order and Final Judgment in a material respect provided Plaintiffs and Landlord agree in writing to remain bound to the Settlement as reversed or modified and (1) the time for any further Appeal has expired without such Appeal having been taken or sought or (2) any further Appeal is finally dismissed or the Order and Final Judgment is finally affirmed with no possibility of subsequent Appeal therefrom. For purposes of this definition, a reversal or modification shall be deemed "material" if it materially affects any term of this Stipulation.

(cc)    "Eligible Class Member" shall have the meaning ascribed in paragraph 19.

(dd)    "Eligible Renters" means tenants: (a) in Units on the date of the Preliminary Approval Order and their spouses who enter into a lease prior to the Effective Date; and (b) who do not opt-out of the Settlement pursuant to paragraph 46.

(ee)    "Escrow Agent" shall mean Lead Counsel, or an escrow agent designated by them subject to Barclays' approval in its sole and absolute discretion, who will act as escrow agent pursuant to an escrow agreement.

(ff)    "Expiration Date" shall have the meaning ascribed in paragraph 1.

(gg)    "First Department" shall have the meaning ascribed on page 4.

(hh)    "Future Rent Claims" means the declaration sought by Plaintiffs in the Complaint that future rents should be set at levels in accordance with the RSL and RSC.

(ii)    "Ground Lessor" shall have the meaning ascribed on page 2.

(jj)    "HCR" means the New York State Homes and Community Renewal formerly known as New York State Division of Housing and Community Renewal ("DHCR").

(kk)    "Incentive Awards to the Named Plaintiff Class Representatives" shall have the meaning ascribed in paragraph 20.

(ll)    "Individual Apartment Improvement Increase" shall mean an adjustment of legal regulated rent pursuant to 9 NYCRR § 2522.4 (a) (1).

(mm)    "Interim Rents Order" shall have the meaning ascribed on page 4.

(nn)    "J-51 Program" means the New York City tax abatement program that was the subject of the Complaint.

(oo)    "J-51 Rider" means the notice accompanying an initial lease or lease renewal pursuant to RSL § 26-504(c).

9

(pp)    "Landlord" shall have the meaning ascribed on page 1.

(qq)    "Lead Counsel" means William Gribben, Ronald S. Languedoc and the law firm Himmelstein, McConnell, Gribben, Donoghue & Joseph LLP, and Matthew D. Brinckerhoff and the law firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP.

(rr)    "Lease Term" shall have the meaning ascribed in paragraph 4.

(ss)    "Legal Rent" shall have the meaning ascribed in paragraph 10 and as determined in paragraphs 11 and 12.

(tt)    "Long Term Vacancy Increase" shall mean a rent adjustment upon vacancy or succession pursuant to 9 NYCRR § 2522.8 (a) and (b).

(uu)    "Major Capital Improvement" shall mean an adjustment of legal regulated rent pursuant to 9 NYCRR § 2522.4 (a) (2).

(vv)    "Minimum Damages Payment" means a payment of one hundred fifty dollars ($150).

(ww)    "Net Term Amount" shall have the meaning ascribed in paragraph 7.

(xx)    "Non-Landlord Defendants" means all of the Defendants except for the Landlord.

(yy)    "Non-Payment Deductions" shall have the meaning ascribed in paragraph 7.

(zz)    "Notice" means the notice of the terms of this Settlement Agreement to be given to the Class following Preliminary Approval as described in paragraph 49.

(aaa)   "Notice Costs" shall mean the actual out-of-pocket costs of providing the Notice.

(bbb)   "NPD Objections" shall have the meaning ascribed in paragraph 40.

(ccc)   "Opt-Out" shall have the meaning ascribed in paragraph 46.

(ddd)   "Order and Final Judgment" means the order to be signed by the Court granting final approval of the Settlement, which shall be agreed upon by the Parties.

(eee)   "Order and Final Judgment Date" means the date the Order and Final Judgment is entered in the New York County Clerk's Office.

(fff)   "Past Damages Amount" shall have the meaning ascribed in paragraph 7.

(ggg)   "Past Rent Claims" means monetary damages sought by Plaintiffs in the Complaint

10

based on the alleged overcharge of rents for the Covered Units calculated as the difference between the rent that would have been charged had the Units been subject to rent stabilization and the rent actually charged for the Units.

(hhh)   "Plan Administrator" means the person appointed as plan administrator for the Debtor by a Confirmation Order entered by the Bankruptcy Court, which will authorize the Plan Administrator to execute this Settlement Agreement on behalf of the Landlord.

(iii)   "Plaintiffs" means Kathryn Casey, Laurie Cagnassola, Gerald Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica Saks and Kirk Swanson, on behalf of themselves and all others similarly situated.

(jjj)   "Plan" shall have the meaning ascribed to such term on page 5.

(kkk)   "Pool Disbursement" shall have the meaning ascribed in paragraph 22.

(lll)   "Pool" means the Cash Component held in escrow pursuant to this Stipulation.

(mmm)   "Preliminary Approval" shall have the meaning ascribed in paragraph 44.

(nnn)   "Preliminary Approval Date" means the date the Preliminary Approval Order is entered in the New York County Clerk's Office.

(ooo)   "Preliminary Approval Order" means the order to be signed by the Court granting Preliminary Approval, which shall be agreed upon by the Parties..

(ppp)   "Property" shall have the meaning ascribed on page 2.

(qqq)   "Rent Guideline Board Increase" shall mean an adjustment in the legal regulated rent pursuant to a determination of the Rent Guidelines Board as defined by 9 NYCRR 2520.5 (m).

(rrr)   "Rent Overcharge Claim" shall mean the amount equal to the difference between past rent actually charged and Agreed Past Rent.

(sss)   "Releasing Class Members" shall have the meaning ascribed in paragraph 31.

(ttt)   "Released Parties" shall have the meaning ascribed in paragraph 30.

(uuu)   "Releasing Landlord" shall have the meaning ascribed in paragraph 32.

(vvv)   "Rent Increases" shall have the meaning ascribed in paragraph 14.

(www)   "Rent Adjustment Date" shall have the meaning ascribed in paragraph 4.

11

(xxx)  "RSC" means the New York City Rent Stabilization Code as amended through June 15, 2019.

(yyy)  "RSL" means the New York City Rent Stabilization Law as amended through June 15, 2019.

(zzz)  "Sale" shall have the meaning ascribed on page 5.

(aaaa)  "Settled Plaintiffs' Claims" shall have the meaning ascribed in paragraph 33.

(bbbb)  "Settlement Agreement" shall have the meaning ascribed on page 1.

(cccc)  "Settlement Expenditures" means Notice Costs and Administration Costs, collectively.

(dddd)  "Settlement Formula" shall have the meaning ascribed in paragraph 5.

(eeee)  "Settlement Hearing" means the judicial hearing, on a date to be set by the Court, at which the Court will consider all arguments concerning whether the Settlement should be finally approved.

(ffff)  "Settlement Pool" shall have the meaning ascribed in paragraph 19.

(gggg)  "Standard Vacancy Increase" shall mean a rent adjustment upon vacancy or succession pursuant to 9 NYCRR § 2522.8 (a) and (b).

(hhhh)  "Stipulated Order" shall have the meaning ascribed in paragraph 15.

(iiii)  "Summary Judgment Order" shall have the meaning ascribed on page 3.

(jjjj)  "Term Amount" shall have the meaning ascribed in paragraph 7.

(kkkk)  "Unclaimed Funds" shall have the meaning ascribed in paragraph 23.

(llll)  "Unit" means any Building apartment for which a Class Member pays or has paid a market rent during the Class Period.

## CLASS CERTIFICATION

1.     All previous Court orders concerning class certification in this action are superseded by this Settlement Agreement.  A class (the "Class") will be certified that consists of all persons (the "Class Members") who occupied an apartment that was treated as deregulated by Landlord while Landlord was receiving J-51 tax benefits (a "Covered Unit"), provided that such a

12

person was an occupant of a Covered Unit on or after the Base Date but before June 30, 2014; or who took occupancy of a Covered Unit after June 30, 2014, and was treated as an unregulated tenant, but after performing the calculation described above it is determined that their initial rent was below the threshold required for high rent vacancy deregulation.  The Covered Units are those units described on Exhibit A.  Notwithstanding the foregoing, the following apartments:  1C, 2H, 2K, 3C, 3D, 3E, 3K, 5B, 5C, 5D, 5K, 7C, 7D, 7G, 7K, 8C, 8E, 9D, 9G, 10G, 11D, 11K, 12K, 14C, 14D, 14G, 14J, 15E, 15G, PHB and PHC (the "Deregulated Units") could have been lawfully deregulated pursuant to high rent vacancy deregulation subsequent to expiration of J-51 on June 30, 2014 and prior to June 14, 2019.  It is acknowledged that these Deregulated Units are properly deregulated and landlord may file exit registrations reflecting the date of deregulation.  It is agreed that the current tenants of these Deregulated Units are not subject to rent regulation but may remain in occupancy at the current rent stabilized rent set forth in Exhibit A for one (1) year from the Effective Date date of this Settlement Agreement (the "Expiration Date").  At the Expiration Date the landlord may offer the tenant a free market lease at the current market rent or provide a notice of non-renewal at landlord's option. In addition, Class Members that were no longer tenants prior to March 1, 2023 will be referenced as Non-Rent Credit Class Members and Class Members that are  tenants as of March 1, 2023 will be referenced as Rent Credit Class Members.

2.      Plaintiffs, all of whom were previously appointed as Class Representatives on August 6, 2012 shall remain Class Representatives for the Class.

3.      Lead Counsel that were previously appointed as Lead Counsel shall remain Lead Counsel for the Class.

## AMENDMENT OF INTERIM RENTS ORDER

4.      To the extent not done by Plaintiffs and the Landlord prior to execution of this

Settlement Agreement, no later than three (3) business days after execution of this Settlement Agreement by the Plan Administrator on behalf of the Landlord, the Plan Administrator, on behalf of the Landlord, and the Plaintiffs shall file a joint stipulation and/or application with the Court seeking to amend the Interim Rents Order and fixing the amount of rent/use and occupancy to be paid for those Covered Units which are currently being leased by Class Members, for the period commencing on the first of the month immediately following the date that the Court enters the order amending the Interim Rent Order (the "Rent Adjustment Date") in the amounts set forth in Exhibit A of this Settlement Agreement.

## SETTLEMENT CONSIDERATION

5.      The Settlement Formula.  The "Agreed Past Rent" shall be calculated by adding to the Base Date Amount for the period from October 14, 2007 through and including the date this Stipulation is executed: (i) all Standard Vacancy Increases; (ii) all Long Term Vacancy Increases after the Base Date; (iii) all Individual Apartment Improvement Increases after the Base Date; (iv) all Rent Guideline Board Increases after the Base Date; and (v) all other rent adjustments permitted by the RSL and RSC after the Base Date (the "Settlement Formula").

6.      The Legal Rent for each of the apartments leased by those Class Members that are currently tenants at the Building, as of March 1, 2023, as calculated pursuant to the Settlement Formula is set forth in Exhibit A of this Settlement Agreement.

7.      Past Damages Amount.  (a) If an Eligible Class Member during the Class Period was billed and paid rent in excess of the applicable Agreed Past Rent as shown in the Data for the term of a lease ("Lease Term"), that Eligible Class Member will have a Past Rent Claim that will be calculated using the amount of that excess for that Lease Term ("Term Amount").  If an Eligible Class Member has more than one Lease Term, all of the Term Amounts will be added together and

14

the sum shall be that Eligible Class Member's "Net Term Amount." The Net Term Amount shall

be reduced by any non-payment of rent by the Eligible Class Member (the "Non-Payment

Deductions") subject to paragraph 9 as described in this Settlement Agreement and any rent

concessions for that Eligible Class Member that are not reflected in the billing used to calculate the

Term Amounts and the resulting amount shall be the "Past Damages Amount" for that Eligible

Class Member. The Past Damages Amount shall be off-set by any Credits received and previously

applied as rent and any amount paid in accordance with the Interim Rent Order subject to paragraph

9. If a Class Representative has a Non-Payment Deduction, any Incentive Award will be used as

a credit against the Non-Payment Deduction and shall also be released from the Pool to Barclays.

By way of example, if the Eligible Class Member had a twelve-month Lease Term that recited a

rent of $1,500 per month, and the Settlement Formula rent during that Lease Term was $1,000 per

month, but the Eligible Class Member was given one month's free rent during that Lease Term, the

Past Damages Amount would be calculated as follows: $[1,500 \text{ X } 11 = 16,500] - [11 \text{ X } 1,000 =$

$11,000] = 5,500$. By way of further example, if in addition to the exemplary facts described above,

the Eligible Class Member failed to pay two month's rent, then the Past Damages Amount due to

the Eligible Class Member for that Lease Term would be calculated as follows: $[1,500 \text{ X } 11 =$

$16,500] - [11 \text{ X } 1,000 = 11,000] - [2 \text{ X } 1,500 = 3,000] = 2,500$. The Past Damage Amount formula

described in this paragraph, including deductions for past non-payment of rent, has been applied

to the rental and payment histories of all Non-Rent Credit Class Members and, subject to a Non-

Rent Credit Class Member disputing the amount of any non-payment deductions, that amount is

$856,796.56.

8.    <u>Multiple Tenancies</u>.  If an Eligible Class Member leased more than one Unit during

the Class Period, all of the Term Amounts will be combined into one Past Damages Amount.

15

9.      <u>Past Nonpayment of Rent</u>.  It is acknowledged that, due to an Interim Rent Order after the granting of the summary judgment motion, Rent Credit Class Members as defined in paragraph 1 above, were billed a default rent and received certain rent Credits.  The Interim Rent Order was without prejudice to the parties' rights.  The Court of Appeals, on April 16, 2023, issued an order reversing said summary judgment motion holding that the rent should be the rent charged on the Base Date.  Thus, as a result of the Court of Appeals determination, Rent Credit Class Members who relied on the rent credits to pay rent and/or paid the default rent, would ordinarily owe the landlord the difference between credit applied toward rent and/or default rent paid and the rent as calculated under this Settlement Agreement.  It is further agreed and acknowledged that as a result of the Interim Order, all Rent Credit Eligible Class Members received a greater amount of Credits than each individual tenant was overcharged and as a result the Rent Credit Class Members are ineligible for any further payments.   All Past Damages Amounts shall pertain only to the compensation that Non-Rent Credit Class Members are entitled to receive under the Settlement Agreement and shall not impact any amount otherwise due Landlord for nonpayment of rent, except that the Landlord waives and releases any claim to recover money damages against, or evict, a current tenant Rent Credit Class Member for past rent due, provided that such current tenant Rent Credit Class Member is current on all rent obligations due under their lease with the Landlord as of the Rent Adjustment Date.  In determining whether non-payment of rent exists with respect to a current tenant Rent Credit Class Member, such Class Member's use of Credits to pay rent for any period after August 1, 2023 shall not be counted as a payment of rent. The Landlord also waives any claim to recover money damages against any past tenant Non-Rent Credit Class Member for non-payment of past rent due.

10.     <u>Transferability</u>.  Past Damages Amounts and claims for Past Damages Amounts

shall not be assignable or otherwise transferable by Eligible Class Members to any person or entity, although an Eligible Class Member's executor, administrator or trustee (for a trust that is in existence as of the Preliminary Approval Date or is a special needs trust) may file or accept payment of that Class Member's claims.

11.    <u>Waiver of Non-Compensatory Damages</u>. The Settlement, Settlement Formula and Past Damages Amounts shall not include any amount based on any claim or calculation of treble damages, any other punitive damages, or fines.  All claims for treble damages, punitive damages, fines and interest under the RSL, RSC or any other provision of law are hereby waived and released, except as to Opt-Outs. The Order and Final Judgment shall provide that because this is a class action, an award of treble damages, punitive damages, and fines would be waived if this Action proceeded to trial.

## **<u>DECLARED RENTS</u>**

12.    The maximum legal regulated rent permitted to be charged pursuant to the RSL and RSC (the "Legal Rent") for each Covered Unit shall be calculated using the Base Date, and the amount of such rent with respect to each apartment being currently leased by a Plaintiff is included in <u>Exhibit</u> <u>A</u>.

13.    The Legal Rent for each Unit shall be determined by increasing the Base Date Amount for each Unit by all of the following that occurred for that Unit from the Base Date to the Order and Final Judgment Date: all Standard Vacancy Increases; all Long Term Vacancy Increases; all Individual Apartment Improvement Increases; all Rent Guideline Board Increases; all Major Capital Improvement Increases; and all other rent increases and adjustments permitted under the Rent Stabilization Law and Code. The maximum legal collectible rent permissible to be charged pursuant to the RSL and RSC for each of the Units shall be calculated by reference to the

#224593883_v14

Base Date.

14.     For purposes of this Stipulation and the Order and Final Judgment, the terms "Standard Vacancy Increases," "Long Term Vacancy Increases," "Individual Apartment Improvement Increases," "Rent Guidelines Board Increases," and "Major Capital Improvements" shall have the meanings ascribed to them under the RSC and/or RSL (collectively, the "Rent Increases"). Rent Increase calculations for each Unit shall be based on the Data.  The absence of any particular back-up documentation in Landlord's files shall not invalidate any Rent Increase.  The cost, scope and necessity of work performed in connection with Individual Apartment Improvement Increases shall be as reflected in Landlord's records and shall not be subject to challenge by Class Members.  Plaintiffs have already had the opportunity prior to moving for Preliminary Approval to conduct discovery pertaining to the Rent Increases and therefore no further confirmatory discovery is necessary.

15.     Except as set forth in paragraph 1 above and paragraph 18 below, the Units shall all be subject to the RSL with Class Members entitled to stabilized leases and rents, rights of renewal and succession, and other benefits under the law, such as the provision of the HCR rider with each lease, pursuant to RSL § 26-511 (d).  The J-51 benefit period expired June 30, 2014.   If a Unit became vacant subsequent to the expiration of the J-51 tax benefit period and the recalculated rent permitted the unit to be deregulated under the applicable deregulated threshold as defined by the RSL, these apartments were deemed deregulated as the application date was set forth in paragraph 1.

16.     The stipulated order shall further provide that in the event a Tenant was supplied a J-51 Rider with each lease and lease renewal for a Unit from the inception of the tenancy through the last lease in effect at the expiration of the J-51 period then that Unit will be deemed deregulated

18

at the expiration of the lease in effect as of the date of this Settlement Agreement if otherwise permitted by law.

17.     Legal Rent shall not include any amount based on any claim or calculation of treble damages, any other punitive damages, fines or interest.

18.     Notwithstanding anything to the contrary contained in this Settlement Agreement, the Deregulated Units are deregulated apartments under the RSL and RSC.  It is established that the legal regulated rent for the aforesaid Deregulated Units reached the threshold prior to June 14, 2019 and subsequent to June 30, 2014.

## CASH COMPONENT

19.     Each Non-Rent Credit Class Member who has a Past Damages Amount that is positive, and who has not elected to be an Opt-Out (an "Eligible Class Member"), shall be eligible to receive compensation as provided for in paragraphs 20 through 25 below.  For this purpose and as otherwise provided for in this Settlement Agreement, $2,200,000.00 (the "Settlement Pool") shall be paid first from the proceeds of the closing of the Sale of the Landlord's interest in the Property pursuant to the Plan to the Escrow Agent, to be held in escrow and distributed pursuant to future order of the Court (the "Cash Component").  No payments will be made to any Class Member or Lead Counsel or any other person or entity for any cost or expense associated, or in connection, with this Settlement Agreement except from the Settlement Pool, and upon Final Approval, the Class Members who have not Opted-Out and their counsel expressly waive and release any right or claim to recover any amount from any other person or entity.

20.     The Cash Component shall be used to pay Past Damages Amounts, Minimum Damages Payments, "Incentive Awards to the Named Plaintiff Class Representatives" in the amount of $10,000 for each Named Plaintiff Class Representative, and Attorneys' Fee Awards and

Expenses, and all other amounts which may be due pursuant to this Stipulation. Paragraphs 21 through 25 below shall govern the distribution of the funds from the Settlement Pool.

21.     The formula for purposes of determining the Past Damages Amount shall be based upon the Settlement Formula, less Non-Payment Deductions and less Credits, as provided in paragraph 7 above. Eligible Class Members who do not Opt-Out affirmatively waive any right to interest, penalties, or fines on these amounts or otherwise except as set forth in this Settlement Agreement.

22.     All current tenant Rent Credit Class Members have already received any respective Past Damages Amounts to which they would have been entitled as of the date of this Settlement Agreement. Each Non-Rent Credit Class Member who files a timely claim form who has a positive Past Damages Amount will receive a disbursement from the Pool (a "Pool Disbursement") pursuant to paragraph 7 above in the amount of such Eligible Class Member's Past Damages Amount(s). By virtue of prior Court Orders and the Credits, current Rent Credit Class Members, as described in paragraph 9 above, have been paid all damages and are not entitled to any additional monies including the minimum payment.     If a Non-Rent Credit Class Member's Past Damages Amount is equal to or less than one hundred fifty dollars ($150), such Non-Rent Credit Class Member will nonetheless receive a Minimum Damages Payment of $150 in lieu of his, her or its Past Damages Amount. For purposes of this Settlement, co-tenants of a single Unit for each Lease Term reflected in the Data shall be considered together as one Class Member. If the Class Member for a particular Lease Term consists of two or more co-tenants, the Past Damages Amount or Minimum Damages Payment will be divided equally among and disbursed proportionally to only those co-tenants who timely submit a Claim Form.     Any Non-Payment Deductions also shall be made equally and proportionally from each such co-tenant's disbursement, even if other co-tenants exist but fail to

submit a Claim Form (unless any other co-tenant opts out, in which case all the co- tenants shall be deemed to have opted out pursuant to paragraphs 46 through 48 below, including those co- tenants who timely submit a Claim form).   Any disputes among co-tenants concerning the allocation of any distributions under this Settlement Agreement must be addressed and resolved amongst the co-tenants outside the scope of this Settlement Agreement and the existence of any such actual or potential disputes shall not be a basis for objecting to the Settlement Agreement.

23.    If, after all the Eligible Class Members that submitted timely claim forms receive 100% of their Past Damages Amount and if there remains any portion of the Pool remaining after the payment of all Court approved Attorneys' Fees and Expenses, Notice Costs and Administrative Costs, and Incentive Awards, if any (the "Unclaimed Funds"), those remaining Unclaimed Funds in the Pool shall be used to make a second payment to all Eligible Class Members that have submitted timely claim forms, on a pro-rata basis (the "Second Payment"). The amount of the Second Payment to each Eligible Class Member that submitted a timely claim form shall not exceed 100% of the amount of Past Damages amount received in the initial payment, e.g., if $20,000 was initially paid on a particular Eligible Class Member's Past Damages Amount, the Second Payment to such Eligible Class Member cannot exceed $20,000. Insofar as any money remains in the Pool after the payment of (1) the initial Past Damages Amount to all Eligible Class Members who submit a timely claim form; (2) all Court approved Attorneys' Fees and Expenses, Notice Costs and Administrative Costs, and Incentive Awards; and (3) the Second Payment to each Eligible Class Member that submits a timely claim form, that amount will  revert to Barclays, and shall be transferred by the Claims Administrator to Barclays no later than seven (7) days after all other amounts to be paid from the Settlement Pool by the Claims Administrator have been paid in full.

24.     If any Unclaimed Funds remain in the Pool one year after the Effective Date for whatever reason, including the failure to cash payment checks disbursed from the Settlement Pool, such funds shall be distributed to Eligible Class Members on a pro-rata basis until Eligible Class Member receive 200% of the Settlement Formula or the cost of additional distributions makes such payments financially infeasible.  Any amount remaining in the Settlement Pool 90 days thereafter shall be transferred to Barclays..

25.     If the Settlement does not become effective or terminates for any reason, the Settlement Pool shall revert to Barclays less all Notice Costs and Administrative Costs, if any, which shall not exceed $35,000.

## TERMINATION PROVISION/OPT-OUT

26.     Any Class Member that timely files an opt-out form and/or request for exclusion will not be bound by any of the terms of this Settlement.   Any Class Member who does not timely opt-out or request exclusion will be bound by the terms of this Settlement, but only those Class Members who file timely claim forms will be eligible to receive payments from the Settlement Pool.

27.     Landlord, only with Barclays' prior written consent, shall have the right to terminate this Settlement Agreement if either: (a) 20% or more of the Class Members opt-out of the Settlement; or (b) the aggregate dollar amount that Class Members who opt-out of the Settlement would have received under the Settlement Formula (had they not opted out) exceeds 20% of the amount paid by Landlord into the Settlement Pool.

## COURT ORDER

28.     The Court shall enter orders, in a form approved by Barclays, ensuring the enforceability of the terms of the  Settlement Agreement.

29.     The Order and Final Judgment shall, among other things, provide for the full and

22

complete dismissal of the Complaint with prejudice against all Defendants.

## **RELEASES**

30.    "Released Parties" means Landlord, all Defendants in the Action, Barclays, the Ground Lessor, any and all purchasers of the Landlord's interest in the Ground Lease and all of the foregoing entities' present and former lenders, investors, affiliates, subsidiaries and parent companies, including without limitation, limited liability companies, partnerships and corporations (including those that are minority-owned), and their respective officers, attorneys, members, principals, shareholders, heirs, executors, administrators, directors, managers, partners, employees, agents, consultants, advisors, or representatives, and the successors and assigns of each of the foregoing, including without limitation, any future owner of the Landlord's interest in the Ground Lease, and any future owner of the fee interest in the Property.

31.    "Releasing Class Members" means Plaintiffs, each Settlement Class Member who does not timely and properly opt out of the Settlement, and the heirs, successors, trustees, executors, administrators and assigns of each of them.

32.    "Releasing Landlord" means Landlord and its successors and assigns.

33.    "Settled Plaintiffs' Claims" means all statutory, regulatory, common law or other claims, causes of action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs, penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal, state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before entry of the Order and Final Judgment, that are based upon or related to, or arise out of, in whole or in part, the facts, transactions, events, occurrences, acts, or failures to act that were or could have been alleged in the Action by Plaintiffs or a Class Member against the Released Parties, including without limitation, damages, penalties, punitive damages, treble damages, liabilities or other remedies relating to (a) residential rents at the Property, (b) the rent-regulated

23

status of any Unit at the Property, (c) Barclays' interest in the leasehold mortgage on the Property

and/or (d) any other claims arising under the RSL or RSC based on any act, event or alleged failure

to act prior to the Order and Final Judgment Date, including but not limited to any claim that a

tenant was entitled to any particular form of lease, rider, notice, or that the Building or Unit had to

be registered with any governmental agency.  For the avoidance of any doubt, this release includes

any successor liability or other claims by Plaintiffs under RSC § 2526.1 (9 NYCRR §2526.1) or

any other law.

34.     Subject to the Court's approval of this Stipulation and entry of the Order and Final

Judgment, as of the Effective Date: (a) each Releasing Class Member hereby forever waives,

releases, and discharges all Settled Plaintiffs' Claims against the Released Parties even if such

Releasing Class Member failed to submit a Notice of Claim Form; (b) each Releasing Class

Member shall be permanently enjoined from commencing, prosecuting, or continuing any of the

Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed

to submit a Notice of Claim Form; and (c) the Releasing Landlord hereby forever releases all Class

Members, except Opt-Outs, from all statutory, regulatory, common law or other claims, causes of

action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs,

penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal,

state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before

entry of the Order and Final Judgment, that are based upon or related to, or arise out of the Action

except non-payment of back rent to the extent otherwise set forth in this Settlement Agreement

and actions or proceedings pending on, or filed after, the date of this Settlement Agreement for

unrelated claims for bodily injury or damage to personal property.

35.     In addition to the above release language, the absence of any forms or notices or

registration through the date of the first lease renewal for each Class Member after the Effective

Date will not cause the loss of any rent increase or other adverse consequences to Landlord.

## RESERVATION OF RIGHTS

36.     Except as expressly set forth herein, if the Court fails to grant preliminary approval

of the Settlement Agreement by the date that is more than forty-five (45) days after the

confirmation of the Plan, or final approval of the Settlement Agreement by the date that is more

than 120 days from the date the Court grants preliminary approval, or if the Settlement Agreement

is terminated or does not become effective for any reason, then, at Plan Administrator's (on behalf

of Landlord's) option, with Barclays' prior written consent, all parties' positions shall return to the

*status quo ante* as if the Settlement Agreement never existed, and each party preserves, reserves

and does not waive any and all of its respective rights, claims, defenses and remedies.

## DEFENDANT'S DOCUMENTS AND CONFIRMATORY DISCOVERY

37.     All Rent Increases shall be calculated at the amount assigned to the Covered Units

based on Landlord's documentation produced during discovery and as updated through the Order

and Final Judgment Date.  The absence of any particular back-up documentation in Landlord's

files shall not invalidate any increase.  The cost, scope, and necessity of work performed in

connection with Individual Apartment Improvements, and Major Capital Improvements shall be

as reflected in Landlord's records and shall not be subject to challenge by Class Members.

Plaintiffs have had the opportunity prior to the execution of the Settlement Agreement to conduct

confirmatory discovery pertaining to the Rent Increases, and waive the right to take any additional

discovery after execution of this Settlement Agreement.

## CLAIMS ADMINISTRATION

38.     With the Court's approval and conditioned on the successful negotiation of a

retention agreement, the Pool shall be administered by a claims administrator selected by

Plaintiffs' counsel (the "Claims Administrator"). If for any reason that firm does not become the Claims Administrator or ceases to serve in that capacity, the Court shall appoint another entity to become the Claims Administrator at the request of Lead Counsel and subject to Plan Administrator's approval. Any dispute concerning the amount of Administrative Costs to be paid to the Claims Administrator will be resolved by the Court. The cost of the Class Administrator shall be paid solely by the Pool.

39.     To receive payment for Past Damages Amounts or Minimum Damages Payments, Eligible Class Members shall file claims for distributions from the Pools pursuant to the procedures set forth in a Claim Form to be agreed upon by the Parties. If a single Unit had multiple co-tenants at any given time, any subsequent dispute as to the entitlement to any distribution under this Stipulation shall be solely between and among such co-tenants without recourse to the Pool and without any liability to any of the parties to this Settlement Agreement. For identity verification purposes, all Claim Forms shall require Class Members to provide the month and year when their lease(s) commenced and terminated and the addresses of such Class Member's leased Unit(s). All Claim Forms shall require Class Members to state whether the Class Member submitting the form subleased his, her, or its Unit(s) with or without the consent of the landlord at any time since the Base Date, to the date he, she or it signed the Claim Form, and, if so, the dates of such subleasing, the rents received from the subtenant(s) and the name or names of the subtenant(s). Class Members who do not timely file a Claim Form pursuant to these procedures shall be deemed to have waived and released their Past Rent Claims, Past Damages Amounts and Minimum Damages Payments but shall nonetheless remain subject to the applicable releases set forth in paragraph 30 above unless he, she or it becomes an Opt-Out. Determinations as to whether a Claim Form has been timely and properly filed shall be made by the Claims Administrator.

40.     Landlord will provide Lead Counsel and/or the Claims Administrator with the names of all Eligible Class Members that Landlord alleges failed to pay rent since the commencement of the Action through the date the Eligible Class Member vacated the Covered Apartment, including the amounts of such alleged non-payment and period during which it allegedly accrued and the total amount of such potential non-payment deductions. If feasible, Eligible Class Members with alleged non-payment histories will be notified of Landlord's claim along with the Notice of Settlement. Any such Class Member that submits a claim form may also submit an objection to the allegation of non-payment and any supporting documentation or other materials (the "NPD Objections"). Plaintiffs and Landlord will confer on the resolution of all NPD Objections. All NPD Objections that cannot be resolved will be submitted to the Court for determination on or before the Settlement Hearing and the Court shall provide such orders and judgments as it deems appropriate. If, by the Effective Date, some disbursements to Eligible Class Members remain unresolved because of a dispute about the Non-Payment Deduction or for any other reason, the amount allocated to the Eligible Class Member (including the disputed Non-Payment Deduction) will remain in the Pool for later distribution at such time as the dispute is resolved.

## ATTORNEYS' FEES AND EXPENSES AWARD

41.     Lead Counsel may apply to the Court, unopposed by Landlord, for an award of Attorneys' Fees and out-of-pocket expenses (the "Attorneys' Fee Award and Expenses") which shall be paid from the Pool, in an amount that shall not exceed the amount available remaining in the Pool, after (a) the allocation of payments to all Eligible Class Members that submit timely claim forms and (b) the allocation of all payments for Notice Costs, Administrative Costs and Incentive Award payments to Class Representatives. The Attorneys' Fee Award and Expenses shall be paid by the Claims Administrator within ten (10) days of the later of: (i) the Effective Date; or (ii) the date the Settlement Pool is transferred to the Class Administrator from the proceeds

of the Sale or as soon thereafter as practical.

42.    Except as expressly provided in this Stipulation, Plaintiffs, Landlord and Lead Counsel shall bear their own fees, costs and expenses.

43.    Any failure of the Court to approve a request for the Attorneys' Fee Award and Expenses, in whole or in part, shall not affect the terms or enforceability of the remainder of this Stipulation or the Settlement.

## SUBMISSION FOR APPROVAL

44.    Promptly after execution of this Settlement Agreement, and no later than 15 days after entry of the Confirmation Order, Plaintiffs with the consent of the Plan Administrator, acting on behalf of Landlord, shall submit this Settlement Agreement with its exhibits to the Court for preliminary approval of this Settlement Agreement (the "Preliminary Approval") and shall seek entry of the Preliminary Approval Order.  Among other matters, the Preliminary Approval Order shall provide for: (a) the preliminary approval of the of the Class as defined herein; (b) the preliminary approval of this Settlement Agreement and the declaratory relief provided  herein as being fair, just, reasonable and adequate to the Class; (c) the approval of the Notice; (d) the approval of a procedure for and the timing of the filing of objections, if any; (e) the approval of the timing for processing Opt-Out requests; (f) the setting of a date for the Court to hold the Settlement Hearing; and (g) a stay of the proceedings in this Action in accordance with paragraphs 56 through 58 below. The motion for Preliminary Approval shall have as an exhibit a schedule identifying all of the Units and the date each was initially treated as deregulated.

45.    At or prior to the Settlement Hearing, Plaintiffs with Landlord's consent shall request that the Court enter the Order and Final Judgment.  The Order and Final Judgment shall have, as exhibits, schedules (to be filed under seal to preserve tenant confidentiality) showing the Legal Rent calculated as of the date of the Settlement Hearing pursuant to the Settlement Formula,

28

for each of the Units as calculated pursuant to this Stipulation. The Settlement shall be considered final on the Effective Date.

<u>**REQUESTS FOR EXCLUSION/OPT OUT**</u>

46.    Each Class Member will be bound by all provisions of the Settlement Agreement, whether favorable or unfavorable, unless such person mails, by first class mail to the Claims Administrator, a written request for exclusion from the Class, postmarked no later than 21 days before the Settlement Hearing (an "Opt-Out"). No Class Member may exclude himself, herself or itself from the Class after that date. The Claims Administrator shall provide regular reports of such requests to each of the parties' attorneys, and counsel for Barclays.    In order to be valid, each request for exclusion (an "Opt-Out") must: (a) set forth the name and address of the Class Member requesting exclusion; (b) state that such Class Member "requests exclusion from the Class in *Casey v. Whitehouse Estates, Inc.*, Index No. 111723/2011"; (c) be signed by such Class Member; and (d) include the addresses of all of such Class Member's leased Unit(s). Requests for exclusion will not be accepted if they do not include the required information or if they are not made within the time stated above. If one co-tenant of a Unit is an Opt-Out, all co-tenants of that Unit shall likewise be deemed to be Opt-Outs as to each Lease Term for which they were co-tenants.

47.    The rent for all Opt-Outs who are current tenants of the Building at the time they opt-out shall be the maximum legal rent permitted by law.

48.    Opt-Outs will not receive any payment from the Settlement Pool and will not be entitled to receive any of the benefits he or she would otherwise have been entitled to pursuant to this Settlement Agreement. In any subsequent proceeding, Opt-Outs may make any claim or argument and Landlord may raise any defenses available to it whether at law or equity. Unless expressly provided in this Settlement Agreement, Eligible Class Members may not choose to be excluded from any individual provisions of this Settlement Agreement including, but not limited

29

to, all provisions regarding Future Rent Claims and the declaratory relief provided in paragraphs 12 through 18 of this Settlement Agreement.

## NOTICE

49.    The Notice to all Class Members, which shall be agreed upon by the Parties, shall be provided to the Class by a mailing and/or by electronic means to all Class Members for whom an address or possible address is known.  Landlord shall supply to the Claims Administrator to the extent Landlord possesses such information, in a confidential manner, each Class Member's: (a) current or last known residential address; (b) current or last known email address; and (c) social security number and date of birth (to facilitate locating and providing Notice to former tenant Class Members who may have changed residences multiple times and to representatives of Class Members who may be incapacitated or deceased).  The foregoing information shall be destroyed by the Claims Administrator after all of its duties under this Settlement Agreement are fulfilled. Lead Counsel shall, at least ten (10) business days before the Settlement Hearing, file with the Court an appropriate affidavit with respect to the preparation, mailing and publication of the Notice.  The language and form of all public notices and other advertisements aimed at reaching potential Class Members shall be subject to review and approval by Barclays.

## CONDITIONS OF SETTLEMENT

50.    Landlord denies and continues to deny that it has committed or aided and abetted the commission of any unlawful or wrongful acts alleged in the Action, and expressly maintains that it diligently and scrupulously complied with the RSL, RSC and all other legal obligations. Landlord is entering into the Settlement solely because the proposed Settlement will eliminate the uncertainties, burden and expense of further litigation.

51.    Plaintiffs and Lead Counsel believe that the Settlement Agreement is fair, reasonable, adequate and in the best interests of the Plaintiffs and the Class.  Plaintiffs and Lead Counsel also

took into consideration the strengths and weaknesses of the Class' claims and defenses and determined that the terms of the proposed Settlement Agreement are fair, reasonable and adequate, and in the best interest of the Class.

52.     This Settlement Agreement is conditioned upon the fulfillment of each of the following:

    (a)     The Court approving the Settlement and entry of the Order and Final Judgment, and such approval and Order and Final Judgment having been affirmed on appeal and/or no longer being subject to appeal;

    (b)     The dismissal with prejudice of this Action against all Defendants without the award of any damages, costs, fees, or the grant of any further relief except as provided in this Stipulation;

    (c)     The Plan Administrator, acting on behalf of Landlord, having not exercised its option to terminate this Settlement Agreement pursuant to the terms hereof; and

    (d)     The occurrence of the Effective Date without any material change (unless agreed to in writing by all parties) to the terms of the proposed Preliminary Approval Order, Order and Final Judgment and/or this Settlement Agreement.

53.     If any of the conditions in paragraph 52 above do not occur for any reason, then any party may terminate this Settlement Agreement by giving ten (10) days written notice to the other parties, in which event: (a) this Settlement Agreement and any related orders shall be null and void and of no further force or effect; (b) certification of the Class as set forth in this Settlement Agreement shall be null and void and automatically set aside; (c) the parties shall revert and be restored to the positions they were in immediately prior to execution of the Settlement Agreement; (d) no statements, agreements or acknowledgements (whether written or oral) made or exchanged in connection with this Settlement Agreement shall be deemed an admission or concession by any party and shall not be admissible for any purpose; (e) the Settlement Agreement shall not be

introduced as evidence or referred to in any action or proceeding other than an action or proceeding

to enforce the terms thereof; and (f) all funds in the Pool will be returned to Landlord, with any

interest earned on those funds while they were held in the Pool, after payment of all  Notice Costs

and up to $20,000 for Administration Costs, within thirty (30) days of the giving of the termination

notice.  Notwithstanding anything to the contrary contained in this Settlement Agreement, the

Landlord may not terminate this Settlement Agreement without the prior written approval of

Barclays.

## BEST EFFORTS

54.    Plaintiffs and Landlord agree to cooperate fully with one another in seeking the

Court's approval of this Settlement Agreement, and to use their best efforts to effect, take, or cause

to be taken all actions, and to do, or cause to be done, all things reasonably necessary, proper, or

advisable under applicable laws, regulations, and agreements to consummate and make effective,

as promptly as practicable, this Settlement Agreement provided for hereunder (including, but not

limited to, using their best efforts to resolve any objections raised to the Settlement Agreement

and the dismissal of the Action with prejudice and without costs, fees or expenses to any party

except as otherwise provided for in this Settlement Agreement.

55.    Without further order of the Court, Plaintiffs and Landlord, with Barclays' prior

written approval, may agree to reasonable extensions of time not expressly set forth by the Court

in order to carry out any provisions of this Stipulation.

## STAY OF PROCEEDINGS

56.    Until the Effective Date, Plaintiffs and Landlord agree to stay this proceeding.

57.    The Preliminary Approval Order shall provide that pending final determination of

whether the Settlement Agreement should be approved, Plaintiffs and all Class Members are

barred and enjoined from commencing, prosecuting, instigating or in any way participating in the

commencement or prosecution of any action asserting any claims asserted in this Action, either directly, representatively, derivatively, or in any other capacity, against Landlord or any of the Released Parties.

58.    Pending the entry of the Preliminary Approval Order and the Effective Date, Landlord is not stayed from taking any actions relating to the leasing or management of the Building or enforcement of the terms of leases for Units including, but not limited to, increasing rents for renewal leases, or new vacancy leases, in a manner not inconsistent with the terms of this Settlement Agreement or the current leases in effect or commencing actions or proceedings for non-payment of rent or holdover proceedings as otherwise allowed by law.

## REPRESENTATIONS AND WARRANTIES

59.    Landlord represents and warrants that it is the ground lessee under the Ground Lease.

60.    Landlord represents and warrants that it has full authority to enter into this Stipulation, and has authorized its counsel to do so.

61.    All Class Members who seek reimbursement for Past Rent Claims and payment from the Pool shall by submitting a  Claim Form, represent and warrant that they are entitled to such reimbursement and have not assigned, pledged, transferred, or lost through bankruptcy, divorce proceeding or any other operation of law the right to the full reimbursement sought.

## SETTLEMENT AGREEMENT NOT AN ADMISSION

62.    The provisions contained in this Settlement Agreement shall not be deemed a presumption, concession, or an admission by Landlord of any fault, liability, or wrongdoing as to any facts or claims alleged or asserted in the Action, or any other action or proceeding, and shall not be interpreted, construed, deemed, invoked, offered, or received in evidence or otherwise used by any person in the Action, or in any other action or proceeding, whether civil, criminal, or

33

administrative, except for any litigation or judicial proceeding arising out of or relating to the enforcement of this Stipulation or the Settlement.

## MISTAKE

63.     Except as otherwise set forth herein, in entering into this Settlement Agreement, Plaintiffs, the Class, and Landlord assume the risk of any mistake of fact or law, and if any of them should later discover that any fact they relied upon in entering into this Settlement Agreement is not true, or that their understanding of the facts or law was incorrect, in such event such party shall not be entitled to seek rescission of this Settlement Agreement, or otherwise attack the validity of the Settlement Agreement, based on any such mistake.  Except as otherwise set forth herein, this Settlement Agreement is intended to be final and binding upon the parties regardless of any mistake of fact or law.

## RETENTION OF JURISDICTION

64.     The Court shall retain jurisdiction for purpose of entering orders to: (a) effectuate the implementation of the Settlement Agreement; (b) enforce the terms of this Settlement Agreement including, but not limited to, the releases provided herein; (c) hear all claims, defenses and counterclaims relating to the interpretation and enforcement of this Settlement Agreement before and after the Effective Date as the Court deems appropriate; (d) review all challenges to final administrative determinations brought by Opt-Outs; and (e) determine all other matters relevant to this Stipulation.

## ENTIRE AGREEMENT

65.     This Settlement Agreement and the Exhibits attached hereto constitute the entire agreement between the parties hereto concerning the subject matter hereof, and all understandings and agreements heretofore or simultaneously had between the parties are merged in and are contained in the Settlement Agreement and the Exhibits attached thereto.  Each of the parties

34

warrants and represents to the others that it has not relied upon any representations or warranties, express or implied, in entering into this Settlement Agreement except those which are expressly set forth in this Settlement Agreement and the Exhibits attached thereto.

## COUNTERPARTS

66.    This Settlement Agreement may be executed in multiple counterparts by any of the signatories hereto, including by facsimile or by e-mail, and as so executed shall constitute one agreement.

## GOVERNING LAW

67.    This Settlement Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to New York's conflict of law rules.  Any change of law occurring after Lead Counsel's execution of this Settlement Agreement shall not affect the Parties' duties and obligations under this Agreement.

68.    The Parties agree that the Cash Component (the "Fund") is intended to be a "Qualified Settlement Fund" within the meaning of Treasury Regulation § 1.468B-1 and that the Escrow Agent, as administrators of that Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be responsible for timely preparing and filing tax returns and related documents for the Fund and paying from the Fund any Taxes owed with respect to interest earned on the Fund.  The Parties agree that the Fund shall be treated as a Qualified Settlement Fund from the earliest date possible, and agree to any relation-back election required to treat the Fund as a Qualified Settlement Fund from the earliest date possible.  Landlord, as "transferor" as defined in Treasury Regulation § 1.468B-1(d)(1), of the amounts specified in paragraph 16, agrees to provide promptly to Lead Counsel or the Escrow Agent, as administrator of the Fund, the statement described in Treasury Regulation § 1.468B-3(e).

#224593883_v14

## NOTICES

69.     Unless otherwise set forth in this Stipulation, any notice permitted or required to be given under this Stipulation from one party to another shall be given in writing by (a) personal delivery, or (b) a nationally recognized overnight courier (and in each case also by electronic mail), sent to the intended addressee(s) at the addresses set forth below, or to such other address(es) or to the attention of such other person(s) as the addressee(s) shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given upon receipt or refusal to accept delivery. Copies of all notices shall also be provided to Barclays in the same manner.  The addresses for giving notice pursuant to this Settlement Agreement shall be as follows:

<u>If to Plaintiffs</u>:       Himmelstein, McConnell, Gribben,
                     Donoghue & Joseph LLP
                     15 Maiden Lane, 17th Floor
                     New York, New York 10038
                     Attn:  William Gribben (wgribben@hmgjlaw.com)
                     Ronald S. Languedoc (rlangeuedoc@hmgjlaw.com)

                     and

                     Emery Celli Brinckerhoff Abady Ward & Maazel LLP
                     600 Fifth Avenue, 10th Floor
                     New York, New York 10022
                     Attn:   Matthew D. Brinckerhoff (mbrinck@ecbawm.com)

<u>If to Landlord</u>:       Trigild Property Management LLC
                     As Plan Administrator for Eastgate Whitehouse LLC
                     4131 N. Central Expressway, Suite 775
                     Dallas, Texas 75204
                     Attn: David Wallace (david.wallace@trigild.com)
                     Chris Neilson (chris.neilson@trigild.com)
                     Ian Lagowtiz (ian.lagowitz@trigild.com)

<u>If to Barclays</u>:       Sarah Jones, Esq.
                     Jonathan Agudelo, Esq.
                     Barclays Bank PCC
                     745 Seventh Ave.
                     New York, New York 10019

With copies to:     Vivian M. Arias, Esq.
                    Holland & Knight LLP
                    131 West 52nd Street
                    New York, New York 10019
                    (vivian.arias@hklaw.com)

                    and

                    Randi B. Gilbert, Esq.
                    Horing Welikson Rosen
                    & Digrugilliers, P.C.
                    11 Hillside Avenue
                    Williston Park, New York 11596
                    (rgilbert@horprc.com)

## HEADINGS

70.     The headings in this Settlement Agreement are used for the purpose of convenience only and are not meant to have legal effect.

## SEVERABILITY

71.     Unless otherwise set forth in this Settlement Agreement, if any provision of this Settlement Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Settlement Agreement shall nonetheless remain in full force and effect; provided that the invalidity or unenforceability of such provision does not materially adversely affect the benefits accruing to any other party hereunder.

## THIRD-PARTY BENEFICIARIES

72.     There are no third-party beneficiaries under this Settlement Stipulation, other than (i) the Released Parties with respect only to the release provisions of this Settlement Agreement; and (ii) Barclays.

## EFFECT OF WAIVER OF BREACH

73.     The waiver by one party of any breach of this Settlement Agreement by any other party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement

37

Agreement.  Unless otherwise stated in this Settlement Agreement, any breach of any provision of this Settlement Agreement by any party to this Settlement Agreement shall not constitute grounds for rescission of this Settlement Agreement, but shall constitute grounds only for a claim for specific performance for breach of this Settlement Agreement.

## SUCCESSORS AND ASSIGNS

74.    This Settlement Agreement, and all rights and powers granted hereby, shall be binding upon and inure to the benefit of the parties and their respective agents, executors, heirs, successors, affiliates and assigns.  All rights and obligations of Landlord shall be binding on and inure to the benefit of any subsequent owners of the Landlord's interest in the Ground Lease or Building.

## CONFIDENTIALITY

75.    Lead Counsel shall not disclose the terms of this Settlement Agreement until it is filed by Barclays in the Bankruptcy Court as an exhibit to the Plan.

76.    If Lead Counsel receive any third-party inquiries, including from news organizations, about any aspect of the terms and conditions of this Settlement Agreement before the Settlement Agreement is fully executed and filed with the State Supreme Court, they will only respond that "the matter is being resolved" or words to that effect. Nothing herein shall prevent Lead Counsel from discussing the Settlement Agreement with their clients.

Dated:   September __, 2023
          New York, New York

### Signature Blocks On the Following Page

Dated: New York, New York
      September _, 2023

**HIMMELSTEIN McCONNELL
GRIBBEN & JOSEPH LLP**
*Attorneys for Plaintiffs*

By: _____
      Ronald S. Languedoc, Esq.
      William J. Gribben, Esq.
15 Maiden Lane, 17th Floor
New York, New York 10038
Tel: (212) 349-3000

**EMERY CELLI BRINCKERHOFF &
ABADY WARD & MAAZEL LLP**
*Attorneys for Plaintiffs*

By: _____
      Matthew Brinckerhoff, Esq.
600 5th Avenue, 10th Floor
New York, New York 10020
Tel: (212) 763-5000

39

Dated: New York, New York
   September 1, 2023

        **HIMMELSTEIN McCONNELL**
        **GRIBBEN & JOSEPH LLP**
        *Attorneys for Plaintiffs*

        By: _____
          Ronald S. Languedoc, Esq.
          William J. Gribben, Esq.
        15 Maiden Lane, 17th Floor
        New York, New York 10038
        Tel: (212) 349-3000

        **EMERY CELLI BRINCKERHOFF &**
        **ABADY WARD & MAAZEL LLP**
        *Attorneys for Plaintiffs*

        By: _____
          Matthew Brinckerhoff, Esq.
        600 5th Avenue, 10th Floor
        New York, New York 10020
        Tel: (212) 763-5000

39

Dated: New York, New York
_____, 2023

<strong>EASTGATE WHITEHOUSE LLC</strong>

By: _____
Name:
Title:  Plan Administrator

## EXHIBIT A

|     | APT | LEGAL RENT | DATE OF DEREGULATION, IF ANY |
| --- | --- | --- | --- |
| 1.  | 1C  | $3,045.00  | 11/01/2015 |
| 2.  | 1D  | $1,934.69  |            |
| 3.  | 2B  | $2,369.52  |            |
| 4.  | 2H  | $1,975.00  | 10/01/2014 |
| 5.  | 2J  | $2,400.00  |            |
| 6.  | 2K  | $2,950.00  | 06/01/2017 |
| 7.  | 3A  | $1,800.00  |            |
| 8.  | 3C  | $2,900.00  | 09/16/2016 |
| 9.  | 3D  | $4,009.25  | 11/15/2015 |
| 10. | 3E  | $3,199.43  | 04/01/2018 |
| 11. | 3G  | $3,800.00  |            |
| 12. | 3H  | $2,075     |            |
| 13. | 3J  | $2,679.92  |            |
| 14. | 3K  | $2,700.00  | 09/01/2015 |
| 15. | 4A  | $1,763.81  |            |
| 16. | 4B  | $2,407.89  |            |
| 17. | 4C  | $2,200.00  |            |
| 18. | 4D  | $2,800.00  |            |
| 19. | 4J  | $1,800.00  |            |
| 20. | 4K  | $2,783.56  |            |

| | | | |
|---|---|---|---|
| 21. | 5B | $2,650.00 | 02/01/2015 |
| 22. | 5C | $3,265.48 | 01/01/2017 |
| 23. | 5D | $3,100.00 | 03/01/2017 |
| 24. | 5G | $3,578.75 | |
| 25. | 5H | $2,223.94 | |
| 26. | 5J | $1,900.00 | |
| 27. | 5K | $4,567.50 | 09/01/2015 |
| 28. | 6B | $2,534.73 | |
| 29. | 6F | $2,096.13 | |
| 30. | 6G | $4,200.00 | |
| 31. | 6H | $2,171.79 | |
| 32. | 6J | $2,350.00 | |
| 33. | 6K | $2,120.25 | |
| 34. | 7C | $2,400.00 | 06/15/2016 |
| 35. | 7D | $3,175.00 | 10/15/2017 |
| 36. | 7F | $2,211.67 | |
| 37. | 7G | $5,400.00 | 09/01/2015 |
| 38. | 7K | $2,900.00 | 10/15/2015 |
| 39. | 8C | 3,000 | 03/01/2018 |
| 40. | 8D | $3,516.24 | |
| 41. | 8E | $2,550.00 | 09/01/2017 |
| 42. | 8J | $2,880.03 | |
| 43. | 8K | $2,900.00 | |
| 44. | 9A | $2,472.54 | |

2

| 45. | 9B | $2,650.00 | |
|-----|-----|-----------|--|
| 46. | 9C | $3,700.00 | |
| 47. | 9D | $2,750.00 | 11/17/2017 |
| 48. | 9G | $5,625.00 | 07/01/2018 |
| 49. | 9H | $1942.75 | |
| 50. | 9J | $1,950 | |
| 51. | 9K | $2,998.57 | |
| 52. | 10A | $2,404.00 | |
| 53. | 10B | $2,200.00 | |
| 54. | 10C | $1,899.77 | |
| 55. | 10D | $2,950.00 | |
| 56. | 10G | $5,000.00 | 08/01/2017 |
| 57. | 10H | $2,309.76 | |
| 58. | 11B | $2,051.00 | |
| 59. | 11C | $3,500.00 | |
| 60. | 11D | $3,200.00 | 04/01/2018 |
| 61. | 11K | $2,700.00 | 03/01/2018 |
| 62. | 12C | $3,000.00 | |
| 63. | 12D | $3,200.00 | |
| 64. | 12E | $1,700.00 | |
| 65. | 12H | $2,100.00 | |
| 66. | 12J | $2,000.00 | |
| 67. | 12K | $3,967.05 | 08/01/2015 |
| 68. | 14C | $2,588.13 | 12/15/2017 |

3

| 69. | 14D | $3,100.00 | 05/15/2017 |
| 70. | 14E | $2,675.00 | |
| 71. | 14F | $2,599.87 | |
| 72. | 14G | $3,700.00 | 06/01/2016 |
| 73. | 14H | $2,502.14 | |
| 74. | 14J | $2,500.00 | 09/01/2016 |
| 75. | 15B | $2,556.56 | |
| 76. | 15E | $3,485.51 | 02/15/2017 |
| 77. | 15G | $5,250.00 | 09/01/2015 |
| 78. | 15J | $2,415.00 | |
| 79. | PHB | $3,919.34 | 05/01/2017 |
| 80. | PHC | $3,500.00 | 02/01/2015 |
| 81. | PHD | $3,888.41 | |

#227479115_v2

**Exhibit C to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

**List Of Leases To Be Assumed**

| TENANT | STREET | APARTMENT |
|---|---|---|
| John Sullivan | 350 E 52nd St | 01C |
| Anastas Anastassov | 350 E 52nd St | 02A |
| Lilian Fernandes | 350 E 52nd St | 02B |
| Marcia Kaufman | 350 E 52nd St | 02C |
| Jenna Lanoil | 350 E 52nd St | 02D |
| Carolyn Feigan | 350 E 52nd St | 02E |
| Monica Passin | 350 E 52nd St | 02F |
| Jhon Smith | 350 E 52nd St | 02G |
| Xiaoli Xu | 350 E 52nd St | 02H |
| Zain Hasan | 350 E 52nd St | 02J |
| Aliza Iiano | 350 E 52nd St | 02K |
| Allison Witlow | 350 E 52nd St | 03A |
| Melissa Li | 350 E 52nd St | 03C |
| Alyssa Williamson | 350 E 52nd St | 03D |
| Mark Bluni | 350 E 52nd St | 03E |
| Samantha Diamond | 350 E 52nd St | 03F |
| Tommaso Degrezia | 350 E 52nd St | 03G |
| Joshua Kaston | 350 E 52nd St | 03H |
| Rachel Marcus | 350 E 52nd St | 03J |
| Stacey Simbal | 350 E 52nd St | 03K |
| Jennifer Puma | 350 E 52nd St | 04A |
| Makenna Pearsall | 350 E 52nd St | 04B |
| Ivan Daskalovski | 350 E 52nd St | 04C |
| Christopher Cassetta | 350 E 52nd St | 04D |
| Melissa Blankstein | 350 E 52nd St | 04E |
| Roxanne Rittberg | 350 E 52nd St | 04F |
| Nessa Obten | 350 E 52nd St | 04G |
| Phyllis Dubrow | 350 E 52nd St | 04H |
| Tommaso Degrezia | 350 E 52nd St | 04J |
| Sharon Rivera | 350 E 52nd St | 05A |
| Emilia Stevens | 350 E 52nd St | 05B |
| Hemantha Parvatharaj | 350 E 52nd St | 05C |
| Brian Bilsback | 350 E 52nd St | 05D |
| Kristin Francis | 350 E 52nd St | 05E |
| Robert Koeppel | 350 E 52nd St | 05F |
| Nancy Ng-Sharp | 350 E 52nd St | 05G |
| Jason & Diana Aptaker | 350 E 52nd St | 05H |
| Shaby Katz | 350 E 52nd St | 05J |
| Mostafa Khairy | 350 E 52nd St | 05K |
| Erica Aronow | 350 E 52nd St | 06A |
| Calvin Yoon | 350 E 52nd St | 06B |
| Les Haber | 350 E 52nd St | 06D |
| Carolina Bowe | 350 E 52nd St | 06E |
| Alisa Badiner | 350 E 52nd St | 06F |
| Kirk & Jennifer Swanson | 350 E 52nd St | 06G |
| Eliza Jacobi | 350 E 52nd St | 06H |
| Roqueline Lustosa-Sary | 350 E 52nd St | 06J |
| Julie Fuschetti | 350 E 52nd St | 06K |
| Karen Cohen | 350 E 52nd St | 07A |
| Caroline Bucca | 350 E 52nd St | 07B |
| Christina Ingram | 350 E 52nd St | 07C |

**Exhibit C**
## List Of Leases To Be Assumed

| | | |
|---|---|---|
| Doris Perlman | 350 E 52nd St | 07E |
| Gerald Cohen | 350 E 52nd St | 07F |
| Brian Kennedy | 350 E 52nd St | 07G |
| First Commerical Bank | 350 E 52nd St | 07J |
| Brian Coltrinai | 350 E 52nd St | 07k |
| Jasmine Louie | 350 E 52nd St | 08A |
| Joseph Schwartz | 350 E 52nd St | 08B |
| Darjan Hristov | 350 E 52nd St | 08C |
| Haley Nitzberg | 350 E 52nd St | 08D |
| Tessa Green | 350 E 52nd St | 08E |
| Diane Perla | 350 E 52nd St | 08F |
| Kimberly Gardner | 350 E 52nd St | 08G |
| Joan Dorbian | 350 E 52nd St | 08H |
| Seiko Mizutani | 350 E 52nd St | 08J |
| Robert Salvit | 350 E 52nd St | 08K |
| Shannon Gorman | 350 E 52nd St | 09A |
| Jack Malykin | 350 E 52nd St | 09B |
| Seth Bergey | 350 E 52nd St | 09C |
| Alessandra Bozzo | 350 E 52nd St | 09D |
| Dani Guglielmo | 350 E 52nd St | 09E |
| Michael Wiseman | 350 E 52nd St | 09F |
| Michaela Nicholas | 350 E 52nd St | 09G |
| Shayna Walter | 350 E 52nd St | 09H |
| Gabrielle Bass | 350 E 52nd St | 09J |
| Sany Marques | 350 E 52nd St | 09K |
| Maryanne McGrath | 350 E 52nd St | 10A |
| Vera Da Costa | 350 E 52nd St | 10C |
| Colleen Jones | 350 E 52nd St | 10D |
| Logan Brodsky | 350 E 52nd St | 10E |
| Joan Asher | 350 E 52nd St | 10F |
| Shannon Simnor | 350 E 52nd St | 10G |
| Gregory Linksman | 350 E 52nd St | 10H |
| Kelly Moran | 350 E 52nd St | 10J |
| Alexa Mandel III | 350 E 52nd St | 10K |
| Max Goldenberg | 350 E 52nd St | 11A |
| Shade Quailey | 350 E 52nd St | 11B |
| Hermes Ademovi-Super | 350 E 52nd St | 11C |
| Stephanie Nwosa | 350 E 52nd St | 11D |
| Friedeke Bastiaans | 350 E 52nd St | 11E |
| Joshua Small | 350 E 52nd St | 11F |
| Jared Kirschner | 350 E 52nd St | 11G |
| Paige Kriftcher | 350 E 52nd St | 11H |
| Francine Oro | 350 E 52nd St | 11J |
| Paul Callamaras | 350 E 52nd St | 11K |
| Samantha Sternschein | 350 E 52nd St | 12A |
| Laurence Hunter | 350 E 52nd St | 12B |
| Richard Rose | 350 E 52nd St | 12C |
| Amanda Cohn | 350 E 52nd St | 12D |
| Kaylee Reynolds | 350 E 52nd St | 12E |
| Alexa Shepherd | 350 E 52nd St | 12F |
| Anusha Basana | 350 E 52nd St | 12G |
| Laurie Cagnassola | 350 E 52nd St | 12H |

**Exhibit C**
**List Of Leases To Be Assumed**

| | | |
|---|---|---|
| Ron Ariel | 350 E 52nd St | 12J |
| Allison Komara | 350 E 52nd St | 12K |
| Tomas Santiago Radnic | 350 E 52nd St | 14A |
| Lihan Wen | 350 E 52nd St | 14B |
| Brandon Chu | 350 E 52nd St | 14C |
| Brittany Meyer | 350 E 52nd St | 14D |
| Sofia Tortora Morel | 350 E 52nd St | 14E |
| Nicholas Cinquina | 350 E 52nd St | 14F |
| Rebecca Wiener | 350 E 52nd St | 14G |
| Ai Hirakawa | 350 E 52nd St | 14H |
| Mariana Garcia | 350 E 52nd St | 14J |
| Sirine Sentissi | 350 E 52nd St | 14K |
| Kathleen Koprswski | 350 E 52nd St | 15A |
| Scott Switzer | 350 E 52nd St | 15B |
| Mikala Zonsius | 350 E 52nd St | 15E |
| Roshan Padaki | 350 E 52nd St | 15G |
| Jack & Maria Torffield | 350 E 52nd St | 15H |
| Jamal Syed | 350 E 52nd St | 15J |
| Mindy Klau | 350 E 52nd St | 15K |
| Support Parking | 350 E 52nd St | GARAGE |
| Tibor Ardai | 350 E 52nd St | PHA |
| Jena Davidson | 350 E 52nd St | PHB |
| Kenneth Keenaghan | 350 E 52nd St | PHC |
| Andrew Fernandes | 350 E 52nd St | PHD |
| Mumbah Style Pizza | 350 E 52nd St | ST1 |
| 939 Mitchel Market | 350 E 52nd St | ST3 |
| 937 First Avenue Food Corp. | 350 E 52nd St | ST4 |

**Exhibit D to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

**Cure Amounts**

**These Cure Amounts represent the amount of tenant security deposits to be restored upon assumption of each lease**

| TENANT | STREET | APARTMENT | CURE AMOUNT |
| --- | --- | --- | --- |
| John Sullivan | 350 E 52nd St | 01C | $3,100.00 |
| Anastas Anastassov | 350 E 52nd St | 02A | $2,400.00 |
| Lilian Fernandes | 350 E 52nd St | 02B | $2,400.00 |
| Marcia Kaufman | 350 E 52nd St | 02C | $1,481.58 |
| Jenna Lanoil | 350 E 52nd St | 02D | $5,000.00 |
| Carolyn Feigan | 350 E 52nd St | 02E | $3,200.00 |
| Monica Passin | 350 E 52nd St | 02F | $1,487.54 |
| Jhon Smith | 350 E 52nd St | 02G | $7,000.00 |
| Xiaoli Xu | 350 E 52nd St | 02H | $1,975.00 |
| Zain Hasan | 350 E 52nd St | 02J | $2,625.00 |
| Aliza Iiano | 350 E 52nd St | 02K | $3,300.00 |
| Allison Witlow | 350 E 52nd St | 03A | $1,800.00 |
| Melissa Li | 350 E 52nd St | 03C | $2,900.00 |
| Alyssa Williamson | 350 E 52nd St | 03D | $4,250.00 |
| Mark Bluni | 350 E 52nd St | 03E | $3,200.00 |
| Samantha Diamond | 350 E 52nd St | 03F | $2,740.75 |
| Tommaso Degrezia | 350 E 52nd St | 03G | $4,200.00 |
| Joshua Kaston | 350 E 52nd St | 03H | $2,075.00 |
| Rachel Marcus | 350 E 52nd St | 03J | $2,800.00 |
| Stacey Simbal | 350 E 52nd St | 03K | $2,700.00 |
| Jennifer Puma | 350 E 52nd St | 04A | $1,825.00 |
| Makenna Pearsall | 350 E 52nd St | 04B | $2,538.04 |
| Ivan Daskalovski | 350 E 52nd St | 04C | $2,200.00 |
| Christopher Cassetta | 350 E 52nd St | 04D | $3,200.00 |
| Melissa Blankstein | 350 E 52nd St | 04E | $2,990.95 |
| Roxanne Rittberg | 350 E 52nd St | 04F | $960.85 |
| Nessa Obten | 350 E 52nd St | 04G | $3,257.30 |
| Phyllis Dubrow | 350 E 52nd St | 04H | $1,464.92 |
| Tommaso Degrezia | 350 E 52nd St | 04J | $1,900.00 |
| Sharon Rivera | 350 E 52nd St | 05A | $2,825.00 |
| Emilia Stevens | 350 E 52nd St | 05B | $2,675.00 |
| Hemantha Parvatharaj | 350 E 52nd St | 05C | $3,350.00 |
| Brian Bilsback | 350 E 52nd St | 05D | $3,450.00 |
| Kristin Francis | 350 E 52nd St | 05E | $2,820.00 |
| Robert Koeppel | 350 E 52nd St | 05F | $1,379.88 |
| Nancy Ng-Sharp | 350 E 52nd St | 05G | $4,000.00 |
| Jason & Diana Aptaker | 350 E 52nd St | 05H | $2,225.00 |
| Shaby Katz | 350 E 52nd St | 05J | $1,900.00 |
| Mostafa Khairy | 350 E 52nd St | 05K | $4,750.00 |
| Erica Aronow | 350 E 52nd St | 06A | $2,533.10 |
| Calvin Yoon | 350 E 52nd St | 06B | $2,598.10 |
| Les Haber | 350 E 52nd St | 06D | $2,301.23 |
| Carolina Bowe | 350 E 52nd St | 06E | $2,669.50 |
| Alisa Badiner | 350 E 52nd St | 06F | $2,100.00 |
| Kirk & Jennifer Swanson | 350 E 52nd St | 06G | $4,200.00 |
| Eliza Jacobi | 350 E 52nd St | 06H | $2,430.00 |
| Roqueline Lustosa-Sary | 350 E 52nd St | 06J | $2,350.00 |
| Julie Fuschetti | 350 E 52nd St | 06K | $3,207.68 |
| Karen Cohen | 350 E 52nd St | 07A | $1,706.91 |

**Exhibit D**

**Cure Amounts**

**These Cure Amounts represent the amount of tenant security deposits to be restored upon assumption of each lease**

| | | | |
|---|---|---|---|
| Caroline Bucca | 350 E 52nd St | 07B | $1,205.47 |
| Christina Ingram | 350 E 52nd St | 07C | $2,400.00 |
| Doris Perlman | 350 E 52nd St | 07E | $1,116.60 |
| Gerald Cohen | 350 E 52nd St | 07F | $2,325.00 |
| Brian Kennedy | 350 E 52nd St | 07G | $3,800.00 |
| First Commerical Bank | 350 E 52nd St | 07J | $1,957.39 |
| Brian Coltrinai | 350 E 52nd St | 07k | $2,900.00 |
| Jasmine Louie | 350 E 52nd St | 08A | $2,019.17 |
| Joseph Schwartz | 350 E 52nd St | 08B | $1,820.83 |
| Darjan Hristov | 350 E 52nd St | 08C | $2,200.00 |
| Haley Nitzberg | 350 E 52nd St | 08D | $4,600.00 |
| Tessa Green | 350 E 52nd St | 08E | $2,650.00 |
| Diane Perla | 350 E 52nd St | 08F | $1,328.68 |
| Kimberly Gardner | 350 E 52nd St | 08G | $5,500.00 |
| Joan Dorbian | 350 E 52nd St | 08H | $1,395.01 |
| Seiko Mizutani | 350 E 52nd St | 08J | $2,280.00 |
| Robert Salvit | 350 E 52nd St | 08K | $2,900.00 |
| Shannon Gorman | 350 E 52nd St | 09A | $2,625.00 |
| Jack Malykin | 350 E 52nd St | 09B | $868.28 |
| Seth Bergey | 350 E 52nd St | 09C | $3,700.00 |
| Alessandra Bozzo | 350 E 52nd St | 09D | $2,750.00 |
| Dani Guglielmo | 350 E 52nd St | 09E | $2,587.31 |
| Michael Wiseman | 350 E 52nd St | 09F | $3,200.00 |
| Michaela Nicholas | 350 E 52nd St | 09G | $5,625.00 |
| Shayna Walter | 350 E 52nd St | 09H | $2,150.00 |
| Gabrielle Bass | 350 E 52nd St | 09J | $876.96 |
| Sany Marques | 350 E 52nd St | 09K | $3,145.00 |
| Maryanne McGrath | 350 E 52nd St | 10A | $2,255.00 |
| Idamarie Pennolin Pennolino | 350 E 52nd St | 10A | $1,208.24 |
| Vera Da Costa | 350 E 52nd St | 10C | $1,355.34 |
| Colleen Jones | 350 E 52nd St | 10D | $2,999.96 |
| Logan Brodsky | 350 E 52nd St | 10E | $2,550.00 |
| Joan Asher | 350 E 52nd St | 10F | $1,039.82 |
| Shannon Simnor | 350 E 52nd St | 10G | $4,850.00 |
| Gregory Linksman | 350 E 52nd St | 10H | $2,309.76 |
| Kelly Moran | 350 E 52nd St | 10J | $1,194.41 |
| Alexa Mandel III | 350 E 52nd St | 10K | $5,500.00 |
| Max Goldenberg | 350 E 52nd St | 11A | $2,478.55 |
| Shade Quailey | 350 E 52nd St | 11B | $2,050.00 |
| Hermes Ademovi-Super | 350 E 52nd St | 11C | $0.00 |
| Stephanie Nwosa | 350 E 52nd St | 11D | $3,200.00 |
| Friedeke Bastiaans | 350 E 52nd St | 11E | $1,375.28 |
| Joshua Small | 350 E 52nd St | 11F | $3,210.34 |
| Jared Kirschner | 350 E 52nd St | 11G | $2,389.61 |
| Paige Kriftcher | 350 E 52nd St | 11H | $2,663.24 |
| Francine Oro | 350 E 52nd St | 11J | $1,138.02 |
| Paul Callamaras | 350 E 52nd St | 11K | $2,860.38 |
| Samantha Sternschein | 350 E 52nd St | 12A | $2,557.80 |
| Laurence Hunter | 350 E 52nd St | 12B | $1,576.22 |
| Richard Rose | 350 E 52nd St | 12C | $3,000.00 |

**Exhibit D**
**Cure Amounts**
**These Cure Amounts represent the amount of tenant security deposits to be restored upon assumption of each lease**

| | | | |
|---|---|---|---|
| Amanda Cohn | 350 E 52nd St | 12D | $1,410.57 |
| Kaylee Reynolds | 350 E 52nd St | 12E | $1,750.00 |
| Alexa Shepherd | 350 E 52nd St | 12F | $3,300.00 |
| Anusha Basana | 350 E 52nd St | 12G | $6,400.00 |
| Laurie Cagnassola | 350 E 52nd St | 12H | $4,200.00 |
| Ron Ariel | 350 E 52nd St | 12J | $2,000.00 |
| Allison Komara | 350 E 52nd St | 12K | $5,300.00 |
| Tomas Santiago Radnic | 350 E 52nd St | 14A | $2,500.00 |
| Lihan Wen | 350 E 52nd St | 14B | $2,013.83 |
| Brandon Chu | 350 E 52nd St | 14C | $2,500.00 |
| Brittany Meyer | 350 E 52nd St | 14D | $3,500.00 |
| Sofia Tortora Morel | 350 E 52nd St | 14E | $2,300.00 |
| Nicholas Cinquina | 350 E 52nd St | 14F | $2,599.87 |
| Rebecca Wiener | 350 E 52nd St | 14G | $3,700.00 |
| Ai Hirakawa | 350 E 52nd St | 14H | $2,850.00 |
| Mariana Garcia | 350 E 52nd St | 14J | $2,500.00 |
| Sirine Sentissi | 350 E 52nd St | 14K | $2,800.00 |
| Kathleen Koprswski | 350 E 52nd St | 15A | $3,300.00 |
| Scott Switzer | 350 E 52nd St | 15B | $2,950.00 |
| Mikala Zonsius | 350 E 52nd St | 15E | $3,600.00 |
| Roshan Padaki | 350 E 52nd St | 15G | $5,000.00 |
| Jack & Maria Torffield | 350 E 52nd St | 15H | $1,245.71 |
| Jamal Syed | 350 E 52nd St | 15J | $834.88 |
| Mindy Klau | 350 E 52nd St | 15K | $3,039.43 |
| Support Parking | 350 E 52nd St | GARAGE | $0.00 |
| Tibor Ardai | 350 E 52nd St | PHA | $3,003.26 |
| Jena Davidson | 350 E 52nd St | PHB | $4,600.00 |
| Kenneth Keenaghan | 350 E 52nd St | PHC | $3,500.00 |
| Andrew Fernandes | 350 E 52nd St | PHD | $4,500.00 |
| Mumbah Style Pizza | 350 E 52nd St | ST1 | $60,000.00 |
| 939 Mitchel Market | 350 E 52nd St | ST3 | $11,200.00 |
| 937 First Avenue Food Corp. | 350 E 52nd St | ST4 | $37,500.00 |