HOLLAND & KNIGHT LLP
Bruce J. Zabarauskas, Esq.
Vivian M. Arias, Esq.
31 West 52nd Street
New York, New York 10019
(212) 751-3001
bruce.zabarauskas@hklaw.com
vivian.arias@hklaw.com
Attorneys for Barclays Bank PLC


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------- X
                                              :

In re                                     :         Chapter 11

EASTGATE WHITEHOUSE, LLC,      :         Case No. 22-22635-SHL
                                              :
                Debtor.            :
                                              :
--------------------------------------------------- X

**DISCLOSURE STATEMENT CONCERNING BARCLAYS
BANK PLC'S CHAPTER 11 LIQUIDATING PLAN FOR THE DEBTOR**


**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF
THE PLAN. ACCEPTANCES OR REJECTIONS
MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS
BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT
IS BEING SUBMITTED FOR CONDITIONAL APPROVAL BUT HAS NOT
YET BEEN APPROVED BY THE COURT**


Dated:      New York, New York
               November 17, 2023

## TABLE OF CONTENTS

<div align="right">**Page**</div>

I.     INTRODUCTION, PURPOSE OF THIS DISCLOSURE STATEMENT AND
       NOTICE OF HEARING ...............................................................................1

II.    EXPLANATION OF CHAPTER 11 AND THE PLAN CONFIRMATION PROCESS .....3

       A.    Impairment And Voting On A Plan...................................................................3

       B.    Requirements For Confirmation Of A Plan.......................................................4

       C.    Confirmation Without The Acceptance Of All Voting Classes ..................5

III.   VOTING PROCEDURES AND REQUIREMENTS FOR THE SECURED LENDER
       PLAN .......................................................................................................6

       A.    Who May Vote ..................................................................................................6

       B.    Voting Instructions and Voting Deadline ........................................................6

       C.    Change of Vote .................................................................................................7

       D.    Miscellaneous ...................................................................................................7

IV.    DESCRIPTION OF THE DEBTOR, ITS PROPERTY AND OPERATIONS ...................8

       A.    The Debtor And Its Business ............................................................................8

       B.    The Loan ...........................................................................................................8

       C.    The Debtor's Defaults Under The Loan ...........................................................9

       D.    The Foreclosure Action And Debtor's Bankruptcy Filing .........................10

       E.    The Class Action Lawsuit...............................................................................10

       F.    Activities During The Debtor's Bankruptcy Case.........................................11

             (1)   The Partial Lifting Of The Automatic Stay In The Class Action Lawsuit
                   And The New York Court Of Appeals Reversal Of The Summary Judgment
                   Order ......................................................................................................11
             (2)   The Secured Lender's Mediation With The Class Action Representatives......12
             (3)   The Class Action Settlement Agreement And The Secured Lender Plan
                   Support Agreement Between The Secured Lender And The Class Action
                   Representatives .....................................................................................12
             (4)   The Class Action Members Claims ......................................................15
             (5)   The Debtor's Use Of Cash Collateral, The Improper Koeppel Payments
                   And The Change Of The Debtor's Managing Agent .........................15
             (6)   The Assumption Of The Ground Lease ................................................17
             (7)   The Settlement And Payment Of Mechanic's Liens And Judgment Liens
                   On The Property.....................................................................................18
             (8)   The Protective Advance Motion ...........................................................18
             (9)   The Indemnification Adversary Proceeding ........................................19
             (10)  The Debtor Plan ....................................................................................20

<div align="center">i</div>

(11) The Filing Of The Secured Lender Plan And Disclosure Statement, And
Conditional Approval Of The Disclosure Statement ........................................20

V.   DESCRIPTION OF THE SECURED LENDER PLAN.....................................................20

A.   Overview of the Secured Lender Plan ........................................................................20

B.   Treatment of Allowed Administrative Claims and Allowed Priority Claims under
the Secured Lender Plan .............................................................................................21

C.   The Classification Of Claims And Interests Under The Secured Lender Plan...........22

D.   The Treatment Of Classified Claims and Interests under the Secured Lender Plan
.......................................................................................................................................23

(1) The Class 1 Allowed Claim – Secured Lender Allowed Secured Claim..........23
(2) Class 2 Claim – The Estate Of William W. Koeppel Secured Claim ...............24
(3) Class 3 Claims – All Allowed Secured Claims against the Debtor, that are
not Class 1 Claims or Class 2 Claims ..............................................................25
(4) Class 4 Claims – Class Action Members' Unsecured Claims ..........................25
(5) Class 5 Claims – General Unsecured Claims, Except For The Class Action
Members' Unsecured Claims and Subordinated General Unsecured Claims
.............................................................................................................................26
(6) Class 6 Claims – Subordinated General Unsecured Claims ............................27
(7) Class 7 Interests – The Interests in the Debtor................................................28

E.   The Treatment Of Unexpired Leases And Executory Contracts Under the Secured
Lender Plan .................................................................................................................28

F.   The Treatment Of Disputed Claims And Objections to Claims Under The Secured
Lender Plan.................................................................................................................30

(1) Treatment Of Disputed Claims In Class 2 and Class 3 ...................................30
(2) Treatment Of Disputed Claims In Class 4 ......................................................31
(3) Right To Seek Estimation Of Claims...............................................................31
(4) Deadline To File Claim Objections.................................................................31

G.   Distributions To Creditors Under The Secured Lender Plan......................................31

(1) Plan Administrator To Act As Disbursing Agent Except With Respect To
Class 4 Claims..................................................................................................31
(2) Distribution Record Date ...............................................................................31
(3) Execution of Rights and Powers of the Plan Administrator As Disbursing
Agent.................................................................................................................31
(4) Unclaimed Property .......................................................................................32
(5) Setoff and Recoupment ...................................................................................32

H.   Means Of Implementing The Secured Lender Plan ...................................................32

(1) Description of Means For Implementing The Secured Lender Plan.................32
(2) Post-Confirmation Management Of The Debtor And Its Property...................32
(3) The Class Action Settlement............................................................................33
(4) The Sale...........................................................................................................34
(5) Purchase and Sale Agreement........................................................................34

|   | (6) | Sale Motion | 34 |
|---|---|---|---|
|   | (7) | Transfer of the Sale Assets to the Secured Lender In Lieu Of Sale | 34 |
|   | (8) | Free and Clear Sale or Transfer | 35 |
|   | (9) | Cancellation of Liens | 35 |
|   | (10) | "As Is Where Is" | 35 |
|   | (11) | Exemption From Taxes | 35 |
|   | (12) | Funding of Class Action Settlement Amount | 36 |
|   | (13) | Funding of Reserves | 36 |
|   | (14) | Restoration of Tenant Security Deposits | 37 |
|   | (15) | Return of Excess Reserve Funds | 37 |
|   | (16) | Plan Administrator Compensation | 37 |
|   | (17) | Effectuating Documents; Further Transactions | 37 |
|   | (18) | Closing of Bankruptcy Case | 37 |
|   | (19) | Injunctions And Exculpation | 37 |

| I. | The Effective Date And Binding Effect Of The Plan Upon Confirmations | 38 |
|---|---|---|
| J. | Modification Of The Plan And Substantial Consummation | 38 |

| VI. | RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT | 39 |
|---|---|---|
| VII. | RELEVANT FINANCIAL INFORMATION | 39 |
| VIII. | LITIGATION CLAIMS WHICH SURVIVE PLAN CONFIRMATION | 39 |
| IX. | INJUNCTIONS, EXCULPATION AND LIMITATION OF LIABILITY AND RELEASES OF CLAIMS PROVISIONS OF THE PLAN | 40 |

| A. | Injunctions | 40 |
|---|---|---|
| B. | Exculpation Provisions | 40 |
| C. | Release Provisions | 41 |

| X. | RISKS FACTORS TO BE CONSIDERED | 42 |
|---|---|---|
| A. | Risk of Non-Confirmation of the Secured Lender Plan | 42 |
| B. | Risk Of Confirmation Of An Alternate Plan | 43 |
| C. | Risk Of Conversion Of Bankruptcy Case From Chapter 11 To Chapter 7 | 43 |
| D. | Risk Of Dismissal Of Bankruptcy Case | 43 |
| E. | Risk Of Non-Occurrence Of Substantial Consummation Of The Plan | 43 |
| F. | Risks That Allowed Claims May Be Greater Than Projected | 44 |
| G. | Risks Associated With The Litigation Claims | 44 |
| H. | No Duty to Update This Disclosure Statement | 44 |
| I. | No Representations Outside This Disclosure Statement Are Authorized | 44 |
| J. | No Legal or Tax Advice Is Provided by this Disclosure Statement | 44 |
| K. | No Admissions Made | 45 |

| XI. | ALTERNATIVES TO THE PROPOSED SECURED LENDER PLAN | 45 |
|---|---|---|
| A. | Alternative Plan of Reorganization | 45 |
| B. | Sale Under Section 363 of the Bankruptcy Code | 45 |
| C. | Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law | 46 |
| D. | Dismissal of the Debtor's Bankruptcy Case | 46 |

XII.   THE CONFIRMATION HEARING ...................................................................................46

    A.    The Confirmation Hearing And Hearing On Final Approval Of This Disclosure Statement  46

    B.    Objection Deadline To Confirmation Of The Secured Lender Plan Or Final Approval Of This Disclosure Statement ................................................. 46

XIII.  CONFIRMATION IN THE ABSENCE OF ACCEPTANCE BY ALL CLASSES OF CLAIMS AND INTERESTS .............................................................................................47

    A.    Acceptance By At Least One Impaired Class Of Claims, Not Including The Votes Of Insiders .................................................................................. 48

    B.    The Fair And Equitable Requirement ................................................. 48

    C.    The Unfair Discrimination Requirement............................................. 48

XIV.   LIQUIDATION ANALYSIS AND BEST INTEREST....................................................49

XV.    CREDITORS' COMMITTEE.........................................................................................49

XVI.   CONCLUSION ..............................................................................................................49

## EXHIBITS

Exhibit 1 -   Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor

Exhibit 2 -   New York Court Of Appeals' Decision, Dated March 16, 2023

Exhibit 3 -   Liquidation Analysis Of The Debtor

Exhibit 4 – Debtors' Schedules Of Assets And Liabilities And Statement Of Financial Affairs Filed With The Bankruptcy Court

Exhibit 5 -   Post-Petition Income Statement Of The Debtor, Derived From Its Monthly Operating Reports Filed With The Bankruptcy Court

HOLLAND & KNIGHT LLP
Bruce J. Zabarauskas, Esq.
Vivian M. Arias, Esq.
31 West 52nd Street
New York, New York 10019
(212) 751-3001
bruce.zabarauskas@hklaw.com
vivian.arias@hklaw.com
Attorneys for Barclays Bank PLC


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------- X
                                    :

In re                              :        Chapter 11
                                     :

EASTGATE WHITEHOUSE, LLC,  :        Case No. 22-22635-SHL
                                     :

             Debtor.           :
                                     :
--------------------------------------------------- X

### DISCLOSURE STATEMENT CONCERNING BARCLAYS BANK PLC'S CHAPTER 11 LIQUIDATING PLAN FOR THE DEBTOR

      Barclays Bank PLC ("Barclays" or "Secured Lender"), a secured creditor in this Chapter 11 case, submits this disclosure statement (the "Disclosure Statement") to all of the Debtor's known creditors and other parties in interest pursuant to 11 U.S.C. Section 1125.

### I.      INTRODUCTION, PURPOSE OF THIS DISCLOSURE STATEMENT AND NOTICE OF HEARING

      On August 19, 2022 (the "Petition Date"), the Debtor commenced a voluntary case (the "Bankruptcy Case") under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This Disclosure Statement is being provided to all of the Debtor's known creditors and other parties in interest in order to provide information material and necessary to enable such creditors and parties in interest to make a reasonably informed decision in the exercise of their rights to vote on the Chapter 11 liquidating plan for the Debtor, which was filed by the Secured Lender (the "Secured Lender Plan"). A copy of the Secured Lender Plan is attached hereto as Exhibit 1. Capitalized terms which are not defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Secured Lender Plan. Creditors and interest holders are urged to review all terms and provisions thereof with their attorneys.

      **THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON FINANCIAL AND OTHER INFORMATION DEVELOPED BY THE**

1

**SECURED LENDER FROM: (i) INFORMATION OBTAINED OR MAINTAINED BY THE DEBTOR AND SECURED LENDER; AND (ii) PLEADINGS AND DOCUMENTS FILED IN THIS CHAPTER 11 CASE AND THE CLASS ACTION LAWSUIT (AS HEREAFTER DEFINED). IT HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT OR INDEPENDENT REVIEW. ACCORDINGLY, THE SECURED LENDER IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY OR IS COMPLETE, ALTHOUGH IT HAS REASONABLY ENDEAVORED TO OBTAIN AND SUPPLY ALL MATERIAL INFORMATION. NO REPRESENTATIONS CONCERNING THE DEBTOR, THE SECURED LENDER OR OTHERWISE ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**BY ORDER DATED NOVEMBER ___, 2023, THE BANKRUPTCY COURT CONDITIONALLY APPROVED THIS DISCLOSURE STATEMENT AND AUTHORIZED THE SECURED LENDER TO SOLICIT VOTES ON THE SECURED LENDER PLAN FROM HOLDERS OF CLAIMS AND INTERESTS WHICH ARE DESIGNATED AS IMPAIRED UNDER THE SECURED LENDER PLAN.**

**THE BANKRUPTCY COURT HAS SET DECEMBER ___, 2023 AT __:__ A.M. OF THAT DAY AS THE DATE AND TIME OF THE HEARING ON FINAL APPROVAL OF THIS DISCLOSURE STATEMENT AND CONFIRMATION OF THE SECURED LENDER PLAN AND OBJECTIONS THERETO, WHICH HEARING WILL BE HELD IN PERSON BEFORE THE HONORABLE SEAN H. LANE IN THE UNITED STATES BANKRUPTCY COURT, 300 QUARROPAS STREET, WHITE PLAINS, NEW YORK 10601. CREDITORS OF, AND HOLDERS OF INTERESTS IN, THE DEBTOR MAY ATTEND SUCH HEARING. THE BANKRUPTCY COURT HAS FIXED DECEMBER __, 2023 AT 5:00 P.M. AS THE DATE AND TIME BY WHICH ALL WRITTEN OBJECTIONS TO CONFIRMATION OF THE SECURED LENDER PLAN SHALL BE FILED WITH THE BANKRUPTCY COURT AND SERVED UPON THE ATTORNEYS FOR THE SECURED LENDER, THE DEBTOR, AND UPON THE UNITED STATES TRUSTEE.**

**A BALLOT ACCOMPANIES THIS DISCLOSURE STATEMENT FOR YOUR USE IN VOTING ON THE SECURED LENDER PLAN. IN ORDER TO BE CONFIRMED, THE SECURED LENDER PLAN MUST BE ACCEPTED BY A MAJORITY IN NUMBER AND TWO-THIRDS IN AMOUNT OF THOSE VOTING IN EACH CLASS IMPAIRED UNDER THE SECURED LENDER PLAN, EXCEPT TO THE EXTENT THAT THE SECURED LENDER PLAN MAY BE CONFIRMED NOTWITHSTANDING THE FAILURE TO OBTAIN SUCH ACCEPTANCE IN ACCORDANCE WITH SECTION 1129(b) OF THE BANKRUPTCY CODE.**

**YOU ARE URGED TO REVIEW THE SECURED LENDER PLAN, THIS DISCLOSURE STATEMENT, AND THE ENCLOSED BALLOT WITH COUNSEL OF YOUR CHOICE. HOLDERS OF CLAIMS OR INTERESTS WHICH ARE IMPAIRED UNDER THE SECURED LENDER PLAN MAY VOTE TO ACCEPT OR REJECT THE SECURED LENDER PLAN BY COMPLETING AND RETURNING THE ENCLOSED BALLOT SO AS TO BE RECEIVED ON OR BEFORE DECEMBER __, 2023 AT 5:00 P.M.**

**BY THE NOTICING AND BALLOTING AGENT - DONLIN RECANO & COMPANY, INC. AT THE ADDRESS SET FORTH BELOW:**

| If by First-Class Mail: | If by Hand Delivery or Overnight Mail: |
|---|---|
| Donlin, Recano & Company, Inc.<br>Re: Eastgate Whitehouse LLC<br>P.O. Box 2053<br>New York, NY 10272-2042 | Donlin, Recano & Company, Inc.<br>c/o Equiniti<br>Attn: Voting Department<br>48 Wall Street, 22nd Floor<br>New York, NY 10005 |

**THE SECURED LENDER RECOMMENDS AND REQUESTS YOUR ACCEPTANCE OF THE SECURED LENDER PLAN.**

## II.   EXPLANATION OF CHAPTER 11 AND THE PLAN CONFIRMATION PROCESS

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor's business may be reorganized or liquidated for the benefit of creditors and interest holders. Formulation of a plan of reorganization is the principal purpose of a Chapter 11 bankruptcy case. A plan sets forth the means for satisfying claims against and interests in the debtor. After a plan has been filed, and a disclosure statement has been approved, either conditionally (as in this case) or on a final basis, the plan and disclosure statement are sent to creditors and interest holders, and holders of all claims and interests who are impaired under the plan may vote to accept or reject the plan.  After the conclusion of voting on the plan, the proponent of the plan will seek confirmation of the plan by the bankruptcy court.  Confirmation, which constitutes bankruptcy court approval of the plan, makes the plan binding upon the debtor and all claimants, and interest holders and other parties-in-interest, regardless of whether they have voted to accept the plan.

In this case, the Secured Lender is the proponent of the Secured Lender Plan, and the Secured Lender seeks confirmation of the Secured Lender Plan by the Bankruptcy Court.

### A.   Impairment And Voting On A Plan

Under a plan, all claims against, and interests in, the debtor (except for administrative and priority claims) are placed in classes. Holders of claims and interests in classes which are "impaired" under the plan are entitled to vote to accept or reject the plan.

A class of claims or interests under a plan is impaired unless the plan:

(A)    leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(B)    reinstates a previously accelerated claim by (a) curing any prepetition defaults (other than a default under Section 365(b)(2) of the Bankruptcy Code), (b) reinstating the maturity of such claim as it existed prior to default, (c) compensating the holder of such claim for damages incurred as a result of

reliance on a contractual acceleration provision or similar applicable law, and (d) not otherwise altering the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### B.    Requirements For Confirmation Of A Plan

A plan may be confirmed only if:

(i)     it is accepted by each impaired class, or (b) it is accepted by at least one impaired class (without counting the votes of "insiders," as defined in the Bankruptcy Code), and the Bankruptcy Court determines that the plan is "fair and equitable" to, and does not "unfairly discriminate against, all rejecting classes of claims and interests; and

(ii)    the plan meets all of the other legal requirements for confirmation.

A class of claims accepts a plan if a majority in number and at least two-thirds in dollar amount of the claims that have voted in that class have timely voted in favor of the plan. A class of interests accepts the plan if at least two-thirds of those interests that have voted have timely voted in favor of the plan. A class of claims or interests which is not impaired under a plan is conclusively deemed to have accepted the plan and is not entitled to vote on the plan.

In addition to the foregoing voting requirements, the Bankruptcy Code sets forth numerous other requirements for confirmation of a plan. These requirements include:

(i)     The plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

(iii)   The plan has been proposed in good faith and not by any means forbidden by law;

(iv)    Any payment made or promised by the plan proponent, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable;

(v)     The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy, and the proponent of the plan has disclosed the identity of any insider that will be employed or retained post-confirmation by the debtor, and the nature of any compensation for such insider;

(vi)    With respect to each impaired class of claims or interests: (i) each holder of a claim or interest of such class has (A) accepted the plan or (B) will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests Test");

(vii)   Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that: (a) holders of administrative and priority claims (except for certain tax claims) will be paid for in full on the effective date of the plan; and (b) with respect to certain priority tax claims each holder of such claim of such class will receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim;

(viii)  If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class;

(ix)    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan; and

(x)     All fees payable to the office of the United States Trustee under 28 U.S.C. Section 1930 will be paid in full on the effective date of the plan.

## C.    <u>Confirmation Without The Acceptance Of All Voting Classes</u>

In the event that any impaired class of claims or interests does not vote to accept the plan, the court may still confirm a plan so long as all other requirements for plan confirmation have been satisfied and the plan is "fair and equitable" to, and does not "unfairly discriminate" against, any class of claims or interests that has voted to reject the plan.

The fair and equitable standard incorporates what is generally known as the "absolute priority rule," which prohibits a class of claims or interests junior in priority to a dissenting class of claims from receiving any distribution on its claims unless all claims in the dissenting class are paid in full.

A plan does not discriminate unfairly against a dissenting class of claims, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those members of the dissenting class. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

### III.    VOTING PROCEDURES AND REQUIREMENTS FOR THE SECURED LENDER PLAN

Before voting to accept or reject the Secured Lender Plan filed by the Secured Lender in this case, all holders of Claims and Interests in the impaired classes should carefully review this Disclosure Statement and the Secured Lender Plan attached hereto as Exhibit 1. All descriptions of the Secured Lender Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Secured Lender Plan.

#### A.    Who May Vote

Holders of Claims or Interests in the following classes (the "Impaired Classes") under the Secured Lender Plan are entitled to vote on the Secured Lender Plan: (i) Class 1 – the Secured Lender Allowed Secured Claim; (ii) Class 2 - Estate Of William W. Koeppel Secured Claim ; (iii) Class 3 - All Secured Claims against the Debtor, that are not a Class 1 Claim or Class 2 Claim; (iv) Class 4 – Class Action Members' Unsecured Claims; (v) Class 5 – General Unsecured Claims against the Debtor, except for the Class Action Members' Unsecured Claims and Subordinated General Unsecured Claims; (vi) Class 6 – Subordinated General Unsecured Claims; and (vii) Class 7 – Interests in the Debtor.

#### B.    Voting Instructions and Voting Deadline

The Secured Lender is providing copies of this Disclosure Statement,  along with a copy of the Secured Lender Plan (with exhibits), a notice of the combined hearing on final approval of this Disclosure Statement and confirmation of the Secured Lender Plan, the Ballot, and counsel to the Class Action Representatives' statement in support of the Plan (collectively, a "Solicitation Package") to all record holders of Claims and Interests in the Impaired Classes.

The Solicitation Package includes a ballot through which holders of Claims and Interests in Impaired Classes will be authorized to vote on the Secured Lender Plan, and permitted to opt not to grant certain releases set forth in the Secured Lender Plan.

**Each ballot contains detailed voting instructions. Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Secured Lender Plan, and the record date for voting purposes. The record date for determining which holders are entitled to vote on the Secured Lender Plan is October 31, 2023. Please complete the information requested on the ballot, sign, date and indicate your vote on the ballot, and return the completed ballot in the manner specified on the ballot you received.**

**FOR YOUR VOTE TO BE COUNTED, AND ANY OPT OUT FROM THE RELEASES PROVIDED UNDER THE SECURED LENDER PLAN TO BE ENFORCEABLE, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICING AND BALLOTING AGENT NO LATER THAN DECEMBER ___, 2023 at 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE").**

**ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE SECURED LENDER**

**PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE
SECURED LENDER PLAN WILL NOT BE COUNTED IN DETERMINING
ACCEPTANCE OF THE SECURED LENDER PLAN.**

If you hold a Claim or Interest in an Impaired Class and you did not receive a ballot,
received a damaged ballot, or lost your ballot, or if you have any questions concerning the
procedures for voting on the Secured Lender Plan contact counsel for the Secured Lender by
emailing bruce.zabarauskas@hklaw.com.

Claims or Interests which are the subject of a pending objection may not vote on the
Secured Lender Plan unless such Claimant or Interest holder files a motion with the Bankruptcy
Court seeking temporary allowance of such Claim or Interest for voting purposes, <u>and</u> such motion
is granted by the Bankruptcy Court prior to the hearing on confirmation of the Secured Lender
Plan.

For a detailed description of the treatment of Claims and Interests under the Secured Lender
Plan, see Article V of this Disclosure Statement, and Article V of the Secured Lender Plan.

### C.    <u>Change of Vote</u>

Any holder of a Claim or Interest who has previously submitted prior to the Voting
Deadline a properly completed ballot may revoke such ballot and change its vote by submitting
prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection
of the Secured Lender Plan.

### D.    <u>Miscellaneous</u>

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and
timely received, but on which a vote to accept or reject the Secured Lender Plan has not been
indicated, will not be counted in determining acceptance or rejection of the Secured Lender Plan.
If you return more than one ballot voting different Claims with the ballots reflecting different
votes, and you do not correct this before the Voting Deadline, those ballots will not be counted.
An otherwise properly executed ballot that attempts to partially accept and partially reject the
Secured Lender Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances
have been received, only holders of Allowed Claims and Interests in Impaired Classes who actually
vote will be counted. The failure of a holder of an Allowed Claim or Interest in such classes to
deliver a duly executed ballot will be deemed to constitute an abstention by such holder with
respect to voting on the Secured Lender Plan and such abstentions will not be counted as votes for
or against the Secured Lender Plan.

## IV.    DESCRIPTION OF THE DEBTOR, ITS PROPERTY AND OPERATIONS

### A.    The Debtor And Its Business

The Debtor is a Delaware limited liability company which was formed on August 7, 2014. The sole member of the Debtor is Whitehouse Estates, Inc. ("WEI"), whose sole shareholder is William W. Koeppel ("Koeppel").

The Debtor's sole substantial asset is its interest as the tenant under a ground lease (the "Ground Lease") and owner of the improvements located at 939 First Avenue (a/k/a 350 East 52nd Street), New York, New York 10022 (the "Property"). The current ground lessor under the Ground Lease and owner of the fee interest in the Property is 939 First Avenue LLC (the "Ground Lessor"). The Property is a mixed use commercial/multifamily residential building consisting of five (5) commercial units, 135 residential units which the Debtor leases to tenants, a laundry room, and a parking garage. The Debtor's business consists solely of leasing the commercial and residential units at the Property to various tenants, and operating and managing the Property.

### B.    The Loan

On or about July 23, 2018, the Debtor entered into a loan agreement (the "Loan Agreement") with the Secured Lender pursuant to which the Debtor borrowed $32,100,000 from the Secured Lender (the "Loan"). To evidence its indebtedness under the Loan, the Debtor executed and delivered to the Secured Lender that certain Consolidated Promissory Note, dated July 23, 2018 in the original principal amount of $32,100,000.00 (the "Note"). Pursuant to that certain Note Splitter and Modification Agreement dated July 23, 2018, by and between the Debtor and Secured Lender (the "Note Splitter Agreement"), the Note was split and severed into two promissory notes, (i) that certain Replacement, Amended and Restated Promissory Note (Note A-1) dated July 23, 2018, evidencing Debtor's obligation to pay the principal amount of $17,000,000.00 ("Note A-1"), and (ii) that certain Replacement, Amended and Restated Promissory Note dated July 23, 2018, evidencing Debtor's obligation to pay the principal amount of $15,100,000.00 ("Note A-2" and, together with Note A-1, collectively, the "Replacement Notes").

The Debtor's obligations under the Loan are secured by, among other things, that certain Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and Consolidation, Modification and Restatement Agreement (as amended and/or assigned, the "Mortgage") dated as of July 23, 2018, executed by the Debtor, as mortgagor, in favor of the Secured Lender, as mortgagee. The Mortgage was recorded on August 10, 2018 with the Office of the City Register of the City of New York (the "City Register's Office") as City Register File No. ("CRFN") 2018000268803. The Mortgage granted the Secured Lender liens and security interests in all of the Debtor's real and personal property, including without limitation, the Debtor's interest in the Ground Lease, Additional Land, Improvements, Easements, Equipment, Fixtures and Personal Property, Leases and Rents, Condemnation Awards, Insurance Proceeds, Tax Certiorari, Conversion, Rights, Agreements, Intangibles, Accounts, Causes of Action, and Other Rights, as each of such terms is defined in the Mortgage.

The loan is further secured by an Assignment of Leases and Rents dated as of July 23, 2018 (the "ALR") executed by Debtor in favor of the Secured Lender. The ALR was duly recorded in the City Register's Office on August 10, 2018 as CRFN 2018000268804. The Secured Lender further perfected its security interests in its collateral through the filing of UCC financing statements (the "UCC Financing Statements") with the Delaware Secretary of State and the City Register's office.

The Debtor's recourse obligations under the Loan were guaranteed by Koeppel.

Pursuant to allonges, dated August 23, 2018, the Replacement Notes were assigned by the Secured Lender to Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Wells Fargo Commercial Mortgage Trust 2018-C46, Commercial Mortgage Pass-Through Certificates, Series 2018-C46 (the "Trust"). The Secured Lender assigned the Mortgage to the Trust pursuant to an assignment of Mortgage, effective as of August 28, 2018, which was recorded with the City Register's Office on October 22, 2018 as CRFN 2018000350970. The Secured Lender assigned the ALR to the Trust pursuant to an Assignment of Assignment of Leases and Rents, effective as of August 27, 2018, which was recorded with the City Register's Office on October 22, 2018 as CRFN 2018000350971. The Secured Lender assigned the UCC Financing Statements pursuant to UCC-3s, which were recorded with the Delaware Secretary of State and the City Register's Office.

Pursuant to allonges, dated January 23, 2023, the Replacement Notes were assigned by the Trust to the Secured Lender. The Trust assigned the Mortgage to the Secured Lender pursuant to an assignment of Mortgage, effective as of January 25, 2023, which was recorded with the City Register's Office on January 27, 2023 as CRFN 2023000026342. The Trust assigned the ALR to the Secured Lender pursuant to an Assignment of Assignment of Leases and Rents, effective as of January 25, 2023, which was recorded with the City Register's Office on January 27, 2023 as CRFN 2023000026343. The Trust assigned the UCC Financing Statements to the Secured Lender pursuant to UCC-3s which were recorded with the Delaware Secretary of State and City Register's Office. Continuations of the UCC Financing Statements were filed with the Delaware Secretary of State and City Register's Office on May 22, 2023 and May 23, 2023, respectively.

The Secured Lender holds all of right, title and interest in and to the Replacement Notes, the Mortgage, the ALR and all related loan documents (collectively, the "Loan Documents"). As a result of the Loan Documents and Original Cash Collateral Order, Amended and Restated Cash Collateral Order, and the Protective Advance Orders (each as hereafter defined), the Secured Lender holds an unavoidable duly perfected first priority security interest and lien in all of the Debtor's assets.

As set forth in the proof of claim filed by the Trust and assigned to the Secured Lender in this Bankruptcy Case, as of the Petition Date, the Debtor was indebted to the Secured Lender in an amount not less than $45,176,900.24.

### C.      The Debtor's Defaults Under The Loan

The Debtor was in default of the Loan at the time of its origination because the Debtor was in breach of the representation that the guarantor (*i.e.*, Koeppel) was not a debtor in an insolvency

proceeding, when in fact the guarantor of the Loan was a debtor in a pending Chapter 11 bankruptcy case before the United States Bankruptcy Court for the Southern District of New York at the time of the Loan's origination, a fact that the Secured Lender asserts was not disclosed at origination. The Debtor also defaulted under the Loan by, among other things, failing to remit the required monthly payments under the Loan in August 2021 and each month thereafter.

### D.    The Foreclosure Action And Debtor's Bankruptcy Filing

On February 1, 2022, the Trust, as the Secured Lender's predecessor, commenced a foreclosure action (the "Foreclosure Action") against the Debtor and others before the United States District Court for the Southern District of New York (the "District Court") (Case No. 22-cv-04326), and filed a motion for the appointment of a temporary receiver (the "Receiver Motion"). The Debtor filed its Chapter 11 petition with the bankruptcy court prior to a hearing on the Receiver Motion, which automatically stayed the Foreclosure Action against the Debtor.

### E.    The Class Action Lawsuit

On October 14, 2011, certain tenants at the Property (the "Class Action Plaintiffs") commenced a class action lawsuit (the "Class Action Lawsuit") against the Debtor and others before the Supreme Court of the State of New York, County of New York (the "State Court") (Index # 111723/11), challenging the Debtor's treatment of apartments at the Property as having been deregulated from rent stabilization.

The Debtor received J-51 tax benefits for the building at the Property between 1991 and 2014. The complaint in the Class Action Lawsuit, as amended (the "Class Action Complaint"), alleges that certain apartment units at the Property had been impermissibly deregulated and/or treated as deregulated pursuant to the so-called "high rent vacancy deregulation" and "high rent/high income deregulation" provisions of the Rent Stabilization Law (the "RSL") while the building was participating in the J-51 Program;

The Class Action Complaint seeks as remedies:

(i)    a declaratory judgment declaring that the Class Action Plaintiffs' "apartments are subject to rent stabilization or rent control and that Defendants are required to offer renewal leases on forms approved by the DHCR and required by the RSL, at legal regulated rents, or to continue their existing tenancy pursuant to the RCL with legal maximum rents as established by the RCL, that past and future allowable rent be set in a manner consistent with the RSL and that Plaintiffs and putative class members receive compensation for Past Rent Claims and Future Rent Claims";

(ii)    an injunction enjoining the Debtor from: (a) "issuing any new lease or lease renewal that does not fully comply with the provision of the RSL and RSC"; (b) issuing "a J-51 rider to any existing tenant who was not required to sign a J-51 rider at the inception of his/her tenancy"; and (c) "imposing any rent increases or charges that do not fully comply with the provisions of the RSL and RSC";

(iii)    damages in the amount of rent overcharges relating to Class Action Plaintiffs' apartments; and

(iv)    an award of legal fees and expenses to Class Action Plaintiffs' counsel.[1]

On or about August 6, 2012, the State Court entered a decision and order certifying the Class Action Lawsuit as a class action with the class defined as: "All current, former, and future tenants of 350 East 52nd Street whose apartments have been, are currently being, or will be deregulated by or subject to attempts to be deregulated by defendants, their predecessors in interest or their successors in interest, pursuant to Luxury Decontrol, while defendants are or have been in receipt of J-51 tax abatement benefits."

On March 28, 2017, the State Court entered a decision and order (the "Summary Judgment Order") granting the Class Action Plaintiffs partial summary judgment declaring that the Class Action Plaintiffs' legal regulated rent should be calculated according to the RSC's "default formula," and referring the case to a referee for a calculation of damages. The Debtor timely filed a notice of appeal of the Summary Judgment Order.

On August 5, 2021, the New York State Appellate Division, First Department (the "First Department") affirmed the Summary Judgment Order (the "Appellate Division Order"). On August 31, 2021, the defendants in the Class Action Lawsuit, including the Debtor, filed a motion with the First Department seeking, among other things, leave to appeal the First Department's order affirming the Summary Judgment Order to the New York Court of Appeals (the "Court of Appeals"), which is the highest court in New York state. On October 7, 2021, the First Department entered an order granting the Defendants' motion for leave to appeal the Summary Judgement Order to the Court of Appeals.

On April 13, 2021, the State Court entered an order (the "Interim Rent Order") granting the motion of the Class Action Plaintiffs to reduce the amount of interim use and occupancy to be paid by the Class Action Plaintiffs with respect to their apartments during the pendency of the Class Action Lawsuit based upon the "default rent" formula.

The Class Action Lawsuit was automatically stayed by the Debtor's bankruptcy filing.

### F.    Activities During The Debtor's Bankruptcy Case

### (1)    The Partial Lifting Of The Automatic Stay In The Class Action Lawsuit And The New York Court Of Appeals Reversal Of The Summary Judgment Order

On November 15, 2022, the Bankruptcy Court entered an order modifying the automatic stay to permit the Debtor to pursue its appeal of the Appellate Division Order and Summary Judgment Order before the Court of Appeals.  [Dkt. No. 59].[2]  On March 16, 2023, the Court of

---

[1]    References to the RSC are to the New York City Rent Stabilization Code.
[2]    References to "Dkt. No." are to documents on file in the Debtor's bankruptcy case, which may be obtained from the Court's PACER website, or by making a written request for such document from undersigned counsel for the Secured Lender.

Appeals entered an order (the "Court of Appeals Order") reversing the Appellate Division Order and Summary Judgment Order. The Court of Appeals determined that: "for purposes of calculating overcharges, where it is possible to determine the rent 'actually charged on the base date' – here October 14, 2007 – that amount should be used and rent increases legally available to defendants pursuant to the RSL during the four-year period should be added" rather than the default formula provided for in the Summary Judgment Order and Interim Rent Order. A copy of the Court of Appeals Order is annexed hereto as <u>Exhibit 2</u>.

<div align="center">

**(2)    The Secured Lender's Mediation With The Class Action
Representatives**

</div>

On February 13, 2023, the Bankruptcy Court entered an order approving a stipulation, which directed the Class Action Plaintiffs and the Secured Lender to engage in a mediation before the Hon. Larry S. Schachner (Retired) "to seek a resolution of the Class Action Plaintiff's Claims against the Debtor in connection with a potential Chapter 11 plan." [Dkt. No. 119]. The Debtor was not a party to the mediation. As a result of such mediation and subsequent substantial negotiations between the Secured Lender and Class Action Representatives, the Secured Lender and counsel for the Class Action Plaintiffs agreed to a settlement of the Class Action Lawsuit as reflected in the terms of the Class Action Settlement Agreement, which is annexed to the Secured Lender Plan as Exhibit B, which settlement is conditioned upon confirmation of the Secured Lender Plan and State Court preliminary and final approval of the Class Action Settlement Agreement.

<div align="center">

**(3)    The Class Action Settlement Agreement And The Secured
Lender Plan Support Agreement Between The Secured Lender
And The Class Action Representatives**

</div>

The Class Action Settlement Agreement provides that $2,200,000 from the Sale or Transfer of the Sale Assets shall be paid to Class Action Members on their claims and for the fees and expenses of the Class Action Members' counsel and other professionals.

The Class Action Settlement Agreement provides for, among other things, (i) the calculation of the Reset Rents pursuant to the Base Date Formula for the 80 affected apartments at the Property (the "Affected Units"), (ii) refund payments to tenants who were owed for prior overcharges by the Debtor, (iii) resolution of claims by the Debtor relating to the Rent Credits that were erroneously issued to certain tenants, (iv) resolution of claims by the Debtor relating to the difference owed by tenants who paid Default Rent and now owe Reset Rents, (v) the deregulation of apartments that could have been deregulated pursuant to applicable law during the pendency of the Class Action Lawsuit, and (vi) the release of claims by the Class Action Members against Debtor and certain other parties.

The Class Action Settlement Agreement will not be binding upon the Debtor unless or until the Bankruptcy Court enters an order confirming the Secured Lender Plan and the State Court approves the Class Action Settlement Agreement on a preliminary and final basis. No later than three (3) Business Days after entry of the Confirmation Order by the Bankruptcy Court, the Plan Administrator to be appointed under the Secured Lender Plan shall execute the Class Action Settlement Agreement on behalf of the Debtor, and the Plan Administrator and counsel for the

<div align="center">12</div>

Class Action Members shall seek preliminary and final approval of the Class Action Settlement Agreement by the State Court. While Class Action Members may opt-out of the Class Action Settlement Agreement ("Opt-Outs") pursuant to New York state law, Opt-Outs will not receive the distribution to be paid to holders of Class 4 Claims under the Secured Lender Plan; rather, Opt-Outs will be treated as holders of Class 5 Claims under the Secured Lender Plan. **Also, Opt-Outs will not be released from any claims held by the Debtor against them for past-due rent at an amount in excess of the rents which were calculated under the "default formula" under the Interim Rent Order.**

With respect to the determination of Reset Rents, Secured Lender and the Class Action Members agreed upon a framework and formula for determining the legal and appropriate rents for the Affected Units in accordance with the Court of Appeals Order (the "Base Date Formula"). Specifically, using the base date of October 14, 2007 (the "Base Date"), rents for the affected units (the "Reset Rents") were calculated using (i) copies of historical leases for each unit, (ii) if no lease was available for a particular apartment for a particular period of time, then the rent provided on the rent roll for that period of time was used, (iii) if no rent roll was available for that period of time, the amount of the rent registered with the Division of Housing and Community Renewal ("DHCR"), using the "preferred rent", if possible, and (iv) if there was no DHCR registered rent for that unit for that period of time, then Rent Guidelines Board ("RGB") rent increases for 2 years were used. The complete list of Affected Units and the applicable Reset Rents are set forth on Exhibit A to the Class Action Settlement Agreement.

In order to pay tenants owed for prior overcharges as well as cover other costs of the settlement, the Class Action Settlement Agreement provides that a settlement amount of $2,200,000.00 (the "Settlement Amount") will be paid out from proceeds of a Sale or Transfer of the Debtor's interest in the Real Property pursuant to the Secured Lender Plan, and will be used to pay the following categories: (i) overcharge refunds to certain past tenant class members (the "Eligible Class Members") who timely submit claims, (ii) class representative service awards in the amount of $10,000 for each named Class Action Representative, or their successors, heirs or assigns (iii) class notice and administrative costs in an amount up to $35,000, and (iv) attorneys' fees and costs of Class Action Members' lead counsel as determined by the State Court in the Class Action Lawsuit..

As further set forth in the Class Action Settlement Agreement, due to the Interim Rent Order entered in the Class Action Lawsuit based upon the now reversed Summary Judgment Order, the current-tenant class members of the property (the "Rent Credit Class Members") were billed rent based upon the default rent formula ("Default Rent") and received certain Rent Credits. The Interim Rent Order was without prejudice to the parties' rights to seek a modification of such order in the event that, among other things, the Summary Judgment Order and Interim Rent Order were reversed on appeal.

Ultimately, on April 16, 2023 the Court of Appeals issued an order reversing the Summary Judgment Order, holding that rent should be calculated based upon the rent charged on the Base Date, and not pursuant to the default rent formula. Thus, as a result of the Court of Appeals' determination, the Rent Credit Class Members, which received Rent Credits and/or paid the Default Rent, would owe the Debtor the difference between the Reset Rents and the Default Rents, plus any Rent Credits that were applied toward rent; however, as set forth below, Class Action

Members who do not Opt-Out of the Class Action Settlement Agreement and who are current on their rent obligations as of the Rent Adjustment Date (as set forth below) will not be required to pay such amounts to the Debtor. In determining whether non-payment of rent exists with respect to a Rent Credit Class Member, such Rent Credit Class Member's use of Rent Credits to pay rent for any period after August 1, 2023 shall not be counted as a payment of rent. Specifically, as a result of the Interim Rent Order, such Rent Credit Class Members received a greater amount of Rent Credits than each such tenant was previously overcharged by Debtor.

Pursuant to the Class Action Settlement Agreement, the Debtor will waive and release any claim to recover money damages against, or evict, a Rent Credit Class Member for past rent due, provided that such Rent Credit Class Member is current on all rent obligations due under their lease as of the first day of the month immediately following the date that the State Court enters an order in the Class Acton Lawsuit amending the Interim Rent Order (the "Rent Adjustment Date"), and so long as such Rent Credit Class Member does not Opt-Out of the Class Action Settlement Agreement.

As set forth in the Class Action Settlement Agreement, the total amount of rents overcharged to the Eligible Class Members, who are not Rent Credit Class Members, is $856,796.56. Pursuant to the Class Action Settlement Agreement, the Debtor also waives any claim to recover money damages against any past tenant Eligible Class Member for non-payment of past rent due as of their date of vacating the property, provided such Class Action Plaintiff does not Opt-Out under the Class Action Settlement Agreement. **These waivers of claims against Class Action Members by the Debtor will not be available to those Class Action Members who opt-out of the Class Action Settlement Agreement, and such Class Action Members may owe substantial back-rent to the Debtor. Moreover, assuming the Class Action Settlement Agreement is approved, any current tenants who Opt-Out of the Class Action Settlement Agreement will still be required to pay the Reset Rents, which have been calculated consistent with the Court of Appeals Order.**

The Class Action Settlement Agreement further provides that the 31 Affected Units identified therein (the "Deregulated Units") could have been lawfully deregulated pursuant to high rent vacancy deregulation under the then-current RSL between June 30, 2014 and June 14, 2019. Accordingly, the Deregulated Units are properly deregulated and Debtor may file exit registrations reflecting the date of deregulation. Pursuant to the Class Action Settlement Agreement, the current tenants of the Deregulated Units are not subject to rent regulation but may remain in occupancy at the applicable Reset Rent for a period of one (1) year from the Effective Date of the Class Action Settlement Agreement (the "Expiration Date"). At the Expiration Date, Debtor may offer the tenant a free market lease at the current market rent or provide a notice of non-renewal at Debtor's option.

**Pursuant to the Class Action Settlement Agreement, all Class Action Members that are bound by the Class Action Settlement Agreement shall be deemed to have released all statutory, regulatory, common law or other claims, causes of action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs, penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal, state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before entry of the Final Order & Judgment, that are based upon or related to, or arise out of, in whole**

or in part, the facts, transactions, events, occurrences, acts, or failures to act that were or could have been alleged in the Class Action Lawsuit by the Class Action Members or a Class Action Plaintiff against the Released Parties, including without limitation, damages, penalties, punitive damages, treble damages, liabilities or other remedies relating to (a) residential rents at the Property, (b) the rent-regulated status of any Affected Unit at the Property, (c) the Secured Lender's interest in the leasehold mortgage on the Property and/or (d) any other claims arising under the RSL or RSC based on any act, event or alleged failure to act prior to the Order and Final Judgment Date, including but not limited to any claim that a tenant was entitled to any particular form of lease, rider, notice, or that the Building or Unit had to be registered with any governmental agency. For the avoidance of any doubt, this release includes any successor liability or other claims by Plaintiffs under RSC Section 2526.1 (9 NYCRR Section2526.1) or any other law.

The Class Action Representatives, through their lead counsel, have also entered into a restructuring support agreement (the "Secured Lender Plan Support Agreement") with the Secured Lender. Under the Secured Lender Plan Support Agreement, the Class Action Representatives have agreed to support confirmation of the Secured Lender Plan by the Bankruptcy Court and approval of the Class Action Settlement Agreement by the State Court.

**Included with the documents being sent to you with this Disclosure Statement is a letter from lead counsel for the Class Action Representatives, requesting Class 4 Members to vote in favor of the Plan.**

### (4)    The Class Action Members Claims

On November 15, 2022, the Bankruptcy Court entered an order (the "Class Proof of Claim Order") authorizing the Class Action Representatives to file a class proof of claim on behalf of the Class Action Members. [Dkt. No. 58], which claim the Class Action Representative filed with the Bankruptcy Court [Claim No. 3] (the "Class Proof of Claim").  The Class Proof Of Claim Order further provided that the Class Action Representatives shall amend such claim after a final determination of the amount of each Class Action Plaintiff's claim, which amended claim shall provide an itemization of the amount of each Class Action Plaintiff's claim.

The Class Action Members will be filing an amended class proof of claim (the "Amended Class Claim"), which provides an itemization of each Class Action Plaintiff's Claim

### (5)    The Debtor's Use Of Cash Collateral, The Improper Koeppel Payments And The Change Of The Debtor's Managing Agent

The Debtor had been authorized to use the Secured Lender's cash collateral (the "Cash Collateral") for operations pursuant to an *Order Authorizing Debtor's Use Of Cash Collateral, And Granting, Inter Alia, Replacement Liens As Adequate Protection to Secured Lender*, entered on December 1, 2022 (with replacement liens granted *nunc pro tunc* to the Petition Date) (the "Original Cash Collateral Order") [Dkt. No. 66]. Pursuant to numerous stipulations (the "Extension Stipulations") between the Debtor and the Secured Lender or its predecessor, the Debtor's right to use cash collateral pursuant to the terms of the Original Cash Collateral Order

was extended through May 10, 2023 pursuant to modified budgets. [Dkt. Nos. 87, 95, 111, 128, 161, 162. 166, 168].

At the time of entry of the Original Cash Collateral Order and Extension Stipulations, the Property was managed by Livingston Management, and Koeppel & Koeppel Realty Management, which is an entity owned and controlled by Koeppel.

The Original Cash Collateral Order provided that the Debtor was authorized to use cash collateral "solely and exclusively" for items included in the budget attached to it. The Original Cash Collateral Order further provided: "notwithstanding anything to contrary contained herein, the Debtor shall not use Cash Collateral to make any payment or distribution to any insider or affiliate of the Debtor."

Notwithstanding the restrictions on the use of Cash Collateral contained in the Original Cash Collateral Order, the Debtor and Koeppel breached the terms of such order and Koeppel improperly converted property of the Debtor's bankruptcy estate by causing the transfer of cash collateral in excess of $150,000 to Koeppel personally, to pay, among other things, Koeppel and his wife's personal income taxes and to have repairs made to vehicles personally owned or leased by Koeppel (collectively, the "Koeppel Payments").

Following the Secured Lender's discovery of the improper Koeppel Payments, the Debtor and the Secured Lender entered into an *Amended And Restated Stipulation And Order Authorizing the Debtor's Use Of Cash Collateral And Granting Adequate Protection To Secured Lender*, which was approved by the Bankruptcy Court on May 11, 2023 ("the "Amended And Restated Cash Collateral Order") [Dkt. No. 169]. The Amended And Restated Cash Collateral Order granted replacement liens and security interests to the Secured Lender as well as a superpriority administrative claim.[3]

Under the Amended And Restated Cash Collateral Order, among other things: (i) Livingston Management and Koeppel & Koeppel Realty Management were terminated as the Debtor's managing agents for the Property; (ii) Koeppel was removed as a signatory on the Debtor's debtor-in-possession bank account; (iii) WEI, which is the Debtor's sole member, was ordered to deposit all funds in its bank account into the Debtor's debtor-in-possession bank account; (iv) Koeppel was ordered to return the Koeppel Payments to the Debtor; (v) Trigild Property Management, LLC ("Trigild") was retained by the Debtor as the exclusive managing agent for the Property and was made sole signatory on the Debtor's debtor-in-possession bank account; (vi) the Debtor's exclusive periods to file and solicit acceptances to a plan were

---

[3]In addition to its existing security interests and liens, the Amended And Restated Cash Collateral Order granted the Secured Lender security interests and liens on all the Debtor's (and its bankruptcy estate's) assets and property whether now owned or hereafter created or acquired, real or personal, assets or rights, of any kind or nature, wherever located, and the income, revenues, receipts, receivables, charges, chapter 5, products, rents and profits thereof, including, without limitation, all cash, accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, insurance proceeds, investment property, letters of credit rights, goods, licenses, causes of action, rights to payment including tax refund claims, insurance proceeds and tort claims and the proceeds, products, rents and profits of all of the foregoing, whether arising from section 552(b) of the Bankruptcy Code or otherwise, and including the proceeds or property recovered pursuant to actions arising under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code. Such liens include, without limitation, liens on all cash, including the Cash Collateral generated or received by the Debtor subsequent to the Petition Date.

terminated; (vii) the Debtor was authorized to use cash collateral pursuant to a budget through August 31, 2023, which deadline could be extended and budget modified pursuant to a stipulation between the Debtor and Secured Lender; and (viii) the Secured Lender received certain replacement liens and a superpriority administrative expense claim as adequate protection for the Debtor's use of cash collateral.

The Debtor's right to use cash collateral pursuant to the Amended And Restated Cash Collateral Order has been extended through December 31, 2023 pursuant to a revised budget as set forth in a stipulation entered into by the Debtor and Secured Lender on August 31, 2023. [Dkt. No. 191].

In August 2023, Koeppel reimbursed the Debtor for the improper Koeppel Payments. However, since the Bankruptcy Court's entry of the Amended and Restated Cash Collateral Order, the Secured Lender has become aware of other irregular actions taken or transfers made by Koeppel on behalf of the Debtor, including: (i) causing the Debtor to enter into a two year rent-free lease with Koeppel's son – Harrison Koeppel - for an apartment at the Property; (ii) causing the Debtor to enter into a rent free lease with Christopher Alvarado, special counsel to the Debtor in this case for two units at the Property, which was not disclosed by Alvarado in his application for employment as Debtor's special counsel; (iii) having a vendor that was performing work at the Property on behalf of the Debtor paint a large advertising mural on the exterior walls of the Property for "Koeppel & Koeppel" and then having the vendor bill the Debtor for such personal advertisement; (iv) entering into a 25 year agreement with Big Man City Laundry Limited, an entity whose president is Harrison Koeppel, pursuant to which Big Man City Laundry Limited allegedly operates the laundry room at the Building and receives all revenues therefrom, while the Debtor receives no compensation, yet pays all of the water charges associated with operating the laundry room; and (v) converting the tenants' security deposits by directing Livingston Management to deposit the security deposits into the Debtor's operating account, where they were expended.  These and possibly other transfers may result in post-plan confirmation litigation against, among others, Koeppel, his family members and other insiders and affiliates of the Debtor.

### (6)    The Assumption Of The Ground Lease

On December 16, 2022, the Debtor filed a motion to assume the Ground Lease (the "Original Assumption Motion"), along with a motion for an expedited hearing. [Dkt. Nos. 80, 81]. A status conference on the Original Assumption Motion was held before the Court on December 21, 2022, at which time, the Court extended the Debtor's time to assume or reject the Ground Lease, pending a hearing on January 6, 2023. On December 21, 2022, the Debtor filed an amended motion to assume the Ground Lease, which requested an extension of its time to assume or reject the Ground Lease, as an alternative to assumption of the Ground Lease (the "Assumption Motion"). [Dkt. No. 83]. Hearings on the Assumption Motion were held on December 29, 2022, January 10 and 13, 2023, and February 2, 20, and 28, 2023. At the conclusion of each of these hearings, the Court further extended the Debtor's time to assume or reject the Ground Lease until the next hearing in the case, except for the February 28, 2023 hearing, where the Court extended the Debtor's time to assume or reject the Ground Lease to March 16, 2023.

At a hearing held on March 16, 2023, the Bankruptcy Court granted the Assumption Motion, which is reflected in a written order of the Court entered on March 22, 2023 (the "Ground Lease Assumption Order"). [Dkt. No. 157].

<div align="center">

**(7)     The Settlement And Payment Of Mechanic's Liens And Judgment Liens On The Property**

</div>

The Ground Lease prohibits any mechanic's liens or judgment liens on the Property. Prior to the Petition Date, V.C. Drywall & Remodeling LLC ("V.C. Drywall") filed a mechanic's lien (the "V.C. Drywall Lien") on the Property in the amount of $77,300.  Thereafter, V.C. Drywall commenced an action to foreclose the V.C. Drywall Lien (the "V.C. Drywall Foreclosure"), and filed a notice of pendency on the Property.  On January 13, 2023, the Debtor filed a motion to approve a settlement with V.C. Drywall, pursuant to which its mechanics' lien would be resolved by the payment of $65,000 (the "V.C. Drywall Settlement"). By order dated March 3, 2023, the Bankruptcy Court approved the V.C. Drywall Settlement. [Dkt. No. 131]. The Debtor made the settlement payment to V.C. Drywall, the V.C. Drywall Lien has been resolved, the V.C. Drywall Foreclosure was dismissed, and a lien release has been provided to Debtor's counsel for filing.

On or about March 8, 2023, NYC Newline Contractors, LLC ("NYC Newline") filed a mechanics lien on the Property in the amount of $8,165.63 (the "NYC Newline Lien"). On June 12, 2023, the Debtor filed a motion to approve a settlement with NYC Newline, which motion was amended on June 29, 2023, pursuant to which the NYC Newline Lien would be resolved by the payment of $7,500.00 (the "NYC Newline Settlement"). [Dkt. Nos. 171, 174].  By order dated August 11, 2023, the Bankruptcy Court approved the NYC Newline Settlement. [Dkt. No. 189]. The Debtor made the settlement payment to NYC Newline, the NYC Newline Lien has been resolved, and a lien release has been provided to Debtor's counsel for filing.

On March 15, 2023, just prior to the hearing on the Assumption Motion, the Ground Lessor advised the Debtor and Secured Lender of two judgment liens filed against the Property by the New York City Department of Buildings in the face amounts of $10,000 and $3,125, respectively. Trigild, as managing agent, investigated these alleged judgment liens, and following such investigation paid such judgment liens in full from Cash Collateral.

<div align="center">

**(8)     The Protective Advance Motion**

</div>

The Debtor's Ground Lease requires the Debtor to pay all real estate taxes on the Property. Pursuant to a property tax bill issued by the New York City Department of Finance (the "Tax Bill"), the Debtor was obligated to pay real estate taxes in the amount of $832,028.18 (the "Real Estate Taxes") to the City of New York by July 3, 2023. However, as of its May 2023 monthly operating report, the Debtor had only $348,923.00 in its debtor-in-possession bank account. Additionally, the Debtor's real estate tax escrow account with the Secured Lender had a negative balance.

Accordingly, the Secured Lender filed a *Motion For An Order: (I) Authorizing Barclays Bank PLC, As Secured Lender, To Make Protective Advance; (II) Granting Liens And Providing Superpriority Administrative Expense Claims In Connection Therewith; And (III) Granting Related Relief* (the "Protective Advance Motion") [Dkt. No. 173], seeking Bankruptcy Court

approval for the Secured Lender to make a protective advance under the Loan Documents on behalf of the Debtor for the purpose of paying the Real Estate Taxes and any interest and penalties accrued thereon.

The Protective Advance Motion was granted by the Bankruptcy Court by interim order entered on July 12, 2023 [Dkt. No. 182] and final order entered on August 11, 2023 [Dkt. No. 188] (collectively, the "Protective Advance Orders"). As a result, the Secured Lender paid the Real Estate Taxes and the interest and penalties thereon. The Debtor is current on all real estate tax obligations to the City of New York. Pursuant to the Protective Advance Orders, the Secured Lender's Protective Advance is secured by all of the Debtor's assets, as set forth in detail in the Protective Advance Orders, and a superpriority administrative claim, which is senior in priority to all administrative expenses in this Chapter 11 case, except any Administrative Claim held by the Ground Lessor, which is *pari pasu* with the Secured Lender's Super-Priority Administrative Claim.

### (9)    The Indemnification Adversary Proceeding

On November 14, 2022, the Debtor commenced an adversary proceeding (the "Indemnification Adversary Proceeding") before the Bankruptcy Court against Roberta Koeppel and Alexandra Koeppel, as Executors and Trustees of the Trust created under Article Fourth of the Last Will of Robert A. Koeppel, Koeppel Management Company, LLC and Roberta Koeppel, individually (the "Indemnification Defendants"). The Debtor's complaint in the Indemnification Adversary Proceeding seeks money damages in the form of indemnification on behalf of the Debtor in connection with certain damages and expenses incurred by the Debtor in connection with the Class Action Lawsuit. The complaint in the Indemnification Adversary Proceeding seeks substantially similar relief to a pre-bankruptcy third party complaint filed in the Class Action Lawsuit by the Debtor, WEI and Koeppel, individually, against the Indemnification Defendants (the "Class Action Third Party Claim").

On June 29, 2023, the Debtor filed a motion with the Bankruptcy Court seeking relief from the automatic stay to permit the continued prosecution of the Class Action Third Party Claim in the Class Action Lawsuit. In its motion, counsel for the Debtor indicated that if the motion were granted, it would dismiss the Indemnification Adversary Proceeding and proceed on the Class Action Third Party Claim before the State Court. The Secured Lender objected to such relief, asserting, among other things, that the causes of action asserted in the Indemnification Adversary Proceeding belong to the Debtor's bankruptcy estate and should be pursued by the Debtor's bankruptcy estate before the Bankruptcy Court, and that Koeppel has a conflict of interest in pursuing the Class Action Third Party Claim in the Class Action Lawsuit simultaneously on the Debtor's behalf and on WEI and Koeppel's personal behalf against the Indemnification Defendants. The Debtor has continued the hearing on its motion for relief from the automatic stay on multiple occasions, and the motion is still pending before the Court.

Under the Secured Lender Plan, the Plan Administrator would be authorized to pursue the Indemnification Claim on behalf of the Debtor.

**(10)    The Debtor Plan**

On November 16, 2022, the Debtor filed its own plan (the "Debtor Plan") and disclosure statement (the "Debtor Disclosure Statement"). [Dkt. Nos. 60, 61]. The Debtor Plan proposed a sale of the Property at some undetermined time in the future, and the litigation of the Class Action Third Party Claim. The Debtor Plan did not provide for a settlement of the Class Action Lawsuit. The Debtor has taken no action to seek approval of the Debtor Disclosure Statement or confirmation of the Debtor Plan since November 2022. The Debtor's exclusive periods to file, and solicit acceptances to a plan were terminated by the Amended and Restated Cash Collateral Order.

**(11)    The Filing Of The Secured Lender Plan And Disclosure Statement, And Conditional Approval Of The Disclosure Statement**

On November 17, 2023, the Secured Lender filed the Secured Lender Plan, the Disclosure Statement and a motion to, among other things, conditionally approve the Disclosure Statement, authorize the Secured Lender to solicit votes with respect to the Secured Lender Plan, and set a hearing on final approval of the Disclosure Statement and confirmation of the Secured Lender Plan (the "Solicitation Procedures Motion"). On November __, 2023, the Bankruptcy Court entered an order, among other things: (i) scheduling a combined hearing for December __, 2023 at __:___ _.m. for a hearing on final approval of the Disclosure Statement and confirmation of the Secured Lender Plan; (ii) authorizing the Secured Lender to solicit votes in connection with the Secured Lender Plan; (iii) authorizing counsel for the Class Representatives to vote on behalf of those Class Action Members who do not vote on the Secured Lender Plan; (iv) fixing December __, 2023 as the deadline for voting on the Secured Lender Plan; and (iv) fixing December __, 2023 as the deadline for filing objections to final approval of the Disclosure Statement and confirmation of the Secured Lender Plan. [Dkt. No. ____].

**V.    DESCRIPTION OF THE SECURED LENDER PLAN**

The following is a summary of certain provisions of the Secured Lender Plan. IT IS NOT A COMPLETE STATEMENT OF THE SECURED LENDER PLAN OR ITS OPERATION AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE SECURED LENDER PLAN, WHICH IS ANNEXED HERETO AS <u>EXHIBIT 1</u>. The Secured Lender Plan, which is subject to the provisions of the Bankruptcy Code, provides for the treatment of all creditors of the Debtor. SINCE THE SECURED LENDER PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS, AND INCORPORATES THE DEFINITIONS AND REQUIREMENTS OF THE BANKRUPTCY CODE, YOU MAY WISH TO CONSULT WITH COUNSEL OF YOUR CHOICE IN MAKING YOUR DECISION REGARDING YOUR VOTING ON THE SECURED LENDER PLAN.

**A.    Overview of the Secured Lender Plan**

The Secured Lender Plan provides for the Sale of the Sale Assets, which are substantially all of the Debtor's assets and the distribution of Sale proceeds, Cash Collateral, and proceeds of certain Litigation Claims to creditors as set forth in detail below.

**B.**     <u>Treatment of Allowed Administrative Claims and Allowed Priority Claims under the Secured Lender Plan</u>

Article II of the Secured Lender Plan governs the payment of Administrative Claims and Priority Claims. Under the Secured Lender Plan, the Plan Administrator shall pay the Secured Lender Allowed Superpriority Administrative Claim in full from either Cash Collateral or from the proceeds of the Sale of the Sale Assets, no later than the Effective Date or such other date agreed to in writing by the Secured Lender. To the extent that the Secured Lender's claim for the protective advance authorized by the Protective Advance Orders is not an Allowed Secured Claim because the value of its collateral is less than the amount owed to the Secured Lender, the amount of the Secured Lender Superpriority Administrative Claim is $835,797.14 plus interests and costs.

The Plan Administrator shall pay Allowed Priority Claims and Allowed Non-Professional Administrative Claims, other than the Secured Lender Allowed Superpriority Advance Administrative Claim from Cash Collateral no later than the Effective Date. Since the Debtor is purportedly current on all post-petition Claims against it, the Secured Lender estimates that Allowed Non-Professional Administrative Claims as of the Effective Date will be $0.

Upon assumption of the unexpired leases being assumed under the Secured Lender Plan, the claims of any tenants at the Property for the restoration of their security deposits will become an Administrative Claim against the Debtor. The Secured Lender estimates that the amount necessary to restore tenant security deposits is approximately $455,000. Additionally, post-confirmation U.S. Trustee fees will continue to accrue until the Bankruptcy Case is closed. The Secured Lender estimates that the Sale will result in a U.S. Trustee fee of $250,000, which will be paid on or before the date such payment is due under 28 U.S.C. Section 1930.

The Secured Lender estimates Allowed Priority Claims are approximately $1,500.

With respect to Administrative Professional Claims, the Secured Lender Plan provides that the Plan Administrator shall pay such Allowed Claims in full from either Cash Collateral or the proceeds of the Sale on the later of: (i) the Effective Date; or (ii) entry of an order of the Court approving the fees and expenses of such Professional.[4] The Secured Lender estimates Allowed Administrative Professional Claims will be approximately $150,000 - $270,000.

The Secured Lender Plan also contains deadlines for the filing of requests for payment of Non-Professional Administrative Claims or fee applications seeking the payment to Professional Administrative Claims. Specifically, all parties asserting a Non-Professional Administrative Claim shall file a request for payment of administrative claim no later than thirty (30) days after the date of service of notice entry of the Confirmation Order unless such day is not a Business Day, then the deadline shall be the next Business Day (the "Non-Professional Administrative Claim Deadline"). Any Non-Professional Administrative Claim for which a request for payment of Administrative Claim is not filed by the Non-Professional Administrative Claim Deadline shall be disallowed and forever barred without the need for the filing of an objection to such Claim. Objections to Non-Professional Administrative Claims for which a Request for Payment of Administrative Claim has been filed shall be interposed by the filing of an objection to claim no

---

4   The Plan defines "Professional" as a person retained by order of the Bankruptcy Court pursuant to Section 327 of the Bankruptcy Code and whose compensation is governed by Section 330 of the Bankruptcy Code.

later than thirty (30) days after the Non-Professional Administrative Claim Deadline unless such date is not a Business Day, in which case the deadline to file objections shall be the next Business Day.

Any and all applications for the final allowance for Professional Administrative Claims for services rendered and expenses shall be filed with the Bankruptcy Court and served no later than thirty (30) days after service of notice of entry the Confirmation Order, unless such day is not a Business Day, in which case the deadline shall be the next Business Day (the "Professional Administrative Claim Bar Date"). Any Professional Administrative Claim for which a fee application is not filed by the Professional Administrative Claim Bar Date shall be disallowed without the need for the filing of an objection to such Claim.

The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without need for Bankruptcy Court approval, including professional fees incurred by professionals retained by the Plan Administrator; provided however, that any fees and expenses incurred by the Plan Administrator in connection with the Litigation Claims shall be subject to Court approval.

### C.      The Classification Of Claims And Interests Under The Secured Lender Plan

Bankruptcy Code Section 1126 requires that a plan designate classes of all Claims and Interests, other than Administrative Claims and Priority Claims. The Secured Lender Plan divides Claims against, and Interests in, the Debtor into seven (7) classes. The chart below describes each of these classes.  All classes of Allowed Claims and Interests are impaired under the Secured Lender Plan and may vote to accept or reject the Secured Lender Plan.

| Class | Description Of Members Of The Class | Impaired Or Unimpaired |
|---|---|---|
| Class 1 Claim | Allowed Secured Lender Claim | Impaired |
| Class 2 Claims | Estate Of William W. Koeppel Secured Claim | Impaired |
| Class 3 Claims | All Secured Claims against the Debtor, that are not a Class 1 Claim or Class 2 Claim | Impaired |
| Class 4 Claims | Class Action Plaintiffs' Unsecured Claims | Impaired |
| Class 5 Claims | General Unsecured Claims against the Debtor, except for the Class Action Members' Unsecured Claims and Subordinated General Unsecured Claims | Impaired |
| Class 6 Claims | Subordinated General Unsecured Claims | Impaired |

| Class 7 Interests | Interests in the Debtor | Impaired |

### D.    The Treatment Of Classified Claims and Interests under the Secured Lender Plan

The Classes and payments to be made in respect of, or treatment proposed to be accorded to, Allowed Claims and Interests of each Class under the Secured Lender Plan are summarized and described below. The term "Allowed Claim" is defined in the Secured Lender Plan. The Secured Lender Plan also defines "Disputed Claim(s)" and proposes the treatment to be accorded to Disputed Claims. The proposed treatment of Disputed Claims is also summarized and described below.

**(1)    The Class 1 Allowed Claim – Secured Lender Allowed Secured Claim.**  Under the Secured Lender Plan, the Class 1 Allowed Claim is fixed as an Allowed Claim in an amount which is not less than $45,176,900.24, plus any and all accrued and unpaid post-petition interest (including default interest under the Loan Documents) to the extent the value of the Secured Lender's collateral exceeds the amount of its claim, premiums, fees and expenses pursuant to the Loan Documents and Protective Advance Orders, including without limitation attorney fees and expenses.  The Class 1 Allowed Claim shall not be subject to any avoidance, reductions, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or other challenges under any applicable law or regulation by any Person.

If the Sale Assets are not transferred to the Secured Lender pursuant to Section 7.5 of the Plan, then on the Closing Date, the Class 1 Allowed Claim shall be paid: (i) all Cash Collateral held by, or on behalf of the Debtor  plus (ii) all of the proceeds of the Sale remaining after the payment of the Closing Costs, the payments to be made to the holders of Allowed Administrative Claims and Allowed Priority Claims pursuant to  Section 2.1, 2.2, 2.3 and 2.4 of the Secured Lender Plan, the Class Action Settlement Amount, and the amount to be deposited into the Class 5 General Unsecured Claims Reserve.

On the Closing Date, the Secured Lender shall also be authorized to set-off any funds in Secured Lender Reserves and apply such funds towards payment of the Class 1 Allowed Claim on the Closing Date.[5]

To the extent that the aforementioned payments to the holder of the Class 1 Allowed Claim are insufficient to pay 100% of such Allowed Claim: (i) the Plan Administrator shall pay to the holder of the Class 1 Allowed Claim all Accounts Receivable and any other funds belonging to the Debtor or its bankruptcy estate for the period prior to the Closing Date, but which are collected by the Plan Administrator subsequent to the Closing Date within seven (7) days of receipt of such funds; and (ii) the Plan Administrator shall pay the proceeds of the Litigation Claims and any proceeds from any tax grievance or certiorari proceeding concerning the Real Property minus the Plan Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims to the extent those fees and expenses are approved by the Court.

---

[5]    The Secured Lender Plan defines the "Closing Date" as the date of closing of the Sale or the Transfer pursuant to (i) the Secured Lender Plan and (ii) the Sale Order or Transfer Order, as applicable.

If the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of the Secured Lender Plan, then on the Closing Date, the Class 1 Allowed Claim shall be paid :(i) all Cash Collateral held by, or on behalf of, the Plan Administrator on the Closing Date (after the payments to be made to the holders of Allowed Administrative Claims and Allowed Priority Claims pursuant Section 2.1, 2.2, 2.3 and 2.4 of the Plan, the Class Action Settlement Amount, and the amount to be deposited unto the Class 5 General Unsecured Claims Reserve), (ii) the amount of Secured Lender Reserves set-off by the Secured Lender, (iii) the proceeds of Accounts Receivable; (iv) the proceeds of the Litigation Claims paid to the Secured Lender by the Plan Administrator pursuant to Section 5.1(c) of the Plan plus (v) the amount of the credit bid made by the Secured Lender for the Transfer of the Sale Assets pursuant to Section 7.5 of the Secured Lender Plan.

The payments to be made to the Secured Lender or the Transfer of the Sale Assets to the Secured Lender under the Secured Lender Plan shall be conditioned upon the payment if the Settlement Amount to the Class Action Claims Administrator or the Secured Noteholder in the event that the Sale Assets are transferred to the Secured Lender under Section 7.5 of the Plan.

To the extent that there are insufficient funds to pay the Class 1 Allowed Claim in full on the Closing Date, the unpaid portion of the Class 1 Allowed Claim shall be a Class 5 General Unsecured Claim against the Debtor.

The Secured Lender shall retain its duly perfected and first priority mortgage and security interests and liens in all of the Debtor's assets, including without limitation the Real Property, the Personal Property, the Litigation Claims, the Accounts Receivable and the Cash Collateral until the Closing Date.  Upon the Closing of the Sale of the Sale Assets, the mortgage, security interests and liens of the holder of the Class 1 Allowed Claim in the Sale Assets shall be released and transferred automatically to the proceeds of the Sale in the same order of priority without any need for the holder of the Class 1 Allowed Claim to take any act of perfection.

The Class 1 Claim is impaired, and is entitled to vote on the Secured Lender Plan.

**(2)**     **Class 2 Claim – The Estate Of William W. Koeppel Secured Claim.**  The Class 2 Claim consists of the Estate Of William W. Koeppel Secured Claim. This Claim is held by Koeppel's personal bankruptcy estate (the "Koeppel Bankruptcy Estate") pursuant to an order confirming a Chapter 11 plan in Koeppel's personal bankruptcy case. The Claim is allegedly secured by the Koeppel Bankruptcy Estate's interest in certain agreements (the "Support Parking Arrears Agreements") between the Debtor and Support Parking, a tenant at the Property, pursuant to which Support Parking is to pay $4,479.17 monthly for pre-petition rent arrears at the Property. Prior to the Petition Date, the Debtor assigned its interest in the Support Parking Arrears Agreements to WWK 140 Bay Bridge, LLC, which assigned its interest to the Koeppel Bankruptcy Estate pursuant to the confirmed plan in Koeppel's personal bankruptcy case. The Koeppel Bankruptcy Estate filed a proof of claim in the Debtor's bankruptcy case, asserting that it is owed $410,000 pursuant to the assigned Support Parking Arrears Agreements.

On the Closing Date, except to the extent that a holder of the Class 2 Claim agrees to a lesser treatment, the Plan Administrator shall either (i) pay one hundred percent of such holder's Allowed Secured Claim, or (ii) the collateral securing the Class 2 Allowed Claim shall be

abandoned to the holder of the Class 2 Allowed Claim, to the extent of such Allowed Secured Claim, in full and complete satisfaction, and as the indubitable equivalent, of the Class 2 Allowed Claim.

The Class 2 Claim is impaired, and is entitled to vote on the Plan.

**(3)     Class 3 Claims – All Allowed Secured Claims against the Debtor, that are not Class 1 Claims or Class 2 Claims**. The Class 3 Claim consists of All Allowed Secured Claims against the Debtor, that are not allowed Class 1 Claims or Class 2 Claims.

The Secured Lender is unaware of the existence of any Class 3 Allowed Claims. However, to the extent any such claims exist, on the Closing Date, except to the extent that a holder of Class 3 Claim agrees to a less favorable treatment, the Plan Administrator shall, at the Plan Administrator's election and in full and final satisfaction of the Class 3 Allowed Claim either (i) pay one hundred percent of such holder's Allowed Secured Claim, or (ii) abandon the Debtor's interest in the collateral securing the Class 3 Allowed Claim to the holder of the Class 3 Allowed Claim as the indubitable equivalent of the Class 3 Allowed Claim.

Class 3 Claims are impaired, and are entitled to vote on the Plan.

**(4)     Class 4 Claims – Class Action Members' Unsecured Claims.**  Class 4 Claims consist of the Class Action Members Unsecured Claims.

The claims of the holders of the Class 4 Allowed Claims shall be treated pursuant to the terms of the Class Action Settlement Agreement, a copy of which is annexed to the Secured Lender Plan as <u>Exhibit B</u>, and receive the distributions provided under the Class Action Settlement Agreement from the Class Action Claims Administrator, subject to entry of the Class Action Order And Final Judgment by the State Court in the Class Action Lawsuit.

Under the Secured Lender Plan, $2,200,000 is being set aside from the Sale, or will be paid by the Secured Lender in the event of a Transfer under Section 7.5 of the Plan,  for the payment of the Class 4 Claims, including the payment of legal fees and expenses to lead counsel for Class Action Members in the Class Action Lawsuit.  Additionally, as more fully described in the Class Action Settlement Agreement, and at pages 12-15 of this Disclosure Statement, the Class Action Settlement Agreement provides that the Debtor shall release certain claims against Class Action Members who were paying rent at the Property which was calculated at the lower Default Rent under the Interim Rent Order instead of the amount of Reset Rent as determined in the Court of Appeals Order based upon the Base Date Formula, provided those Class Action Members do not Opt-Out of the Class Action Settlement Agreement, and they are current on all of their rent obligations to the Debtor beginning on the Rent Adjustment Date.  **Those Class Action Members that do not Opt-Out of the Class Action Settlement Agreement will also be releasing all claims arising from the Class Action Lawsuit against, among others, all parties to the Class Action Lawsuit, Barclays and any purchaser of the Debtor's interest in the Property and any subsequent purchasers thereof, all as described in further detail in Section IX of this Disclosure Statement, subject to the State Court's approval of the Class Action Settlement Agreement and entry of the Class Action Order and Final Judgment.**

**Notwithstanding anything to the contrary contained in the Plan: (i) any holder of a Class 4 Claim that Opt-Out of the Class Action Settlement Agreement will not receive a distribution under the Class Action Settlement Agreement and will be treated as the holder of a Class 5 Claim under the Secured Lender Plan, and the Plan Administrator shall retain all claims and Causes of Action against the holder of such Claim who has elected to Opt-Out of the Class Action Settlement Agreement; and (ii) any holder of a Class 4 Claim that has voted to accept the plan on its Ballot shall be deemed to have agreed not to Opt-Out of the Class Action Settlement, provided that any vote cast by counsel for the Class Representatives on behalf of a Class Action Member shall not waive the right of such Class Action Member to Opt-Out of the Class Action Settlement Agreement.  The treatment provided in the Class Action Settlement Agreement shall be in full and complete satisfaction of the Class Action Proof Of Claim and the Claims of the Class Action Members.**

The amount to be paid to Class Action Claims Administrator from the Sale Assets pursuant to the Class Action Settlement Agreement will be $2,200,000.  The ultimate percentage distribution to holders of Class 4 Allowed Claims are unknown at this time because it will depend upon the total amount of claims filed by the holders of the Class 4 Claims with the Class Action Claims Administrator under the Class Action Settlement Agreement, and the amount of legal fees and expenses awarded to counsel for the Class Action Members in the Class Action Lawsuit.

Class 4 is impaired under the Secured Lender Plan and holders of Class 4 Claims are entitled to vote on the Secured Lender Plan.

**(5)** **Class 5 Claims – General Unsecured Claims, Except For The Class Action Members' Unsecured Claims and Subordinated General Unsecured Claims.**  The Class 5 Claims consist of the General Unsecured Claims against the Debtor, except for the Class Action Members' Unsecured Claims, and Subordinated General Unsecured Claims.

The Secured Lender Plan provides that no later than thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class Action Order And Final Judgment and (iii) the Closing Date, the Plan Administrator shall pay any proceeds from the Sale which remain after the payments made pursuant to holders of Administrative Claims, Priority Claims, Class 1, Class 2 and Class 3 Claims under the Secured Lender Plan and the funding of the Class Action Settlement Amount pursuant to Class 4, to the holders of the Class 5 Allowed Claims on a *pro-rata* basis up to one hundred percent (100%) of their Allowed Claims; provided however, that if the amount of proceeds from the Sale are insufficient to pay the Class 5 Allowed Claims a distribution of at least five percent (5%) of Class 5 Allowed Claims, or if the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of the Secured Lender Plan, then no later than no later than thirty (30) days after the later of the (A) Claims Resolution Date, (B) the date of entry of the Class Action Order And Final Judgment and (C) the Closing Date, the Plan Administrator shall pay the funds in the Class 5 General Unsecured Claim Reserve ($25,000) to the holders of the Class 5 Allowed Claims on a *pro-rata* basis.

The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claims is paid in full to the holders of Class 5 Allowed Claims on a *pro-rata* basis. Any such payment(s) shall be made within thirty (30) days

after the later of: (I) the date the Class 1 Claim is paid in full; (II) the Claims Resolution Date; (III) the date of entry of the Class Action Order and Final Judgement; (IV) the Closing Date; and (V) the Plan Administrator's receipt of such funds.

In no event shall the distribution to holders of Class 5 Allowed Claims exceed one hundred percent (100%) of their Allowed Claims. As part of the Secured Lender Plan, and to the extent that the Secured Lender holds a Class 5 Claim, the Secured Lender has agreed to waive any distribution from the Class 5 Unsecured Claims Reserve, but retains its right to vote such claim in connection with the Secured Lender Plan and retains all rights to seek payment of the deficiency from Koeppel and any other appropriate non-Debtor party. The treatment provided herein shall be in full and complete satisfaction of all Claims held by the holders of Class 5 Claims.

Class 5 is impaired under the Secured Lender Plan and is entitled to vote on the Secured Lender Plan. The total amount of general unsecured claims scheduled by the Debtor or evidenced by a proof of claim held by non-insider or affiliates of the Debtor is $531,102.45, and the total amount of insider or affiliate claims is $5,400,000, which are claims filed by Debtor's insiders and affiliates.[6] Based on the foregoing, it is estimated that if purchase price of the Sale Assets is less than the amount of the Class 1 Allowed Claim, holders of Class 5 Claims will receive approximately 4.7% on their claims if the insider or affiliate claims are disallowed or subordinated, or 0.42% on their claims if insider and affiliate claims are not disallowed or subordinated, plus the amount of any distribution of proceeds of the Litigation Claims.[7]

**(6)    Class 6 Claims – Subordinated General Unsecured Claims.** Class 6 Claims consist of those General Unsecured Claims which are subordinated by order or judgment of the Bankruptcy Court.

The Secured Lender Plan provides that no later than thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class Action Order And Final Judgment and (iii) the Closing Date, the Plan Administrator shall pay any remaining proceeds from the Sale after the payments are made in full to holders of Administrative Claims, Priority Claims, Class 1, Class 2, Class 3, Class 4 and Class 5 Claims under the Secured Lender Plan, to the holders of the Class 6 Allowed Claims on a *pro-rata* basis up to one hundred percent (100%) of their Allowed Claims. This treatment shall be in full and complete satisfaction of all Claims held by the holders of Class 6 Claims.

The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan Administrator's reasonable fees and fees and expenses approved by the Court of asserting and litigating those claims which remain after the Class 1 Allowed Claim and Class 5 Allowed Claims are paid in full to the holders of Class 6 Allowed Claims on a *pro-rata* basis. Any such payment(s) shall be made within thirty (30) days after the later of: (A) the date the Class 1 Claim and Class 5 Claims are paid in full; (B) the Claims Resolution Date; (C) the date of entry of the Class Action

---

[6]    While the Ground Lessor filed a general unsecured claim in this Bankruptcy Case, the claim of a party to an assumed lease is an Administrative Claim under the Bankruptcy Code and not a General Unsecured Claim. Hence, the General Unsecured Claim of the Ground Lessor is not included in this analysis.

[7]    These percentages assume that there will be no Opt-Outs under the Class Action Settlement Agreement.

27

Order and Final Judgement; (D) the Closing Date; and (E) the Plan Administrator's receipt of such funds.

There are currently no Class 6 Claims. It is anticipated that, Secured Lender or the Plan Administrator will be commencing proceedings to disallow or subordinate the claims of William Koeppel and WWK 140 Bay Bridge, LLC on the grounds that that such Persons and entities are affiliates of the Debtor and such alleged claims were incurred in violation of the Debtor's operating agreement and were *ultra vires*. Therefore such claims should either be disallowed or subordinated to all other claims in this Chapter 11 case. The amount of any recovery on Class 6 Claims is unknown.

Class 6 is impaired and is entitled to vote on the Secured Lender Plan.

**(7)** **Class 7 Interests – The Interests in the Debtor.** The Class 7 Interests consist of the Interests in the Debtor, which are held by Whitehouse Estates, Inc.

The Secured Lender Plan provides that no later than thirty (30) days after the later of the (A) Claims Resolution Date, (B) the date of entry of the Class Action Order And Final Judgment and (C) the Closing Date, the Plan Administrator shall pay any remaining proceeds from the Sale after payments are made to holders of Administrative Claims, Priority Claims, Class 1, Class 2, Class 3, Class 4, Class 5 and Class 6 Claims under the Secured Lender Plan to the holders of the Class 7 Interests.

The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claim, Class 5 Allowed Claims and Class 6 Allowed Claims are paid in full to the holders of Class 7 Interests. Any such payment(s) shall be made within thirty (30) days after the later of: (A) the date the Class 1 Allowed Claim, Class 5 Allowed Claims and Class 6 Allowed Claims are paid in full; (B) the Claims Resolution Date; (C) the date of entry of the Class Action Order and Final Judgement; (D) the Closing Date; and (E) the Plan Administrator's receipt of such funds.  The Interests in the Debtor shall be cancelled upon entry of an order of the Court closing the Bankruptcy Case.  The amount of recovery on the Class 7 Interests is unknown.

Class 7 is impaired and is entitled to vote on the Secured Lender Plan.

**E.** **The Treatment Of Unexpired Leases And Executory Contracts Under the Secured Lender Plan**

Bankruptcy Code Section 365 governs the treatment of unexpired leases and executory contracts in bankruptcy. Unexpired leases are either assumed or rejected by the debtor in bankruptcy. Additionally, generally, unexpired leases and executory contracts which are assumed (except for personal services contracts) may be assigned to a third party, provided certain requirements are met. Specifically, if there has been a default in the unexpired lease or executory contract to be assumed or assigned, Bankruptcy Code Section 365(b)(1) requires that (i) all defaults must be cured or there must be adequate assurances of a prompt cure of defaults; (ii) the non-debtor party must be compensated for any actual pecuniary loss resulting from default; and (iii) there must be adequate assurances of future performance under the lease.

Article VIII of the Secured Lender Plan governs the procedures for the rejection, assumption and assignment of unexpired leases and executory contracts in this case. The Ground Lease has already been assumed by the Debtor pursuant to the Ground Lease Assumption Order. The Secured Lender Plan provides that on the Closing Date the following additional unexpired leases and executory contracts will be assumed under the Secured Lender Plan: (i) those leases with the Debtor's tenants at the Real Property and executory contracts which are listed on <u>Exhibit C</u> to the Secured Lender Plan; (ii) the Debtor's insurance policies; and (iii) those executory contracts listed on <u>Exhibit C</u> to the Secured Lender Plan. The Secured Lender Plan further provides that at any time prior to the Closing Date, the Plan Administrator on behalf of the Debtor, with the Secured Lender's written consent, may file and serve on affected parties, an updated list of unexpired leases and executory contracts being assumed or rejected by the Debtor under the Secured Lender Plan (the "Supplemental List Of Executory Contracts Or Unexpired Leases Being Assumed Or Rejected").

The Secured Lender Plan provides that the Debtor's leases with Harrison Koeppel and Christopher Alvarado, and any lease with Admir Haxhiu, who is the Debtor's former superintendent (to the extent not terminated by the Effective Date), and its executory contract/unexpired lease with Big Man City Laundry LLC and any executory contract with Living NY (to the extent not already terminated) shall be rejected as of the Effective Date.

Annexed to the Secured Lender Plan as <u>Exhibit D</u> is the amount necessary to cure any defaults under unexpired leases and executory contracts being assumed under the Secured Lender Plan (each, a "Cure Amount"), provided that any amounts owed to Class Action Members shall constitute Class 4 Claims under the Secured Lender Plan and are not Cure Claims under such tenants' leases, except claims relating to the return of tenant security deposits to any tenants that may vacate the Property following the Effective Date. Any objection to the Cure Amount shall be filed by the tenants under such unexpired leases or parties to executory contracts being assumed with the Clerk of the Court no later than seven (7) seven days prior to the Confirmation Hearing on the Secured Lender Plan. The failure to file a timely objection shall constitute consent to the proposed assumption or rejection of such unexpired lease or executory contract and consent to the Cure Amount set forth in the <u>Exhibit D</u> to the Secured Lender Plan; provided that any party whose unexpired lease or executory contract is identified on any Supplemental Notice Of Assumed/Rejected Unexpired Leases And Executory Contracts shall have fourteen (14) days to file with the Bankruptcy Court an objection to such assumption or rejection or to such Cure Amount.

Those unexpired leases and executory contracts which are being assumed pursuant to the Secured Lender Plan (the "Assumed Unexpired Leases And Executory Contracts"), and which either are identified for assignment pursuant to the Sale Motion or the Transfer Motion, shall be assigned as set forth therein, subject to the right of the non-debtor party to such unexpired lease or executory contract to object to such assignment by filing an objection to either the Sale Motion or Transfer Motion no later than fourteen days before the hearing on such motion, which objection will be determined by the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Secured Lender Plan, in the event that the Secured Lender or an affiliate thereof is the Purchaser of the Sale Assets, or the Sale Assets are transferred to it under Section 7.5 of the Secured Lender Plan, then the Secured Lender or its affiliate shall be conclusively deemed to have

established adequate assurance of future performance under such assigned unexpired lease or executory contract under Bankruptcy Code Section 365.

The assignment of any Assumed Unexpired Lease And Executory Contract pursuant to the Secured Lender Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed and assigned unexpired lease or executory contract at any time before the date that the Debtor assumes or assumes and assigns such unexpired lease or executory contract. In accordance with Bankruptcy Code Section 365(k), assumption and assignment of any unexpired lease and executory contract, releases the Debtor from any liability for breach of such unexpired lease or executory contract occurring after the date of such assignment. Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assignment of such executory contract or unexpired lease.

Any and all executory contracts and unexpired leases of the Debtor which are not rejected, assumed or assumed and assigned under the Secured Lender Plan shall be deemed rejected as of the Closing Date of the Secured Lender Plan unless otherwise rejected, assumed, or assumed and assigned pursuant to an order of the Bankruptcy Court.

Parties whose unexpired leases or executory contracts have been rejected under the Secured Lender Plan may file a claim for damages resulting from such rejection (a "Rejection Claim") with the Clerk of the Court, and serve such claim upon the Debtor, the Secured Lender and Plan Administrator, within twenty-one days (21) days following service upon such party of notice of entry of the Confirmation Order or if the unexpired lease or executory contract is rejected after entry of the Confirmation Order then within twenty-one (21) days after entry of the order authorizing such rejection. If such Claim is not filed within such specified time, it shall forever be barred from assertion against the Debtor's estate without further notice to, or action, order or approval of the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Secured Lender Plan, the Plan Administrator shall have until the later of (i) thirty (30) days after the filing of such Rejection Claim unless such date is not a Business Day, then the deadline shall be the next Business Day or (ii) the General Claim Objection Deadline (as hereafter defined) to file an objection to such claim. Rejection Claims shall be treated as Class 5 Claims under the Secured Lender Plan.

### F.   The Treatment Of Disputed Claims And Objections to Claims Under The Secured Lender Plan

**(1)**   **Treatment Of Disputed Claims In Class 2 and Class 3.** In connection with cash distributions to be made in respect of Allowed Claims in Class 2 and Class 3, there shall be reserved from any distribution to the holder of a Disputed Claim the amount of Cash which then otherwise would be paid in respect to such Disputed Claim if the full amount of such Claim were deemed to be an Allowed Claim or such lesser amount as the Bankruptcy Court may determine. Notwithstanding anything in the Secured Lender Plan to the contrary, if any portion of a Class 2 or Class 3 Claim is a Disputed Claim, the Plan Administrator shall not be required to make any

payment or distribution provided in the Secured Lender Plan on account of the disputed portion of such Claim unless and until the disputed portion of such Claim becomes an Allowed Claim. Upon such Claim becoming an Allowed Claim, any distribution then due to be made in respect of such claim shall be paid no later than ten (10) Business Days thereafter in accordance with the provisions of the Secured Lender Plan and of such order of the Bankruptcy Court. Any monies remaining on deposit with respect to any Disputed Claim of a Class 2 Claimant or Class 3 Claimant after its resolution or determination by the Bankruptcy Court shall be returned to the Disbursing Agent and distributed pursuant to the terms of the Secured Lender Plan.

**(2)** **Treatment Of Disputed Claims In Class 4.** Any disputes as to the allowability or amount of Class 4 Claims shall be determined by the State Court in the Class Action Lawsuit pursuant to the Class Action Settlement Agreement, except the Bankruptcy Court shall determine the temporary allowance of Class 4 Claims for voting purposes under the Secured Lender Plan.

**(3)** **Right To Seek Estimation Of Claims.** Nothing in the Secured Lender Plan prohibits the Plan Administrator or Secured Lender from filing a motion to estimate any Claim for distribution purposes under Bankruptcy Code Section 502.

**(4)** **Deadline To File Claim Objections.** Except for Rejection Claims and Administrative Claims, all objections to Claims or motions to estimate a claim for distribution purposes shall be filed with the Court no later than one hundred twenty (120) days after the Confirmation Date (the "General Claim Objection Deadline") unless such date is not a Business Day, then the deadline shall be the next Business Day. Notwithstanding anything to the contrary in the Secured Lender Plan, no objections may be filed to the Claim of the Secured Lender, which is fixed and allowed as provided in Section 5.1 of the Secured Lender Plan, and prior orders of the Bankruptcy Court.

## G.   Distributions To Creditors Under The Secured Lender Plan

**(1)** **Plan Administrator To Act As Disbursing Agent Except With Respect To Class 4 Claims.** Except with respect to Class 4 Claims, the Plan Administrator shall act as Disbursing Agent under the Secured Lender Plan and shall make all distributions under the Secured Lender Plan to the appropriate holders of Allowed Claims and Interests in accordance with the terms of the Secured Lender Plan. Allowed Class 4 Claims will be paid by the Class Action Claims Administrator under the Class Action Settlement Agreement.

**(2)** **Distribution Record Date.** As of the Voting Deadline, the various transfer registers for the Debtor shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Secured Lender Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims. The Plan Administrator, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the Voting Deadline.

**(3)** **Execution of Rights and Powers of the Plan Administrator As Disbursing Agent.** From and after the Effective Date, the Plan Administrator, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtor and other parties in interest, from any and all Claims,

31

Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Plan Administrator as Disbursing Agent under the Secured Lender Plan and any order of the Bankruptcy Court entered pursuant to or in furtherance of the Secured Lender Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of the Plan Administrator. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Plan Administrator as Disbursing Agent, for making distributions in accordance with the Secured Lender Plan or for implementing provisions of the Secured Lender Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

**(4)** **Unclaimed Property.** Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. The amount represented by such voided check shall be deemed undeliverable property and shall be paid by the Plan Administrator to the Secured Lender, provided the Allowed Class 1 Claim has not been paid in full under the Secured Lender Plan.

**(5)** **Setoff and Recoupment.** The Debtor through the Plan Administrator may, but shall not be required to, setoff or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtor may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any claims, rights, or Causes of Action that the Debtor may possess against the holder of such Claim.

## H.    Means Of Implementing The Secured Lender Plan

**(1)** **Description of Means For Implementing The Secured Lender Plan.** The means for implementation of the Secured Lender Plan consist of: (i) the appointment of the Plan Administrator to manage and operate the Debtor and to execute all documents in connection with the Class Action Settlement Agreement and the Sale or Transfer of the Sale Assets and to pursue the Litigation Claims; (ii) the settlement of the Class Action Lawsuit pursuant to the Class Action Settlement Agreement; (iii) the Sale or Transfer of the Sale Assets, and the use of the proceeds from the Sale to make distributions to creditors under the Secured Lender Plan; (iv) the use of Cash Collateral to make distributions on Allowed Claims to the extent provided under the Secured Lender Plan; (v) the set-off of Secured Lender Reserves by the Secured Lender; (vi) the funding of a Class 5 Unsecured Creditors Reserve to ensure a distribution on Class 5 General Unsecured Claims; (vii) any amounts required by the Secured Lender Plan to be funded by the Secured Lender in the event the Sale Assets are transferred to it under Section 7.5 of the Secured Lender Plan; and (viii) the proceeds of the Litigation Claims.

**(2)** **Post-Confirmation Management Of The Debtor And Its Property.** Upon the Effective Date,, the Debtor's manager, officers and directors shall be conclusively deemed to have resigned and the Plan Administrator shall take over exclusive management and control of the Debtor. Upon the Effective Date, the Plan Administrator  shall be exclusively authorized to take all actions and execute all documents and instruments on behalf of the Debtor, including without

limitation: (i) the retention of Trigild as managing agent pursuant to the terms of a management to be approved by the Court; (ii) the retention of the Broker on behalf of the Debtor, which shall be selected by the Plan Administrator, and approved in writing by the Secured Lender, to sell the Sale Assets, which retention shall be subject to Bankruptcy Court approval; (iii) the execution of the Class Action Settlement Agreement; (iv) the retention of special counsel for the Plan Administrator on behalf of the Debtor for the purpose of filing and prosecuting the motions before the Bankruptcy Court and in the State Court, including without limitation motions seeking the approval of the Class Action Settlement Agreement and modification of the Interim Rent Order, which retention shall be subject to Bankruptcy Court approval; (v) commencing or continuing the prosecution of adversary proceedings or lawsuits before this or any other Court, asserting the Litigation Claims; and (vi) to enforce the provisions of the Plan and Confirmation Order.

The Plan Administrator shall be authorized to use the Secured Lender's Cash Collateral to operate the Property through the Closing Date pursuant to the terms of the existing Cash Collateral Orders and a budget either agreed upon by the Plan Administrator and Secured Lender, or approved by the Court, which budget shall include the Litigation Claims Carve-Out. The Plan Administrator shall also act as Disbursing Agent for all payments under the Plan, except for payment of Class 4 Claims, which shall be paid by the Class Action Claims Administrator. Upon the Effective Date, the Plan Administrator shall be named as an additional insured in all insurance policies for the Debtor or Property.

The Plan Administrator will be David Wallace. Mr. Wallace is the chief operating officer and general counsel for Trigild. Mr., Wallace is an attorney who has been practicing law for approximately 18 years and has been with Trigild for over 12 years, He has been appointed as a Chapter 11 Trustee or receiver in numerous cases. For example, Mr. Wallace was appointed and served as the Chapter 11 Trustee in the CFO Management Holdings, LLC bankruptcy case, which was pending before the United States Bankruptcy Court for the Eastern District of Texas (Case No. 19-40426), where he was responsible for the liquidation of interests in a real estate portfolio which was valued in excess of $50 million. Mr. Wallace is also currently the Chapter 11 trustee in the Buffalo Station, LLC bankruptcy case, which is pending before the United States Bankruptcy Court for the Northern District of Texas (Case No. 22-42843), which involves four debtors and multi-family residential properties located in Oklahoma.

Mr. Wallace also was counsel for a Chapter 11 Trustee that liquidated $1.6 billion in real estate interests and included more than 100 companies with equity and other management interests. Mr. Wallace's experience has also included overseeing and serving as lead counsel in a number of fraudulent transfer actions with ultimate recoveries in excess of tens of millions of dollars.

**(3)    The Class Action Settlement.** No later than three (3) Business Days after entry of the Confirmation Order, the Plan Administrator shall file on behalf of the Debtor a joint motion with the Class Action Members in the State Court in the Class Action Lawsuit for entry of an order: (i) preliminarily approving the Class Action Settlement Agreement, (ii) scheduling a final hearing on approval of the Class Action Settlement Agreement; (iii) modifying the Interim Rent Order as provided in the Class Action Settlement Agreement; and (iv) approving entry of the Class Action Order and Final Judgment. **In addition to and not in substitution of the Releases set forth in Section 10.3 of the Secured Lender Plan, pursuant to the Class Action Settlement Agreement, upon entry of the Class Action Order and Final Judgment and payment of the**

**Class Action Settlement Amount, all claims of the Class Action Members (except for those who have validly opted-out of the Class Acton Settlement pursuant to New York Civil Practice Law And Rule 908) against the Released Parties, Debtor, the Secured Lender and any purchaser or transferee of the Debtor's interest in the Real Property and any subsequent purchaser or assignee of the Debtor's interest in the Real Property, and all defendants in the Class Action Lawsuit shall be deemed released as set forth in paragraph 34 of the Class Action Settlement Agreement.**

(4)     **The Sale.** Upon entry of the Confirmation Order and Broker Retention Order, the Broker shall market the Sale Assets for sale for a period of up to one hundred  twenty (120) days (the "Marketing Period"), which period may be extended for up to an additional one hundred twenty (120) days with the prior written consent of the holder of the Class 1 Allowed Claim (the "Extended Marketing Period"). It shall be the Broker's duty to seek to obtain the highest and best price for the Sale Assets, taking into account the ability of proposed purchasers to close on their offers to purchase the Sale Assets.

(5)     **Purchase and Sale Agreement.** During the Marketing Period, the Plan Administrator on behalf of the Debtor shall have the authority to enter into a purchase and sale agreement to sell the Sale Assets (the "Purchase and Sale Agreement"), provided such agreement is subject to: (i) the Secured Lender' prior written consent; (ii) the submission of higher and better offers, including the Secured Lender's right to submit an offer through a credit bid pursuant to Bankruptcy Code Section 363(k); (iii) Bankruptcy Court approval; and (iv) the closing of such Sale occurring no later than thirty (30) days after entry of the Sale Order, unless such date is extended with the written consent of the Secured Lender.

(6)     **Sale Motion.** No later than three (3) Business Days after entry into a Purchase and Sale Agreement, the Plan Administrator shall file a motion (the "Sale Motion") with the Bankruptcy Court seeking entry of an order: (i) approving the Sale to the purchaser under the Purchase and Sale Agreement, subject to higher and better offers (the "Purchaser"); (ii) finding that the Purchaser of the Sale Assets is a good faith purchaser entitled to the protections of Bankruptcy Code Section 363(m); and (iii) scheduling a hearing to approve the Sale (the "Sale Hearing").

(7)     **Transfer of the Sale Assets to the Secured Lender In Lieu Of Sale.** In the event that the Debtor, through the Plan Administrator fails to both enter into a Purchase and Sale Agreement to sell the Sale Assets, and file the Sale Motion within thirty days of the end of the Marketing Period or Extended Marketing Period, then at the Secured Lender's option either (i) the Plan Administrator or Secured Lender shall file a motion with the Court setting forth bid procedures for an auction sale of the Sale Assets to occur on or before the Marketing Period, or Extended Marketing Period, as applicable, or (ii) the Secured Lender shall submit a credit bid to the Plan Administrator pursuant to Bankruptcy Code Section 363(k), and the Plan Administrator shall accept such credit bid. If the Secured Lender selects option (ii) of the previous sentence, then within three (3) Business Days of receiving such credit bid, the Plan Administrator shall file a motion (the "Transfer Motion") with the Court for entry of an Order directing the Plan Administrator to transfer the Sale Assets to the Secured Lender or its designee free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code Section 363(k) along with such other distribution as is consistent with Section 5.1 of the Secured Lender Plan, and a determination that

the Secured Lender is a good faith purchaser under Bankruptcy Code Section 363(m), and the Secured Lender shall be entitled to set-off against Secured Lender Reserves. Such Transfer to the Secured Lender shall not be subject to higher and better offers. In the event that the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of the Secured Lender Plan, the Secured Lender shall, among  other things, pay the Class Action Settlement Amount to the Class Action Claims Administrator pursuant to the Class Acton Settlement Agreement.

(8)      **Free and Clear Sale or Transfer.** The Sale Assets shall be sold or transferred free and clear of all liens, Claims encumbrances, and Interests pursuant to Bankruptcy Code Section 363(f), which liens, claims, encumbrances and interests shall upon the Closing Date attach to the proceeds of the Sale in the same order of priority that currently exist on the Sale Assets.

(9)      **Cancellation of Liens.** Except as otherwise specifically provided in the Secured Lender Plan, upon the payment in full in Cash of a Secured Claim, any Lien securing such Claim, shall be deemed released, and the holder of such Secured Claim shall be directed to release any collateral or other property of the Debtor held by such holder and to take such actions as may be requested by the Plan Administrator to evidence the release of such lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Plan Administrator on behalf of the Debtor.

(10)      **"As Is Where Is".** The Sale or Transfer as contemplated by the Secured Lender Plan shall be without representations or warranties of any kind, nature or description by the Debtor. The Sale Assets shall be sold or transferred "as is," "where is" and "with all faults." ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS EXPRESSLY DISCLAIMED AND THERE SHALL BE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF THE SALE ASSETS OR ANY PORTION THEREOF. Any purchaser of the Sale Assets will be deemed to acknowledge and represent that it: (a) has had an opportunity to conduct due diligence regarding the Sale Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and inspection of any documents and/or the Sale Assets in making its bid; and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Assets, or the completeness of any information provided in connection with the Sale or the Auction.

(11)      **Exemption From Taxes.** The Sale or Transfer pursuant to the Secured Lender Plan including without limitation, the Real Property, shall be exempt from New York State and New York City transfer taxes and stamp taxes pursuant to Bankruptcy Code Section 1146. Specifically, pursuant to Bankruptcy Code Section 1146: (a) the Sale or Transfer, including without limitation, the transfer of the Real Property to the Purchaser or Secured Lender, or its designee, and the making or delivery of any instrument of transfer in connection or furtherance of the Secured Lender Plan, and any financing by the Purchaser, (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Secured Lender Plan and the Purchase and Sale Agreement, (c) the creation of any Lien, mortgage, deed of trust, or other security interest, (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other Instrument of transfer under, pursuant to, in furtherance of, or in connection with the Secured Lender Plan, including, without limitation, any deeds, bills

of sale, or assignments executed in connection with the Sale or Transfer, and the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Secured Lender Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate Transfer Tax imposed under Article 31 of the Tax Law of the State of New York, (iii) the New York City Real Property Transfer Tax imposed by title 11, chapter 21 of the New York City Administrative Code and, (iv) any similar tax on the recording of deeds, transfers or property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof. Consistent with the foregoing, the recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded, including without limitation, the City Register's Office shall, pursuant to the Confirmation Order and/or Sale Order, or order approving the Transfer to the Secured Lender be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax, as well as cancel and discharge of record all liens, judgments, encumbrances, claims, and other adverse interests in or against the Real Property. All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Real Property or other Sale Assets, any taxes from which the transactions effectuated pursuant to the Secured Lender Plan and Confirmation Order are exempt, pursuant to and in furtherance of Bankruptcy Code Section 1146(a) and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Tax, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto. The City Register's Office is hereby authorized and directed to record any deed, mortgage of the Property and any modification, restatement, amendment or assignment of any mortgages and any other similar conveyance, indenture or other documents contemplated under the Secured Lender Plan without the payment of any of the aforementioned exempt taxes or any other stamp tax, transfer tax or similar tax, and without the presentation of affidavits, instruments or returns otherwise required for recording or filing pursuant to the provisions of Bankruptcy Code Section 1146(a).

(12)    **Funding of Class Action Settlement Amount.** The Plan Administrator or the Secured Lender in the event of a Transfer under Section 7.5 of the Plan, shall distribute the Class Action Settlement Amount to the Class Action Claim Administrator under the Class Action Settlement no later than: (i) the Closing Date; or (ii) three (3) Business Days after entry of the Class Action Order and Final Judgment by the State Court in the Class Action Lawsuit.

(13)    **Funding of Reserves.** On the Effective Date, the Plan Administrator shall reserve from Cash Collateral such funds as are necessary to pay all Allowed Administrative Claims and All Allowed Priority Claims which are due and owing as of the Effective Date. On the Effective Date, the Plan Administrator shall reserve $25,000 from Cash Collateral to establish the Class 5 Unsecured Creditors Reserve.

**(14)    Restoration of Tenant Security Deposits.**  On the Closing Date, the Purchaser of the Sale Assets or the Secured Lender in the event that the Sale Assets are transferred to it under Section 7.5 of the Secured Lender Plan, if not previously restored, shall establish a separate tenant security deposit account for security deposits received from tenants at the Property, and shall fund any insufficiency in tenant security deposits.  On the Closing Date, the Plan Administrator shall assign to the Purchaser or the Secured Lender, any claim held by the Debtor against William W. Koeppel, Whitehouse Estates, Inc., Koeppel & Koeppel Realty Management or any Person or Entity in connection with the conversion of tenant security deposits, to the extent that the Purchaser or the Secured Lender was the party that restored the tenant security deposits.

**(15)    Return of Excess Reserve Funds.** The Plan Administrator shall pay to the Secured Lender, all funds remaining in the Class 5 Unsecured Creditors Reserve remaining after the payment of all distributions under the Secured Lender Plan, provided the Allowed Class 1 Claim has not been paid in full under the Secured Lender Plan.

**(16)    Plan Administrator Compensation.**  The Plan Administrator shall be paid $10,000 per month from Cash Collateral for his services and shall be entitled to reimbursement of his reasonable documented expenses in the ordinary course and without need for Bankruptcy Court approval pursuant to the Plan Administrator Agreement from the Effective Date through the Closing, and thereafter his compensation shall be paid from the Litigation Claims Carve=-Out or proceeds of the Litigation Claims through the date of closing of the Bankruptcy Case.

**(17)    Effectuating Documents; Further Transactions.** Upon the Effective Date, all actions contemplated by the Secured Lender Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms thereof. On or as soon as practicable after the Effective Date, the Plan Administrator may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Secured Lender Plan, including without limitation (i) the execution and delivery of appropriate agreements or other documents on behalf of the Debtor containing terms that are consistent with the terms of the Secured Lender Plan, (ii) the execution and delivery on behalf of the Debtor of appropriate instruments of transfer, assignment, assumption, or delegation of any Sale Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Secured Lender Plan and having other terms to which the applicable parties agree; and (iii) all other actions that the Plan Administrator determines to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**(18)    Closing of Bankruptcy Case.** After the Debtor's bankruptcy estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Bankruptcy Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**(19)    Injunctions And Exculpation.** The Plan contains injunctions and exculpations provisions which are set forth in detail in Section IX of this Disclosure Statement.

## I.  The Effective Date And Binding Effect Of The Plan Upon Confirmations

The Effective Date of the Plan shall occur on the date that the Court enters an order confirming the Plan. Upon the Effective Date, the Plan and Confirmation Order shall be binding on all holders of a Claim or Interest and such holder's respective successors and assigns, whether or not: (a) the Claim or Interest is Impaired under the Plan; (b) such holder has accepted the Plan; (c) such holder has failed to vote to accept or reject the Plan or voted to reject the Plan; (d) such holder is entitled to a distribution under the Plan; (e) such holder will receive or retain any property or interests in property under the Plan; and (f) such holder has filed a Proof of Claim in the Bankruptcy Case. The Plan, and the Confirmation Order will constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms. Pursuant to Bankruptcy Code Section 1142(e), the Plan and the Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

## J.  Modification Of The Plan And Substantial Consummation

A proponent of a plan, such as the Secured Lender may seek to modify a confirmed plan up to the date of substantial consummation of the Plan, subject to Bankruptcy Court approval. After substantial consummation, a confirmed plan may no longer be modified. Depending upon the scope of any proposed modification, the Bankruptcy Court may require a re-solicitation of votes with respect to any plan modification.

While the Secured Lender does not have any present intention to seek any modification of the Secured Lender Plan, the Secured Lender shall have the right to seek modification of the Secured Lender Plan to the extent permitted under Bankruptcy Code Section 1127 at any time through the date of substantial consummation of the Plan. The Secured Lender Plan provides substantial consummation of the Secured Lender Plan shall occur on the latest of the following:

(a)     The date that the Confirmation Order becomes a Final Order;

(b)     The date of entry of the Class Action Order And Final Judgment by the State Court in the Class Action Lawsuit;

(c)     The date that all actions, documents, and agreements necessary to implement and consummate the Plan (the "Plan Documents") shall have been effected or executed and binding on all parties thereto and to the extent required, filed with the applicable governmental units in accordance with applicable law;

(d)     The Closing Date pursuant to the Plan; and

(e)     The deadline for Class Action Members to Opt-Out of the Class Action Settlement has expired, and the number of Opt-Outs did not exceed 20% of the Class Action Members.

Notwithstanding the foregoing, Substantial Consummation shall not be deemed to have occurred in the event that the number of Opt-Outs exceeds 20% of Class Action Members.

## VI.    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Except for those matters reserved to the jurisdiction of the State Court in the Class Action Lawsuit as set forth in the Secured Lender Plan or Class Action Settlement Agreement, the Secured Lender Plan provides that the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under and related to the Bankruptcy Case including, without limitation, the determination of all controversies arising under or in regard to the Secured Lender Plan, objections to Claims, and the enforcement or continuation of orders entered in this Bankruptcy Case, all as set forth in more detail in Article XV of the Secured Lender Plan.

## VII.    RELEVANT FINANCIAL INFORMATION

Included herewith for the review of all holders of Claims and Interests and all other parties in interest are the following financial documents which are incorporated herein and made a part hereof:

(a)    Estimated Liquidation Analysis of the Debtor, which is attached as <u>Exhibit 3</u> to this Disclosure Statement;

(b)    The Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, which are attached as <u>Exhibit 4</u> to this Disclosure Statement; and

(c)    The Debtor's Post-Petition Income Statement derived from its Monthly Operating Report, which is attached as <u>Exhibit 5</u> to this Disclosure Statement.

## VIII.    LITIGATION CLAIMS WHICH SURVIVE PLAN CONFIRMATION

All claims and Causes of Action held by the Debtor or its bankruptcy estate, including all claims (the "Litigation Claims") under contract, tort, state law or Article 5 or any other provision of the Bankruptcy Code against the following persons and entities shall be preserved and retained following the Effective Date, shall be carved out from the releases granted pursuant to Section 10.3 of the Secured Lender Plan and shall survive confirmation of the Secured Lender Plan, and the Plan Administrator, in its discretion, shall have the authority to commence, prosecute, settle or abandon any or all of such claims, including any claims of Causes of Action which are currently the subject of any pending litigation involving the Debtor: (i) William W. Koeppel; (ii) the Estate of William W. Koeppel; (iii) Jean Koeppel; (iv) Whitehouse Estates, Inc.; (v) Koeppel & Koeppel Realty Management; (vi) WWK 140 Bay Ridge, LLC; (vii) Livingston Management; (viii) Living NY; (ix) Christopher Alvarado; (x) Harrison Koeppel; (xi) Roberta L. Koeppel; (xii) Koeppel Management Company LLC; (xiii) Alexandra Koeppel; (xiv) Roberta L. Koeppel and Alexandra Koeppel as Executors and Trustees of the Trust created under Article Fourth of the Last Will and Testament of Robert A. Koeppel; (xv) Big Man City Laundry Limited; (xvi) any and all affiliates or insiders of the foregoing persons and entities; (xvii) any insiders and affiliates of the Debtor; and (xviii) any Class Action Members that Opt-Out of the Class Action Settlement.  The Litigation Claims shall also include any and all administrative claims and proceedings and tax grievance and certiorari claims concerning the Property, which shall be preserved and may be asserted by the Plan Administrator, whether or not pending as of the Effective Date.

There shall be carved out from the Secured Lender's cash collateral the sum of $100,000, to be used the purpose of paying reasonable expenses incurred by the Plan Administrator investigating and/or prosecuting the Litigation Claims, including the payment of reasonable professional fees incurred by the Plan Administrator in connection therewith (to the extent approved by the Court), and paying the Plan Administrator's monthly compensation (the "Litigation Claims Carve-Out"). Any amount of the Litigation Claim Carve-Out not expended by the Plan Administrator as of the date of the closing of the Debtor's Bankruptcy Case shall be paid to the Secured Lender to the extent that it has not been paid one hundred percent of its Class 1 Claim.

## IX.    INJUNCTIONS, EXCULPATION AND LIMITATION OF LIABILITY AND RELEASES OF CLAIMS PROVISIONS OF THE PLAN

**The Secured Lender Plan contains several injunction and exculpation provisions which are described below.**

A.    **Injunctions**. Section 10.1 of the Secured Lender Plan provides that upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Secured Lender Plan in relation to any Claim or Interest paid or treated pursuant to the Secured Lender Plan, provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Secured Lender Plan. Except as expressly provided in the Secured Lender Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Plan Administrator and a holder of a Claim against or Interest in the Debtor, with the Secured Lender's written consent, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Secured Lender Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are paid or treated pursuant to the Secured Lender Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, or the property of the Debtor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, or the property of Debtor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, or the property of any of the Debtor; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor or against property of the Debtor, except as contemplated or allowed by the Secured Lender Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Secured Lender Plan.

B.    **Exculpation Provisions**. Section 10.2 of the Secured Lender Plan provides that to the maximum extent permitted by applicable law, the Plan Administrator and  the Secured Lender

and with respect to each of the foregoing, all Related Parties (as defined in Article I of the Secured Lender Plan) shall be released and exculpated from any claim, objection, suit judgment, damage, demand, debt, right, cause of action, remedy, loss and liability for any conduct occurring on or after the Petition Date through the date of Substantial Consummation of the Secured Lender Plan in connection with or arising out of or related to the filing and administration of the Bankruptcy Case, including without limitation the formulation, negotiation, preparation, execution or implementation of the Secured Lender Plan including the Class Action Settlement Agreement or documents ancillary to the Secured Lender Plan, the Disclosure Statement, the solicitation of votes for and pursuit of confirmation of the Secured Lender Plan, the property or funds to be sold or distributed pursuant to the Secured Lender Plan, the consummation of the Secured Lender Plan, the Cash Collateral Orders, the administration of the Plan and all decisions, actions, inactions and alleged negligence relating to any of the foregoing, except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.

    **C.**    <u>Release Provisions</u>. (1) Section 10.3(a) of the Secured Lender Plan provides that upon entry of the Class Action Order and Final Judgment, as of the Effective Date: (i) each Releasing Class Member hereby forever waives, releases, and discharges all Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed to submit a Notice of Claim Form; (ii) each Releasing Class Member shall be permanently enjoined from commencing, prosecuting, or continuing any of the Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed to submit a Notice of Claim Form; and (iii) the Releasing Landlord hereby forever releases all Class Action Members, except Opt-Outs, from all statutory, regulatory, common law or other claims, Causes of Action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs, penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal, state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before entry of the Final Order & Judgment, that are based upon or related to, or arise out of the Class Action Lawsuit, except non-payment of back rent to the extent otherwise set forth in the Class Action Settlement Agreement and actions or proceedings pending on, or filed after, the date of the Class Action Settlement Agreement for unrelated claims for bodily injury or damage to personal property.[8] Notwithstanding anything to the contrary contained in the Secured Lender Plan, upon entry of the Class Order and Final Judgment, each Releasing Class Member will be bound by the terms of the releases contained in the Class Action Settlement Agreement, regardless as to whether such Releasing Class Member indicated on its ballot for accepting or rejecting the Plan that it did not consent to being bound by the release contained in Section 10.3 of the Secured Lender Plan

    **(2)**    **Section 10.3(b) of the Secured Lender Plan provides that unless they have affirmatively opted out of the release set forth in Section 10.3(b) of the Secured Lender Plan by checking the box on the Ballot indicating that they opt not to grant the release, each Claimant or holder of an Interest shall be deemed to have conclusively released and**

---

[8]    The Secured Lender Plan defines "Releasing Class Member: as "each Class Member who: (i) has not affirmatively opted out of the release set forth in Section 10.3(a) of the Plan by checking the box on the Ballot indicating that they opt not to grant such release; or (ii) does not timely opt out of the Class Action Settlement Agreement, and the heirs, successor trustees, executors, administrators and assigns of each of them. All capitalized terms in this section which are not otherwise defined in the Secured Lender Plan or this Disclosure Statement shall have the meanings ascribed to such terms in the Class Action Settlement Agreement, which is annexed to the Plan as <u>Exhibit B</u>.

discharged each of the Released Parties from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively) based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Bankruptcy Case, the restructuring of the Claims and Interests before or during the Bankruptcy Case, the negotiation, formulation, preparation or consummation of the Plan, the Plan Documents, the Cash Collateral Orders, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all of the foregoing cases based on any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary contained in the Secured Lender Plan Section 10.3(b) of the Secured Lender Plan shall not be deemed to have released any claims or Causes of Action constituting Litigation Claims that the Plan Administrator is entitled to assert against any Person or Entity under Article XI or any other provision of the Secured Lender Plan.

(3)    The Entities referred to above and in Section 10.3(a) and (b) of the Secured Lender Plan shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under Section 10.3 of the Secured Lender Plan against each of the Released Parties.

(4)    Notwithstanding anything to the contrary contained in the Plan, nothing in this the Plan shall be construed to release the Released Parties from any gross negligence, willful misconduct, or actual fraud as determined by a Final Order of the Bankruptcy Court, or from any Litigation Claims, or to release any claims that the Secured Lender has against Insider or Affiliate of the Debtor.

A.    Notwithstanding anything to the contrary contained in the Secured Lender Plan or Disclosure Statement, all Litigation Claims referred to in Article XI of the Secured Lender Plan shall not be released by the Secured Lender Plan or the Class Action Settlement Agreement, and nothing shall constitute a release, waiver or discharge of any claim held by the Secured Lender against any Person or Entity.

## X.    RISKS FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Secured Lender Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Secured Lender Plan or its implementation.

A.    **Risk of Non-Confirmation of the Secured Lender Plan.** Although the Secured Lender believes that the Secured Lender Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Secured Lender Plan will not be required for confirmation or that modifications may need to be made after the Secured Lender Plan's Effective Date but before Substantial Consummation of the Secured Lender Plan. The Secured

Lender can make no assurances that it will receive the requisite acceptances of all classes of Claims and Interests to confirm the Secured Lender Plan on a consensual basis. Even if all voting Classes voted in favor of the Secured Lender Plan, or the requirements for "cramdown" are met with respect to any Class that rejects the Secured Lender Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Secured Lender Plan. If the Secured Lender Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in this Bankruptcy Case.

**B.**    **Risk Of Confirmation Of An Alternate Plan.** If the Secured Lender Plan is not confirmed, it is possible that another plan could be confirmed in this Chapter 11 case. The only other plan that has been filed in this Bankruptcy Case to date is a plan filed by the Debtor, which does not contain a settlement of the Class Action Lawsuit, and provides that the Debtor's interest in the Real Property will be sold for an undisclosed amount at an undetermined point in the future, and that creditors may receive a distribution from the proceeds of the Indemnification Action (with respect to Class Action Members), and the proceeds of the sale available after the Secured Lender's Claim is paid. However, the Debtor has taken no action to seek confirmation of its plan since it was filed in November 2022.

The Secured Lender believes that any plan which does not result in a resolution of the Class Action Lawsuit will not generate sufficient sale proceeds for a distribution to Class Action Members and other unsecured creditors in this Bankruptcy Case because the continuation of the Class Action Lawsuit and the payment of below-market rents pursuant to the existing Interim Rent Order, along with the risk that Class Action Members may have successor liability claims against any purchaser will chill bidding on the Sale Assets and depress the value of the Property for potential purchasers.

**C.**    **Risk Of Conversion Of Bankruptcy Case From Chapter 11 To Chapter 7.** If the Secured Lender Plan is not confirmed, the Bankruptcy Court may convert the Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. As set forth in the liquidation analysis set forth in Exhibit 3 to this Disclosure Statement and as discussed in Section XIV of this Disclosure Statement, the Secured Lender believes that a sale of the Debtor's assets in Chapter 7 will not generate sufficient proceeds to make a distribution to any creditor in this Bankruptcy Case, other than the Secured Lender.

**D.**    **Risk Of Dismissal Of Bankruptcy Case.** If the Secured Lender Plan is not confirmed, there is a risk that the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case. If the Bankruptcy Case is dismissed, the Secured Lender will pursue its remedies in its pending Foreclosure Action, and will seek the appointment of a receiver for the Real Property and a foreclosure sale of the Real Property. The Secured Lender believes that a foreclosure sale of the Real Property would generate insufficient proceeds to pay any creditors other than the Secured Lender.

**E.**    **Risk Of Non-Occurrence Of Substantial Consummation Of The Plan.** As set forth earlier the Plan contains several requirements for Substantial Consummation of the Plan

including: (i) the Confirmation Order becoming a Final Order; (ii) entry of the Class Action Order And Final Judgment by the State Court in the Class Action Lawsuit; (iii) all Plan Documents shall have been effected or executed and binding on all parties thereto and to the extent required, filed with the applicable governmental units in accordance with applicable law; (iv) the Closing of the Sale or Transfer of the Sale Assets pursuant to the Plan; and (v) the deadline for Class Action Members to Opt-Out of the Class Action Settlement has expired, and the number of Opt-Outs shall not exceed 20% of the Class Action Members.

While the Secured Lender is confident that Substantial Consummation of the Secured Lender Plan will occur, if Substantial Consummation does not occur because one or more of the requirements for Substantial Consummation have not been met, there could be a modification of the Secured Lender Plan filed by the Secured Lender, or the Debtor's bankruptcy case could be dismissed or converted to Chapter 7.

**F.** **Risks That Allowed Claims May Be Greater Than Projected.** Under the Secured Lender Plan, Claims in Class 4, Class 5 and Class 6 will be paid a *pro-rata* share of the amount of funds set aside for the payment of Allowed Claims in such classes. There can be no assurance that the estimated allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Therefore, the actual amount of Allowed Claims in each Class and any projected distribution on such Claims under the Secured Lender Plan may vary from the amounts set forth in the Disclosure Statement and the variation may be material.

**G.** **Risks Associated With The Litigation Claims.** The Secured Lender Plan provides that the Litigation Claims will be retained by the Plan Administrator on behalf of the Debtor post-confirmation and that the Plan Administrator will have the sole authority to commence, litigate, abandon and resolve such claims, and that the proceeds of any such litigation, after the payment of reasonable Court-approved expenses associated with such litigation, will be distributed to creditors pursuant to the Secured Lender Plan. The Secured Lender is unable to predict the amount of such litigation proceeds, if any, which will be available for distribution to creditors in this case.

**H.** **No Duty to Update This Disclosure Statement.** The statements contained in this Disclosure Statement are made by the Secured Lender as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Secured Lender has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**I.** **No Representations Outside This Disclosure Statement Are Authorized.** No representations concerning or related to the Debtor, the Bankruptcy Case, or the Secured Lender Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

**J.** **No Legal or Tax Advice Is Provided by this Disclosure Statement.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder

of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or whether to object to confirmation of the Plan.

**K.**    **No Admissions Made.** Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims or Interests.

## XI.    ALTERNATIVES TO THE PROPOSED SECURED LENDER PLAN

The Secured Lender has evaluated several alternatives to the Plan. After studying these alternatives, the Secured Lender has concluded that the Secured Lender Plan is the best option, which will maximize recoveries to parties in interest, assuming confirmation and Substantial Consummation of the Plan.

If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the consideration of an alternative plan; (ii) a sale of the Debtor's assets pursuant to Bankruptcy Code Section 363; (iii) liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code; or (iv) dismissal of the Debtor's Bankruptcy Case. A discussion of each of these alternatives is set forth below.

**A.**    **Alternative Plan of Reorganization.** If the Plan is not confirmed, the Debtor or another party-in-interest could attempt to confirm or formulate a different plan. As set forth earlier, the only other party to file a plan in this Bankruptcy Case was the Debtor, and the Debtor has taken no action to seek to confirm its Plan since November 2022. The Debtor's plan, which does not resolve the Class Action Lawsuit, provides for the sale of the Debtor's interest in the Property at an unknown time in the future, and that creditors may receive a distribution from the proceeds of the Indemnification Adversary Proceeding or Class Action Third Party Claim, or the sale of the Real Property after the Secured Lender is paid in full. The Secured Lender believes that any Plan which provides for a sale of the Debtor's interest in the Property without a resolution of the Class Action Lawsuit will not result in sufficient sale proceeds for a distribution to be made to any creditors in this Bankruptcy Case, other than the Secured Lender. Therefore, the Secured Lender believes that confirmation of the Secured Lender Plan will result in the highest distribution to creditors in this Bankruptcy Case.

**B.**    **Sale Under Section 363 of the Bankruptcy Code.** If the Plan is not confirmed, the Debtor could seek authorization from the Bankruptcy Court, after notice and a hearing, to sell its assets under Section 363 of the Bankruptcy Code. However, upon analysis and consideration of this alternative, the Secured Lender does not believe a sale of the Sale Assets under Section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Secured Lender Plan because the Class Action Lawsuit would remain pending, and with it the possibility that the Class Action Members may hold a successor liability claim against any purchaser of the Debtor's interest in the Property, which would depress the purchase price for the Debtor's assets. Additionally, unlike a sale pursuant to a Chapter 11 plan, a sale under Bankruptcy Code Section 363 is not exempt from state and local transfer taxes, which would be substantial in a sale of the Debtor's interest in the Real Property in this case, and would most likely be borne by the purchaser.

The requirement to pay these taxes would likely reduce the price that a purchaser would be willing to pay for the Real Property.

**C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law.** If the Debtor's Bankruptcy Case were converted to a Chapter 7 liquidation, a trustee would be appointed to sell the Debtor's assets and pursue any litigation claims that the Debtor may have. This would result in the accumulation of additional administrative expenses in the Bankruptcy Case which would have priority over General Unsecured Claims against the Debtor. Additionally, the Secured Lender would not be required to carve out any funds from the sale of its collateral for the payment of creditors, which is the key element of the Secured Lender Plan which ensures that holders of Class 4 and Class 5 Claims will receive a distribution in this Bankruptcy Case.

As set forth in the liquidation analysis attached to this Disclosure Statement as Exhibit 3, and as set forth in Section XIV of the Disclosure Statement, the Secured Lender believes that a liquidation under Chapter 7 will not result in any funds being available to make a distribution to any creditors of the Debtor, except for the Secured Lender. Therefore, the Secured Lender believes that confirmation of the Secured Lender Plan is better for creditors than a Chapter 7 liquidation.

**D.    Dismissal of the Debtor's Bankruptcy Case.** As set forth earlier, a dismissal will result in the Secured Lender pursuing its remedies in its pending Foreclosure Action, including the appointment of a receiver for the Property and a foreclosure sale of the Property. The Secured Lender believes that a foreclosure sale of the Property would generate insufficient proceeds to pay any creditor other than the Secured Lender. Accordingly, the Secured Lender believes that confirmation of the Secured Lender Plan will yield the best distribution for creditors in this Bankruptcy Case.

## XII.    THE CONFIRMATION HEARING

**A.    The Confirmation Hearing And Hearing On Final Approval Of This Disclosure Statement**. Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Bankruptcy Court has scheduled a hearing for December __, 2023 at _____ _.m. (the "Hearing") to consider both confirmation of the Secured Lender Plan and final approval of this Disclosure Statement. The Hearing will be held in person before the Honorable Sean H. Lane in the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601. Creditors of, and holders of Interests in, the Debtor may attend such hearing. The Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date at the Confirmation Hearing, at any subsequent continued Hearing, or pursuant to a notice filed on the docket in the Bankruptcy Case.

**B.    Objection Deadline To Confirmation Of The Secured Lender Plan Or Final Approval Of This Disclosure Statement**. The Bankruptcy Court has fixed December __, 2023 at __:__ p.m. as the date and time by which all written objections to confirmation of the Secured Lender Plan or final approval of this Disclosure Statement shall be filed with the Bankruptcy Court and served upon the attorneys for the Secured Lender, the Debtor, and upon the United States Trustee at the following addresses:

**To The Secured Lender:**

Bruce J. Zabarauskas, Esq.
Vivian M. Arias, Esq.
Holland & Knight LLP
31 West 52nd Street, 12th Floor
New York, New York 10019

**To The Debtor:**
C. Nathan Dee, Esq,
Elizabeth M. Aboulafia, Esq.
Cullen & Dykman LLP
333 Earle Ovington Blvd., 2nd Floor
Uniondale, New York 11553

and

Joel Shafferman, Esq.
Shafferman & Feldman, LLP
137 Fifth Avenue, 9th Floor
New York, NY 10010

**To The United States Trustee:**

United States Trustee's Office
Attn: Paul Schwartzberg, Esq.
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10004

**UNLESS AN OBJECTION TO CONFIRMATION OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## XIII.   CONFIRMATION IN THE ABSENCE OF ACCEPTANCE BY ALL CLASSES OF CLAIMS AND INTERESTS

Section II of this Disclosure Statement described generally the requirements for confirmation of a Chapter 11 plan. The Secured Lender Plan may be confirmed if all impaired classes have voted to accept the Secured Lender Plan, and the Secured Lender Plan satisfies all of the other requirements for plan confirmation set for in the Bankruptcy Code Section 1129(a). However, even if one or more classes of Claims or Interests votes to reject the Secured Lender Plan, the Secured Lender Plan may still be confirmed if: (i) at least one impaired class of claims has voted to accept the Secured Lender Plan, not including the votes of Insiders of the Debtor; (ii) the Secured Lender Plan is fair and equitable to dissenting classes; and (iii) the Secured Lender

Plan does not unfairly discriminate against dissenting classes. Confirmation of a plan without the acceptance of all classes of creditors under the plan is known as a "cram down."

The Secured Lender believes that even if one or more classes votes to reject the Secured Lender Plan, the requirements for cram down will be met in this case, and the Bankruptcy Court may still confirm the Secured Lender Plan for the reasons set forth below.

**A.** **Acceptance By At Least One Impaired Class Of Claims, Not Including The Votes Of Insiders.** First. the Secured Lender, which is the holder of the Class 1 Claim, will be voting to accept the Secured Lender Plan. Therefore, the requirement that at least one class of impaired claims has voted to accept the Secured Lender Plan, not including the votes of Insiders, will be met.

**B.** **The Fair And Equitable Requirement.** As set forth earlier, the fair and equitable requirement incorporates the absolute priority rule, which generally requires that no class of claims that is junior in priority to a class that has voted to reject the plan (a "Dissenting Class") may receive a distribution under the plan until the Dissenting Class has been paid in full. The Secured Lender Plan provides for the payment of claims in their order of priority under the Bankruptcy Code, except that holders of general unsecured claims (other than Subordinated General Unsecured Claims) will receive a distribution on their Allowed Claims prior to the Secured Lender being paid in full. However, the Secured Lender will be voting to accept the Secured Lender Plan and has agreed to the treatment of Allowed Claims provided for in the Secured Lender the Plan. Hence, the Secured Lender asserts that the fair and equitable standard has been met because the Secured Lender Plan does not provide for any distributions to be made to holders of Allowed Claims which are junior in priority to the Allowed Claims in any Dissenting Class.

**C.** **The Unfair Discrimination Requirement.** As set forth earlier, the purpose of the unfair discrimination requirement is to ensure that a class of Claims which has rejected the plan is not unfairly treated vis-à-vis a substantially similar class of Claims. Under the Secured Lender Plan, the Claims of Class Action Members, which is Class 4, are being treated differently than the Claims of Class 5 General Unsecured Claims because the holders of Class 4 Claims also have potential successor liability claims against any purchaser of the Debtor's interest in the Property. Under the Class Action Settlement, the holders of Class 4 Claims (except for Opt-Outs) are releasing any successor liability claims against any purchaser of the Debtor's interest in the Real Property. This release of successor liability claims benefits creditors in this case, because the existence of potential successor liability claims against a purchaser of the Debtor's interest in the Real Property would chill potential purchasers and depress the potential sale price for the Debtor's interest in the Real Property. Additionally, the Class Action Settlement increases the rents for existing tenants at the Real Property, who are Class 4 members, and the Class Action Settlement will result in the deregulation of 31 apartments at the Real Property, which will increase the rent roll at, and the value of, the Real Property which is being sold under the Secured Lender Plan. These differences between Class 4 Claims and Class 5 Claims justify the different treatment between those classes. Hence, the Secured Lender does not believe there is any unfair discrimination under the Secured Lender Plan.

## XIV.   LIQUIDATION ANALYSIS AND BEST INTEREST

Before the Secured Lender Plan may be confirmed, the Bankruptcy Court must find that the Secured Lender Plan provides that holders of Claims and Interests that have voted to reject the Secured Lender Plan will receive or retain under the Secured Lender Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. The Secured Lender believes that this test is satisfied as indicated by the Liquidation Analysis annexed hereto as Exhibit 3.

## XV.   CREDITORS' COMMITTEE

As of the date of this Disclosure Statement, no creditors' committee has been appointed. The Secured Lender Plan does not contemplate the existence of a creditors' committee after the Confirmation Date.

## XVI.   CONCLUSION

The formation of the Secured Lender Plan was the result of careful review and analysis by the Secured Lender. This has led to a Secured Lender Plan that is endorsed by the Secured Lender and the Class Action Representatives. The Secured Lender respectfully requests that you vote to accept the Secured Lender Plan.

Dated:      New York, New York
            November 17, 2023

HOLLAND & KNIGHT LLP
Attorneys for Barclay Bank PLC
31 West 52nd Street
New York, New York 10019
(212) 751-3001
bruce.zabarauskas@hklaw.com

By:      /s/ Bruce J. Zabarauskas
         Bruce J. Zabarauskas (BZ-7085)

**Exhibit 1 to Disclosure Statement Concerning
Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

HOLLAND & KNIGHT LLP
Bruce J. Zabarauskas, Esq.
Vivian M. Arias, Esq.
31 West 52nd Street
New York, New York 10019
(212) 751-3001
bruce.zabarauskas@hklaw.com
vivian.arias@hklaw.com
Attorneys for Barclays Bank PLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
In re                                     :     Chapter 11
                                          :
                                          :
EASTGATE WHITEHOUSE, LLC,                 :     Case No. 22-22635-SHL
                                          :
                                          :
                          Debtor.         :
-----------------------------------------------------------------x
```

## BARCLAYS BANK PLC'S CHAPTER 11 LIQUIDATING PLAN FOR THE DEBTOR

Barclays Bank PLC (the "Secured Lender") hereby proposes the following *Chapter 11 Liquidating Plan for Eastgate Whitehouse, LLC* pursuant to Section 1121(c) of the Bankruptcy Code.

### ARTICLE I

### Definitions

The following terms shall have the respective meanings set forth below. Unless otherwise indicated, the singular shall include the plural. Any term not defined herein which is defined by the Bankruptcy Code shall have the meaning ascribed to it in the Bankruptcy Code.

1.1    "Accounts Receivable" means any moneys owed to the Debtor from any source.

1.2    "Affiliate" means "affiliate" as such term is defined in Section 101(2) of the Bankruptcy Code.

1.3     "Allowed Administrative Claim" means a claim which is an Allowed Claim and not a Secured Claim, accruing from and after the Petition Date, including the fees and expenses of professional persons retained or to be compensated pursuant to the Bankruptcy Code, and any fees or charges assessed against the Debtor's estate under Chapter 123, title 28, of the United States Code.

1.4     "Allowed Claim" means a claim which is scheduled pursuant to Section 521(1) of the Bankruptcy Code, other than a claim scheduled as disputed, contingent or unliquidated, or a claim which has been filed pursuant to Section 501(a) of the Bankruptcy Code, and with respect to which no objection to the allowance thereof has been interposed within the period of limitation fixed by the Bankruptcy Court, or as to which any objection has been overruled (and to the extent so overruled) by the Bankruptcy Court; provided, however, that except as otherwise set forth in this Plan, interest accrued after the Petition Date shall not be part of any Allowed Claim.

1.5     "Allowed General Unsecured Claim" means an Allowed Claim which is not an Allowed Priority Claim, an Allowed Secured Claim, or an Allowed Administrative Claim, or is not a claim entitled to priority under Section 507(a) of the Bankruptcy Code and which is not secured by a valid, perfected security interest or lien, but including an Allowed Claim, if any, arising from the rejection of an executory contract.

1.6     "Allowed Non-Professional Administrative Claims" means those Allowed Administrative Claims which are neither Allowed Professional Administrative Claims, nor Allowed Administrative Claims held by the Office of the United States Trustee.

1.7     "Allowed Priority Claim" means the portion of an Allowed Claim entitled to priority under Section 507(a) of the Bankruptcy Code.

1.8     "Allowed Professional Administrative Claims" means those Allowed Administrative Claims held by Professionals.

1.9     "Allowed Secured Claim" means a Secured Claim to the extent it is an Allowed Claim.

1.10    "Assumed Unexpired Leases And Executory Contracts" shall have the meaning ascribed to such term in Section 8.7 of the Plan.

1.11    "Ballot" means the ballot provided to holders of Claims and Interests to, among other things, vote to accept or reject the Plan.

1.12    "Barclays" means Barclays Bank PLC and/or any assignee of the Secured Lender Allowed Secured Claim.

1.13    "Bankruptcy Case" shall mean the above-captioned Chapter 11 case commenced by the Debtor on the Petition Date before the Bankruptcy Court (Case No. 22-22635-SHL).

1.14    "Bankruptcy Code" means Title 11, United States Bankruptcy Code, 101 *et seq.*, commonly referred to as the Bankruptcy Code.

1.15    "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Southern District of New York.

1.16    "Broker Retention Order" means an order of the Bankruptcy Court authorizing the Plan Administrator to retain the Broker to sell the Sale Assets pursuant to the Plan.

1.17    "Broker" means the broker to be selected by the Secured Lender and retained by the Plan Administrator on behalf of the Debtor by order of the Bankruptcy Court as the broker to market and sell the Real Property pursuant to Article VII of the Plan.

1.18    "Business Day" means any day other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

3

1.19    "Cash Collateral" shall have the meaning ascribed to such term in 363 of the Bankruptcy Code.

1.20    "Cash Collateral Orders" means: (i) the *Order Authorizing Debtor's Use Of Cash Collateral, And Granting, Inter Alia, Replacement Liens As Adequate Protection to Secured Lender*, entered on December 1, 2022 (with replacement liens granted *nunc pro tunc* to the Petition Date) (the "Original Cash Collateral Order") [Dkt. No. 66]; (ii) the *Amended And Restated Stipulation and Order Authorizing the Debtor's Use of Cash Collateral And Granting Adequate Protection To Secured Lender*, which was approved by the Bankruptcy Court, along with any stipulation extending or modifying such orders Court on May 11, 2023 ("the "Amended And Restated Cash Collateral Order"),  [Dkt. No. 169], and all stipulations extending the Original Cash Collateral Order and Amended and Restated Cash Collateral Orders [Dkt. Nos. 65, 87, 95, 111, 128, 161, 162, 169].

1.21    "Causes of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit , obligation, liability, loan, debtor, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, or after, the Petition Date, in contract or in tort, in law or in equity or pursuant to any  other theory of law (including, without limitation, under any state or federal securities).  Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach  of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or

4

Chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury and any other defense set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.22    "Claim" means a claim against the Debtor as defined in Section 101(5) of the Bankruptcy Code.

1.23    "Claim Resolution Date" means the date which is after the deadline for filing objections to Claims under Article VI of the Plan, when all filed objections to Class 5 Claims General Unsecured Claims have been resolved by a Final Order.

1.24    "Claimant" means a holder of a Claim.

1.25    "Class" means a group of claims or interests, consisting of Claims or Interests which are substantially similar to each other, as classified pursuant to the Plan.

1.26    "Class 5 General Unsecured Claims Reserve" means $25,000 which shall be set aside by the Plan Administrator from either Cash Collateral or the proceeds of the Sale for purposes of ensuring a distribution to holders of Class 5 General Unsecured Claims.

1.27    "Class Action Claims Administrator" shall have the meaning ascribed to the term "Class Administrator" in the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.28    "Class Action Lawsuit" means the lawsuit currently pending before the Supreme Court for the State of New York, County of New York entitled *Kathryn, Casey, et al on behalf of themselves and all others similarly situated, plaintiffs v. Whitehouse Estates, Inc., et al, Defendants* (Index No. 111723/2011).

1.29    "Class Action Members" means the "Class Members" described in the Class Action Settlement Agreement, defined as: (i) all persons who occupied an apartment that was treated as

5

deregulated by Landlord while Landlord was receiving J-51 tax benefits (a "Covered Unit"), provided that such a person was an occupant of a Covered Unit on or after the Base Date but before June 30, 2014, or who took occupancy of a Covered Unit after June 30, 2014, and was treated as an unregulated tenant, but after performing the calculation described in the Class Action Settlement Agreement it is determined that their initial rent was below the threshold required for high rent vacancy deregulation.  The Covered Units are those units described in Exhibit A to the Class Action Settlement Agreement.  For purposes of this Plan only, the term Class Action Members also includes counsel for the Class Action Members in the Class Action Lawsuit.  .

1.30    "Class Action Order and Final Judgment" means the order to be signed by the State Court in the Class Action Lawsuit granting final approval of the Class Action Settlement Agreement.

1.31    "Class Action Proof of Claim" means the contingent and unliquidated general unsecured proof of claim filed on behalf of the Class Action Members on November 10, 2022, in the Bankruptcy Case, as amended.

1.32    "Class Action Settlement Agreement" means that *Stipulation and Agreement of Settlement* annexed to this Plan as Exhibit B, executed by counsel to the plaintiffs in the Class Action Lawsuit, and which shall be executed no later than three (3) Business Days after the Confirmation Date by the Plan Administrator on behalf of the Debtor.

1.33    "Class Action Settlement Amount" means $2,200,000, which will be paid to the Class Action Claims Administrator pursuant to Sections 5.4 and 7.9 of the Plan following the Closing of the Sale or Transfer, and entry of the Class Action Order And Final Judgment from either (i) the proceeds of the Sale, or (ii) the Secured Lender in the event that the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of the Plan.

#233753295_v1

1.34    "Class Action Representatives" mean Kathryn Casey, Laurie Cagnassola, Gerald

Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica

Saks and Kirk Swanson, and their successors, heirs and assigns, the class representatives appointed

in connection with the Class Action Lawsuit to act on behalf of the Class Action Members.

1.35    "Closing Date" shall mean the date of the closing of the Sale or the Transfer

pursuant to (i) the Plan and (ii) the Sale Order or Transfer Order, as applicable.

1.36    "Closing Expenses" means those expenses that will be required to be paid by the

Debtor in connection with the Sale or Transfer pursuant to either: (i) the Purchase and Sale

Agreement that has been approved by the Bankruptcy Court; or (ii) order of the Bankruptcy Court.

1.37    "Confirmation Date" means the date of entry of the Confirmation Order.

1.38    "Confirmation Hearing" means the hearing to be held by the Bankruptcy Court to

consider confirmation of the Plan.

1.39    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan

under and pursuant to Section 1129 of the Bankruptcy Code and related sections thereof.

1.40    "Court" means the Bankruptcy Court.

1.41    "Covered Unit" shall have the meaning set forth in Section 1.29 of this Plan.

1.42    "Cure Claim" shall have the meaning ascribed to such term in Section 8.6 of the

Plan.

1.43    "Debtor" means, as applicable, prior to the Effective Date, Eastgate Whitehouse,

LLC, and after the Effective Date, means Eastgate Whitehouse, LLC (or any successor entity).

1.44    "Disbursing Agent" means the Plan Administrator.

1.45    "Disputed Claim" means any claim listed on the Debtor's Schedules as disputed or

as to which an objection to the allowance thereof has been interposed and not determined by a

7

Final Order pursuant to Article VI of this Plan.  The term Disputed Claim shall not include any Claim held by the Secured Lender.

1.46    "Effective Date" means the Confirmation Date.

1.47    "Entity" means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental unit (as defined on section 101(27) of the Bankruptcy Code), or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.48    "Estate Of William W. Koeppel Secured Claim" means the proof of claim filed in the Bankruptcy Case (Claim No. 4), which purports to be secured by the Debtor's interest in the Icon Note.

1.49    "Exculpated Party" means the Plan Administrator and the Secured Lender, and with respect to each of the forgoing, all Related Parties who acted on their behalf in connection with the matters as to which exculpation is provided in the Plan.

1.50    "Extended Marketing Period" shall have the meaning ascribed to such term in Section 7.4 of the Plan.

1.51    "Final Order" means an order or a judgment which has not been reversed or stayed and as to which (i) the time to appeal or to seek review, rehearing or certiorari has expired pursuant to applicable law and (ii) no appeal or petition for review, rehearing or certiorari is pending.

1.52    "Ground Lease" means that ground lease between 939 First Avenue LLC, as ground lessor and the Debtor as ground tenant for the Real Property.

1.53    "HCR" means the New York State Homes and Community Renewal, formerly known as New York State Division of Housing and Community Renewal ("DHCR").

8

1.54    "Icon Note" means those agreements between the Debtor and Support Parking LLC dated between June 1, 2020 and March 8, 2021, concerning arrearages owed by Support Parking LLC to the Debtor for its lease of a garage at the Real Property.

1.55    "Impaired" when used with respect to any Claim, Interest or Class, has the same meaning as that contained in Section 1124 of the Bankruptcy Code.

1.56    "Impaired Class" means a class of Claims or Interests under the Plan pursuant which is not an Unimpaired Class.

1.57    "Indemnity Claim" means any claim that the Debtor has against: (i) Alexandra Koeppel, as Executors and Trustees of the Trust created under Article Fourth of the Last Will Of Robert A. Koeppel; (ii) Roberta Koeppel; and (iii) Koeppel Management Company, LLC.

1.58    "Insider" means "insider" as such term is defined in Section 101(31) of the Bankruptcy Code

1.59    "Insider and Affiliate Claims" means unsecured clams held by Insiders and Affiliates of the Debtor, as defined in Bankruptcy Code Section 101 to the extent that such claims are Allowed General Unsecured Claims, and include any claims held or filed by WWK 140 Bay Ridge, LLC and William Koeppel.

1.60    "Interests" means the rights of the equity security holders in the Debtor.

1.61    "Interim Rent Order" the order entered in the Class Action Lawsuit setting rents, on an interim basis, for apartments at the Real Property listed in such order, based upon the default formula.

1.62    "Landlord" means the Debtor and Whitehouse Estates, Inc., which is the Debtor's predecessor under the Ground Lease.

9

1.63    "Litigation Claims" shall have the meaning ascribed to such term in Section 11.1(a) of the Plan.

1.64    "Litigation Claims Carve-Out" shall have the meaning ascribed to such term in Section 11.2(b) of the Plan.

1.65    "Loan Documents" means the documents relating to the loan between the Debtor, as borrower and the Secured Lender, as lender, including without limitation the loan agreement, note, mortgage and assignment of leases and rents, copies of which are attached to the proof of claim held by the Secured Lender in the Bankruptcy Case.

1.66    "Marketing Period" shall have the meaning ascribed to such term in Section 7.4 of the Plan.

1.67    Managing Agent" means Trigild Property Management, LLC.

1.68    "Non-Professional Administrative Claims" means Administrative Claims which are not Professional Administrative Claims.

1.69    "Non-Professional Administrative Claim Bar Date" shall have the meaning ascribed to such term in Section 2.4 of the Plan.

1.70    "Notice of Claim Form" shall mean the "Claim Form" and "Notice of Claim Form" as such terms are defined in the Class Action Settlement Agreement and used in paragraph 34 of the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.71    "Notice And Balloting Agent" means Donlin Recano & Company, Inc.

1.72    "Opt-Out" shall have the meaning ascribed to such term in paragraph 46 of the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.73    "Personal Property" means all assets of the Debtor which are not Real Property, Accounts Receivable, cash, Cash Collateral or Litigation Claims.

#233753295_v1

1.74    "Petition Date" means August 19, 2022, the date on which the Debtor filed its Chapter 11 petition with the Bankruptcy Court.

1.75    "Plan" means this plan of reorganization, and all exhibits hereto, as the same may be modified or amended from time to time as and to the extent permitted herein or by the Bankruptcy Code.

1.76    "Plan Administrator" means David Wallace of Trigild Property Management as plan administrator pursuant to that Plan Administrator Agreement approved by order of the Bankruptcy Court, or such other Person appointed as Plan Administrator pursuant to the terms ofteh Plan Administrator Agreement.

1.77    "Plan Administrator Agreement" shall have the meaning ascribed to such term in Section 7.2 of the Plan.

1.78    "Professional" means a person or entity retained by order of the Court pursuant to Section 327 of the Bankruptcy Code and whose compensation is governed by Section 330 of the Bankruptcy Code.

1.79    "Professional Administrative Claim Bar Date" shall have the meaning ascribed to such term in Section 2.5 of the Plan.

1.80    "Protective Advance Orders" means the: (a) *Interim Order Granting Motion For An Order: (I) Authorizing Barclays Bank PLC, As Secured Lender, To Make Protective Advance; (II) Granting Liens And Superpriority Administrative Expense Claims In Connection Therewith And (III) Granting Interim Relief*, entered on July 12, 2023 [Dkt. No. 182]; and (b) *Final Order Granting Motion For An Order: (I) Authorizing Barclays Bank PLC, As Secured Lender To Make Protective Advance; (II) Granting Liens And Providing Superpriority Administrative Expense*

11

*Claim In Connection Therewith; And (III) Granting Related Relief*, entered on August 11, 2023 [Dkt. No. 188].

1.81    "Purchase and Sale Agreement" shall have the meaning ascribed to such term under Section 7.4(b) of the Plan.

1.82    "Purchaser" shall have the meaning ascribed to such term under Section 7.4(c) of the Plan.

1.83    "Rejection Claim" shall have the meaning ascribed to such term in Section 8.9 of the Plan.

1.84    "Real Property" means the Debtor's leasehold interest in the real property located at 939-943 First Avenue, a/k/a 344-350 East 52nd Street, New York, New York, and the Debtor's interest in the improvements located at such property, along with any leases entered into by the Debtor as landlord with tenants at the Property and assumed pursuant to the Plan.  The legal description of the Real Property is annexed hereto as Exhibit A.

1.85    "Related Parties" means with respect to any Entity, such Entity's predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, all of their respective officers, directors, principals, stockholders, members, partners, employees, agents, trustees, advisors, administrators, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals and such persons' respective heir, executors, estates and nominees, including without limitation, any future owner of the Debtor's interests in the Ground Lease and any future owner of the fee interests in the Real Property.

1.86    "Released Parties" means the Debtor, all defendants in the Class Action Lawsuit, the Secured Lender, the Ground Lessor, any and all purchasers of the Debtor's interest in the

#233753295_v1

Ground Lease, and all of the foregoing entities' present and former lenders, investors, affiliates, subsidiaries and parent companies, including without limitation, limited liability companies, partnerships and corporations (including those that are minority-owned), and their respective officers, attorneys, members, principals, shareholders, heirs, executors, administrators, directors, managers, partners, employees, agents, consultants, advisors, or representatives, and the successors and assigns of each of the foregoing, including without limitation, any future owner of the Debtor's interest in the Ground Lease, and any future owner of the fee interest in the Real Property.

1.87    "Releasing Class Member" means each Class Member who: (i) has not affirmatively opted out of the release set forth in Section 10.3(a) of the Plan by checking the box on the Ballot indicating that they opt not to grant such release; or (ii) does not timely and properly opt out of the Class Action Settlement Agreement, and their heirs, successors, trustees, executors, administrators and assigns.

1.88    "Releasing Landlord" means the Debtor, its Affiliates, and each of its predecessors in interest.

1.89    "Request for Payment of Administrative Claim" shall have the meaning ascribed to such term in Section 2.4 of the Plan.

1.90    "Sale" means the sale of the Sale Assets pursuant to Article VII the Plan.

1.91    "Sale Assets" means the Real Property, the Personal Property and those Assumed Unexpired Leases and Executory Contracts designated for assignment pursuant to: (i) the Purchase and Sale Agreement or the Sale Motion; or (ii) Transfer Motion.

1.92    "Sale Motion" shall have the meaning ascribed to such term in Section 7.4(c) of the Plan.

1.93    "Sale Order" shall have the meaning ascribed to such term in Section 7.4(c) of The Plan.

1.94    "Schedules" means the schedules of assets and liabilities in accordance with Bankruptcy Rule 1007(b), filed by the Debtor with the Bankruptcy Court (as they may be amended from time to time in accordance with Bankruptcy Rule 1009).

1.95    "Secured Claim" means a Claim which is secured by a valid, perfected and enforceable lien on property owned by the Debtor, to the extent of the value of the interest of the holder of such claim in such property as determined by the Bankruptcy Court pursuant to Section 506(a) of the Bankruptcy Code.

1.96    "Secured Lender Allowed Secured Claim" means the Allowed Secured Claim of Barclays and any assignee thereof.

1.97    "Secured Lender Allowed Superpriority Administrative Claim" means the superpriority Administrative Claim granted to Barclays pursuant to the Protective Advance Orders. [Dkt. Nos. 182 and 188].

1.98    "Secured Lender Reserves" shall mean any escrows or reserves held by the Secured Lender under the Loan Documents.

1.99    "Settled Plaintiffs' Claims" shall have the meaning ascribed to such term in paragraph 33 of the Class Action Settlement Agreement, which is annexed hereto as Exhibit B.

1.100    "State Court" means the Supreme Court of the State of New York for New York County in the Class Action Lawsuit.

1.101    "Subordinated General Unsecured Claims" means a General Unsecured Claim, which is an Allowed Claim that has been subordinated to other Allowed Claims pursuant to an order of the Bankruptcy Court.

1.102   "Substantial Consummation" shall have the meaning ascribed to such term under Section 12.1 of the Plan.

1.103   "Supplemental Notice of Assumed Rejected Unexpired Leases and Executory Contracts" shall have the meaning ascribed to such term in Section 8.5 of the Plan.

1.104   "Transfer" means a transfer of the Sale Assets to the Secured Lender or its designee under Section 7.5 of this Plan.

1.105   "Transfer Motion" shall have the meaning ascribed to such term in Section 7.5 of the Plan.

1.106   "Unimpaired Class" means a class of Claims or Interests under the Plan pursuant to which the Plan either (1) leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Bankruptcy Case, other than a default of a kind specified in Bankruptcy Code Section 365(b)(2) or of a kind that Bankruptcy Code Section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such Claim or Interest as such maturity existed before such default; (C) compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such Claim or such Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Bankruptcy Code Section 365(b)(1)(A), compensates the holder of such Claim or such Interest (other than the Debtor or an Insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E)

15

does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

1.107 "Voting Deadline" means the last day to vote to accept or reject the Plan as set forth on the Ballots provided to Claimants and holders of Interests for voting purposes.

B. **Interpretation; Application of Definitions and Rules of Construction**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time as provided for in the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as otherwise required by the Plan; (c) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. Nothing in this Plan shall alter, modify, supersede, or limit the consent provided or approval rights granted under any orders of

16

the Bankruptcy Court entered in this Bankruptcy Case, including the Cash Collateral Orders, and the Protective Advance Orders all of which remain in full force and effect. Notwithstanding anything to the contrary herein, the power and authority of the Plan Administrators shall be defined by, and subject in all respects to, the terms and conditions of the Plan Administrator Agreement

## ARTICLE II

### Treatment Of Administrative And Priority Claims

2.1    **Payment Of Secured Lender Allowed Superpriority Administrative Claim.** The Plan Administrator shall pay the Secured Lender Allowed Superpriority Administrative Claim in full from either Cash Collateral or from the proceeds of the Sale, no later than the Effective Date or such other date agreed to in writing by the Secured Lender.

2.2    **Payment Of Non-Professional Administrative Claims.**  The Plan Administrator shall pay Allowed Priority Claims and Allowed Non-Professional Administrative Claims which are due and owing, other than the Secured Lender Allowed Superpriority Administrative Claim, from Cash Collateral no later than the Effective Date.

2.3    **Payment Of Administrative Claims Of Professionals.**    With respect to Administrative Claims of Professionals, the Plan Administrator shall pay such Allowed Claims in full from either Cash Collateral or the proceeds of the Sale on the later of: (i) the Effective Date; or (ii) entry of an order of the Court approving the fees and expenses of such Professional.

2.4    **Payment Of Administrative Claims Of The Office Of The United States Trustee.**  The Plan Administrator shall pay the Allowed Administrative Claim of the United States Trustee which is due as of the Confirmation Date on the Effective Date of the Plan.  The Plan Administrator shall pay any Allowed Administrative Claim of the Office of the United States Trustee which accrues subsequent to the Effective Date on or before the date such payment is due and owing under 28 U.S.C. Section 1930.

17

2.5    **Deadline For Filing Requests For Payment Of Non-Professional Administrative Claims**.  All parties asserting a Non-Professional Administrative Claim shall file a request for payment of administrative claim (the "Request for Payment of Administrative Claim") no later than thirty (30) days after the date of service of notice of entry of the Confirmation Order unless such day is not a Business Day, then the deadline shall be the next Business Day (the "Non- Professional Administrative Claim Deadline"). Any Non-Professional Administrative Claim for which a Request for Payment of Administrative Claim is not filed by the Non-Professional Administrative Claim Deadline shall be disallowed and forever barred without the need for the filing of an objection to such Claim. Objections to Non-Professional Administrative Claims for which a Request for Payment of Administrative Claim has been filed shall be interposed by the filing of an objection to claim no later than thirty (30) days after the Non-Professional Administrative Claim Deadline unless such day is not a Business Day, then the deadline shall be the next Business Day.

2.6    **Deadline For Filing Of Fee Applications For Professional Administrative Claims**.  Any and all applications for the final allowance for Professional Administrative Claims for services rendered and expenses shall be filed with the Bankruptcy Court and served no later than thirty (30) days after service of notice of entry of the Confirmation Order, unless such day is not a Business Day, then the deadline is the next Business Day (the "Professional Administrative Claim Bar Date").   Any Professional Administrative Claim for which a fee application is not filed by the Professional Administrative Claim Bar Date shall be disallowed and forever barred without the need for the filing of an objection to such Claim.

2.7    **Post-Effective Date Administrative Claims Of Professionals Retained By The Plan Administrator**.  Notwithstanding Section 2.5 of this Plan, the Plan Administrator is

18

authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without need for Bankruptcy Court approval, including professional fees incurred by professionals retained by the Plan Administrator; provided however, that any fees and expenses incurred by the Plan Administrator in connection with the Litigation Claims or any administrative proceeding or tax grievance or certiorari proceeding concerning the Real Property, shall be subject to Court approval as reasonable.

## ARTICLE III

## Designation of Claims and Interests

3.1     **Classifications in General.**  A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.  No distribution on an Allowed Claim shall exceed one hundred percent (100%) of the amount of such Allowed Claim.

3.2     **Classification Of Claims And Interests Under The Plan.**  The following Classes of Claims and Interests are designated pursuant to and in accordance with Section 1123(a)(1) of the Bankruptcy Code:

(a)     "Class 1 Allowed Claim" shall consist of the Secured Lender Allowed Secured Claim.

(b)     "Class 2 Allowed Claim" consists of the Estate Of William W. Koeppel Secured Claim to the extent it is an Allowed Secured Claim.

(c)     "Class 3 Allowed Claims" consist of all Allowed Secured Claims that are not a Class 1 Claim or Class 2 Claim.

19

(d)     "Class 4 Allowed Claims" shall consist of the Class Action Members Unsecured Claims.

(e)     "Class 5 Allowed Claims" shall consist of the General Unsecured Claims against the Debtor, except for the Class Action Members Unsecured Claims and Subordinated General Unsecured Claims.

(f)     "Class 6 Claims" shall consist Subordinated General Unsecured Claims.

(g)     "Class 7 Interests" shall consist of the Interests in the Debtor.

3.3     **Special Provision Governing Unimpaired Claims.**     Except as otherwise provided in the Plan, nothing in the Plan shall affect the rights of the Debtor by its Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4     **Elimination Of Vacant Classes**.  Any Class of Claims against the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim that is Allowed Claim in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.5     **Voting Classes; Presumed Acceptance By Non-Voting Classes.** If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Secured Lender shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

## ARTICLE IV

### Claims and Interests Impaired Under the Plan

4.1     Class 1 Claims, Class 2 Claims, Class 3 Claims, Class 4 Claims, Class 5 Claims, Class 6 Claims and Class 7 Interests are all impaired and entitled to vote on the Plan.

20

## ARTICLE V

### Treatment of and Methods of
### Distribution to Classes Under the Plan

5.1    **Class 1 Claim – Allowed Secured Lender Claim**. (a)   The Class 1 Allowed Claim is fixed as an Allowed Claim in an amount which is not less than $45,176,900.24, plus any and all accrued and unpaid post-petition interest (including default interest under the Loan Documents) to the extent that the value of the Secured Lender's collateral exceeds the amount of its claim, premiums, fees and expenses  pursuant to the Loan Documents and Protective Advance Orders, including without limitation attorneys' fees and expenses and special servicing fees.  The Class 1 Allowed Claim shall not be subject to any avoidance, reductions, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or other challenges under any applicable law or regulation by any Person.

(b)      If the Sale Assets are not transferred to the Secured Lender pursuant to Section 7.5 of the Plan, then, on the Closing Date, the Plan Administrator shall pay the Secured Lender, on account of the Class 1 Allowed Claim: (i) all Cash Collateral held by, or on behalf of the Debtor; plus (ii) all of the proceeds of the Sale remaining after the payment of the Closing Costs, the payments to be made to the holders of Allowed Administrative Claims and Allowed Priority Claims pursuant to Section  2.1, 2.2, 2.3 and 2.4 of this Plan, the Class Action Settlement Amount, and the amount to be deposited into the Class 5 General Unsecured Claims Reserve.

(c)      On the Closing Date, the Secured Lender shall also be authorized to set-off any funds in Secured Lender Reserves and apply such funds towards payment of the Class 1 Allowed Claim.  To the extent that the aforementioned payments to the holder of the Class 1 Allowed Claim are insufficient to pay 100% of such Allowed Claim: (i) the Plan Administrator shall pay to the

21

holder of the Class 1 Allowed Claim all Accounts Receivable and any other funds belonging to

the Debtor or its bankruptcy estate for the period prior to the Closing Date, but which are collected

by the Plan Administrator subsequent to the Closing Date within seven (7) days of receipt of such

funds; and (ii) the Plan Administrator shall pay the proceeds of the Litigation Claims and any

proceeds from any tax grievance or certiorari proceeding concerning the Property minus the Plan

Administrator's reasonable fees and expenses approved by the Court of asserting and litigating

those claims.

(d)       If the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of

the Plan, then, on the Closing Date, the Class 1 Allowed Claim shall be paid: (i) all Cash Collateral

held by, or on behalf of the Plan Administrator on the Closing Date (after the payments to be made

to the holders of Allowed Administrative Claims and Allowed Priority Claims pursuant to Sections

2.1, 2.2, 2.3 and 2.4 of this Plan, the Class Action Settlement Amount, and the amount to be

deposited into the Class 5 General Unsecured Claims Reserve), (ii) the amount of Secured Lender

Reserves set-off by the Secured Lender, (iii) the proceeds of Accounts Receivable, (iv) the

proceeds of the Litigation Claims paid to the Secured Lender by the Plan Administrator paid to the

Secured Lender pursuant to Section 5.1(b) of this Plan, plus (v) the amount of the credit bid made

by the Secured Lender for the Transfer of the Sale Assets pursuant to Section 7.5 of this Plan.

(e)       The payments to be made to the Secured Lender or the Transfer of the Sale Assets

to the Secured Lender under this Plan shall be conditioned upon the payment of the Settlement

Amount to the Class Action Claim Administrator by either the Plan Administrator or the Secured

Lender in the event that the Sale Assets are transferred to the Secured Lender under Section 7.5 of

this Plan..

(f)     To the extent that there are insufficient funds to pay the Class 1 Allowed Claim in full on the Closing Date, the unpaid portion of the Class 1 Allowed Claim shall be a Class 5 General Unsecured Claim against the Debtor.

(g)     The Secured Lender shall retain its duly perfected and first priority mortgage and security interests and liens in all of the Debtor's assets, including without limitation the Real Property, the Personal Property, the Litigation Claims, the Accounts Receivable, and the Cash Collateral until the Closing Date.  Effective as of the Closing Date, the mortgage, security interests and liens of the Class 1 Allowed Claim shall be transferred automatically to the proceeds of the Sale in the same order of priority without any need for the holder of the Class 1 Allowed Claim to take any act of perfection.

5.2     **Class 2 Claim - Estate of William W. Koeppel Secured Claim**. On the Closing Date, except to the extent that a holder of the Class 2 Allowed Claim agrees to a lesser treatment the Plan Administrator shall, at the Plan Administrator's election and in full and final satisfaction of the Class 2 Allowed Claim, either (i) pay one hundred percent of such Allowed Secured Claim or (ii) abandon the Debtor's interest in the collateral securing the Class 2 Allowed Claim to the holder of the Class 2 Allowed Claim, to the extent of such Allowed Secured Claim, as the indubitable equivalent of the Class 2 Allowed Claim.

5.3     **Class 3 Claims - All Secured Claims Against the Debtor that are not Class 1 or Class 2 Claims**. The Secured Lender is unaware of the existence of any Class 3 Allowed Claims. However, to the extent any such claims exist, on the Closing Date, except to the extent that a holder of Class 3 Allowed Claim agrees to a lesser treatment the Plan Administrator shall, at the Plan Administrator's election and in full and final satisfaction of the Class 3 Allowed Claim, either (i) pay one hundred percent of such holder's Allowed Secured Claim, or (ii) abandon the Debtor's

23

interest in the collateral securing the Class 3 Allowed Claim to the holder of the Class 3 Allowed Claim as the indubitable equivalent of the Class 3 Allowed Claim.

5.4    **Class 4 Claims - Class Action Members Unsecured Claims**.  The claims of the holders of the Class 4 Allowed Claims shall be treated pursuant to the terms of the Class Action Settlement Agreement, a copy of which is annexed hereto as <u>Exhibit B</u>, and receive the distributions provided under the Class Action Settlement Agreement from the Class Action Claims Administrator, subject to entry of the Class Action Order And Final Judgment by the State Court in the Class Action Lawsuit.  Notwithstanding anything to the contrary in the Plan: (i)  any holder of a Class 4 Claim that Opt-Outs of the Class Action Settlement pursuant to the terms of the Class Action Settlement will not receive a distribution under the Class Action Settlement Agreement and will be treated as the holder of a Class 5 Claim, and the Plan Administrator shall retain all claims and Causes of Action against the holder of such Claims; and (ii) any holder of a Class 4 Claim that has voted to accept the Plan on its Ballot shall be deemed to have agreed not to Opt-Out of the Class Action Settlement, provided that any vote cast by counsel for the Class Representatives on behalf of a Class Action Member shall not waive the right of such Class Action Member to Opt-Out of the Class Action Settlement Agreement.  The treatment provided in the Class Action Settlement Agreement shall be in full and complete satisfaction of the Class Action Proof of Claim and the Claims of the Class Action Members.

5.5    **Class 5 Claims - General Unsecured Claims, Except for the Class Action Members Unsecured Claims and Subordinated General Unsecured Claims**.  No later than thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class Action Order and Final Judgment and (iii) the Closing Date, the Plan Administrator shall pay any remaining proceeds from the Sale after payments are made in full  pursuant to Sections 2.1, 2.2,

24

2.3, 2.4, 5.1, 5.2, 5.3 and 5.4 of the Plan and the funding of the Class Action Settlement Amount pursuant to Class 4, to the holders of the Class 5 Allowed Claims on a *pro-rata* basis up to one hundred percent (100%) of their Allowed Claims; provided however, that if the amount of proceeds from the Sale are insufficient to pay the Class 5 Allowed Claims a distribution of at least five percent (5%) of Class 5 Allowed Claims or if the Sale Assets are transferred to the Secured Lender pursuant to Section 7.5 of the Plan, then no later than no later than thirty (30) days after the later of the (A) Claims Resolution Date, (B) the date of entry of the Class Action Order And Final Judgment and (C) the Closing Date, the Plan Administrator shall pay the funds in the Class 5 General Unsecured Claim Reserve to the holders of the Class 5 Allowed Claims on a *pro-rata* basis. The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claim is paid in full, to the holders of Class 5 Allowed Claims on a *pro-rata* basis. Such payment(s) shall be made within thirty (30) days after the later of: (I) the date that the Allowed Class 1, Class 2 and Class 3 Claims are paid in full; (II) the Claims Resolution Date; (III) the date of entry of the Class Action Order and Final Judgment; (IV) the Closing Date; and (V) the date of the Plan Administrator's receipt of such proceeds of the Litigation Claims. In no event shall the distribution to holders of Class 5 Allowed Claims exceed one hundred percent (100%) of their Allowed Claims. As part of this Plan, and to the extent that the Secured Lender holds a Class 5 Claim, the Secured Lender has agreed to waive any distribution from the Class 5 Unsecured Claims Reserve on its Class 5 Claim, but retains its right to vote such claim in connection with this Plan. The treatment provided herein shall be in full and complete satisfaction of all Claims held by the holders of Class 5 Claims.

5.6    **Class 6 Claims – Subordinated General Unsecured Claims**.  No later than thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class Action Order And Final Judgment, and (iii) the Closing Date, the Plan Administrator shall pay any remaining proceeds from the Sale after payments are made in full pursuant to Sections 2.1, 2.2, 2.3, 2.4, 5.1, 5.2, 5.3, 5.4 and 5.5 of the Plan to the holders of the Class 6 Allowed Claims on a *pro-rata* basis up to one hundred percent (100%) of their Allowed Claims.  The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claim and Class 5 Allowed Claims are paid in full, to the holders of Class 6 Allowed Claims on a *pro-rata* basis.  Such payment(s) shall be made within thirty (30) days after the later of: (A) the date that the Class 1 Allowed Claim and Class 5 Allowed Claims are paid in full; (B) the Claims Resolution Date; (C) the date of entry of the Class Action Order and Final Judgment; (D) the Closing Date; and (E) the date of the Plan Administrator's receipt of such proceeds of the Litigation Claims.  In no event shall the distribution to holders of Class 6 Allowed Claims exceed one hundred percent (100%) of their Allowed Claims.  The treatment provided herein shall be in full and complete satisfaction of all Claims held by the holders of Class 6 Claims.

5.7    **Class 7 Interests**.  No later than thirty (30) days after the later of the (i) Claims Resolution Date, (ii) the date of entry of the Class Action Order And Final Judgment and (iii) the Closing Date, the Plan Administrator shall pay any remaining proceeds from the Sale after the payments are made pursuant to Sections 2.1, 2.2, 2.3, 2.4, 5.1, 5.2, 5.3, 5.5, 5.6 and 5.7 of the Plan and the funding of the Class Action Settlement Amount to the holder of the Class 7 Interests.  The Plan Administrator shall also pay any proceeds of the Litigation Claims minus the Plan

26

Administrator's reasonable fees and expenses approved by the Court of asserting and litigating those claims, which remain after the Class 1 Allowed Claim, Class 5 Allowed Claims, and Class 6 Allowed Claims  are paid in full, to the holder of the Class 7 Interests. Such payment(s) shall be made within thirty (30) days after the later of: (A) the date that the Class 1 Allowed Claim, Class 5 Allowed Claims, and Class 6 Allowed Claims are paid in full; (B) the Claims Resolution Date; (C) the date of entry of the Class Action Order and Final Judgment; (D) the Closing Date; and (E) the date of the Plan Administrator's receipt of such proceeds of the Litigation Claims. The Interests in the Debtor shall be cancelled upon entry of an order of the Court closing the Bankruptcy Case.

## ARTICLE VI

### Provisions as to Disputed Claims and Distributions

6.1.    **Disputed Claims In Class 2 and Class 3**. In connection with cash distributions to be made in respect of Allowed Claims in Class 2 and Class 3, there shall be reserved from any distribution to the holder of a Disputed Claim the amount of Cash which then otherwise would be paid in respect to such Disputed Claim if the full amount of such Claim were deemed to be an Allowed Claim or such lesser amount as the Bankruptcy Court may determine.  Notwithstanding anything in the Plan to the contrary, if any portion of a Class 2 Claim or Class 3 Claim is a Disputed Claim, the Plan Administrator shall not be required to make any payment or distribution provided in the Plan on account of the disputed portion of such Claim unless and until the disputed portion of such Claim becomes an Allowed Claim.  Upon such Claim becoming an Allowed Claim, any distribution then due to be made in respect of such claim shall be paid no later than ten (10) Business Days thereafter in accordance with the provisions hereof and of such order of the Bankruptcy Court. Any monies remaining on deposit with respect to any Disputed Claim of a Class 2 Claimant or Class 3 Claimant after its resolution or determination by the Bankruptcy Court shall be returned to the Disbursing Agent and distributed pursuant to the terms of the Plan.

27

6.2.    **Disputed Claims In Class 4**.  Any disputes as to the allowability or amount of any Class 4 Claims shall be determined by the State Court in the Class Action Lawsuit pursuant to the Class Action Settlement Agreement, except the Bankruptcy Court shall have the authority to determine the temporary allowance of any Class 4 Claims for voting purposes under the Plan.

6.3.    **Right To Seek Estimation Of Claims.**  Nothing in this Plan shall prohibit the Plan Administrator or Secured Lender from filing a motion to estimate any Claim for distribution purposes under Bankruptcy Code Section 502.

6.4.    **Deadline To File Claim Objections**.    Except for Rejection Claims and Administrative Claims, objections to Disputed Claims or motions to estimate a claim for distribution purposes shall be filed with the Court no later than one hundred twenty (120) days after the Effective Date unless such day is not a Business Day, then the deadline is the next Business Day.  Notwithstanding anything to the contrary herein, no objections may be filed to the Claim of the Secured Lender, which is fixed and allowed as provided in Section 5.1 of the Plan, and prior orders of the Bankruptcy Court.

## ARTICLE VII

## Means for Execution of the Plan

7.1    **Means for Implementation**. The means for implementation of the Plan consist of: (i) the appointment of the Plan Administrator to manage and operate the Debtor and to execute all documents in connection with the Class Action Settlement Agreement and the Sale and to pursue the Litigation Claims; (ii) the settlement of the Class Action Lawsuit pursuant to the Class Action Settlement Agreement; (iii) the Sale or Transfer, and the use of the proceeds from the Sale to make distributions to creditors under the Plan; (iv) the use of Cash Collateral to make distributions to creditors to the extent provided under this Plan; (v) the set-off of Secured Lender Reserves by the Secured Lender; (vi) the funding of a Class 5 Unsecured Creditors Reserve to ensure a distribution

28

on Class 5 General Unsecured Claims; (vii) any amounts required by the Plan to be funded by the Secured Lender in the event the Sale Assets are transferred to it under Section 7.5 of the Plan; and (viii) the proceeds of the Litigation Claims.

7.2    **Post-Confirmation Management Of The Debtor And Its Properties**.  Upon the Effective Date, the Debtor's manager, officers and directors shall be conclusively deemed to have resigned and Plan Administrator shall take over exclusive management and control of the Debtor. Upon the Effective Date, the Plan Administrator shall be exclusively authorized to take all actions and execute all documents and instruments on behalf of the Debtor including without limitation: (i) the retention of Trigild Management Group as management agent pursuant to the terms of a management agreement to be approved by the Court; (ii) the retention of the Broker on behalf of the Debtor, which shall be selected by the Plan Administrator and approved by the Secured Lender in writing, to sell the Sale Assets, which retention shall be subject to Bankruptcy Court approval; (iii) the execution of the Class Action Settlement Agreement; (iv) the retention of special counsel for the purpose of filing and prosecuting the motions before this Court and in the State Court, including without limitation motions seeking the approval of the Class Action Settlement Agreement and modification of the Interim Rents Order, which retention shall be subject to Court approval; (v) commencing adversary proceedings or lawsuits before this or any other Court, asserting the Litigation Claims and tax grievance and certiorari claims concerning the Real Property; and (vi) to enforce the provisions of the Plan and Confirmation Order.  The Plan Administrator's obligations and duties shall be governed by an agreement (the "Plan Administrator Agreement") to be filed with, and approved by, the Court by the Effective Date.  The Plan Administrator shall be authorized to use the Secured Lender's cash collateral to operate the Property through the Closing Date pursuant to the terms of the existing Cash Collateral Orders and

29

a budget either agreed upon by the Plan Administrator and Secured Lender, or approved by order of the Court, which budget shall include the Litigation Claims Carve-Out.  The Plan Administrator shall also act as the Disbursing Agent for all payments under the Plan, except for payments to holders of Class 4 Claims, which shall be paid by the Class Action Claims Administrator.  Upon the Effective Date, the Plan Administrator shall be named as an additional insured on all insurance policies for the Debtor and Property.

7.3    **The Class Action Settlement**.  No later than three (3) Business Days after the Effective Date, the Class Action Representatives and Plan Administrator shall file a joint motion in the State Court in the Class Action Lawsuit for entry of an order: (i) preliminarily approving the Class Action Settlement, (ii) scheduling a final hearing on approval of the Class Action Settlement; (iii) modifying the Interim Rent Order as provided in the Class Action Settlement Agreement; and (iv) approving the Class Action Order and Final Judgment.  **In addition to and not in substitution of the Releases set forth in Section 10.3 of the Plan, pursuant to the Class Action Settlement Agreement, upon entry of the Class Action Order and Final Judgment and payment of the Class Action Settlement Amount to the Class Action Claims Administrator, all claims of the Class Action Members (except for those who have validly opted-out of the Class Action Settlement pursuant to CPLR 908) against the Released Parties, Debtor, the Secured Lender and any purchaser or transferee of the Debtor's interest in the Real Property and any subsequent purchaser or assignee of the Debtor's interest in the Real Property, and all defendants in the Class Action Lawsuit shall be deemed released as set forth in paragraph 34 of the Class Action Settlement Agreement.**

7.4    **The Sale**.  (a)    Upon entry of the Confirmation Order and Broker Retention Order, the Broker shall market the Sale Assets for sale for a period of up to one hundred twenty (120)

days (the "Marketing Period"), which period may be extended for up to an additional one hundred twenty (120) days with the prior written consent of the holder of the Class 1 Allowed Claim (the "Extended Marketing Period"). It shall be the Broker's duty to seek to obtain the highest and best price for the Sale Assets, taking into account the ability of proposed purchasers to close on their offers to purchase the Sale Assets.

(b) **Purchase and Sale Agreement.** During the Marketing Period, the Plan Administrator on behalf of the Debtor shall have the authority to enter into a purchase and sale agreement to sell the Sale Assets (the "Purchase and Sale Agreement"), provided such agreement is subject to: (i) the Secured Lender's prior written consent; (ii) the submission of higher and better offers, including the Secured Lender' right to submit an offer through a credit bid pursuant to Bankruptcy Code Section 363(k); (iii) Bankruptcy Court approval; and (iv) the closing of such Sale occurring no later than thirty (30) days after the Bankruptcy Court's entry of the Sale Order, unless such date is extended with the prior written consent of the Secured Lender.

(c) **Sale Motion.** No later than three (3) Business Days after entry into a Purchase and Sale Agreement, the Plan Administrator shall file a motion (the "Sale Motion") with the Bankruptcy Court seeking entry of an order: (i) approving the Sale to the purchaser under the Purchase and Sale Agreement, subject to higher and better offers (the "Purchaser"); (ii) finding that the Purchaser is a good faith purchaser entitled to the protections of Bankruptcy Code Section 363(m); and (iii) scheduling a hearing to approve the Sale (the "Sale Hearing").

7.5 **Transfer of the Sale Assets to the Secured Lender In Lieu Of Sale.** In the event that the Debtor, through the Plan Administrator, fails to both enter into a Purchase and Sale Agreement and file the Sale Motion within the thirty days of the end of the Marketing Period, or Extended Marketing Period as applicable, then at the Secured Lender's option either (i) the Plan

31

Administrator or Secured Lender shall file a motion with the Court setting forth bid procedures for an auction sale of the Sale Assets to occur on or before the Marketing Period, or Extended Marketing Period as applicable, or (ii) the Secured Lender shall submit a credit bid to the Plan Administrator pursuant to Bankruptcy Code Section 363(k), and the Plan Administrator shall accept such credit bid.  If the Secured Lender selects option (ii) of the previous sentence, then within three (3) Business Days of receiving such credit bid,  the Plan Administrator shall file a motion (the "Transfer Motion") with the Court for entry of an Order directing the Plan Administrator to transfer the Sale Assets to the Secured Lender or its designee free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code Section 363(k) along with such other distribution as is consistent with Section 5.1(b) of the Plan, and a determination that the Secured Lender is a good faith purchaser under Bankruptcy Code Section 363(m), and a transfer of the Secured Lender Reserves to the Secured Lender. Such Transfer to the Secured Lender shall not be subject to higher and better offers. In the event that the Sale Assets are transferred to the Secured Lender pursuant to this provision of the Plan, the Secured Lender shall, among other things, pay the Class Action Settlement Amount to the Class Action Claims Administrator pursuant to the Class Action Settlement Agreement.

7.6 **Free and Clear Sale or Transfer.** The Sale Assets shall be sold or transferred free and clear of all liens, claims encumbrances, and interests pursuant to Bankruptcy Code Section 363(f), which liens, claims, encumbrances and interests shall upon the Closing Date attach to the proceeds of the Sale in the same order of priority that currently exist on the Sale Assets.

7.7 **Cancellation of Liens.** Except as otherwise specifically provided herein, upon the payment in full in Cash of a Secured Claim, any Lien securing such Claim, shall be deemed released, and the holder of such Other Secured Claim shall be directed to release any collateral or

32

other property of the Debtor held by such holder and to take such actions as may be requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Plan Administrator on behalf of the Debtor.

7.8    **"As Is Where Is"**.  The Sale or Transfer as contemplated by this Plan shall be without representation or warranties of any kind, nature or description by the Debtor.  The Sale Assets shall be sold or transferred "as is," "where is" and "with all faults."  ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IS EXPRESSLY DISCLAIMED AND THERE SHALL BE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF THE SALE ASSETS OR ANY PORTION THEREOF.  Any purchaser of the Sale Assets will be deemed to acknowledge and represent that it: (a) has had an opportunity to conduct due diligence regarding the Sale Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and inspection of any documents and/or the Sale Assets in making its bid; and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Assets, or the completeness of any information provided in connection with the Sale or the Auction.

7.9    **Funding of Class Action Settlement Amount**. The Plan Administrator, or the Secured Lender in the event of a Transfer under Section 7.5 of the Plan, shall distribute the Class Action Settlement Amount to the Class Action Claim Administrator under the Class Action Settlement  no later than: (i) the Closing Date; or (ii) three Business Days after entry of the Class

33

Action Order and Final Judgment by the State Court in the Class Action Lawsuit, whichever is later.

7.10   **Funding of Reserves**.  (a) On the Effective Date, the Plan Administrator shall reserve from Cash Collateral such funds as are necessary to pay all Allowed Administrative Claims and All Allowed Priority Claims which are due on the Effective Date.

(b) On the Effective Date, the Plan Administrator shall reserve $25,000 from Cash Collateral to establish the Class 5 Unsecured Creditors Reserve.

7.11   **Restoration of Tenant Security Deposits.**  On the Closing Date, the Purchaser of the Sale Assets or the Secured Lender in the event that the Sale Assets are transferred to it under Section 7.5 of the Plan, if not previously restored, shall establish a separate tenant security deposit account for security deposits received from tenants at the Property, and shall fund any insufficiency in tenant security deposits. On the Closing Date, the Plan Administrator shall assign to Purchaser or the Secured Lender any claim held by the Debtor against William W. Koeppel, Whitehouse Estates, Inc., Koeppel & Koeppel Realty Management. Livingston Management or any other Person or Entity for the conversion of tenant security deposits to the extent the Purchaser or Secured Lender was the party that restored the tenant security deposits..

7.12   **Return of Excess Reserve Funds**. The Plan Administrator shall pay to the Secured Lender all funds remaining in the Class 5 Unsecured Creditors Reserve remaining after the payment of all distributions under the Plan.

7.13   **Plan Administrator Compensation.**   The Plan Administrator shall be paid $10,000 per month from Cash Collateral for his services and shall be entitled to reimbursement of reasonable and documented expenses in the ordinary course and without the need for Bankruptcy Court approval pursuant to the Plan Administrator Agreement from the Effective Date through the

34

Closing Date, and thereafter his compensation shall be paid from the Litigation Claims Carve-Out or proceeds of the Litigation Claims through the date of closing of this Bankruptcy Case.

7.14   **Effectuating Documents; Further Transactions.**   Upon the Confirmation Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms hereof.   On or as soon as practicable after the Confirmation Date, the Plan Administrator may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including without limitation (i) the execution and delivery of appropriate agreements or other documents on behalf of the Debtor containing terms that are consistent with the terms of the Plan, (ii) the execution and delivery on behalf of the Debtor of appropriate instruments of transfer, assignment, assumption, or delegation of any Sale Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; and (iii) all other actions that the Plan Administrator determines to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

7.15   **Closing of Bankruptcy Case.** After the Debtor's bankruptcy estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Bankruptcy Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE VIII

## Executory Contracts

8.1   **Ground Lease.**   The Debtor's Ground Lease with the Ground Lessor was assumed by order of the Bankruptcy Court dated March 24, 2023 [Dkt. No. 157].

#233753295_v1

8.2    **Unexpired Leases And Executory Contracts**.  The Debtor's unexpired leases with those tenants at the Real Property which are listed on Exhibit C to this Plan shall be assumed as of the Closing Date.  The Debtor's unexpired leases with Christopher Alvarado and Harrison Koeppel, and any lease with Admir Haxhiu, who is the Debtor's former superintendent at the Property (to the extent not terminated by the Effective Date), and its executory contract/unexpired lease with Big Man City Laundry Limited and any executory contract with Living NY (to the extent not previously terminated) shall be deemed rejected as of the Effective Date.

8.3    **Insurance Policies.**  On the Effective Date (i) all insurance policies issued or providing coverage to the Debtor shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtor pursuant to Bankruptcy Code Sections 365 and 1123 of the Bankruptcy Code, and the Debtor shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of the Debtor under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Expense Claim or objection to any Cure Amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer.

8.4    **Other Executory Contracts Being Assumed**.  The Debtor's executory contracts described on Exhibit C to this Plan shall be assumed as of the Closing Date.

8.5    **Right To Supplement List Of Executory Contracts Or Unexpired Leases Being Assumed Or Rejected**.  At any time prior to the Closing Date, the Plan Administrator, on behalf of the Debtor, with the Secured Lender's written consent, may file and serve on affected parties, an updated list of unexpired leases and executory contracts being assumed or rejected by the

36

Debtor under the Plan, along with a notice of the amount of any claim required by the Debtor to cure any defaults under such unexpired lease or executory contract (the "Supplemental Notice Of Assumed/Rejected Unexpired Leases And Executory Contracts").  Any party whose unexpired lease or executory contract is identified on any Supplemental Notice Of Assumed/Rejected Unexpired Leases And Executory Contracts shall have fourteen (14) days to file with the Bankruptcy Court an objection to such assumption or rejection or to such cure amount.  The failure to file a timely objection shall constitute consent to the proposed assumption or rejection of such unexpired lease or executory contract and consent to the amount of any cure claim set forth in the Supplemental Notice Of Assumed/Rejected Unexpired Leases And Executory Contracts.

8.6  **Cure Amounts.**  Annexed hereto as <u>Exhibit D</u> is the amount necessary to cure any defaults under unexpired leases and executory contracts being assumed under Sections 8.1, 8.2, 8.3, 8.4 and 8.5 of the Plan (each, a "Cure Claim"), provided that any amounts owed to Class Action Members pursuant to the Class Action Settlement Agreement shall constitute Class 4 Claims under this Plan and are not Cure Claims under such tenants' leases.  Any objection to such cure amount shall be filed no later than seven (7) seven days prior to the Confirmation Hearing on the Plan.  The failure to file a timely objection shall constitute consent to the proposed assumption or rejection of such unexpired lease or executory contract and consent to the amount of any cure claim set forth in the Supplemental Notice Of Assumed/Rejected Contracts.

8.7  <u>**Assignment of Certain Assumed Unexpired Leases And Executory Contracts**</u>.

Those unexpired leases and executory contracts which are being assumed pursuant to this Plan (the "Assumed Unexpired Leases And Executory Contracts") and which either are identified for assignment pursuant to the Sale Motion or the Transfer Motion shall be assigned as set forth therein, subject to the right of the non-debtor party to such unexpired lease or executory contract's

37

right to object to such assignment by filing an objection to either the Sale Motion or Transfer Motion no later than fourteen days before the hearing on such motion, which objection will be determined by the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, in the event that the Secured Lender or an affiliate thereof is the Purchaser of the Sale Assets, or the Sale Assets are transferred to the Secured Lender or an affiliate thereof, then the Secured Lender or its affiliate shall be conclusively deemed to have established adequate assurance of future performance under such assigned unexpired lease or executory contract under Bankruptcy Code Section 365. The assignment of any Assumed Unexpired Lease and Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against the Debtor or defaults by the Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed and assigned unexpired lease or executory contract at any time before the date that the Debtor assumes or assumes and assigns such unexpired lease or executory contract. In accordance with Bankruptcy Code Section 365(k), assumption and assignment of any Assumed Unexpired Lease and Executory Contract unexpired leases and executory contracts releases the Debtor from any liability for breach of such Assumed Unexpired Lease and Executory Contract occurring after the date of such assignment. Any proofs of Claim filed with respect to an Assumed Unexpired Lease and Executory Contract shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assignment of such Assumed Unexpired Lease and Executory Contract.

8.8     **Rejection Of Unexpired Leases And Executory Contracts That Are Not Being Assumed.**  Except as set forth in Sections 8.1, 8.2, 8.3, 8.4 and 8.5 of this Plan, any and all

executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Closing Date unless assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court.

8.9    **Claims Arising From The Rejection Of Unexpired Leases Or Executory Contracts (i.e., Rejection Claims).**    Any Entity whose Claim arises from rejection of an executory contract or unexpired lease (a "Rejection Claim") shall, to the extent such Claim becomes an Allowed Claim, have the rights of the holder of a Class 5 Claim.

8.10    **Deadline To File Rejection Claims And Objections Thereto.**    Any Entity who has a Claim against the Debtor by virtue of rejection of an executory contract or unexpired lease may file a Claim with the Clerk of the Court, and serve such claim upon the Plan Proponent, Plan Administrator, within twenty one days (21) days following service upon such Entity of notice of entry of the order confirming the Plan or order authorizing such rejection whichever is later. If such Claim is not filed within such specified time, it shall forever be barred from assertion against the Debtor's estate without further notice to or action, order or approval of the Bankruptcy Court. Notwithstanding anything to the contrary contained in this Plan, the Plan Administrator shall have until the later of (i) thirty (30) days after the filing of such Rejection Claim or the (ii) General Claim Objection Deadline, to file an objection to such claim, unless such day is not a Business Day, then the deadline shall be the next Business Day.

## ARTICLE IX

### Effective Date; Substantial Consummation; Right To Modify Plan

9.1    **The Effective Date.**    The Effective Date of the Plan shall be the Confirmation Date.

9.2    **Secured Lender's Right To Modify Plan.**    The Secured Lender reserves the right to modify the Plan prior to the Confirmation Date and it thereafter may modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code, provided that such modifications are

#233753295_v1

set forth in a writing signed by both the Plan Administrator on behalf of the Debtor and the Secured Lender.

9.3 **Substantial Consummation.** Substantial Consummation of the Plan shall occur on the last of the following to occur:

(a) The date the Confirmation Order becomes a Final Order;

(b) The date of entry of the Class Action Order And Final Judgment by the State Court in the Class Action Lawsuit;

(c) All actions, documents, and agreements necessary to implement and consummate the Plan (the "Plan Documents") shall have been effected or executed and binding on all parties thereto and to the extent required, filed with the applicable governmental units in accordance with applicable law;

(d) The Closing Date pursuant to the Plan; and

(e) The deadline for Class Action Members to Opt-Out of the Class Action Settlement has expired, and the number of Opt-Outs does not exceed 20% of Class Action Members (subject to the waiver of this condition by the Secured Lender in its sole discretion).

## ARTICLE X

## Injunctions, Exculpation And Limitation Of Liability And Releases Of Claims

10.1 **Injunctions. Upon the Effective Date, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Interest paid or treated pursuant to the Plan; provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan. Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, or as agreed to by the Plan Administrator and a holder of a Claim against or Interest in the Debtor, with the Secured**

40

Lender's written consent, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are paid or treated pursuant to the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, or the property of the Debtor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, or the property of Debtor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, or the property of any of the Debtor; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor or against property of the Debtor, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

10.2    **Exculpation. To the maximum extent permitted by applicable law, each Exculpated Party is hereby released and exculpated from any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss and liability for any**

41

conduct occurring on or after the Petition Date through the date of Substantial Consummation in connection with, or arising after the Petition Date in connection with, arising out of, or related to, the filing and administration of the Bankruptcy Case, including without limitation the formulation, negotiation, preparation, execution or implementation of this Plan or documents ancillary to the Plan, including the Class Action Settlement Agreement, the Disclosure Statement, the solicitation of votes for and pursuit of confirmation of the Plan, the property or funds to be sold or distributed pursuant to the Plan, the consummation of the Plan, the Cash Collateral Orders, the administration of the Plan, and all decisions, actions, inactions and alleged negligence relating to any of the foregoing, except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.

10.3    **Releases.**  (a)  Upon entry of the Class Action Order and Final Judgment: (i) each Releasing Class Member hereby forever waives, releases, and discharges all Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed to submit a Notice of Claim Form; (ii) each Releasing Class Member shall be permanently enjoined from commencing, prosecuting, or continuing any of the Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed to submit a Notice of Claim Form; and (iii) the Releasing Landlord hereby forever releases all Releasing Class Members from all statutory, regulatory, common law or other claims, Causes of Action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs, penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal, state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before entry of the Final Order & Judgment, that are based upon or related to, or

arise out of the Class Action Lawsuit except non-payment of back rent to the extent otherwise set forth in the Class Action Settlement Agreement and actions or proceedings pending on, or filed after, the date of the Class Action Settlement Agreement for unrelated claims for bodily injury or damage to personal property. Notwithstanding anything to the contrary contained in the Plan, upon entry of the Class Action Order and Final Judgment, each Releasing Class Member will be bound by the terms of the releases contained in the Class Action Settlement Agreement, regardless as to whether such Releasing Class Member indicated on its ballot for accepting or rejecting the Plan that it did not consent to being bound by the release contained in Section 10.3(b) of the Plan.

(b) Unless they have affirmatively opted out of the release set forth in this Section 10.3(b) by checking the box on the Ballot indicating that they opt not to grant the release, each Claimant or holder of Interest shall be deemed to have conclusively released and discharged each of the Released Parties from any and all Claims, Interests, or Causes of Action whatsoever, including any derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively) based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Bankruptcy Case, the restructuring of the Claims and Interests before or during the Bankruptcy Case, the negotiation, formulation, preparation or consummation of the Plan, the Plan Documents, the Cash Collateral Orders, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all of the foregoing cases based on any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date. Notwithstanding

#233753295_v1

anything to the contrary contained in the Plan, this Section 10.3(b) shall not be deemed to have released any claims or Causes of Action constituting Litigation Claims that the Plan Administrator is entitled to assert against any Person or Entity under Article XI or any other provision of the Plan.

(c) The Entities in (a) through (b) of this section shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under this Section 10.3 of this Plan against each of the Released Parties.

(d) Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan shall be construed to release the Released Parties from any gross negligence, willful misconduct, or actual fraud as determined by a Final Order of the Bankruptcy Court, or from any Litigation Claims, or to release any claims that the Secured Lender has against any Person or Entity.

## ARTICLE XI

### Litigation Claims

11.1    All claims and Causes of Action held by the Debtor or its bankruptcy estate, including all claims (he "Litigation Claims") under contract, tort, state law or Article 5 of any other provision of the Bankruptcy Code against the following entities shall be preserved and retained following the Effective Date, shall be carved out from the releases granted pursuant to Section 10.3 of the Plan and shall survive confirmation of the Plan, and the Plan Administrator, in his discretion, shall have the authority to commence, prosecute, settle or abandon any or all of such claims, including any claims or claims Causes of Action which are currently the subject of pending litigation involving the Debtor: (i) William W. Koeppel; (ii) Jean Koeppel; (iii) the Estate of William W. Koeppel; (iv) Whitehouse Estates, Inc.; (v) Koeppel & Koeppel Realty Management; (vi) WWK 140 Bay Ridge, LLC; (vii) Livingston Management; (viii) Living NY; (ix) Christopher

44

Alvarado; (x) Harrison Koeppel; (xi) Roberta L. Koeppel; (xii) Koeppel Management Company LLC; (xiii) Alexandra Koeppel; (xiv) Alexandra Koeppel as Executors and Trustees of the Trust created under Article Fourth of the Last Will and Testament of Robert A. Koeppel; (xv) Big Man City Laundry Limited; (xvi) any and all affiliates or insiders of the foregoing persons and entities; (xvii) any Insiders and Affiliates of the Debtor; and (xviii) any Class Action Members that Opt-Out of the Class Action Settlement.  Litigation Claims shall also include any and all administrative claims and proceedings and tax grievance and certiorari claims concerning the Property, which shall also be preserved and may be asserted by the Plan Administrator, whether or not pending as of the Effective Date.

11.2    There shall be carved out from the Secured Lender's cash collateral the sum of $100,000, to be used the purpose of paying reasonable expenses incurred by the Plan Administrator investigating and/or prosecuting the Litigation Claims, including the payment of reasonable professional fees incurred by the Plan Administrator in connection therewith (to the extent approved by the Court), and paying the Plan Administrator's monthly compensation (the "Litigation Claims Carve-Out").  Any amount of the Litigation Claims Carve-Out not expended by the Plan Administrator as of the date of the closing of the Debtor's Bankruptcy Case shall be paid to the Secured Lender to the extent that it has not been paid one hundred percent of its Class 1 Claim.

## ARTICLE XII

### Transfer Tax Exemption

12.1    The Sale or Transfer pursuant to the Plan including without limitation, the Real Property, shall be exempt from New York State and New York City transfer taxes and stamp taxes pursuant to Bankruptcy Code Section 1146.  Specifically, pursuant to Bankruptcy Code Section 1146: (a) the Sale or Transfer, including without limitation, the transfer of the Real Property to the

45

Purchaser or Secured Lender or its designee, and the making or delivery of any instrument of transfer in connection or furtherance of the Plan, and any financing by the Purchaser, (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Plan and the Purchase And Sale Agreement, (c) the creation of any Lien, mortgage, deed of trust, or other security interest, (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with the Sale or Transfer, and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate Transfer Tax imposed under Article 31 of the Tax Law of the State of New York, (iii) the New York City Real Property Transfer Tax imposed by title 11, chapter 21 of the New York City Administrative Code and, (iv) any similar tax on the recording of deeds, transfers or property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof. Consistent with the foregoing, the recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded including without limitation, the City Register's

Office shall, pursuant to the Confirmation Order and/or Sale Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax, as well as cancel and discharge of record all liens, judgments, encumbrances, claims, and other adverse interests in or against the Real Property. All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Property, or other Sale Assets, any taxes from which the transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of Bankruptcy Code Section 1146(a) and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto. The Office of the City Register is hereby authorized and directed to record any deed, mortgage of the Property and any modification, restatement, amendment or assignment of any mortgages and any other similar conveyance, indenture or other documents contemplated under the Plan without the payment of any of the aforementioned exempt taxes or any other stamp tax, transfer tax or similar tax, and without the presentation of affidavits, instruments or returns otherwise required for recording or filing pursuant to the provisions of Bankruptcy Code Section 1146(a).

## ARTICLE XIII

### Distributions

13.1    **Plan Administrator To Act As Disbursing Agent**. Except with respect to Class 4 Claims, the Plan Administrator shall act as Disbursing Agent under the Plan and shall make all distributions under the Plan to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.  The Disbursing Agent may utilize and rely upon the

47

Notice and Balloting Agent to mail distribution checks to holders of Claims and Interests under the Plan.

13.2    **Distribution Record Date**. As of the Voting Deadline, the various transfer registers for each of the Classes of Claims shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims. The Plan Administrator, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the Voting Date.

13.3    **Liability of Plan Administrator As Disbursing Agent**.  From and after the Effective Date, the Plan Administrator, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such the Plan Administrator by the Plan and Plan Administrator Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of the Plan Administrator. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Plan Administrator as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

13.4   **Unclaimed Property**.  Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof.  The amount represented by such voided check shall be deemed undeliverable property and shall be paid by the Plan Administrator to the Secured Lender, provided the Allowed Class 1 Claim has not been paid in full under this Plan.

13.5   **Setoff and Recoupment**.  The Debtor through its Plan Administrator may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and causes of action of any nature whatsoever that the Debtor may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, or its successor, of any claims, rights, or causes of action  may possess against the holder of such Claim.

## ARTICLE XIV

### General Provisions

14.1   **Severability Of Plan Provisions**.  If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable

49

pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Secured Lender, and (c) nonseverable and mutually dependent.

14.2    **Governing Law.**  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; provided, however, that corporate or entity governance matters relating to the Debtor shall be governed by the laws of the state of its organization.

14.3    **Deemed Acts.**  Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

14.4    **Successors and Assigns.**  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

14.5    **Entire Agreement.**  On the Effective Date, the Plan and the exhibits thereto shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

14.6    **Debtor's Requirement To Maintain Insurance.**  The Debtor shall continue to maintain insurance on the Sale Assets and its business until the Closing Date.

## ARTICLE XV

## Retention of Jurisdiction

15.1    Except for those matters reserved to the jurisdiction of the State Court in the Class Action Lawsuit as set forth in this Plan or the Class Action Settlement Agreement, on and after the

#233753295_v1

Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in,

arising under, and related to the Bankruptcy Case for, among other things, the following purposes:

(a)     To determine any and all objections to the allowance, disallowance or subordination of Claims or any controversy as to the classification of Claims;

(b)     To determine any and all applications for professional and similar fees and for the reimbursement of disbursements and expenses;

(c)     To liquidate any disputed, contingent, or unliquidated Claims;

(d)     To determine any and all pending motions and applications for assumption or rejection of executory contracts and leases and the allowance and classification of any Claims resulting from the rejection of executory contracts and leases;

(e)     To determine any and all motions, applications, adversary proceedings, contested and litigated matters or such other matters over which the Bankruptcy Court has jurisdiction, including the enforcement, prosecution, litigation, settlement and/or other disposition of claims of the Debtor;

(f)     To enforce the provisions of, and resolve any and all disputes under or pertaining to the Plan, or the Bankruptcy Case;

(g)     To modify the Plan or to correct any defect, cure any omission or reconcile any inconsistency in the Plan or in the order of the Bankruptcy Court confirming the Plan, or to enter such orders as may be necessary to effectuate the terms and conditions of the Plan to the extent authorized by the Bankruptcy Code as may be necessary to carry out the purpose and intent of the Plan, provided that the Secured Lender must consent in writing to any modification of the Plan;

(h)     To determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(i)     To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of this Court in the Bankruptcy Case;

(j)     To hear and determine any and all controversies and disputes arising under, or in connection with, the Plan or the order confirming the Plan;

(k)     To adjudicate all controversies concerning the classification of any Claim;

(l)     To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

(m)     To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(n)     To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken during the pendency of this Bankruptcy Case;

(o)     To adjudicate all matters concerning the assumption and the assumption and assignment of unexpired leases and executory contracts, including without limitation, disputes concerning Cure Claims;

(p)     To recover all assets and properties of the Debtor wherever located, including the prosecution and adjudication of all causes of action available to the Debtor as of the Confirmation Date;

(q)     To determine all questions and disputes regarding recovery of and entitlement to the Debtor's assets and determine all claims and disputes between the Debtor and any other Entity, whether or not subject to an action pending as of the Confirmation Date;

(r)     To enter any order, including injunctions, necessary to enforce the title, rights and powers of the Debtor and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Court may deem necessary or appropriate;

(s)     To enter an order or final decree closing and terminating the Bankruptcy Case; and

(t)     To make such orders as are necessary or appropriate to carry out the provisions of this Plan, including but not limited to orders interpreting, clarifying or enforcing the provisions thereof and/or confirming the Plan.

Dated: November 17, 2023
       New York, New York

HOLLAND & KNIGHT LLP
Attorneys for Barclays Bank PLC
31 West 52nd Street
New York, New York 10019
(212) 751-3001
bruce.zabarauskas@hklaw.com
vivian.arias@hklaw.com

By: /s/ Bruce J. Zabarauskas
        Bruce J. Zabarauskas (BZ-7085)

#233753295_v1

**Exhibit A to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

Title No. NCS-1124340-DC72

## SCHEDULE "A"

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF FIFTY-SECOND STREET AND THE WESTERLY SIDE OF FIRST AVENUE;

RUNNING THENCE SOUTHERLY, ALONG THE WESTERLY SIDE OF FIRST AVENUE, SEVENTY-SEVEN FEET, FIVE INCHES;

THENCE WESTERLY AND PARALLEL WITH THE SOUTHERLY SIDE OF FIFTY-SECOND STREET AND PART OF THE WAY THROUGH A PARTY WALL, ONE HUNDRED FEET;

THENCE AGAIN SOUTHERLY, AND PARALLEL WITH THE WESTERLY SIDE OF FIRST AVENUE, TWENTY-TWO FEET, THREE INCHES;

THENCE AGAIN WESTERLY, AND PARALLEL WITH THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, THIRTY FEET;

THENCE AGAIN SOUTHERLY, AND PARALLEL WITH THE WESTERLY SIDE OF FIRST AVENUE, NINE INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN FIFTY-FIRST AND FIFTY SECOND STREETS;

THENCE AGAIN WESTERLY, PARALLEL WITH THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, TWENTY FEET;

THENCE NORTHERLY, PARALLEL WITH THE WESTERLY SIDE OF FIRST AVENUE AND PART OF THE WAY THROUGH A PARTY WALL, ONE HUNDRED FEET, FIVE INCHES TO THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, AND

THENCE EASTERLY, ALONG THE SOUTHERLY SIDE OF FIFTY-SECOND STREET, ONE HUNDRED FIFTY FEET TO THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property**.**

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

**Exhibit B to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

| | |
|---|---|
| KATHRYN CASEY, LAURIE CAGNASSOLA, GERALD COHEN, BETTY FURR, FRANCESCA GAGLIANO, CAROLYN KLEIN, JOSEPH MORGAN, RICHARD ROSE, JESSICA SAKS and KIRK SWANSON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>WHITEHOUSE ESTATES, INC. KOEPPEL & KOEPPEL, INC., DUELL 5 MANAGEMENT LLC d/b/a DUELL MANAGEMENT SYSTEMS, WILLIAM W. KOEPPEL and EASTGATE WHITEHOUSE ESTATES, LLC,<br><br>Defendants. | Index No. 111723/2011<br><br>**STIPULATION AND AGREEMENT OF SETTLEMENT** |

---

This stipulation and agreement of settlement (the "Settlement Agreement") is submitted pursuant to CPLR 908 in furtherance of the settlement of this Action.[1]  Subject to preliminary and final approval of the Court, the Settlement is entered into by Plaintiffs and Class Representatives Kathryn Casey, Laurie Cagnassola, Gerald Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica Saks and Kirk Swanson on behalf of themselves and all others similarly situated ("Plaintiffs"), and defendant Eastgate Whitehouse LLC, which is incorrectly referred to as Eastgate Whitehouse Estates, LLC in the caption ("Landlord"), by and through their respective attorneys.

---

[1]    Capitalized terms shall have the meanings ascribed to them below.  Except as otherwise set forth herein, all defined terms used in this Stipulation shall include the singular and plural form of the term defined.

The Settlement is intended by Plaintiffs and Landlord to fully and finally compromise, resolve, discharge and settle the Plaintiffs' claims in the Action including, but not limited to, securing a restoration of the future rights and liabilities of the parties pertaining to the issues raised by the Plaintiffs in the Complaint subject to the terms and conditions set forth below and the final approval of the Court.

WHEREAS, the Landlord is the ground lessee under a ground lease originally entered into with First and Fifty Second Corporation, as ground lessor, with respect to the real property located at 939 First Avenue (a/k/a 350 East 52nd Street), New York, New York 10022 (the "Property");

WHEREAS, Barclays Bank PLC ("Barclays") holds, *inter alia*, a duly recorded leasehold mortgage on the Landlord's ground lessee interest in the Property, and the leases and rents therefrom;

WHEREAS, 939 First Avenue LLC (the "Ground Lessor") is the current ground lessor under the Ground Lease;

WHEREAS, the Landlord leases residential units to tenants at the building (the "Building") on the Property;

WHEREAS, on October 14, 2011, Plaintiffs commenced the above-captioned action (the "Action"), before this court (the "Court") as a putative class action challenging Landlord's treatment of certain apartments at the Property as having been deregulated from rent stabilization;

WHEREAS, the Landlord was named as a defendant in the Action;

WHEREAS, Landlord received J-51 tax benefits for the Building between 1991 and 2014;

WHEREAS, the Complaint in the Action, as amended (the "Complaint"), alleges that certain apartment units had been impermissibly deregulated and/or treated as deregulated pursuant to the so-called "high rent vacancy deregulation" and "high rent/high income deregulation"

2

provisions of the Rent Stabilization Law (the "RSL") while the Building was participating in the

J-51 Program;

WHEREAS, the Complaint seeks as remedies:

(i)    a declaratory judgment declaring that the Plaintiffs' "apartments are subject to rent stabilization and that Defendants are required to offer renewal leases on forms approved by the DHCR and required by the RSL, at legal regulated rents, or to continue their existing tenancy pursuant to the RCL with legal maximum rents as established by the RCL, that past and future allowable rent be set in a manner consistent with the RSL and that Plaintiffs and putative class members receive compensation for Past Rent Claims and Future Rent Claims";

(ii)   an injunction enjoining the Landlord from: (a) "issuing any new lease or lease renewal that does not fully comply with the provision of the RSL and RSC"; (b) issuing "a J-51 rider to any existing tenant who was not require to sign a J-51 rider at the inception of his/her tenancy"; and (c) "imposing any rent increases or charges that do not fully comply with the provisions of the RSL and RSC";

(iii)  damages in the amount of rent overcharges relating to Plaintiffs' apartments; and

(iv)   an award of legal fees and expenses to Plaintiffs' counsel.

WHEREAS, on August 6, 2012, this Court entered a Decision and Order certifying the

Action as a class action with the class defined as: "All current, former, and future tenants of 350

East 52nd Street whose apartments have been, are currently being, or will be deregulated by or

subject to attempts to be deregulated by defendants, their predecessors in interest or their

successors in interest, pursuant to Luxury Decontrol, while defendants are or have been in receipt

of J-51 tax abatement benefits";

WHEREAS, on March 28, 2017 this Court entered a Decision and Order (the "Summary

Judgment Order") granting Plaintiffs partial summary judgment declaring that their legal regulated

#224593883_v14

rent should be calculated according to the RSC's "default formula", and referring the case to a referee for a calculation of damages;

WHEREAS, on April 13, 2021, this Court entered an order (the "Interim Rents Order") granting the motion of the Plaintiffs to reduce the amount of interim use and occupancy to be paid by the Plaintiffs with respect to their apartments during the pendency of this Action based upon the "default rent" formula set forth in the RSC;

WHEREAS, subsequent to entry of the Summary Judgment Order, the Landlord issued certain rental credits (the "Credits") to the Plaintiffs in satisfaction (in whole or part) of their damages in this Action;

WHEREAS, by order dated August 5, 2021, the Appellate Division, First Department (the "First Department") affirmed this Court's Summary Judgment Order (the "Appellate Division Order");

WHEREAS, on August 31, 2021, the Defendants filed a motion with the First Department seeking, *inter alia*, leave to appeal the First Department's order affirming the Summary Judgment Order to the New York Court of Appeals (the "Court of Appeals");

WHEREAS, on October 7, 2021, the First Department entered an order granting the Defendants' motion for leave to appeal the Summary Judgement Order to the Court of Appeals;

WHEREAS, on August 19, 2022 (the "Bankruptcy Petition Date"), the Landlord filed a voluntary Chapter 11 bankruptcy petition (Case No. 22-22635) with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which had the effect of staying the Action pursuant to Bankruptcy Code § 362 (the "Automatic Stay");

WHEREAS, on November 15, 2022, the Bankruptcy Court entered an order modifying the Automatic Stay to permit the Debtor to prosecute its appeal before the Court of Appeals.

4

WHEREAS, on April 16, 2023, the Court of Appeals entered an order reversing the Summary Judgment Order;

WHEREAS, the Court of Appeals held that: "Defendants' deregulation of the apartments was based on [a] "misinterpretation of law" involved in *Regina* and therefore that conduct did not constitute fraud."

WHEREAS, the Court of Appeals determined that: "for purposes of calculating overcharges, where it is possible to determine the rent 'actually charged on the base date' – here October 14. 2007 – that amount should be used and rent increases legally available to defendants pursuant to the RSL during the four-year period should be added" rather than the default formula provided for in the Summary Judgment Order;

WHEREAS, on February 13, 2023, the Bankruptcy Court entered an order approving a stipulation, which directed the Plaintiffs and Barclays, the two largest creditors in Landlord's bankruptcy case, to engage in a mediation before the Hon. Larry S. Schachner (Retired) "to seek a resolution of the Class Action Plaintiffs' Claims against the [Landlord] in connection with a potential Chapter 11 Plan to be filed jointly by [Barclays] and the [Plaintiffs]";

WHEREAS, Barclays will file a Chapter 11 plan (the "Plan") with the Bankruptcy Court in the Landlord's bankruptcy case pursuant to Bankruptcy Code § 1121;

WHEREAS, the Plaintiffs will execute a Plan Support Agreement in support of the Plan;

WHEREAS, the Plan provides for the treatment of all claims against the Landlord, including Plaintiffs' claims in the Action;

WHEREAS, the Plan provides that the Plaintiffs' claims against the Landlord shall be treated as provided in, and governed by, this Settlement Agreement, subject to this Court's approval pursuant to CPLR 907 and 908;

WHEREAS, the Plan provides for the sale (the "Sale") of the Landlord's ground lessee interest in the Property and the use of the proceeds from the Sale to, among other things, repay the amounts owed to Barclays on its mortgage, and to fund the Pool, which will provide for distributions to Plaintiffs pursuant to the terms of this Settlement Agreement following the Sale and following final approval of the Settlement Agreement by this Court;

WHEREAS, the Plan provides that upon confirmation of the Plan by order of the Bankruptcy Court (the "Confirmation Order") the Plan Administrator, as defined in the Plan, is authorized to execute this Settlement Agreement on behalf of the Landlord;

WHEREAS, pursuant to the Plan and to avoid the costs, distractions and uncertainties of litigation, Plaintiffs and Landlord have agreed to the resolution of all of the Plaintiffs' claims in this Action pursuant to the terms and conditions set forth below in this Settlement Agreement that shall be presented to the Court for preliminary approval pursuant to CPLR 907 and final approval pursuant to CPLR 908 after notice to the Class Members;

WHEREAS, on the basis of information available to them, including publicly available information and documentation made available by Landlord, Lead Counsel have determined that the settlement described herein is fair, reasonable, adequate, and in the best interests of the Plaintiffs and the Class.

THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by the undersigned counsel for the parties:

## **DEFINITIONS**

Terms not otherwise defined in this Settlement Agreement shall have the following meanings.

(a)     "Action" means the class action lawsuit titled *Casey, et al. v. Whitehouse Estates, Inc., et al.*, Sup. Ct. N.Y. Co., Index No. 111723/2011.

#224593883_v14

(b)    "Administration Costs" means all costs and expenses incurred by the Claims Administrator or any other entity relating to the administration of the Settlement, other than Notice Costs.

(c)    "Agreed Past Rent" shall have the meaning ascribed in paragraph 5 and shall be calculated pursuant to the Settlement Formula.

(d)    "Appeal" means an appeal or other judicial review seeking to modify or reverse an order or judgment of the order(s) of this Court approving the Settlement Agreement on an interim or final basis, by any person or entity with standing to do so including, without limitation, any petition or motion including petitions for rehearing or reargument, petitions for rehearing en banc, petitions for leave to appeal, and petitions for certiorari or any other form of review by a court of competent jurisdiction.

(e)    "Attorneys' Fee Award and Expenses" shall have the meaning ascribed in paragraph 41.

(f)    "Automatic Stay" shall have the meaning ascribed on page 4.

(g)    "Bankruptcy Court" shall have the meaning ascribed on page 4.

(h)    "Bankruptcy Petition Date" shall have the meaning ascribed on page 4.

(i)    "Barclays" shall have the meaning ascribed on page 2.

(j)    "Base Date" pursuant to RSC § 2520.6(f)(1) is the date four years prior to the commencement of this action.  This action commenced on October 14, 2011 with the filing of the Summons and Class Action Complaint. Therefore, the "Base Date" is October 14, 2007.

(k)    "Base Date Amount" means rent in effect as of October 14, 2007.

(l)    "Building" shall have the meaning ascribed on page 2.

(m)    "Cash Component" shall have the meaning ascribed in paragraph 19.

(n)    "Claim Form" means the document an Eligible Class Members shall use to file a Past Rent Claim, which shall be agreed upon by the Parties.

(o)    "Claims Administrator" shall have the meaning ascribed in paragraph 38.

(p)    "Class", "Class Members", "Rent Credits Class Members" and "Non-Rent Credit Class Members" shall have the meanings ascribed in paragraph 1.

(q)    "Class Period" is the period from October 14, 2007 through the date this Settlement Agreement is executed.  Except as otherwise set forth herein, any tenant of the Building paying or that paid a rent greater than the Base Date Amount and subsequent increases as set forth in paragraph 3, during the Class Period is a "Class Member."

(r)    "Class Representatives" mean Kathryn Casey, Laurie Cagnassola, Gerald Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica Saks and Kirk Swanson.

(s)    "Complaint" shall have the meaning ascribed on page 2.

(t)    "Confirmation Order" shall have the meaning ascribed on page 6.

(u)    "Covered Unit" shall have the meaning ascribed in paragraph 1.

(v)    "Court" shall have the meaning ascribed on page 2.

(w)    "Court of Appeals" shall have the meaning ascribed on page 4.

(x)    "Credits" shall have the meaning ascribed on page 4.

(y)    "Data" means the information set forth in Landlord's documentation of the rental history of the Units which was previously delivered to, and reviewed by, Plaintiffs Counsel.

(z)    "Defendants" means Whitehouse Estates, Inc., Koeppel & Koeppel, Inc., Duell 5 Management LLC d/b/a Duell Management Systems, William W. Koeppel and the Landlord, which is incorrectly referred to as Eastgate Whitehouse Estates, LLC in the caption of the Action.

(aa)    "Deregulated Units" shall have the meaning ascribed in paragraph 1.

(bb)    "Effective Date" means the earliest date that the Order and Final Judgment shall Become Effective.  The Order and Final Judgment shall "Become Effective" on the first day following the last of the following occurrences: (a) the last date to file an Appeal or seek permission to Appeal has expired with no Appeal having been taken or sought; or (b) if any Appeal is taken or sought, the date a remittitur or order is entered by a court (i) affirming the Order and Final Judgment or denying or dismissing any Appeal from the Order and Final Judgment, and any Appeal is finally dismissed or the Order and Final Judgment is finally affirmed with no possibility of subsequent Appeal therefrom, (ii) reversing or modifying the Order and Final Judgment in any non-material respect and (1) the time for any further Appeal has expired without such Appeal having been taken or sought or (2) any further Appeal is finally denied or dismissed or the Order and Final Judgment is

8

finally affirmed with no possibility of subsequent Appeal therefrom, and (iii) reversing or modifying the Order and Final Judgment in a material respect provided Plaintiffs and Landlord agree in writing to remain bound to the Settlement as reversed or modified and (1) the time for any further Appeal has expired without such Appeal having been taken or sought or (2) any further Appeal is finally dismissed or the Order and Final Judgment is finally affirmed with no possibility of subsequent Appeal therefrom. For purposes of this definition, a reversal or modification shall be deemed "material" if it materially affects any term of this Stipulation.

(cc)    "Eligible Class Member" shall have the meaning ascribed in paragraph 19.

(dd)    "Eligible Renters" means tenants: (a) in Units on the date of the Preliminary Approval Order and their spouses who enter into a lease prior to the Effective Date; and (b) who do not opt-out of the Settlement pursuant to paragraph 46.

(ee)    "Escrow Agent" shall mean Lead Counsel, or an escrow agent designated by them subject to Barclays' approval in its sole and absolute discretion, who will act as escrow agent pursuant to an escrow agreement.

(ff)    "Expiration Date" shall have the meaning ascribed in paragraph 1.

(gg)    "First Department" shall have the meaning ascribed on page 4.

(hh)    "Future Rent Claims" means the declaration sought by Plaintiffs in the Complaint that future rents should be set at levels in accordance with the RSL and RSC.

(ii)    "Ground Lessor" shall have the meaning ascribed on page 2.

(jj)    "HCR" means the New York State Homes and Community Renewal formerly known as New York State Division of Housing and Community Renewal ("DHCR").

(kk)    "Incentive Awards to the Named Plaintiff Class Representatives" shall have the meaning ascribed in paragraph 20.

(ll)    "Individual Apartment Improvement Increase" shall mean an adjustment of legal regulated rent pursuant to 9 NYCRR § 2522.4 (a) (1).

(mm)    "Interim Rents Order" shall have the meaning ascribed on page 4.

(nn)    "J-51 Program" means the New York City tax abatement program that was the subject of the Complaint.

(oo)    "J-51 Rider" means the notice accompanying an initial lease or lease renewal pursuant to RSL § 26-504(c).

9

(pp) "Landlord" shall have the meaning ascribed on page 1.

(qq) "Lead Counsel" means William Gribben, Ronald S. Languedoc and the law firm Himmelstein, McConnell, Gribben, Donoghue & Joseph LLP, and Matthew D. Brinckerhoff and the law firm Emery Celli Brinckerhoff Abady Ward & Maazel LLP.

(rr) "Lease Term" shall have the meaning ascribed in paragraph 4.

(ss) "Legal Rent" shall have the meaning ascribed in paragraph 10 and as determined in paragraphs 11 and 12.

(tt) "Long Term Vacancy Increase" shall mean a rent adjustment upon vacancy or succession pursuant to 9 NYCRR § 2522.8 (a) and (b).

(uu) "Major Capital Improvement" shall mean an adjustment of legal regulated rent pursuant to 9 NYCRR § 2522.4 (a) (2).

(vv) "Minimum Damages Payment" means a payment of one hundred fifty dollars ($150).

(ww) "Net Term Amount" shall have the meaning ascribed in paragraph 7.

(xx) "Non-Landlord Defendants" means all of the Defendants except for the Landlord.

(yy) "Non-Payment Deductions" shall have the meaning ascribed in paragraph 7.

(zz) "Notice" means the notice of the terms of this Settlement Agreement to be given to the Class following Preliminary Approval as described in paragraph 49.

(aaa) "Notice Costs" shall mean the actual out-of-pocket costs of providing the Notice.

(bbb) "NPD Objections" shall have the meaning ascribed in paragraph 40.

(ccc) "Opt-Out" shall have the meaning ascribed in paragraph 46.

(ddd) "Order and Final Judgment" means the order to be signed by the Court granting final approval of the Settlement, which shall be agreed upon by the Parties.

(eee) "Order and Final Judgment Date" means the date the Order and Final Judgment is entered in the New York County Clerk's Office.

(fff) "Past Damages Amount" shall have the meaning ascribed in paragraph 7.

(ggg) "Past Rent Claims" means monetary damages sought by Plaintiffs in the Complaint

based on the alleged overcharge of rents for the Covered Units calculated as the difference between the rent that would have been charged had the Units been subject to rent stabilization and the rent actually charged for the Units.

(hhh)    "Plan Administrator" means the person appointed as plan administrator for the Debtor by a Confirmation Order entered by the Bankruptcy Court, which will authorize the Plan Administrator to execute this Settlement Agreement on behalf of the Landlord.

(iii)    "Plaintiffs" means Kathryn Casey, Laurie Cagnassola, Gerald Cohen, Betty Furr, Francesca Gagliano, Carolyn Klein, Joseph Morgan, Richard Rose, Jessica Saks and Kirk Swanson, on behalf of themselves and all others similarly situated.

(jjj)    "Plan" shall have the meaning ascribed to such term on page 5.

(kkk)    "Pool Disbursement" shall have the meaning ascribed in paragraph 22.

(lll)    "Pool" means the Cash Component held in escrow pursuant to this Stipulation.

(mmm)"Preliminary Approval" shall have the meaning ascribed in paragraph 44.

(nnn)    "Preliminary Approval Date" means the date the Preliminary Approval Order is entered in the New York County Clerk's Office.

(ooo)    "Preliminary Approval Order" means the order to be signed by the Court granting Preliminary Approval, which shall be agreed upon by the Parties..

(ppp)    "Property" shall have the meaning ascribed on page 2.

(qqq)    "Rent Guideline Board Increase" shall mean an adjustment in the legal regulated rent pursuant to a determination of the Rent Guidelines Board as defined by 9 NYCRR 2520.5 (m).

(rrr)    "Rent Overcharge Claim" shall mean the amount equal to the difference between past rent actually charged and Agreed Past Rent.

(sss)    "Releasing Class Members" shall have the meaning ascribed in paragraph 31.

(ttt)    "Released Parties" shall have the meaning ascribed in paragraph 30.

(uuu)    "Releasing Landlord" shall have the meaning ascribed in paragraph 32.

(vvv)    "Rent Increases" shall have the meaning ascribed in paragraph 14.

(www) "Rent Adjustment Date" shall have the meaning ascribed in paragraph 4.

(xxx)   "RSC" means the New York City Rent Stabilization Code as amended through June 15, 2019.

(yyy)   "RSL" means the New York City Rent Stabilization Law as amended through June 15, 2019.

(zzz)   "Sale" shall have the meaning ascribed on page 5.

(aaaa)   "Settled Plaintiffs' Claims" shall have the meaning ascribed in paragraph 33.

(bbbb)   "Settlement Agreement"  shall have the meaning ascribed on page 1.

(cccc)   "Settlement Expenditures" means Notice Costs and Administration Costs, collectively.

(dddd)   "Settlement Formula" shall have the meaning ascribed in paragraph 5.

(eeee)   "Settlement Hearing" means the judicial hearing, on a date to be set by the Court, at which the Court will consider all arguments concerning whether the Settlement should be finally approved.

(ffff)   "Settlement Pool" shall have the meaning ascribed in paragraph 19.

(gggg)   "Standard Vacancy Increase" shall mean a rent adjustment upon vacancy or succession pursuant to 9 NYCRR § 2522.8 (a) and (b).

(hhhh)   "Stipulated Order" shall have the meaning ascribed in paragraph 15.

(iiii)   "Summary Judgment Order" shall have the meaning ascribed on page 3.

(jjjj)   "Term Amount" shall have the meaning ascribed in paragraph 7.

(kkkk)   "Unclaimed Funds" shall have the meaning ascribed in paragraph 23.

(llll)   "Unit" means any Building apartment for which a Class Member pays or has paid a market rent during the Class Period.

## CLASS CERTIFICATION

1.   All previous Court orders concerning class certification in this action are superseded by this Settlement Agreement.  A class (the "Class") will be certified that consists of all persons (the "Class Members") who occupied an apartment that was treated as deregulated by Landlord while Landlord was receiving J-51 tax benefits (a "Covered Unit"), provided that such a

person was an occupant of a Covered Unit on or after the Base Date but before June 30, 2014; or who took occupancy of a Covered Unit after June 30, 2014, and was treated as an unregulated tenant, but after performing the calculation described above it is determined that their initial rent was below the threshold required for high rent vacancy deregulation.   The Covered Units are those units described on Exhibit A.   Notwithstanding the foregoing, the following apartments:  1C, 2H, 2K, 3C, 3D, 3E, 3K, 5B, 5C, 5D, 5K, 7C, 7D, 7G, 7K, 8C, 8E, 9D, 9G, 10G, 11D, 11K, 12K, 14C, 14D, 14G, 14J, 15E, 15G, PHB and PHC (the "Deregulated Units") could have been lawfully deregulated pursuant to high rent vacancy deregulation subsequent to expiration of J-51 on June 30, 2014 and prior to June 14, 2019.  It is acknowledged that these Deregulated Units are properly deregulated and landlord may file exit registrations reflecting the date of deregulation.  It is agreed that the current tenants of these Deregulated Units are not subject to rent regulation but may remain in occupancy at the current rent stabilized rent set forth in Exhibit A for one (1) year from the Effective Date date of this Settlement Agreement (the "Expiration Date").  At the Expiration Date the landlord may offer the tenant a free market lease at the current market rent or provide a notice of non-renewal at landlord's option. In addition, Class Members that were no longer tenants prior to March 1, 2023 will be referenced as Non-Rent Credit Class Members and Class Members that are  tenants as of March 1, 2023 will be referenced as Rent Credit Class Members.

2.      Plaintiffs, all of whom were previously appointed as Class Representatives on August 6, 2012 shall remain Class Representatives for the Class.

3.      Lead Counsel that were previously appointed as Lead Counsel shall remain Lead Counsel for the Class.

## AMENDMENT OF INTERIM RENTS ORDER

4.      To the extent not done by Plaintiffs and the Landlord prior to execution of this

#224593883_v14

Settlement Agreement, no later than three (3) business days after execution of this Settlement Agreement by the Plan Administrator on behalf of the Landlord, the Plan Administrator, on behalf of the Landlord, and the Plaintiffs shall file a joint stipulation and/or application with the Court seeking to amend the Interim Rents Order and fixing the amount of rent/use and occupancy to be paid for those Covered Units which are currently being leased by Class Members, for the period commencing on the first of the month immediately following the date that the Court enters the order amending the Interim Rent Order (the "Rent Adjustment Date") in the amounts set forth in Exhibit A of this Settlement Agreement.

## **SETTLEMENT CONSIDERATION**

5.      The Settlement Formula.  The "Agreed Past Rent" shall be calculated by adding to the Base Date Amount for the period from October 14, 2007 through and including the date this Stipulation is executed: (i) all Standard Vacancy Increases; (ii) all Long Term Vacancy Increases after the Base Date; (iii) all Individual Apartment Improvement Increases after the Base Date; (iv) all Rent Guideline Board Increases after the Base Date; and (v) all other rent adjustments permitted by the RSL and RSC after the Base Date (the "Settlement Formula").

6.      The Legal Rent for each of the apartments leased by those Class Members that are currently tenants at the Building, as of March 1, 2023, as calculated pursuant to the Settlement Formula is set forth in Exhibit A of this Settlement Agreement.

7.      Past Damages Amount.  (a) If an Eligible Class Member during the Class Period was billed and paid rent in excess of the applicable Agreed Past Rent as shown in the Data for the term of a lease ("Lease Term"), that Eligible Class Member will have a Past Rent Claim that will be calculated using the amount of that excess for that Lease Term ("Term Amount").  If an Eligible Class Member has more than one Lease Term, all of the Term Amounts will be added together and

the sum shall be that Eligible Class Member's "Net Term Amount." The Net Term Amount shall be reduced by any non-payment of rent by the Eligible Class Member (the "Non-Payment Deductions") subject to paragraph 9 as described in this Settlement Agreement and any rent concessions for that Eligible Class Member that are not reflected in the billing used to calculate the Term Amounts and the resulting amount shall be the "Past Damages Amount" for that Eligible Class Member. The Past Damages Amount shall be off-set by any Credits received and previously applied as rent and any amount paid in accordance with the Interim Rent Order subject to paragraph 9. If a Class Representative has a Non-Payment Deduction, any Incentive Award will be used as a credit against the Non-Payment Deduction and shall also be released from the Pool to Barclays. By way of example, if the Eligible Class Member had a twelve-month Lease Term that recited a rent of $1,500 per month, and the Settlement Formula rent during that Lease Term was $1,000 per month, but the Eligible Class Member was given one month's free rent during that Lease Term, the Past Damages Amount would be calculated as follows: $[1,500 \times 11 = 16,500] - [11 \times 1,000 = 11,000] = 5,500$. By way of further example, if in addition to the exemplary facts described above, the Eligible Class Member failed to pay two month's rent, then the Past Damages Amount due to the Eligible Class Member for that Lease Term would be calculated as follows: $[1,500 \times 11 = 16,500] - [11 \times 1,000 = 11,000] - [2 \times 1,500 = 3,000] = 2,500$. The Past Damage Amount formula described in this paragraph, including deductions for past non-payment of rent, has been applied to the rental and payment histories of all Non-Rent Credit Class Members and, subject to a Non-Rent Credit Class Member disputing the amount of any non-payment deductions, that amount is $856,796.56.

8.    <u>Multiple Tenancies</u>. If an Eligible Class Member leased more than one Unit during the Class Period, all of the Term Amounts will be combined into one Past Damages Amount.

#224593883_v14

9.     <u>Past Nonpayment of Rent</u>.  It is acknowledged that, due to an Interim Rent Order after the granting of the summary judgment motion, Rent Credit Class Members as defined in paragraph 1 above, were billed a default rent and received certain rent Credits.  The Interim Rent Order was without prejudice to the parties' rights.  The Court of Appeals, on April 16, 2023, issued an order reversing said summary judgment motion holding that the rent should be the rent charged on the Base Date.  Thus, as a result of the Court of Appeals determination, Rent Credit Class Members who relied on the rent credits to pay rent and/or paid the default rent, would ordinarily owe the landlord the difference between credit applied toward rent and/or default rent paid and the rent as calculated under this Settlement Agreement.  It is further agreed and acknowledged that as a result of the Interim Order, all Rent Credit Eligible Class Members received a greater amount of Credits than each individual tenant was overcharged and as a result the Rent Credit Class Members are ineligible for any further payments.    All Past Damages Amounts shall pertain only to the compensation that Non-Rent Credit Class Members are entitled to receive under the Settlement Agreement and shall not impact any amount otherwise due Landlord for nonpayment of rent, except that the Landlord waives and releases any claim to recover money damages against, or evict, a current tenant Rent Credit Class Member for past rent due, provided that such current tenant Rent Credit Class Member is current on all rent obligations due under their lease with the Landlord as of the Rent Adjustment Date.  In determining whether non-payment of rent exists with respect to a current tenant Rent Credit Class Member, such Class Member's use of Credits to pay rent for any period after August 1, 2023 shall not be counted as a payment of rent. The Landlord also waives any claim to recover money damages against any past tenant Non-Rent Credit Class Member for non-payment of past rent due.

10.     <u>Transferability</u>.  Past Damages Amounts and claims for Past Damages Amounts

shall not be assignable or otherwise transferable by Eligible Class Members to any person or entity, although an Eligible Class Member's executor, administrator or trustee (for a trust that is in existence as of the Preliminary Approval Date or is a special needs trust) may file or accept payment of that Class Member's claims.

11.    <u>Waiver of Non-Compensatory Damages</u>. The Settlement, Settlement Formula and Past Damages Amounts shall not include any amount based on any claim or calculation of treble damages, any other punitive damages, or fines.  All claims for treble damages, punitive damages, fines and interest under the RSL, RSC or any other provision of law are hereby waived and released, except as to Opt-Outs. The Order and Final Judgment shall provide that because this is a class action, an award of treble damages, punitive damages, and fines would be waived if this Action proceeded to trial.

## **<u>DECLARED RENTS</u>**

12.    The maximum legal regulated rent permitted to be charged pursuant to the RSL and RSC (the "Legal Rent") for each Covered Unit shall be calculated using the Base Date, and the amount of such rent with respect to each apartment being currently leased by a Plaintiff is included in <u>Exhibit</u> <u>A</u>.

13.    The Legal Rent for each Unit shall be determined by increasing the Base Date Amount for each Unit by all of the following that occurred for that Unit from the Base Date to the Order and Final Judgment Date: all Standard Vacancy Increases; all Long Term Vacancy Increases; all Individual Apartment Improvement Increases; all Rent Guideline Board Increases; all Major Capital Improvement Increases; and all other rent increases and adjustments permitted under the Rent Stabilization Law and Code. The maximum legal collectible rent permissible to be charged pursuant to the RSL and RSC for each of the Units shall be calculated by reference to the

#224593883_v14

Base Date.

14.    For purposes of this Stipulation and the Order and Final Judgment, the terms "Standard Vacancy Increases," "Long Term Vacancy Increases," "Individual Apartment Improvement Increases," "Rent Guidelines Board Increases," and "Major Capital Improvements" shall have the meanings ascribed to them under the RSC and/or RSL (collectively, the "Rent Increases"). Rent Increase calculations for each Unit shall be based on the Data.  The absence of any particular back-up documentation in Landlord's files shall not invalidate any Rent Increase.  The cost, scope and necessity of work performed in connection with Individual Apartment Improvement Increases shall be as reflected in Landlord's records and shall not be subject to challenge by Class Members.  Plaintiffs have already had the opportunity prior to moving for Preliminary Approval to conduct discovery pertaining to the Rent Increases and therefore no further confirmatory discovery is necessary.

15.    Except as set forth in paragraph 1 above and paragraph 18 below, the Units shall all be subject to the RSL with Class Members entitled to stabilized leases and rents, rights of renewal and succession, and other benefits under the law, such as the provision of the HCR rider with each lease, pursuant to RSL § 26-511 (d).  The J-51 benefit period expired June 30, 2014.   If a Unit became vacant subsequent to the expiration of the J-51 tax benefit period and the recalculated rent permitted the unit to be deregulated under the applicable deregulated threshold as defined by the RSL, these apartments were deemed deregulated as the application date was set forth in paragraph 1.

16.    The stipulated order shall further provide that in the event a Tenant was supplied a J-51 Rider with each lease and lease renewal for a Unit from the inception of the tenancy through the last lease in effect at the expiration of the J-51 period then that Unit will be deemed deregulated

at the expiration of the lease in effect as of the date of this Settlement Agreement if otherwise permitted by law.

17.    Legal Rent shall not include any amount based on any claim or calculation of treble damages, any other punitive damages, fines or interest.

18.    Notwithstanding anything to the contrary contained in this Settlement Agreement, the Deregulated Units are deregulated apartments under the RSL and RSC.  It is established that the legal regulated rent for the aforesaid Deregulated Units reached the threshold prior to June 14, 2019 and subsequent to June 30, 2014.

## CASH COMPONENT

19.    Each Non-Rent Credit Class Member who has a Past Damages Amount that is positive, and who has not elected to be an Opt-Out (an "Eligible Class Member"), shall be eligible to receive compensation as provided for in paragraphs 20 through 25 below.  For this purpose and as otherwise provided for in this Settlement Agreement, $2,200,000.00 (the "Settlement Pool") shall be paid first from the proceeds of the closing of the Sale of the Landlord's interest in the Property pursuant to the Plan to the Escrow Agent, to be held in escrow and distributed pursuant to future order of the Court (the "Cash Component").  No payments will be made to any Class Member or Lead Counsel or any other person or entity for any cost or expense associated, or in connection, with this Settlement Agreement except from the Settlement Pool, and upon Final Approval, the Class Members who have not Opted-Out and their counsel expressly waive and release any right or claim to recover any amount from any other person or entity.

20.    The Cash Component shall be used to pay Past Damages Amounts, Minimum Damages Payments, "Incentive Awards to the Named Plaintiff Class Representatives" in the amount of $10,000 for each Named Plaintiff Class Representative, and Attorneys' Fee Awards and

Expenses, and all other amounts which may be due pursuant to this Stipulation. Paragraphs 21 through 25 below shall govern the distribution of the funds from the Settlement Pool.

21.    The formula for purposes of determining the Past Damages Amount shall be based upon the Settlement Formula, less Non-Payment Deductions and less Credits, as provided in paragraph 7 above.  Eligible Class Members who do not Opt-Out affirmatively waive any right to interest, penalties, or fines on these amounts or otherwise except as set forth in this Settlement Agreement.

22.    All current tenant Rent Credit Class Members have already received any respective Past Damages Amounts to which they would have been entitled as of the date of this Settlement Agreement.  Each Non-Rent Credit Class Member who files a timely claim form who has a positive Past Damages Amount will receive a disbursement from the Pool (a "Pool Disbursement") pursuant to paragraph 7 above in the amount of such Eligible Class Member's Past Damages Amount(s).  By virtue of prior Court Orders and the Credits, current Rent Credit Class Members, as described in paragraph 9 above, have been paid all damages and are not entitled to any additional monies including the minimum payment.    If a Non-Rent Credit Class Member's Past Damages Amount is equal to or less than one hundred fifty dollars ($150), such Non-Rent Credit Class Member will nonetheless receive a Minimum Damages Payment of $150 in lieu of his, her or its Past Damages Amount.  For purposes of this Settlement, co-tenants of a single Unit for each Lease Term reflected in the Data shall be considered together as one Class Member.  If the Class Member for a particular Lease Term consists of two or more co-tenants, the Past Damages Amount or Minimum Damages Payment will be divided equally among and disbursed proportionally to only those co-tenants who timely submit a Claim Form.    Any Non-Payment Deductions also shall be made equally and proportionally from each such co-tenant's disbursement, even if other co-tenants exist but fail to

20

submit a Claim Form (unless any other co-tenant opts out, in which case all the co- tenants shall be deemed to have opted out pursuant to paragraphs 46 through 48 below, including those co- tenants who timely submit a Claim form).   Any disputes among co-tenants concerning the allocation of any distributions under this Settlement Agreement must be addressed and resolved amongst the co-tenants outside the scope of this Settlement Agreement and the existence of any such actual or potential disputes shall not be a basis for objecting to the Settlement Agreement.

23.     If, after all the Eligible Class Members that submitted timely claim forms receive 100% of their Past Damages Amount and if there remains any portion of the Pool remaining after the payment of all Court approved Attorneys' Fees and Expenses, Notice Costs and Administrative Costs, and Incentive Awards, if any (the "Unclaimed Funds"), those remaining Unclaimed Funds in the Pool shall be used to make a second payment to all Eligible Class Members that have submitted timely claim forms, on a pro-rata basis (the "Second Payment"). The amount of the Second Payment to each Eligible Class Member that submitted a timely claim form shall not exceed 100% of the amount of Past Damages amount received in the initial payment, e.g., if $20,000 was initially paid on a particular Eligible Class Member's Past Damages Amount, the Second Payment to such Eligible Class Member cannot exceed $20,000. Insofar as any money remains in the Pool after the payment of (1) the initial Past Damages Amount to all Eligible Class Members who submit a timely claim form; (2) all Court approved Attorneys' Fees and Expenses, Notice Costs and Administrative Costs, and Incentive Awards; and (3) the Second Payment to each Eligible Class Member that submits a timely claim form, that amount will  revert to Barclays, and shall be transferred by the Claims Administrator to Barclays no later than seven (7) days after all other amounts to be paid from the Settlement Pool by the Claims Administrator have been paid in full.

#224593883_v14

24.     If any Unclaimed Funds remain in the Pool one year after the Effective Date for whatever reason, including the failure to cash payment checks disbursed from the Settlement Pool, such funds shall be distributed to Eligible Class Members on a pro-rata basis until Eligible Class Member receive 200% of the Settlement Formula or the cost of additional distributions makes such payments financially infeasible.  Any amount remaining in the Settlement Pool 90 days thereafter shall be transferred to Barclays..

25.     If the Settlement does not become effective or terminates for any reason, the Settlement Pool shall revert to Barclays less all Notice Costs and Administrative Costs, if any, which shall not exceed $35,000.

## **TERMINATION PROVISION/OPT-OUT**

26.     Any Class Member that timely files an opt-out form and/or request for exclusion will not be bound by any of the terms of this Settlement.   Any Class Member who does not timely opt-out or request exclusion will be bound by the terms of this Settlement, but only those Class Members who file timely claim forms will be eligible to receive payments from the Settlement Pool.

27.     Landlord, only with Barclays' prior written consent, shall have the right to terminate this Settlement Agreement if either: (a) 20% or more of the Class Members opt-out of the Settlement; or (b) the aggregate dollar amount that Class Members who opt-out of the Settlement would have received under the Settlement Formula (had they not opted out) exceeds 20% of the amount paid by Landlord into the Settlement Pool.

## **COURT ORDER**

28.     The Court shall enter orders, in a form approved by Barclays, ensuring the enforceability of the terms of the  Settlement Agreement.

29.     The Order and Final Judgment shall, among other things, provide for the full and

complete dismissal of the Complaint with prejudice against all Defendants.

## **RELEASES**

30.    "Released Parties" means Landlord, all Defendants in the Action, Barclays, the Ground Lessor, any and all purchasers of the Landlord's interest in the Ground Lease and all of the foregoing entities' present and former lenders, investors, affiliates, subsidiaries and parent companies, including without limitation, limited liability companies, partnerships and corporations (including those that are minority-owned), and their respective officers, attorneys, members, principals, shareholders, heirs, executors, administrators, directors, managers, partners, employees, agents, consultants, advisors, or representatives, and the successors and assigns of each of the foregoing, including without limitation, any future owner of the Landlord's interest in the Ground Lease, and any future owner of the fee interest in the Property.

31.    "Releasing Class Members" means Plaintiffs, each Settlement Class Member who does not timely and properly opt out of the Settlement, and the heirs, successors, trustees, executors, administrators and assigns of each of them.

32.    "Releasing Landlord" means Landlord and its successors and assigns.

33.    "Settled Plaintiffs' Claims" means all statutory, regulatory, common law or other claims, causes of action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs, penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal, state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before entry of the Order and Final Judgment, that are based upon or related to, or arise out of, in whole or in part, the facts, transactions, events, occurrences, acts, or failures to act that were or could have been alleged in the Action by Plaintiffs or a Class Member against the Released Parties, including without limitation, damages, penalties, punitive damages, treble damages, liabilities or other remedies relating to (a) residential rents at the Property, (b) the rent-regulated

23

status of any Unit at the Property, (c) Barclays' interest in the leasehold mortgage on the Property

and/or (d) any other claims arising under the RSL or RSC based on any act, event or alleged failure

to act prior to the Order and Final Judgment Date, including but not limited to any claim that a

tenant was entitled to any particular form of lease, rider, notice, or that the Building or Unit had to

be registered with any governmental agency. For the avoidance of any doubt, this release includes

any successor liability or other claims by Plaintiffs under RSC § 2526.1 (9 NYCRR §2526.1) or

any other law.

34.     Subject to the Court's approval of this Stipulation and entry of the Order and Final

Judgment, as of the Effective Date: (a) each Releasing Class Member hereby forever waives,

releases, and discharges all Settled Plaintiffs' Claims against the Released Parties even if such

Releasing Class Member failed to submit a Notice of Claim Form; (b) each Releasing Class

Member shall be permanently enjoined from commencing, prosecuting, or continuing any of the

Settled Plaintiffs' Claims against the Released Parties even if such Releasing Class Member failed

to submit a Notice of Claim Form; and (c) the Releasing Landlord hereby forever releases all Class

Members, except Opt-Outs, from all statutory, regulatory, common law or other claims, causes of

action, suits, administrative proceedings, arbitrations, liabilities, obligations, expenses, costs,

penalties, damages, demands, and/or any other remedies of any nature whatsoever, under federal,

state, local or any other law, whether legal, equitable or otherwise, arising at any time on or before

entry of the Order and Final Judgment, that are based upon or related to, or arise out of the Action

except non-payment of back rent to the extent otherwise set forth in this Settlement Agreement

and actions or proceedings pending on, or filed after, the date of this Settlement Agreement for

unrelated claims for bodily injury or damage to personal property.

35.     In addition to the above release language, the absence of any forms or notices or

registration through the date of the first lease renewal for each Class Member after the Effective Date will not cause the loss of any rent increase or other adverse consequences to Landlord.

## RESERVATION OF RIGHTS

36.     Except as expressly set forth herein, if the Court fails to grant preliminary approval of the Settlement Agreement by the date that is more than forty-five (45) days after the confirmation of the Plan, or final approval of the Settlement Agreement by the date that is more than 120 days from the date the Court grants preliminary approval, or if the Settlement Agreement is terminated or does not become effective for any reason, then, at Plan Administrator's (on behalf of Landlord's) option, with Barclays' prior written consent, all parties' positions shall return to the *status quo ante* as if the Settlement Agreement never existed, and each party preserves, reserves and does not waive any and all of its respective rights, claims, defenses and remedies.

## DEFENDANT'S DOCUMENTS AND CONFIRMATORY DISCOVERY

37.     All Rent Increases shall be calculated at the amount assigned to the Covered Units based on Landlord's documentation produced during discovery and as updated through the Order and Final Judgment Date.  The absence of any particular back-up documentation in Landlord's files shall not invalidate any increase.  The cost, scope, and necessity of work performed in connection with Individual Apartment Improvements, and Major Capital Improvements shall be as reflected in Landlord's records and shall not be subject to challenge by Class Members. Plaintiffs have had the opportunity prior to the execution of the Settlement Agreement to conduct confirmatory discovery pertaining to the Rent Increases, and waive the right to take any additional discovery after execution of this Settlement Agreement.

## CLAIMS ADMINISTRATION

38.     With the Court's approval and conditioned on the successful negotiation of a retention agreement, the Pool shall be administered by a claims administrator selected by

25

Plaintiffs' counsel (the "Claims Administrator").  If for any reason that firm does not become the Claims Administrator or ceases to serve in that capacity, the Court shall appoint another entity to become the Claims Administrator at the request of Lead Counsel and subject to Plan Administrator's approval.  Any dispute concerning the amount of Administrative Costs to be paid to the Claims Administrator will be resolved by the Court.  The cost of the Class Administrator shall be paid solely by the Pool.

39.     To receive payment for Past Damages Amounts or Minimum Damages Payments, Eligible Class Members shall file claims for distributions from the Pools pursuant to the procedures set forth in a Claim Form to be agreed upon by the Parties. If a single Unit had multiple co-tenants at any given time, any subsequent dispute as to the entitlement to any distribution under this Stipulation shall be solely between and among such co-tenants without recourse to the Pool and without any liability to any of the parties to this Settlement Agreement.  For identity verification purposes, all Claim Forms shall require Class Members to provide the month and year when their lease(s) commenced and terminated and the addresses of such Class Member's leased Unit(s).  All Claim Forms shall require Class Members to state whether the Class Member submitting the form subleased his, her, or its Unit(s) with or without the consent of the landlord at any time since the Base Date, to the date he, she or it signed the Claim Form, and, if so, the dates of such subleasing, the rents received from the subtenant(s) and the name or names of the subtenant(s). Class Members who do not timely file a Claim Form pursuant to these procedures shall be deemed to have waived and released their Past Rent Claims, Past Damages Amounts and Minimum Damages Payments but shall nonetheless remain subject to the applicable releases set forth in paragraph 30 above unless he, she or it becomes an Opt-Out.  Determinations as to whether a Claim Form has been timely and properly filed shall be made by the Claims Administrator.

26

40.     Landlord will provide Lead Counsel and/or the Claims Administrator with the names of all Eligible Class Members that Landlord alleges failed to pay rent since the commencement of the Action through the date the Eligible Class Member vacated the Covered Apartment, including the amounts of such alleged non-payment and period during which it allegedly accrued and the total amount of such potential non-payment deductions. If feasible, Eligible Class Members with alleged non-payment histories will be notified of Landlord's claim along with the Notice of Settlement.  Any such Class Member that submits a claim form may also submit an objection to the allegation of non-payment and any supporting documentation or other materials (the "NPD Objections").  Plaintiffs and Landlord will confer on the resolution of all NPD Objections.  All NPD Objections that cannot be resolved will be submitted to the Court for determination on or before the Settlement Hearing and the Court shall provide such orders and judgments as it deems appropriate.  If, by the Effective Date, some disbursements to Eligible Class Members remain unresolved because of a dispute about the Non-Payment Deduction or for any other reason, the amount allocated to the Eligible Class Member (including the disputed Non-Payment Deduction) will remain in the Pool for later distribution at such time as the dispute is resolved.

## ATTORNEYS' FEES AND EXPENSES AWARD

41.     Lead Counsel may apply to the Court, unopposed by Landlord, for an award of Attorneys' Fees and out-of-pocket expenses (the "Attorneys' Fee Award and Expenses") which shall be paid from the Pool, in an amount that shall not exceed the amount available remaining in the Pool, after (a) the allocation of payments to all Eligible Class Members that submit timely claim forms and (b) the allocation of all payments for Notice Costs, Administrative Costs and Incentive Award payments to Class Representatives.  The Attorneys' Fee Award and Expenses shall be paid by the Claims Administrator within ten (10) days of the later of: (i) the Effective Date; or (ii) the date the Settlement Pool is transferred to the Class Administrator from the proceeds

of the Sale or as soon thereafter as practical.

42.    Except as expressly provided in this Stipulation, Plaintiffs, Landlord and Lead Counsel shall bear their own fees, costs and expenses.

43.    Any failure of the Court to approve a request for the Attorneys' Fee Award and Expenses, in whole or in part, shall not affect the terms or enforceability of the remainder of this Stipulation or the Settlement.

<div align="center"><u>**SUBMISSION FOR APPROVAL**</u></div>

44.    Promptly after execution of this Settlement Agreement, and no later than 15 days after entry of the Confirmation Order, Plaintiffs with the consent of the Plan Administrator, acting on behalf of Landlord, shall submit this Settlement Agreement with its exhibits to the Court for preliminary approval of this Settlement Agreement (the "Preliminary Approval") and shall seek entry of the Preliminary Approval Order.  Among other matters, the Preliminary Approval Order shall provide for: (a) the preliminary approval of the of the Class as defined herein; (b) the preliminary approval of this Settlement Agreement and the declaratory relief provided  herein as being fair, just, reasonable and adequate to the Class; (c) the approval of the Notice; (d) the approval of a procedure for and the timing of the filing of objections, if any; (e) the approval of the timing for processing Opt-Out requests; (f) the setting of a date for the Court to hold the Settlement Hearing; and (g) a stay of the proceedings in this Action in accordance with paragraphs 56 through 58 below. The motion for Preliminary Approval shall have as an exhibit a schedule identifying all of the Units and the date each was initially treated as deregulated.

45.    At or prior to the Settlement Hearing, Plaintiffs with Landlord's consent shall request that the Court enter the Order and Final Judgment.  The Order and Final Judgment shall have, as exhibits, schedules (to be filed under seal to preserve tenant confidentiality) showing the Legal Rent calculated as of the date of the Settlement Hearing pursuant to the Settlement Formula,

<div align="center">28</div>

for each of the Units as calculated pursuant to this Stipulation.  The Settlement shall be considered final on the Effective Date.

### REQUESTS FOR EXCLUSION/OPT OUT

46.     Each Class Member will be bound by all provisions of the Settlement Agreement, whether favorable or unfavorable, unless such person mails, by first class mail to the Claims Administrator, a written request for exclusion from the Class, postmarked no later than 21 days before the Settlement Hearing (an "Opt-Out").  No Class Member may exclude himself, herself or itself from the Class after that date.  The Claims Administrator shall provide regular reports of such requests to each of the parties' attorneys, and counsel for Barclays.    In order to be valid, each request for exclusion (an "Opt-Out") must: (a) set forth the name and address of the Class Member requesting exclusion; (b) state that such Class Member "requests exclusion from the Class in *Casey v. Whitehouse Estates, Inc.*, Index No. 111723/2011"; (c) be signed by such Class Member; and (d) include the addresses of all of such Class Member's leased Unit(s).  Requests for exclusion will not be accepted if they do not include the required information or if they are not made within the time stated above.  If one co-tenant of a Unit is an Opt-Out, all co-tenants of that Unit shall likewise be deemed to be Opt-Outs as to each Lease Term for which they were co-tenants.

47.     The rent for all Opt-Outs who are current tenants of the Building at the time they opt-out shall be the maximum legal rent permitted by law.

48.     Opt-Outs will not receive any payment from the Settlement Pool and will not be entitled to receive any of the benefits he or she would otherwise have been entitled to pursuant to this Settlement Agreement.  In any subsequent proceeding, Opt-Outs may make any claim or argument and Landlord may raise any defenses available to it whether at law or equity.  Unless expressly provided in this Settlement Agreement, Eligible Class Members may not choose to be excluded from any individual provisions of this Settlement Agreement including, but not limited

to, all provisions regarding Future Rent Claims and the declaratory relief provided in paragraphs 12 through 18 of this Settlement Agreement.

## NOTICE

49.    The Notice to all Class Members, which shall be agreed upon by the Parties, shall be provided to the Class by a mailing and/or by electronic means to all Class Members for whom an address or possible address is known.  Landlord shall supply to the Claims Administrator to the extent Landlord possesses such information, in a confidential manner, each Class Member's: (a) current or last known residential address; (b) current or last known email address; and (c) social security number and date of birth (to facilitate locating and providing Notice to former tenant Class Members who may have changed residences multiple times and to representatives of Class Members who may be incapacitated or deceased).  The foregoing information shall be destroyed by the Claims Administrator after all of its duties under this Settlement Agreement are fulfilled.  Lead Counsel shall, at least ten (10) business days before the Settlement Hearing, file with the Court an appropriate affidavit with respect to the preparation, mailing and publication of the Notice.  The language and form of all public notices and other advertisements aimed at reaching potential Class Members shall be subject to review and approval by Barclays.

## CONDITIONS OF SETTLEMENT

50.    Landlord denies and continues to deny that it has committed or aided and abetted the commission of any unlawful or wrongful acts alleged in the Action, and expressly maintains that it diligently and scrupulously complied with the RSL, RSC and all other legal obligations. Landlord is entering into the Settlement solely because the proposed Settlement will eliminate the uncertainties, burden and expense of further litigation.

51.    Plaintiffs and Lead Counsel believe that the Settlement Agreement is fair, reasonable, adequate and in the best interests of the Plaintiffs and the Class.  Plaintiffs and Lead Counsel also

took into consideration the strengths and weaknesses of the Class' claims and defenses and

determined that the terms of the proposed Settlement Agreement are fair, reasonable and adequate,

and in the best interest of the Class.

52.    This Settlement Agreement is conditioned upon the fulfillment of each of the

following:

(a)    The Court approving the Settlement and entry of the Order
and Final Judgment, and such approval and Order and Final
Judgment having been affirmed on appeal and/or no longer
being subject to appeal;

(b)    The dismissal with prejudice of this Action against all
Defendants without the award of any damages, costs, fees, or
the grant of any further relief except as provided in this
Stipulation;

(c)    The Plan Administrator, acting on behalf of Landlord, having
not exercised its option to terminate this Settlement
Agreement pursuant to the terms hereof; and

(d)    The occurrence of the Effective Date without any material
change (unless agreed to in writing by all parties) to the terms
of the proposed Preliminary Approval Order, Order and Final
Judgment and/or this Settlement Agreement.

53.    If any of the conditions in paragraph 52 above do not occur for any reason, then

any party may terminate this Settlement Agreement by giving ten (10) days written notice to the

other parties, in which event: (a) this Settlement Agreement and any related orders shall be null

and void and of no further force or effect; (b) certification of the Class as set forth in this Settlement

Agreement shall be null and void and automatically set aside; (c) the parties shall revert and be

restored to the positions they were in immediately prior to execution of the Settlement Agreement;

(d) no statements, agreements or acknowledgements (whether written or oral) made or exchanged

in connection with this Settlement Agreement shall be deemed an admission or concession by any

party and shall not be admissible for any purpose; (e) the Settlement Agreement shall not be

31

introduced as evidence or referred to in any action or proceeding other than an action or proceeding to enforce the terms thereof; and (f) all funds in the Pool will be returned to Landlord, with any interest earned on those funds while they were held in the Pool, after payment of all Notice Costs and up to $20,000 for Administration Costs, within thirty (30) days of the giving of the termination notice. Notwithstanding anything to the contrary contained in this Settlement Agreement, the Landlord may not terminate this Settlement Agreement without the prior written approval of Barclays.

## BEST EFFORTS

54.     Plaintiffs and Landlord agree to cooperate fully with one another in seeking the Court's approval of this Settlement Agreement, and to use their best efforts to effect, take, or cause to be taken all actions, and to do, or cause to be done, all things reasonably necessary, proper, or advisable under applicable laws, regulations, and agreements to consummate and make effective, as promptly as practicable, this Settlement Agreement provided for hereunder (including, but not limited to, using their best efforts to resolve any objections raised to the Settlement Agreement and the dismissal of the Action with prejudice and without costs, fees or expenses to any party except as otherwise provided for in this Settlement Agreement.

55.     Without further order of the Court, Plaintiffs and Landlord, with Barclays' prior written approval, may agree to reasonable extensions of time not expressly set forth by the Court in order to carry out any provisions of this Stipulation.

## STAY OF PROCEEDINGS

56.     Until the Effective Date, Plaintiffs and Landlord agree to stay this proceeding.

57.     The Preliminary Approval Order shall provide that pending final determination of whether the Settlement Agreement should be approved, Plaintiffs and all Class Members are barred and enjoined from commencing, prosecuting, instigating or in any way participating in the

commencement or prosecution of any action asserting any claims asserted in this Action, either directly, representatively, derivatively, or in any other capacity, against Landlord or any of the Released Parties.

58.     Pending the entry of the Preliminary Approval Order and the Effective Date, Landlord is not stayed from taking any actions relating to the leasing or management of the Building or enforcement of the terms of leases for Units including, but not limited to, increasing rents for renewal leases, or new vacancy leases, in a manner not inconsistent with the terms of this Settlement Agreement or the current leases in effect or commencing actions or proceedings for non-payment of rent or holdover proceedings as otherwise allowed by law.

## REPRESENTATIONS AND WARRANTIES

59.     Landlord represents and warrants that it is the ground lessee under the Ground Lease.

60.     Landlord represents and warrants that it has full authority to enter into this Stipulation, and has authorized its counsel to do so.

61.     All Class Members who seek reimbursement for Past Rent Claims and payment from the Pool shall by submitting a  Claim Form, represent and warrant that they are entitled to such reimbursement and have not assigned, pledged, transferred, or lost through bankruptcy, divorce proceeding or any other operation of law the right to the full reimbursement sought.

## SETTLEMENT AGREEMENT NOT AN ADMISSION

62.     The provisions contained in this Settlement Agreement shall not be deemed a presumption, concession, or an admission by Landlord of any fault, liability, or wrongdoing as to any facts or claims alleged or asserted in the Action, or any other action or proceeding, and shall not be interpreted, construed, deemed, invoked, offered, or received in evidence or otherwise used by any person in the Action, or in any other action or proceeding, whether civil, criminal, or

33

administrative, except for any litigation or judicial proceeding arising out of or relating to the enforcement of this Stipulation or the Settlement.

## MISTAKE

63.    Except as otherwise set forth herein, in entering into this Settlement Agreement, Plaintiffs, the Class, and Landlord assume the risk of any mistake of fact or law, and if any of them should later discover that any fact they relied upon in entering into this Settlement Agreement is not true, or that their understanding of the facts or law was incorrect, in such event such party shall not be entitled to seek rescission of this Settlement Agreement, or otherwise attack the validity of the Settlement Agreement, based on any such mistake.  Except as otherwise set forth herein, this Settlement Agreement is intended to be final and binding upon the parties regardless of any mistake of fact or law.

## RETENTION OF JURISDICTION

64.    The Court shall retain jurisdiction for purpose of entering orders to: (a) effectuate the implementation of the Settlement Agreement; (b) enforce the terms of this Settlement Agreement including, but not limited to, the releases provided herein; (c) hear all claims, defenses and counterclaims relating to the interpretation and enforcement of this Settlement Agreement before and after the Effective Date as the Court deems appropriate; (d) review all challenges to final administrative determinations brought by Opt-Outs; and (e) determine all other matters relevant to this Stipulation.

## ENTIRE AGREEMENT

65.    This Settlement Agreement and the Exhibits attached hereto constitute the entire agreement between the parties hereto concerning the subject matter hereof, and all understandings and agreements heretofore or simultaneously had between the parties are merged in and are contained in the Settlement Agreement and the Exhibits attached thereto.  Each of the parties

34

warrants and represents to the others that it has not relied upon any representations or warranties, express or implied, in entering into this Settlement Agreement except those which are expressly set forth in this Settlement Agreement and the Exhibits attached thereto.

## COUNTERPARTS

66.    This Settlement Agreement may be executed in multiple counterparts by any of the signatories hereto, including by facsimile or by e-mail, and as so executed shall constitute one agreement.

## GOVERNING LAW

67.    This Settlement Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to New York's conflict of law rules.  Any change of law occurring after Lead Counsel's execution of this Settlement Agreement shall not affect the Parties' duties and obligations under this Agreement.

68.    The Parties agree that the Cash Component (the "Fund") is intended to be a "Qualified Settlement Fund" within the meaning of Treasury Regulation § 1.468B-1 and that the Escrow Agent, as administrators of that Fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be responsible for timely preparing and filing tax returns and related documents for the Fund and paying from the Fund any Taxes owed with respect to interest earned on the Fund.  The Parties agree that the Fund shall be treated as a Qualified Settlement Fund from the earliest date possible, and agree to any relation-back election required to treat the Fund as a Qualified Settlement Fund from the earliest date possible.  Landlord, as "transferor" as defined in Treasury Regulation § 1.468B-1(d)(1), of the amounts specified in paragraph 16, agrees to provide promptly to Lead Counsel or the Escrow Agent, as administrator of the Fund, the statement described in Treasury Regulation § 1.468B-3(e).

## NOTICES

69.    Unless otherwise set forth in this Stipulation, any notice permitted or required to be given under this Stipulation from one party to another shall be given in writing by (a) personal delivery, or (b) a nationally recognized overnight courier (and in each case also by electronic mail), sent to the intended addressee(s) at the addresses set forth below, or to such other address(es) or to the attention of such other person(s) as the addressee(s) shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given upon receipt or refusal to accept delivery. Copies of all notices shall also be provided to Barclays in the same manner.  The addresses for giving notice pursuant to this Settlement Agreement shall be as follows:

If to Plaintiffs:    Himmelstein, McConnell, Gribben,
Donoghue & Joseph LLP
15 Maiden Lane, 17th Floor
New York, New York 10038
Attn:  William Gribben (wgribben@hmgjlaw.com)
Ronald S. Languedoc (rlangeuedoc@hmgjlaw.com)

and

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10022
Attn:    Matthew D. Brinckerhoff (mbrinck@ecbawm.com)

If to Landlord:    Trigild Property Management LLC
As Plan Administrator for Eastgate Whitehouse LLC
4131 N. Central Expressway, Suite 775
Dallas, Texas 75204
Attn: David Wallace (david.wallace@trigild.com)
Chris Neilson (chris.neilson@trigild.com)
Ian Lagowtiz (ian.lagowitz@trigild.com)

If to Barclays:    Sarah Jones, Esq.
Jonathan Agudelo, Esq.
Barclays Bank PCC
745 Seventh Ave.
New York, New York 10019

#224593883_v14

With copies to:      Vivian M. Arias, Esq.
Holland & Knight LLP
131 West 52nd Street
New York, New York 10019
(vivian.arias@hklaw.com)

and

Randi B. Gilbert, Esq.
Horing Welikson Rosen
& Digrugilliers, P.C.
11 Hillside Avenue
Williston Park, New York 11596
(rgilbert@horprc.com)

## HEADINGS

70.     The headings in this Settlement Agreement are used for the purpose of convenience only and are not meant to have legal effect.

## SEVERABILITY

71.     Unless otherwise set forth in this Settlement Agreement, if any provision of this Settlement Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Settlement Agreement shall nonetheless remain in full force and effect; provided that the invalidity or unenforceability of such provision does not materially adversely affect the benefits accruing to any other party hereunder.

## THIRD-PARTY BENEFICIARIES

72.     There are no third-party beneficiaries under this Settlement Stipulation, other than (i) the Released Parties with respect only to the release provisions of this Settlement Agreement; and (ii) Barclays.

## EFFECT OF WAIVER OF BREACH

73.     The waiver by one party of any breach of this Settlement Agreement by any other party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement

#224593883_v14

Agreement.  Unless otherwise stated in this Settlement Agreement, any breach of any provision of this Settlement Agreement by any party to this Settlement Agreement shall not constitute grounds for rescission of this Settlement Agreement, but shall constitute grounds only for a claim for specific performance for breach of this Settlement Agreement.

## SUCCESSORS AND ASSIGNS

74.    This Settlement Agreement, and all rights and powers granted hereby, shall be binding upon and inure to the benefit of the parties and their respective agents, executors, heirs, successors, affiliates and assigns.  All rights and obligations of Landlord shall be binding on and inure to the benefit of any subsequent owners of the Landlord's interest in the Ground Lease or Building.

## CONFIDENTIALITY

75.    Lead Counsel shall not disclose the terms of this Settlement Agreement until it is filed by Barclays in the Bankruptcy Court as an exhibit to the Plan.

76.    If Lead Counsel receive any third-party inquiries, including from news organizations, about any aspect of the terms and conditions of this Settlement Agreement before the Settlement Agreement is fully executed and filed with the State Supreme Court, they will only respond that "the matter is being resolved" or words to that effect. Nothing herein shall prevent Lead Counsel from discussing the Settlement Agreement with their clients.

Dated:   September __, 2023
          New York, New York

**Signature Blocks On the Following Page**

#224593883_v14

Dated: New York, New York
      September _, 2023

 

**HIMMELSTEIN McCONNELL**
**GRIBBEN & JOSEPH LLP**
*Attorneys for Plaintiffs*

By: _Ronald S. Languedoc_
       Ronald S. Languedoc, Esq.
       William J. Gribben, Esq.
15 Maiden Lane, 17th Floor
New York, New York 10038
Tel: (212) 349-3000

**EMERY CELLI BRINCKERHOFF &**
**ABADY WARD & MAAZEL LLP**
*Attorneys for Plaintiffs*

By: _____
       Matthew Brinckerhoff, Esq.
600 5th Avenue, 10th Floor
New York, New York 10020
Tel: (212) 763-5000

#224593883_v14

Dated: New York, New York
        September 1, 2023

**HIMMELSTEIN McCONNELL
GRIBBEN & JOSEPH LLP**
*Attorneys for Plaintiffs*

By: _____

        Ronald S. Languedoc, Esq.
        William J. Gribben, Esq.
15 Maiden Lane, 17th Floor
New York, New York 10038
Tel: (212) 349-3000

**EMERY CELLI BRINCKERHOFF &
ABADY WARD & MAAZEL LLP**
*Attorneys for Plaintiffs*

By: _____

        Matthew Brinckerhoff, Esq.
600 5th Avenue, 10th Floor
New York, New York 10020
Tel: (212) 763-5000

#224593883_v14

Dated: New York, New York
_____, 2023

                        **EASTGATE WHITEHOUSE LLC**

                        By: _____
                        Name:
                        Title:  Plan Administrator

#224593883_v14

## EXHIBIT A

|  | APT | LEGAL RENT | DATE OF DEREGULATION, IF ANY |
|---|---|---|---|
| 1. | 1C | $3,045.00 | 11/01/2015 |
| 2. | 1D | $1,934.69 | |
| 3. | 2B | $2,369.52 | |
| 4. | 2H | $1,975.00 | 10/01/2014 |
| 5. | 2J | $2,400.00 | |
| 6. | 2K | $2,950.00 | 06/01/2017 |
| 7. | 3A | $1,800.00 | |
| 8. | 3C | $2,900.00 | 09/16/2016 |
| 9. | 3D | $4,009.25 | 11/15/2015 |
| 10. | 3E | $3,199.43 | 04/01/2018 |
| 11. | 3G | $3,800.00 | |
| 12. | 3H | $2,075 | |
| 13. | 3J | $2,679.92 | |
| 14. | 3K | $2,700.00 | 09/01/2015 |
| 15. | 4A | $1,763.81 | |
| 16. | 4B | $2,407.89 | |
| 17. | 4C | $2,200.00 | |
| 18. | 4D | $2,800.00 | |
| 19. | 4J | $1,800.00 | |
| 20. | 4K | $2,783.56 | |

| | | | |
|---|---|---|---|
| 21. | 5B | $2,650.00 | 02/01/2015 |
| 22. | 5C | $3,265.48 | 01/01/2017 |
| 23. | 5D | $3,100.00 | 03/01/2017 |
| 24. | 5G | $3,578.75 | |
| 25. | 5H | $2,223.94 | |
| 26. | 5J | $1,900.00 | |
| 27. | 5K | $4,567.50 | 09/01/2015 |
| 28. | 6B | $2,534.73 | |
| 29. | 6F | $2,096.13 | |
| 30. | 6G | $4,200.00 | |
| 31. | 6H | $2,171.79 | |
| 32. | 6J | $2,350.00 | |
| 33. | 6K | $2,120.25 | |
| 34. | 7C | $2,400.00 | 06/15/2016 |
| 35. | 7D | $3,175.00 | 10/15/2017 |
| 36. | 7F | $2,211.67 | |
| 37. | 7G | $5,400.00 | 09/01/2015 |
| 38. | 7K | $2,900.00 | 10/15/2015 |
| 39. | 8C | 3,000 | 03/01/2018 |
| 40. | 8D | $3,516.24 | |
| 41. | 8E | $2,550.00 | 09/01/2017 |
| 42. | 8J | $2,880.03 | |
| 43. | 8K | $2,900.00 | |
| 44. | 9A | $2,472.54 | |

2

| 45. | 9B | $2,650.00 | |
| 46. | 9C | $3,700.00 | |
| 47. | 9D | $2,750.00 | 11/17/2017 |
| 48. | 9G | $5,625.00 | 07/01/2018 |
| 49. | 9H | $1942.75 | |
| 50. | 9J | $1,950 | |
| 51. | 9K | $2,998.57 | |
| 52. | 10A | $2,404.00 | |
| 53. | 10B | $2,200.00 | |
| 54. | 10C | $1,899.77 | |
| 55. | 10D | $2,950.00 | |
| 56. | 10G | $5,000.00 | 08/01/2017 |
| 57. | 10H | $2,309.76 | |
| 58. | 11B | $2,051.00 | |
| 59. | 11C | $3,500.00 | |
| 60. | 11D | $3,200.00 | 04/01/2018 |
| 61. | 11K | $2,700.00 | 03/01/2018 |
| 62. | 12C | $3,000.00 | |
| 63. | 12D | $3,200.00 | |
| 64. | 12E | $1,700.00 | |
| 65. | 12H | $2,100.00 | |
| 66. | 12J | $2,000.00 | |
| 67. | 12K | $3,967.05 | 08/01/2015 |
| 68. | 14C | $2,588.13 | 12/15/2017 |

3

| 69. | 14D | $3,100.00 | 05/15/2017 |
| 70. | 14E | $2,675.00 | |
| 71. | 14F | $2,599.87 | |
| 72. | 14G | $3,700.00 | 06/01/2016 |
| 73. | 14H | $2,502.14 | |
| 74. | 14J | $2,500.00 | 09/01/2016 |
| 75. | 15B | $2,556.56 | |
| 76. | 15E | $3,485.51 | 02/15/2017 |
| 77. | 15G | $5,250.00 | 09/01/2015 |
| 78. | 15J | $2,415.00 | |
| 79. | PHB | $3,919.34 | 05/01/2017 |
| 80. | PHC | $3,500.00 | 02/01/2015 |
| 81. | PHD | $3,888.41 | |

4

**Exhibit C to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

## List Of Leases To Be Assumed

| TENANT | STREET | APARTMENT |
|---|---|---|
| John Sullivan | 350 E 52nd St | 01C |
| Anastas Anastassov | 350 E 52nd St | 02A |
| Lilian Fernandes | 350 E 52nd St | 02B |
| Marcia Kaufman | 350 E 52nd St | 02C |
| Jenna Lanoil | 350 E 52nd St | 02D |
| Carolyn Feigan | 350 E 52nd St | 02E |
| Monica Passin | 350 E 52nd St | 02F |
| Jhon Smith | 350 E 52nd St | 02G |
| Xiaoli Xu | 350 E 52nd St | 02H |
| Zain Hasan | 350 E 52nd St | 02J |
| Aliza Iiano | 350 E 52nd St | 02K |
| Allison Witlow | 350 E 52nd St | 03A |
| Melissa Li | 350 E 52nd St | 03C |
| Alyssa Williamson | 350 E 52nd St | 03D |
| Mark Bluni | 350 E 52nd St | 03E |
| Samantha Diamond | 350 E 52nd St | 03F |
| Tommaso Degrezia | 350 E 52nd St | 03G |
| Joshua Kaston | 350 E 52nd St | 03H |
| Rachel Marcus | 350 E 52nd St | 03J |
| Stacey Simbal | 350 E 52nd St | 03K |
| Jennifer Puma | 350 E 52nd St | 04A |
| Makenna Pearsall | 350 E 52nd St | 04B |
| Ivan Daskalovski | 350 E 52nd St | 04C |
| Christopher Cassetta | 350 E 52nd St | 04D |
| Melissa Blankstein | 350 E 52nd St | 04E |
| Roxanne Rittberg | 350 E 52nd St | 04F |
| Nessa Obten | 350 E 52nd St | 04G |
| Phyllis Dubrow | 350 E 52nd St | 04H |
| Tommaso Degrezia | 350 E 52nd St | 04J |
| Sharon Rivera | 350 E 52nd St | 05A |
| Emilia Stevens | 350 E 52nd St | 05B |
| Hemantha Parvatharaj | 350 E 52nd St | 05C |
| Brian Bilsback | 350 E 52nd St | 05D |
| Kristin Francis | 350 E 52nd St | 05E |
| Robert Koeppel | 350 E 52nd St | 05F |
| Nancy Ng-Sharp | 350 E 52nd St | 05G |
| Jason & Diana Aptaker | 350 E 52nd St | 05H |
| Shaby Katz | 350 E 52nd St | 05J |
| Mostafa Khairy | 350 E 52nd St | 05K |
| Erica Aronow | 350 E 52nd St | 06A |
| Calvin Yoon | 350 E 52nd St | 06B |
| Les Haber | 350 E 52nd St | 06D |
| Carolina Bowe | 350 E 52nd St | 06E |
| Alisa Badiner | 350 E 52nd St | 06F |
| Kirk & Jennifer Swanson | 350 E 52nd St | 06G |
| Eliza Jacobi | 350 E 52nd St | 06H |
| Roqueline Lustosa-Sary | 350 E 52nd St | 06J |
| Julie Fuschetti | 350 E 52nd St | 06K |
| Karen Cohen | 350 E 52nd St | 07A |
| Caroline Bucca | 350 E 52nd St | 07B |
| Christina Ingram | 350 E 52nd St | 07C |

**Exhibit C**
**List Of Leases To Be Assumed**

| | | |
|---|---|---|
| Doris Perlman | 350 E 52nd St | 07E |
| Gerald Cohen | 350 E 52nd St | 07F |
| Brian Kennedy | 350 E 52nd St | 07G |
| First Commerical Bank | 350 E 52nd St | 07J |
| Brian Coltrinai | 350 E 52nd St | 07k |
| Jasmine Louie | 350 E 52nd St | 08A |
| Joseph Schwartz | 350 E 52nd St | 08B |
| Darjan Hristov | 350 E 52nd St | 08C |
| Haley Nitzberg | 350 E 52nd St | 08D |
| Tessa Green | 350 E 52nd St | 08E |
| Diane Perla | 350 E 52nd St | 08F |
| Kimberly Gardner | 350 E 52nd St | 08G |
| Joan Dorbian | 350 E 52nd St | 08H |
| Seiko Mizutani | 350 E 52nd St | 08J |
| Robert Salvit | 350 E 52nd St | 08K |
| Shannon Gorman | 350 E 52nd St | 09A |
| Jack Malykin | 350 E 52nd St | 09B |
| Seth Bergey | 350 E 52nd St | 09C |
| Alessandra Bozzo | 350 E 52nd St | 09D |
| Dani Guglielmo | 350 E 52nd St | 09E |
| Michael Wiseman | 350 E 52nd St | 09F |
| Michaela Nicholas | 350 E 52nd St | 09G |
| Shayna Walter | 350 E 52nd St | 09H |
| Gabrielle Bass | 350 E 52nd St | 09J |
| Sany Marques | 350 E 52nd St | 09K |
| Maryanne McGrath | 350 E 52nd St | 10A |
| Vera Da Costa | 350 E 52nd St | 10C |
| Colleen Jones | 350 E 52nd St | 10D |
| Logan Brodsky | 350 E 52nd St | 10E |
| Joan Asher | 350 E 52nd St | 10F |
| Shannon Simnor | 350 E 52nd St | 10G |
| Gregory Linksman | 350 E 52nd St | 10H |
| Kelly Moran | 350 E 52nd St | 10J |
| Alexa Mandel III | 350 E 52nd St | 10K |
| Max Goldenberg | 350 E 52nd St | 11A |
| Shade Quailey | 350 E 52nd St | 11B |
| Hermes Ademovi-Super | 350 E 52nd St | 11C |
| Stephanie Nwosa | 350 E 52nd St | 11D |
| Friedeke Bastiaans | 350 E 52nd St | 11E |
| Joshua Small | 350 E 52nd St | 11F |
| Jared Kirschner | 350 E 52nd St | 11G |
| Paige Kriftcher | 350 E 52nd St | 11H |
| Francine Oro | 350 E 52nd St | 11J |
| Paul Callamaras | 350 E 52nd St | 11K |
| Samantha Sternschein | 350 E 52nd St | 12A |
| Laurence Hunter | 350 E 52nd St | 12B |
| Richard Rose | 350 E 52nd St | 12C |
| Amanda Cohn | 350 E 52nd St | 12D |
| Kaylee Reynolds | 350 E 52nd St | 12E |
| Alexa Shepherd | 350 E 52nd St | 12F |
| Anusha Basana | 350 E 52nd St | 12G |
| Laurie Cagnassola | 350 E 52nd St | 12H |

**Exhibit C**
**List Of Leases To Be Assumed**

| | | |
|---|---|---|
| Ron Ariel | 350 E 52nd St | 12J |
| Allison Komara | 350 E 52nd St | 12K |
| Tomas Santiago Radnic | 350 E 52nd St | 14A |
| Lihan Wen | 350 E 52nd St | 14B |
| Brandon Chu | 350 E 52nd St | 14C |
| Brittany Meyer | 350 E 52nd St | 14D |
| Sofia Tortora Morel | 350 E 52nd St | 14E |
| Nicholas Cinquina | 350 E 52nd St | 14F |
| Rebecca Wiener | 350 E 52nd St | 14G |
| Ai Hirakawa | 350 E 52nd St | 14H |
| Mariana Garcia | 350 E 52nd St | 14J |
| Sirine Sentissi | 350 E 52nd St | 14K |
| Kathleen Koprswski | 350 E 52nd St | 15A |
| Scott Switzer | 350 E 52nd St | 15B |
| Mikala Zonsius | 350 E 52nd St | 15E |
| Roshan Padaki | 350 E 52nd St | 15G |
| Jack & Maria Torffield | 350 E 52nd St | 15H |
| Jamal Syed | 350 E 52nd St | 15J |
| Mindy Klau | 350 E 52nd St | 15K |
| Support Parking | 350 E 52nd St | GARAGE |
| Tibor Ardai | 350 E 52nd St | PHA |
| Jena Davidson | 350 E 52nd St | PHB |
| Kenneth Keenaghan | 350 E 52nd St | PHC |
| Andrew Fernandes | 350 E 52nd St | PHD |
| Mumbah Style Pizza | 350 E 52nd St | ST1 |
| 939 Mitchel Market | 350 E 52nd St | ST3 |
| 937 First Avenue Food Corp. | 350 E 52nd St | ST4 |

**Exhibit D to**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

**Exhibit D**
**Cure Amounts**
**These Cure Amounts represent the amount of tenant security deposits to be restored upon assumption of each lease**

| TENANT | STREET | APARTMENT | CURE AMOUNT |
|---|---|---|---|
| John Sullivan | 350 E 52nd St | 01C | $3,100.00 |
| Anastas Anastassov | 350 E 52nd St | 02A | $2,400.00 |
| Lilian Fernandes | 350 E 52nd St | 02B | $2,400.00 |
| Marcia Kaufman | 350 E 52nd St | 02C | $1,481.58 |
| Jenna Lanoil | 350 E 52nd St | 02D | $5,000.00 |
| Carolyn Feigan | 350 E 52nd St | 02E | $3,200.00 |
| Monica Passin | 350 E 52nd St | 02F | $1,487.54 |
| Jhon Smith | 350 E 52nd St | 02G | $7,000.00 |
| Xiaoli Xu | 350 E 52nd St | 02H | $1,975.00 |
| Zain Hasan | 350 E 52nd St | 02J | $2,625.00 |
| Aliza Iiano | 350 E 52nd St | 02K | $3,300.00 |
| Allison Witlow | 350 E 52nd St | 03A | $1,800.00 |
| Melissa Li | 350 E 52nd St | 03C | $2,900.00 |
| Alyssa Williamson | 350 E 52nd St | 03D | $4,250.00 |
| Mark Bluni | 350 E 52nd St | 03E | $3,200.00 |
| Samantha Diamond | 350 E 52nd St | 03F | $2,740.75 |
| Tommaso Degrezia | 350 E 52nd St | 03G | $4,200.00 |
| Joshua Kaston | 350 E 52nd St | 03H | $2,075.00 |
| Rachel Marcus | 350 E 52nd St | 03J | $2,800.00 |
| Stacey Simbal | 350 E 52nd St | 03K | $2,700.00 |
| Jennifer Puma | 350 E 52nd St | 04A | $1,825.00 |
| Makenna Pearsall | 350 E 52nd St | 04B | $2,538.04 |
| Ivan Daskalovski | 350 E 52nd St | 04C | $2,200.00 |
| Christopher Cassetta | 350 E 52nd St | 04D | $3,200.00 |
| Melissa Blankstein | 350 E 52nd St | 04E | $2,990.95 |
| Roxanne Rittberg | 350 E 52nd St | 04F | $960.85 |
| Nessa Obten | 350 E 52nd St | 04G | $3,257.30 |
| Phyllis Dubrow | 350 E 52nd St | 04H | $1,464.92 |
| Tommaso Degrezia | 350 E 52nd St | 04J | $1,900.00 |
| Sharon Rivera | 350 E 52nd St | 05A | $2,825.00 |
| Emilia Stevens | 350 E 52nd St | 05B | $2,675.00 |
| Hemantha Parvatharaj | 350 E 52nd St | 05C | $3,350.00 |
| Brian Bilsback | 350 E 52nd St | 05D | $3,450.00 |
| Kristin Francis | 350 E 52nd St | 05E | $2,820.00 |
| Robert Koeppel | 350 E 52nd St | 05F | $1,379.88 |
| Nancy Ng-Sharp | 350 E 52nd St | 05G | $4,000.00 |
| Jason & Diana Aptaker | 350 E 52nd St | 05H | $2,225.00 |
| Shaby Katz | 350 E 52nd St | 05J | $1,900.00 |
| Mostafa Khairy | 350 E 52nd St | 05K | $4,750.00 |
| Erica Aronow | 350 E 52nd St | 06A | $2,533.10 |
| Calvin Yoon | 350 E 52nd St | 06B | $2,598.10 |
| Les Haber | 350 E 52nd St | 06D | $2,301.23 |
| Carolina Bowe | 350 E 52nd St | 06E | $2,669.50 |
| Alisa Badiner | 350 E 52nd St | 06F | $2,100.00 |
| Kirk & Jennifer Swanson | 350 E 52nd St | 06G | $4,200.00 |
| Eliza Jacobi | 350 E 52nd St | 06H | $2,430.00 |
| Roqueline Lustosa-Sary | 350 E 52nd St | 06J | $2,350.00 |
| Julie Fuschetti | 350 E 52nd St | 06K | $3,207.68 |
| Karen Cohen | 350 E 52nd St | 07A | $1,706.91 |

**Exhibit D**
**Cure Amounts**
**These Cure Amounts represent the amount of tenant security deposits to be restored upon assumption of each lease**

| | | | |
|---|---|---|---|
| Caroline Bucca | 350 E 52nd St | 07B | $1,205.47 |
| Christina Ingram | 350 E 52nd St | 07C | $2,400.00 |
| Doris Perlman | 350 E 52nd St | 07E | $1,116.60 |
| Gerald Cohen | 350 E 52nd St | 07F | $2,325.00 |
| Brian Kennedy | 350 E 52nd St | 07G | $3,800.00 |
| First Commerical Bank | 350 E 52nd St | 07J | $1,957.39 |
| Brian Coltrinai | 350 E 52nd St | 07k | $2,900.00 |
| Jasmine Louie | 350 E 52nd St | 08A | $2,019.17 |
| Joseph Schwartz | 350 E 52nd St | 08B | $1,820.83 |
| Darjan Hristov | 350 E 52nd St | 08C | $2,200.00 |
| Haley Nitzberg | 350 E 52nd St | 08D | $4,600.00 |
| Tessa Green | 350 E 52nd St | 08E | $2,650.00 |
| Diane Perla | 350 E 52nd St | 08F | $1,328.68 |
| Kimberly Gardner | 350 E 52nd St | 08G | $5,500.00 |
| Joan Dorbian | 350 E 52nd St | 08H | $1,395.01 |
| Seiko Mizunin | 350 E 52nd St | 08J | $2,280.00 |
| Robert Salvit | 350 E 52nd St | 08K | $2,900.00 |
| Shannon Gorman | 350 E 52nd St | 09A | $2,625.00 |
| Jack Malykin | 350 E 52nd St | 09B | $868.28 |
| Seth Bergey | 350 E 52nd St | 09C | $3,700.00 |
| Alessandra Bozzo | 350 E 52nd St | 09D | $2,750.00 |
| Dani Guglielmo | 350 E 52nd St | 09E | $2,587.31 |
| Michael Wiseman | 350 E 52nd St | 09F | $3,200.00 |
| Michaela Nicholas | 350 E 52nd St | 09G | $5,625.00 |
| Shayna Walter | 350 E 52nd St | 09H | $2,150.00 |
| Gabrielle Bass | 350 E 52nd St | 09J | $876.96 |
| Sany Marques | 350 E 52nd St | 09K | $3,145.00 |
| Maryanne McGrath | 350 E 52nd St | 10A | $2,255.00 |
| Idamarie Pennolin Pennolino | 350 E 52nd St | 10A | $1,208.24 |
| Vera Da Costa | 350 E 52nd St | 10C | $1,355.34 |
| Colleen Jones | 350 E 52nd St | 10D | $2,999.96 |
| Logan Brodsky | 350 E 52nd St | 10E | $2,550.00 |
| Joan Asher | 350 E 52nd St | 10F | $1,039.82 |
| Shannon Simnor | 350 E 52nd St | 10G | $4,850.00 |
| Gregory Linksman | 350 E 52nd St | 10H | $2,309.76 |
| Kelly Moran | 350 E 52nd St | 10J | $1,194.41 |
| Alexa Mandel III | 350 E 52nd St | 10K | $5,500.00 |
| Max Goldenberg | 350 E 52nd St | 11A | $2,478.55 |
| Shade Quailey | 350 E 52nd St | 11B | $2,050.00 |
| Hermes Ademovi-Super | 350 E 52nd St | 11C | $0.00 |
| Stephanie Nwosa | 350 E 52nd St | 11D | $3,200.00 |
| Friedeke Bastiaans | 350 E 52nd St | 11E | $1,375.28 |
| Joshua Small | 350 E 52nd St | 11F | $3,210.34 |
| Jared Kirschner | 350 E 52nd St | 11G | $2,389.61 |
| Paige Kriftcher | 350 E 52nd St | 11H | $2,663.24 |
| Francine Oro | 350 E 52nd St | 11J | $1,138.02 |
| Paul Callamaras | 350 E 52nd St | 11K | $2,860.38 |
| Samantha Sternschein | 350 E 52nd St | 12A | $2,557.80 |
| Laurence Hunter | 350 E 52nd St | 12B | $1,576.22 |
| Richard Rose | 350 E 52nd St | 12C | $3,000.00 |

**Exhibit D**

**Cure Amounts**

**These Cure Amounts represent the amount of tenant security deposits to be restored upon assumption of each lease**

| | | | |
|---|---|---|---|
| Amanda Cohn | 350 E 52nd St | 12D | $1,410.57 |
| Kaylee Reynolds | 350 E 52nd St | 12E | $1,750.00 |
| Alexa Shepherd | 350 E 52nd St | 12F | $3,300.00 |
| Anusha Basana | 350 E 52nd St | 12G | $6,400.00 |
| Laurie Cagnassola | 350 E 52nd St | 12H | $4,200.00 |
| Ron Ariel | 350 E 52nd St | 12J | $2,000.00 |
| Allison Komara | 350 E 52nd St | 12K | $5,300.00 |
| Tomas Santiago Radnic | 350 E 52nd St | 14A | $2,500.00 |
| Lihan Wen | 350 E 52nd St | 14B | $2,013.83 |
| Brandon Chu | 350 E 52nd St | 14C | $2,500.00 |
| Brittany Meyer | 350 E 52nd St | 14D | $3,500.00 |
| Sofia Tortora Morel | 350 E 52nd St | 14E | $2,300.00 |
| Nicholas Cinquina | 350 E 52nd St | 14F | $2,599.87 |
| Rebecca Wiener | 350 E 52nd St | 14G | $3,700.00 |
| Ai Hirakawa | 350 E 52nd St | 14H | $2,850.00 |
| Mariana Garcia | 350 E 52nd St | 14J | $2,500.00 |
| Sirine Sentissi | 350 E 52nd St | 14K | $2,800.00 |
| Kathleen Koprswski | 350 E 52nd St | 15A | $3,300.00 |
| Scott Switzer | 350 E 52nd St | 15B | $2,950.00 |
| Mikala Zonsius | 350 E 52nd St | 15E | $3,600.00 |
| Roshan Padaki | 350 E 52nd St | 15G | $5,000.00 |
| Jack & Maria Torffield | 350 E 52nd St | 15H | $1,245.71 |
| Jamal Syed | 350 E 52nd St | 15J | $834.88 |
| Mindy Klau | 350 E 52nd St | 15K | $3,039.43 |
| Support Parking | 350 E 52nd St | GARAGE | $0.00 |
| Tibor Ardai | 350 E 52nd St | PHA | $3,003.26 |
| Jena Davidson | 350 E 52nd St | PHB | $4,600.00 |
| Kenneth Keenaghan | 350 E 52nd St | PHC | $3,500.00 |
| Andrew Fernandes | 350 E 52nd St | PHD | $4,500.00 |
| Mumbah Style Pizza | 350 E 52nd St | ST1 | $60,000.00 |
| 939 Mitchel Market | 350 E 52nd St | ST3 | $11,200.00 |
| 937 First Avenue Food Corp. | 350 E 52nd St | ST4 | $37,500.00 |

**Exhibit 2 to Disclosure Statement Concerning
Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

# State of New York
# Court of Appeals

## MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 10
Kathryn Casey, et al.,
       Respondents,
Pamela Renna et al.,
   Plaintiffs-Intervenors,
     v.
Whitehouse Estates, Inc., et al.,
      Appellants.
----------------------------
Whitehouse Estates, Inc., et al.,
   Third-Party Appellants,
     v.
Roberta L. Koeppel, et al.,
   Third-Party Defendants.

Jeffrey Turkel, for appellants.
Ronald S. Languedoc, for respondents.
Rent Stabilization Association of NYC, Inc. et al., Housing Rights Initiative, amici curiae.

MEMORANDUM:

The order of the Appellate Division insofar as appealed from should be reversed, with costs, plaintiffs' motion insofar as it sought summary judgment declaring that their legal regulated rent should be calculated according to the Rent Stabilization Code's default

formula denied, the case remitted to Supreme Court for further proceedings in accordance

with this memorandum, and the certified question answered in the negative.

On October 14, 2011, plaintiffs, tenants of a building located in Manhattan, brought

a class action against defendants, the building's owners, managing agents, and landlords

seeking, in relevant part, rent overcharges.  After extensive discovery, plaintiffs moved for

summary judgment, alleging that defendants engaged in fraud and failed to produce

adequate rent records, therefore requiring use of the default formula to determine any

overcharge.  Supreme Court granted plaintiffs' motion.  A divided Appellate Division

affirmed Supreme Court's order "which, insofar as appealed from as limited by the briefs,

granted plaintiffs' motion for summary judgment declaring that their legal regulated rent

should be calculated according to the Rent Stabilization Code's default formula and denied

defendants' cross motion to determine the amount of use and occupancy."[1]

*Matter of Regina Metro. Co., LLC v New York State Div. of Hous. and Community*

*Renewal* was decided after Supreme Court granted plaintiffs' motion (35 NY3d 332

[2020]).  There, this Court made clear that, under the pre-Housing Stability and Tenant

Protection Act of 2019 law applicable here, "review of rental history outside the four-year

lookback period [i]s permitted only in the limited category of cases where the

tenant produced evidence of a fraudulent scheme to deregulate and, even then, solely to

---

[1] At the Appellate Division, plaintiffs conceded that they had "previously stated to [that] Court that they do not oppose that part of the appeal which deals with [d]efendants' affirmative defenses that two of the [d]efendants were acting as agents of a disclosed principal."

ascertain whether fraud occurred—not to furnish evidence for calculation of the base date rent or permit recovery for years of overcharges barred by the statute of limitations" (*id.* at 335 [internal citations omitted]).  In fraud cases, because the reliability of the base date rent has been tainted, "this Court sanctioned use of the default formula to set the base date rent" (*id.*; *see Matter of Grimm v State Div. of Hous. and Community Renewal Off. of Rent Admin.*, 15 NY3d 358, 367 [2010]).  *Regina* also held that "deregulation of [ ] apartments during receipt of J-51 benefits was not based on a fraudulent misstatement of fact but on a misinterpretation of the law [and so] a finding of willfulness is generally not applicable to cases arising in the aftermath of *Roberts* [and] [b]ecause conduct cannot be fraudulent without being willful, it follows that the fraud exception to the lookback rule is generally inapplicable to *Roberts* overcharge claims" (*Regina*, 35 NY3d at 356 [internal quotations and citations omitted]).

Plaintiffs failed to meet their burden on summary judgment.  Defendants' deregulation of the apartments was based on this same "misinterpretation of the law" involved in *Regina* and therefore that conduct did not constitute fraud (*id.*).  Defendants' subsequent re-registering of the apartments occurred after the four-year lookback period, and plaintiffs have failed to offer evidence that it somehow affected the reliability of the actual rent plaintiffs paid on the base date.

For purposes of calculating overcharges, where it is possible to determine the rent "actually charged on the base date"—here October 14, 2007—that amount should be used and rent increases legally available to defendants pursuant to the RSL during the four-year period should be added (*id.* at 355-56).  We agree with the dissent below that "[i]t is unclear

whether the records made available by either party provide enough information to

determine the base date rent in accordance with *Regina* for any of the subject apartments"

(197 AD3d 401, 411 [2021] [Gische, J., dissenting]).  On remittal, that assessment must be

made for each apartment.


Order insofar as appealed from reversed, with costs, plaintiffs' motion insofar as sought
summary judgment declaring that their legal regulated rent should be calculated
according to the Rent Stabilization Code's default formula denied, case remitted to
Supreme Court, New York County, for further proceedings in accordance with the
memorandum herein, and certified question answered in the negative. Acting Chief Judge
Cannataro and Judges Rivera Garcia, Wilson, Singas and Troutman concur.

Decided March 16, 2023

**Exhibit 3 to Disclosure Statement Concerning**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

## Eastgate Whitehouse LLC Liquidation Analysis

**A.  Estimate Of Funds Available For Distribution To Creditors Under Hypothetical Chapter 7 Liquidation Of The Debtor Compared To Estimate Of Funds Available For Distribution To Creditors Under The Secured Lender Plan**

| | Estimated Liquidation Value As Of Confirmation Hearing Date | Estimated Value Pursuant To Plan |
|---|---|---|
| **Real Property – Debtor's Interest As Tenant Under Ground Lease** | $29,000,000[1] | $40,000,000[2] |
| **Cash (Secured Lender's Cash Collateral)[3]** | $838,181 | $838,181 |
| **Litigation Claims** | $0[4] | Unknown |
| **Total** | **$29,838,181** | **$40,838,181** |

---

[1] Estimate is based upon offer made to Secured Lender's predecessor during Chapter 11 case.  It also assumes that the Class Action Settlement Agreement is not entered into by the Chapter 7 Trustee.

[2] **The value of the Debtor's interest in the Real Property for purposes of determining potential distributions under the Secured Lender Plan is estimated solely for the purpose of this liquidation analysis, and illustrative purposes only.  The actual value received from a sale of the Debtor's interest in the Real Property is subject to a variety of  factors which are subject to change, including the status of the post-confirmation real estate market, and market interest rates, among other things,  The Secured Lender makes no representations or guarantees as to what value may be received from the sale of the Debtor's interest in the Real Property. Regardless as to what value for the Real Property is used in this liquidation analysis, the distribution to all creditors under the Secured Lender Plan will be greater than what creditors would receive in a Chapter 7 liquidation.**

[3] Based upon the Debtor's actual November 1, 2023 cash balance.

[4] There would be no cash available to fund a Chapter 7 Trustee to pursue the Litigation Claims in a Chapter 7 liquidation of the Debtor.

**B. Comparison Of Estimated Distribution To Creditors Under Hypothetical Chapter 7 Liquidation Of The Debtor With Estimated Distribution To Creditors Under The Secured Lender Plan**

| | Amount Of Claims For Distribution Purposes | Estimated Distribution In Hypothetical Chapter 7 Liquidation | Estimated Percentage Distribution In Hypothetical Chapter 7 Liquidation | Estimated Distribution Under Secured Lender Plan | Estimated Percentage Distribution Under Secured Lender Plan |
|---|---|---|---|---|---|
| **Secured Claims** | | | | | |
| Class 1 – Allowed Secured Lender Claim | $29,838,181 in Chapter 7 and 40,838,181 in Chapter 11[5] | $29,838,811 | 100% | $35,569,620 - $36,689,620 | 87.1% - 89.8% plus possible distribution from Litigation Claims |
| Class 2 – Estate Of William W. Koeppel Secured Claim | $410,000 Disputed Claim | To the Extent the Class 2 Claim is Allowed by the Court: Abandonment of Collateral to the holder of the Allowed Class 2 Secured Claim | 100% | To the Extent the Class 2 Claim is Allowed by the Court: Abandonment of Collateral to the holder of the Allowed Class 2 Secured Claim[6] | 100% |
| Class 3 – All Secured Claims against the Debtor that are not a Class 1 Claim or Class 2 Claim[7] | $0 | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Administrative And Priority Claims** | | | | | |
| Chapter 7 Administrative Claims | $1,119,150[8] | $0 | 0% | Not Applicable | Not Applicable |
| Chapter 11 Superpriority Claim | $917,061 | $0 | 0% | $917,061 | 100% |

[5]    For illustrative purposes only.  The Secured Lender's Allowed Secured Claim will be equal to the value of its collateral, which will be greater in a sale under the Chapter 11, than it would be in a hypothetical Chapter 7 liquidation by a Chapter 7 Trustee as of the date of the confirmation hearing on the Secured Lender Plan.  The Secured Lender will have an unsecured deficiency claim for the difference between the amount of its Allowed Claim and the value of its collateral.

[6]    The Plan Administrator also has option to pay Allowed Class 2 Claim in full in cash instead of abandoning its collateral to the holder of the Allowed Class 2 Claim.  For purposes of this liquidation analysis, it is assumed that collateral will be abandoned to the holder of any Allowed Class 2 Claim.

[7]    The Secured Lender is not aware of any Class 3 Claims.

[8]    This amount consists of the Chapter 7 Trustee's fee based upon the maximum compensation available under Bankruptcy Code § 326 ($901,650) plus a 0.75% commission on the sale of the Property ($217,500).

2

| Of Secured Lender Pursuant To Protective Advance Orders | | | | | |
|---|---|---|---|---|---|
| Chapter 11 Administrative Claims, not including Superpriority Claim of Secured Lender And U.S. Trustee fee[9] | $150,000 - $270,000 if case were converted to Chapter 7; $755,000 - $875,000 if Secured Lender Plan is confirmed[10] | $0 | 0% | $755,000 - $875,000 | 100% |
| U.S. Trustee Fee Due upon Closing of the Sale under the Plan | $0 in Chapter 7; $250,000 in Chapter 11 | Not Applicable | Not Applicable | $250,000[11] | 100% |
| Priority Claims | $1,500 | $0 | 0% | $1,500 | 100% |
| **Unsecured Claims** | | | | | |
| Class 4 - Class Action Members General Unsecured Claims | To Be Determined, Includes Legal Fees And Expenses Of Class Action Counsel | $0 | 0% | $2,200,000 | To Be Determined By State Court In Class Action Lawsuit After Determining Amount of Claims For Distribution Purposes, Allowable Class Action Counsel Fees And Allowable Fees And Expenses Of Class Action Administrator And Noticing Agent |
| Class 5 – General Unsecured Claims, except for the Class Action Members Unsecured Claims | $986,102 in Chapter 7 Liquidation and $531,102 under Chapter 11 Plan[13] | $0 | 0% | $25,000 plus possible distribution from Litigation Claims | 4.7% plus possible distribution from Litigation Claims |

[9]     Assumes solely for purposes of this liquidation analysis that: (i)  the claim filed by the Ground Lessor under assumed Ground Lease will be fixed at $0; and (ii) cure claims for tenant security deposit will be $455,000

[10]     Chapter 11 Administrative Claims would be greater if the Plan is confirmed because they would include an approximately $300,000 real estate brokerage commission on the sale of the Debtor's interest in the Real Property (0.75% real estate brokerage commission X $40,000,000) plus $455,000 for the restoration of tenant security deposits due upon assumption of the tenant leases.

[11]     Payable during the calendar quarter of the transfer of the Debtor's interest in the Real Property, and only if the sale occurs under Chapter 11 of the Bankruptcy Code.

[13]     Does not include any general unsecured deficiency claim of Secured Lender, who has agreed to waive distribution on its deficiency claim under the Secured Lender Plan.  Assumes that: (i)  the claim filed by the Ground

| | | | | | |
|---|---|---|---|---|---|
| and Subordinated General Unsecured Claims[12] | | | | | |
| Class 6 - Subordinated General Unsecured Claims | To Be Determined | $0 | 0% | Possible distribution from Litigation Claims | Possible distribution from Litigation Claims |
| **Equity Interests** | | | | | |
| Class 7 - Interests In The Debtor | Not Applicable | $0 | Not Applicable | Possible distribution from Litigation Claims | Not Applicable |

---

Lessor will be recharacterized as an Administrative Claim based upon the Bankruptcy Court's prior order approving the assumption of the Ground Lease; (ii) no Class Action Members will opt-out of the Class Action Settlement; and (iii) claims of Insiders or Affiliates ($5,400,000) are disallowed. If the claims of Insiders and Affiliates are Allowed Class 5 Claims then the estimated percentage distribution under Secured Lender Plan to Class 5 Claimants will be approximately 0.42% plus a possible distribution from the Litigation Claims.

    The difference is the amount of General Unsecured Claims in Chapter 7 as compared to Chapter 11 is based upon the amount of tenant security deposit claims ($455,000). In a Chapter 7 liquidation, a trustee would lack the funds to assume tenant leases and cure the amount of missing tenant security deposits. Under the Secured Lender Plan, there would be sufficient funds for the assumption of tenant leases and restoration of tenant security deposits. Under Bankruptcy Code § 365, the assumption of tenant leases converts the tenants claim for restoration of their security deposits (which would receive no distribution in a Chapter 7 liquidation) into an Administrative Claim (which would be paid in full under the Secured Lender Plan).

[12]    Assumes Secured Lender waives distribution on any general unsecured deficiency claim as provided in Secured Lender Plan.

**Exhibit 4 to Disclosure Statement Concerning**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

**Fill in this information to identify the case:**

Debtor name   **Eastgate Whitehouse LLC**

United States Bankruptcy Court for the:   SOUTHERN DISTRICT OF NEW YORK

Case number (if known)   **22- 22635**

☐ Check if this is an
  amended filing

# Official Form 206A/B
# Schedule A/B: Assets - Real and Personal Property                    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest.
Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties
which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts
or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write
the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an
additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset
schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the
debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |

1. **Does the debtor have any cash or cash equivalents?**

   ■ No.  Go to Part 2.
   ☐ Yes Fill in the information below.

   **All cash or cash equivalents owned or controlled by the debtor**        | Current value of
                                                                               debtor's interest

| Part 2: | Deposits and Prepayments |

6. **Does the debtor have any deposits or prepayments?**

   ■ No.  Go to Part 3.
   ☐ Yes Fill in the information below.

| Part 3: | Accounts receivable |

10. **Does the debtor have any accounts receivable?**

   ■ No.  Go to Part 4.
   ☐ Yes Fill in the information below.

| Part 4: | Investments |

13. **Does the debtor own any investments?**

   ■ No.  Go to Part 5.
   ☐ Yes Fill in the information below.

| Part 5: | Inventory, excluding agriculture assets |

18. **Does the debtor own any inventory (excluding agriculture assets)?**

   ■ No.  Go to Part 6.
   ☐ Yes Fill in the information below.

| Part 6: | Farming and fishing-related assets (other than titled motor vehicles and land) |

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

   ■ No.  Go to Part 7.

| Debtor | **Eastgate Whitehouse LLC** | Case number *(If known)* | **22- 22635** |
|---|---|---|---|
| | Name | | |

☐ Yes Fill in the information below.

**Part 7:** **Office furniture, fixtures, and equipment; and collectibles**

**Part 7:** **Office furniture, fixtures, and equipment; and collectibles**

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.
☐ Yes Fill in the information below.

**Part 8:** **Machinery, equipment, and vehicles**

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.
☐ Yes Fill in the information below.

**Part 9:** **Real property**

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.
■ Yes Fill in the information below.

55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest

| Description and location of property Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building, if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1. **Leasehold Interest in the Real Property Known as and Located at 939-943 First Avenue a/k/a 344-350 East 52nd Street, NY NY** | **Leasehold Interest** | **Unknown** | | **Unknown** |

56. **Total of Part 9.**
Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
Copy the total to line 88.

| | **$0.00** |
|---|---|

57. **Is a depreciation schedule available for any of the property listed in Part 9?**
■ No
☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**
■ No
☐ Yes

**Part 10:** **Intangibles and intellectual property**

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.
☐ Yes Fill in the information below.

| Debtor | **Eastgate Whitehouse LLC** | Case number *(If known)* | **22- 22635** |
|---|---|---|---|
| | Name | | |

| Part 11: | All other assets |
|---|---|

**70. Does the debtor own any other assets that have not yet been reported on this form?**
   Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No.  Go to Part 12.
■ Yes Fill in the information below.

|  | Current value of debtor's interest |
|---|---|

| 71. | **Notes receivable** |
| | Description (include name of obligor) |

| 72. | **Tax refunds and unused net operating losses (NOLs)** |
| | Description (for example, federal, state, local) |

| 73. | **Interests in insurance policies or annuities** |

| 74. | **Causes of action against third parties (whether or not a lawsuit has been filed)** |

| **Various Accounts Receivable** | | $600,000.00 |
|---|---|---|
| Nature of claim | | |
| Amount requested | **$600,000.00** | |

| **judgments against tenants Gisa Chatel** | | $299,570.19 |
|---|---|---|
| Nature of claim | | |
| Amount requested | **$299,570.19** | |

| **Judgment against Tenant Laurie Cagnassola** | | $230,915.38 |
|---|---|---|
| Nature of claim | | |
| Amount requested | **$230,915.38** | |

| 75. | **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims** |

| 76. | **Trusts, equitable or future interests in property** |

| 77. | **Other property of any kind not already listed** *Examples:* Season tickets, country club membership |

| 78. | **Total of Part 11.** | | $1,130,485.57 |
|---|---|---|---|
| | Add lines 71 through 77. Copy the total to line 90. | | |

| 79. | **Has any of the property listed in Part 11 been appraised by a professional within the last year?** |

■ No
☐ Yes

Official Form 206A/B              Schedule A/B Assets - Real and Personal Property              page 3

Debtor   **Eastgate Whitehouse LLC**                                        Case number *(If known)*  **22- 22635**
         Name

---

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $0.00 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.*..........................................................> | | $0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $1,130,485.57 | |
| 91. **Total.** Add lines 80 through 90 for each column | $1,130,485.57 | + 91b.  $0.00 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $1,130,485.57 |

---

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 4

**Fill in this information to identify the case:**

Debtor name **Eastgate Whitehouse LLC**

United States Bankruptcy Court for the: SOUTHERN DISTRICT OF NEW YORK

Case number (if known) **22- 22635**

☐ Check if this is an amended filing

Official Form 206D
# Schedule D: Creditors Who Have Claims Secured by Property
12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☐ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
|---|---|

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | **Column A**<br>Amount of claim<br><br>Do not deduct the value of collateral. | **Column B**<br>Value of collateral that supports this claim |
|---|---|---|

| 2.1 | **Gordon H. Smith Corporation** | | |
|---|---|---|---|

Creditor's Name

**C/O Duane Morris LLP
1540 Broadway
New York, NY 10036**

Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☐ No
☑ Yes. Specify each creditor, including this creditor and its relative priority.
**1. Gordon H. Smith Corporation
2. NYC Water Board
3. V.C. Drywall & Remodeling, LLC
4. WFCM 2018-C46**

**Describe debtor's property that is subject to a lien**
**Leasehold Interest in the Real Property Known as and Located at 939-943 First Avenue a/k/a 344-350 East 52nd Street, NY NY**

**Describe the lien**
**Mechanic's Lien**

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply
☐ Contingent
☐ Unliquidated
☐ Disputed

Column A: **$53,354.02**    Column B: **Unknown**

| 2.2 | **NYC Water Board** | | |
|---|---|---|---|

Creditor's Name

**59-17 Junction Blvd
Elmhurst, NY 11373**

Creditor's mailing address

Creditor's email address, if known

**Describe debtor's property that is subject to a lien**
**Leasehold Interest in the Real Property Known as and Located at 939-943 First Avenue a/k/a 344-350 East 52nd Street, NY NY**

**Describe the lien**
**Statutory Lien**

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**

Column A: **$22,000.00**    Column B: **Unknown**

| Debtor | **Eastgate Whitehouse LLC** | Case number (if known) | **22- 22635** |
|---|---|---|---|
| | Name | | |

**Date debt was incurred**

■ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Last 4 digits of account number**

| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** |
|---|---|
| ☐ No | Check that all apply |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Contingent |
| **Specified on line 2.1** | ☐ Unliquidated |
| | ☐ Disputed |

---

| 2.3 | **V.C. Drywall & Remodeling, LLC** | Describe debtor's property that is subject to a lien | $50,000.00 | Unknown |
|---|---|---|---|---|

Creditor's Name

**C/O Smith, Buss & Jacobs, LLP**
**733 Yonkers Avenue, Suite 200**
**Yonkers, NY 10704**

Creditor's mailing address

**Leasehold Interest in the Real Property Known as and Located at 939-943 First Avenue a/k/a 344-350 East 52nd Street, NY NY**

**Describe the lien**
**Mechanic's Lien**

Is the creditor an insider or related party?

Creditor's email address, if known

■ No
☐ Yes

Is anyone else liable on this claim?
☐ No
■ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Date debt was incurred**

**Last 4 digits of account number**

| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** |
|---|---|
| ☐ No | Check that all apply |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Contingent |
| **Specified on line 2.1** | ☐ Unliquidated |
| | ☐ Disputed |

---

| 2.4 | **WFCM 2018-C46** | Describe debtor's property that is subject to a lien | $32,100,000.00 | Unknown |
|---|---|---|---|---|

Creditor's Name

**c/o Holland & Knight LLP**
**900 Third Avenue, 20th Floor**
**New York, NY 10022**

Creditor's mailing address

**Leasehold Interest in the Real Property Known as and Located at 939-943 First Avenue a/k/a 344-350 East 52nd Street, NY NY**

**Describe the lien**
**Leasehold Mortgage**

Is the creditor an insider or related party?
■ No
☐ Yes

Creditor's email address, if known

Is anyone else liable on this claim?

**Date debt was incurred**
■ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

**Last 4 digits of account number**

| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:** |
|---|---|
| ☐ No | Check that all apply |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ☐ Contingent |
| **Specified on line 2.1** | ☐ Unliquidated |
| | ■ Disputed |

---

| Debtor | **Eastgate Whitehouse LLC** | Case number (if known) | **22- 22635** |
|---|---|---|---|
| | Name | | |

| | | |
|---|---|---|
| 3. | **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.** | $32,225,354.02 |

| Part 2: | List Others to Be Notified for a Debt Already Listed in Part 1 |
|---|---|

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name  and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | | |

**Fill in this information to identify the case:**

Debtor name  **Eastgate Whitehouse LLC**

United States Bankruptcy Court for the:  SOUTHERN DISTRICT OF NEW YORK

Case number (if known)  22- 22635

☐ Check if this is an
amended filing

## Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims.
List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and
Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and
2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| Part 1: | List All Creditors with PRIORITY Unsecured Claims |
| --- | --- |

1.  **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

☐ No. Go to Part 2.

■ Yes. Go to line 2.

2.  **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors
with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  |  | Total claim | Priority amount |
| --- | --- | --- | --- | --- |

| 2.1 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $0.00 | $0.00 |
| --- | --- | --- | --- | --- |

**Interal Revenue Service**
**P.O. Box 7346**
**Philadelphia, PA 19101-7346**

*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (8)

| 2.2 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $0.00 | $0.00 |
| --- | --- | --- | --- | --- |

**NYC Department of Finance**
**Field Collection**
**59 Maiden Lane**
**New York, NY 10038**

*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number

Is the claim subject to offset?
■ No
☐ Yes

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (8)

| Debtor | **Eastgate Whitehouse LLC** | | Case number (if known) | 22- 22635 |
|---|---|---|---|---|
| | Name | | | |

| 2.3 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $0.00 | $0.00 |
|---|---|---|---|---|

**NYS Dept of Tax & Finance**
**Bankruptcy Unit**
**PO Box 5300**
**Albany, NY 12227-0001**

*Check all that apply.*
■ Contingent
■ Unliquidated
■ Disputed

| Date or dates debt was incurred | Basis for the claim: |
|---|---|

| Last 4 digits of account number | Is the claim subject to offset? |
|---|---|

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (8)

■ No
☐ Yes

---

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

| 3.1 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $0.00 |
|---|---|---|---|

**Kathryn Casey, Laurie Cagnassola et al**
**c/o Himmelstein McConnell Gribben & Josp**
**15 Maiden Lane, 17th Floor**
**New York, NY 10038**

☐ Contingent
☐ Unliquidated
■ Disputed

**Date(s) debt was incurred** _

Basis for the claim:  **DHCR Claims**

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

| 3.2 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $400,000.00 |
|---|---|---|---|

**Leech Tishman Robinson Brog**
**875 Third Ave**
**9th Floor**
**New York, NY 10022**

☐ Contingent
☐ Unliquidated
■ Disputed

**Date(s) debt was incurred** _

Basis for the claim:  **Professional Services Rendered**

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

| 3.3 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $15,000.00 |
|---|---|---|---|

**NYC Dept of Finance**
**66 John Street**
**Room 104**
**New York, NY 10038**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

Basis for the claim:  **DOB fines for building violations**

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

| 3.4 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $46,000.00 |
|---|---|---|---|

**Povol & Company CPA, P.C.**
**1981 Marcus Avenue**
**Suite C100**
**New Hyde Park, NY 11042**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

Basis for the claim:  **Professional Services Rendered**

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

| 3.5 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $20,000.00 |
|---|---|---|---|

**Pyramid Restoration NY, LLC**
**52-02 11th Street**
**Long Island City, NY 11101**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

Basis for the claim:  **Engineering Boom Truck Rental**

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | **Eastgate Whitehouse LLC** | Case number (if known) | **22- 22635** |
|---|---|---|---|
| | Name | | |

| 3.6 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$350,000.00** |
|---|---|---|---|

**Rosenberg & Estis, P.C.**
**733 Third Avenue**
**New York, NY 10017**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _____

Basis for the claim:  **Professional Services Rendered**

Last 4 digits of account number _____

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.7 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$100,000.00** |
|---|---|---|---|

**SEIU 32BJ**
**25 West 18th Street**
**New York, NY 10011**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _____

Basis for the claim:  **Settlement Agreement**

Last 4 digits of account number _____

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.8 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$3,400,000.00** |
|---|---|---|---|

**William W. Koeppel**
**6 Puritan Road**
**Rye, NY 10580**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _____

Basis for the claim:  **Loan**

Last 4 digits of account number _____

Is the claim subject to offset? ■ No  ☐ Yes

---

| 3.9 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$2,000,000.00** |
|---|---|---|---|

**WWK 140 Bay Ridge, LLC**
**6 Puritan Road**
**Rye, NY 10580**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred _____

Basis for the claim:  **Loan**

Last 4 digits of account number _____

Is the claim subject to offset? ■ No  ☐ Yes

---

| **Part 3:** | **List Others to Be Notified About Unsecured Claims** |
|---|---|

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

| **Part 4:** | **Total Amounts of the Priority and Nonpriority Unsecured Claims** |
|---|---|

5. Add the amounts of priority and nonpriority unsecured claims.

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. | $ 0.00 |
| 5b. Total claims from Part 2 | 5b. + | $ 6,331,000.00 |
| **5c. Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | $ 6,331,000.00 |

**Fill in this information to identify the case:**

Debtor name    **Eastgate Whitehouse LLC**

United States Bankruptcy Court for the:    SOUTHERN DISTRICT OF NEW YORK

Case number (if known)    **22- 22635**

☐ Check if this is an
    amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1.   **Does the debtor have any executory contracts or unexpired leases?**
    ☐ No. Check this box and file this form with the debtor's other schedules. There is nothing else to report on this form.
    ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal   Property*
(Official Form 206A/B).

| **2. List all contracts and unexpired leases** | **State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease** |
|---|---|
| **2.1.**   State what the contract or lease is for and the nature of the debtor's interest    **Ground Lease** | |
| State the term remaining    **Expires June 30, 2055** | **939 First Avenue LLC** <br> **c/o Sol Goldman Investments LL** <br> **1185 Sixth Avenue, 10th Floor** <br> **New York, NY 10036** |
| List the contract number of any government contract | |

Official Form 206G      **Schedule G: Executory Contracts and Unexpired Leases**      Page 1 of 1

**Fill in this information to identify the case:**

Debtor name __Eastgate Whitehouse LLC__

United States Bankruptcy Court for the: __SOUTHERN DISTRICT OF NEW YORK__

Case number (if known) __22- 22635__

☐ Check if this is an
amended filing

## Official Form 206H
## Schedule H: Your Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the
Additional Page to this page.

**1. Do you have any codebtors?**

☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

■ Yes

**2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of
creditors, Schedules D-G.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule
on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

*Column 1:* **Codebtor**

*Column 2:* **Creditor**

| | Name | Mailing Address | Name | Check all schedules that apply: |
|---|---|---|---|---|
| 2.1 | **Whitehouse Estates, Inc.** | **6 Puritan Road Rye, NY 10580** | **Kathryn Casey, Laurie Cagnassola et al** | ☐ D _____<br>■ E/F __3.1__<br>☐ G _____ |
| 2.2 | **Whitehouse Estates, Inc.** | **6 Puritan Road Rye, NY 10580** | **V.C. Drywall & Remodeling, LLC** | ■ D __2.3__<br>☐ E/F _____<br>☐ G _____ |
| 2.3 | **William W. Koeppel** | **6 Puritan Road Rye, NY 10580** | **Kathryn Casey, Laurie Cagnassola et al** | ☐ D _____<br>■ E/F __3.1__<br>☐ G _____ |
| 2.4 | **William W. Koeppel** | **6 Puritan Road Rye, NY 10580** | **WWK 140 Bay Ridge, LLC** | ☐ D _____<br>■ E/F __3.9__<br>☐ G _____ |

**Fill in this information to identify the case:**

Debtor name      **Eastgate Whitehouse LLC**

United States Bankruptcy Court for the:      SOUTHERN DISTRICT OF NEW YORK

Case number (if known)      **22- 22635**

☐ Check if this is an
amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy          04/22

**The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages,
write the debtor's name and case number (if known).**

**Part 1:      Income**

1. **Gross revenue from business**

    ☐ None.

| **Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year** | **Sources of revenue** Check all that apply | **Gross revenue** (before deductions and exclusions) |
|---|---|---|
| **From the beginning of the fiscal year to filing date:** From **1/01/2022** to **Filing Date** | ☑ Operating a business ☐ Other _____ | **$1,615,224.65** |
| **For year before that:** From **1/01/2020** to **12/31/2020** | ☑ Operating a business ☐ Other _____ | **$4,862,434.00** |

2. **Non-business revenue**
    Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

    ☑ None.

| | **Description of sources of revenue** | **Gross revenue from each source** (before deductions and exclusions) |
|---|---|---|

**Part 2:      List Certain Transfers Made Before Filing for Bankruptcy**

3. **Certain payments or transfers to creditors within 90 days before filing this case**
    List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

    ☑ None.

| **Creditor's Name and Address** | **Dates** | **Total amount of value** | **Reasons for payment or transfer** *Check all that apply* |
|---|---|---|---|

| Debtor | Eastgate Whitehouse LLC | | Case number *(if known)* | 22- 22635 |
|---|---|---|---|---|

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None.

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|

5. **Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. **Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

| **Part 3:** | **Legal Actions or Assignments** |
|---|---|

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| Case title Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1. **Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Well Fargo Commercial Mortgage Trust 2018-C46, Commercial Mortgage Passthrough Certificates, Series 2018-C46 v. Eastgate Whitehouse LLC, et al.** **1:22-cv-04326** | **Foreclosure Action** | **New York Supreme Court, New York County 111 Centre Street New York, NY 10013** | ☑ Pending ☐ On appeal ☐ Concluded |

| Debtor | **Eastgate Whitehouse LLC** | | Case number *(if known)* | 22- 22635 |

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.2. | In the Matter of the Amended Petition of William W. Koeppel<br>for the Removal of the Trustees and Appointment of Successor<br>Trustees of the Trust Under Article FOURTH of the Last Will<br>and Testament of Robert A. Koeppel, Deceased<br>1996-4098/E/F | Decree: (i) pursuant to SCP A §711 removing respondents Roberta L. Koeppel ("Roberta") and Action seeking, in part, a decree removing Alexandra Koeppel as Trustees of the Trust created under Article Fourth of the Last Will and Testament of Robert A. Koeppel, dated May 29, 1996 | **Surrogates Court of NYS, New York County<br>31 Chambers Street<br>New York, NY 10007** | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.3. | Kathryn Casey, Laurie Cagnassola et al. and Pamela Renna and Vittina Degrezia aka Vittina Luppino v. Whitehouse Estates, Inc., Koeppel & Koeppel, Inc.,Duell 5 Mangagement LLC d/b/a Duell Management Systems, William W. Koeppel and Eastgate Whitehouse Estates, LLC<br>APL-2021-00169 | Appeal of Action Brought under DHCR | **New York State Court of Appeals<br>20 Eagle Street<br>Albany, NY 12207** | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.4. | V.C. Drywall & Remodeling, LLC and Victor Carabajo v. 939 First Avenue, LLC, Eastgate Whitehouse LLC, Whitehouse Estates Inc., WWK 140 Bay Ridge, LLC, William W. Koeppel, and Wilmington Trust National Association as Trustee for the Benefit of The Registered Holders of Wells Fargo Commercial Mortgage Trust 2018-C46, Commercial Mortgage Pass-Through Certificates Series 2018-C46<br>161453/2018 | Collection Action | **Supreme Court, New York County<br>60 Centre Street<br>New York, NY 10007** | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.5. | Eastgate Whitehouse LLC v. Gordon H. Smith Corporation<br>656231/2018 | Collection Action | **New York Supreme Court<br>60 Centre Street<br>New York, NY 10007** | ☑ Pending<br>☐ On appeal<br>☐ Concluded |

**8. Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

Debtor    **Eastgate Whitehouse LLC**                                      Case number *(if known)* **22- 22635**

☑ None

| Part 4: | **Certain Gifts and Charitable Contributions** |
|---|---|

9. **List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

   ☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

| Part 5: | **Certain Losses** |
|---|---|

10. **All losses from fire, theft, or other casualty within 1 year before filing this case.**

   ☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | Dates of loss | Value of property lost |
|---|---|---|---|

| Part 6: | **Certain Payments or Transfers** |
|---|---|

11. **Payments related to bankruptcy**
    List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

   ☐ None.

| | Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | **Shafferman & Feldman LLP**<br>**137 Fifth Avenue**<br>**9th Floor**<br>**New York, NY 10010** | **Attorney Fees** | **7-19-22**<br>**8-12-22** | **$15,062.00** |
| | Email or website address<br>**shaffermanjoel@gmail.com** | | | |
| | Who made the payment, if not debtor?<br>**Whitehouse Estates, Inc.** | | | |

12. **Self-settled trusts of which the debtor is a beneficiary**
    List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
    Do not include transfers already listed on this statement.

   ☑ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

13. **Transfers not already listed on this statement**
    List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

   ☑ None.

Debtor    **Eastgate Whitehouse LLC**                                   Case number *(if known)*  **22- 22635**

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

<div style="background:black;color:white">**Part 7:**</div>   **Previous Locations**

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☑ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

<div style="background:black;color:white">**Part 8:**</div>   **Health Care Bankruptcies**

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

<div style="background:black;color:white">**Part 9:**</div>   **Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.
☐ Yes. State the nature of the information collected and retained.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.
☐ Yes. Does the debtor serve as plan administrator?

<div style="background:black;color:white">**Part 10:**</div>   **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Does debtor still have it? |
|---|---|---|---|

Debtor    **Eastgate Whitehouse LLC**    Case number *(if known)* **22- 22635**

---

### 20. Off-premises storage

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|

---

| **Part 11:** | Property the Debtor Holds or Controls That the Debtor Does Not Own |
|---|---|

### 21. Property held for another

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

---

| **Part 12:** | Details About Environment Information |
|---|---|

For the purpose of Part 12, the following definitions apply:

*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

### 22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

☑ No.
☐ Yes. Provide details below.

| Case title Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

### 23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

### 24. Has the debtor notified any governmental unit of any release of hazardous material?

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

---

| **Part 13:** | Details About the Debtor's Business or Connections to Any Business |
|---|---|

### 25. Other businesses in which the debtor has or has had an interest

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

---

| Debtor | **Eastgate Whitehouse LLC** | | Case number *(if known)* | **22- 22635** |

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| | | |

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☑ None

| Name and address | Date of service<br>From-To |
|---|---|

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☑ None

| Name and address | If any books of account and records are<br>unavailable, explain why |
|---|---|

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

| Name and address |
|---|

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

**29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No

☐ Yes. Identify below.

**30. Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No

☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No

☐ Yes. Identify below.

| Debtor | Eastgate Whitehouse LLC | Case number *(if known)* | 22- 22635 |
|---|---|---|---|

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|

**Part 14:   Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on     September 1, 2022

**/s/ William W. Koeppel**                                          **William W. Koeppel, as President of**
                                                                                    **Whitehouse Estates, Inc., the sole member**
                                                                                    **of Eastgate Whitehouse LLC**
Signature of individual signing on behalf of the debtor        Printed name

Position or relationship to debtor

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**
☑ No
☐ Yes

**Fill in this information to identify the case:**

Debtor name    **Eastgate Whitehouse LLC**

United States Bankruptcy Court for the:    SOUTHERN DISTRICT OF NEW YORK

Case number (if known)    **22- 22635**

☐ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/22

**The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).**

**Part 1:    Income**

1. **Gross revenue from business**

   ☐ None.

   | Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
   |---|---|---|
   | **From the beginning of the fiscal year to filing date:**<br>From  **1/01/2022** to **Filing Date** | ☑ Operating a business<br>☐ Other _____ | **$1,615,224.65** |
   | **For year before that:**<br>From  **1/01/2020** to **12/31/2020** | ☑ Operating a business<br>☐ Other _____ | **$4,862,434.00** |

2. **Non-business revenue**
   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

   ☑ None.

   | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
   |---|---|---|

**Part 2:    List Certain Transfers Made Before Filing for Bankruptcy**

3. **Certain payments or transfers to creditors within 90 days before filing this case**
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

   ☑ None.

   | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
   |---|---|---|---|

| Debtor | Eastgate Whitehouse LLC | Case number (if known) | 22- 22635 |
|---|---|---|---|

4.  **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None.

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|

5.  **Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6.  **Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

---

**Part 3:    Legal Actions or Assignments**

7.  **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| Case title Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1. **Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of Well Fargo Commercial Mortgage Trust 2018-C46, Commercial Mortgage Passthrough Certificates, Series 2018-C46 v. Eastgate Whitehouse LLC, et al.** **1:22-cv-04326** | **Foreclosure Action** | **New York Supreme Court, New York County 111 Centre Street New York, NY 10013** | ☑ Pending ☐ On appeal ☐ Concluded |

---

| Debtor | Eastgate Whitehouse LLC | | Case number *(if known)* | 22- 22635 |

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.2. | In the Matter of the Amended Petition of William W. Koeppel for the Removal of the Trustees and Appointment of Successor Trustees of the Trust Under Article FOURTH of the Last Will and Testament of Robert A. Koeppel, Deceased 1996-4098/E/F | Decree: (i) pursuant to SCP A §711 removing respondents Roberta L. Koeppel ("Roberta") and Action seeking, in part, a decree removing Alexandra Koeppel as Trustees of the Trust created under Article Fourth of the Last Will and Testament of Robert A. Koeppel, dated May 29, 1996 | Surrogates Court of NYS, New York County 31 Chambers Street New York, NY 10007 | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.3. | Kathryn Casey, Laurie Cagnassola et al. and Pamela Renna and Vittina Degrezia aka Vittina Luppino v. Whitehouse Estates, Inc., Koeppel & Koeppel, Inc.,Duell 5 Mangagement LLC d/b/a Duell Management Systems, William W. Koeppel and Eastgate Whitehouse Estates, LLC APL-2021-00169 | Appeal of Action Brought under DHCR | New York State Court of Appeals 20 Eagle Street Albany, NY 12207 | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.4. | V.C. Drywall & Remodeling, LLC and Victor Carabajo v. 939 First Avenue, LLC, Eastgate Whitehouse LLC, Whitehouse Estates Inc., WWK 140 Bay Ridge, LLC, William W. Koeppel, and Wilmington Trust National Association as Trustee for the Benefit of The Registered Holders of Wells Fargo Commercial Mortgage Trust 2018-C46, Commercial Mortgage Pass-Through Certificates Series 2018-C46 161453/2018 | Collection Action | Supreme Court, New York County 60 Centre Street New York, NY 10007 | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.5. | Eastgate Whitehouse LLC v. Gordon H. Smith Corporation 656231/2018 | Collection Action | New York Supreme Court 60 Centre Street New York, NY 10007 | ☑ Pending<br>☐ On appeal<br>☐ Concluded |

**8. Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

| Debtor | Eastgate Whitehouse LLC | Case number *(if known)* | 22- 22635 |
|---|---|---|---|

☑ None

| Part 4: | Certain Gifts and Charitable Contributions |
|---|---|

9.  **List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

| Part 5: | Certain Losses |
|---|---|

10. **All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | Dates of loss | Value of property lost |
|---|---|---|---|

| Part 6: | Certain Payments or Transfers |
|---|---|

11. **Payments related to bankruptcy**
    List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

|  | Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | Shafferman & Feldman LLP<br>137 Fifth Avenue<br>9th Floor<br>New York, NY 10010 | Attorney Fees | 7-19-22<br>8-12-22 | $15,062.00 |
|  | Email or website address<br>shaffermanjoel@gmail.com |  |  |  |
|  | Who made the payment, if not debtor?<br>Whitehouse Estates, Inc. |  |  |  |

12. **Self-settled trusts of which the debtor is a beneficiary**
    List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
    Do not include transfers already listed on this statement.

☑ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

13. **Transfers not already listed on this statement**
    List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None.

| Debtor | **Eastgate Whitehouse LLC** | | | Case number *(if known)* | **22- 22635** |

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

---

**Part 7:** Previous Locations

**14. Previous addresses**
   List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☑ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

---

**Part 8:** Health Care Bankruptcies

**15. Health Care bankruptcies**
   Is the debtor primarily engaged in offering services and facilities for:
   - diagnosing or treating injury, deformity, or disease, or
   - providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

---

**Part 9:** Personally Identifiable Information

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.
☐ Yes. State the nature of the information collected and retained.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.
☐ Yes. Does the debtor serve as plan administrator?

---

**Part 10:** Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**
   Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
   Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

**19. Safe deposit boxes**
   List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Does debtor still have it? |
|---|---|---|---|

---

Official Form 207   Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy   page **5**

| Debtor | **Eastgate Whitehouse LLC** | Case number *(if known)* | **22- 22635** |
|--------|------------------------------|--------------------------|---------------|

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---------------------------|-----------------------------------|-----------------------------|-----------------------------|

| **Part 11:** | **Property the Debtor Holds or Controls That the Debtor Does Not Own** |
|---|---|

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| **Part 12:** | **Details About Environment Information** |
|---|---|

For the purpose of Part 12, the following definitions apply:

*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No.
☐ Yes. Provide details below.

| Case title Case number | Court or agency name and address | Nature of the case | Status of case |
|------------------------|----------------------------------|---------------------|-----------------|

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|-----------------------|-------------------------------------|------------------------------|-----------------|

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|-----------------------|-------------------------------------|------------------------------|-----------------|

| **Part 13:** | **Details About the Debtor's Business or Connections to Any Business** |
|---|---|

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

Debtor   **Eastgate Whitehouse LLC**                                     Case number *(if known)*  **22- 22635**

| Business name address | Describe the nature of the business | Employer Identification number |
|---|---|---|
| | | Do not include Social Security number or ITIN. |
| | | **Dates business existed** |

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☑ None

| Name and address | Date of service From-To |
|---|---|

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☑ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

| Name and address |
|---|

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28. List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

**29. Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

**30. Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

Debtor    **Eastgate Whitehouse LLC**                                Case number *(if known)* **22- 22635**

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|
| | |

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|
| | |

---

**Part 14:**    **Signature and Declaration**

---

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    September 1, 2022

/s/ William W. Koeppel                                    **William W. Koeppel, as President of**
                                                          **Whitehouse Estates, Inc., the sole member**
                                                          **of Eastgate Whitehouse LLC**
Signature of individual signing on behalf of the debtor    Printed name

Position or relationship to debtor

**Are additional pages to** *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* **(Official Form 207) attached?**
☑ No
☐ Yes

**Exhibit 5 to Disclosure Statement Concerning**
**Barclays Bank PLC's Chapter 11 Liquidating Plan For The Debtor**

**Eastgate Whitehouse LLC**
**Post-Petition Income Statement**
**(Taken From Part 4 Of Debtor's Monthly Operating Reports Filed With The Bankruptcy Court)[1]**

| | September 2022 | October 2022 | November 2022 | December 2022 | January 2023 | February 2023 | March 2023 | April 2023 | May 2023 | June 2023 | July 2023 | August 2023 | September 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | $325,740 | $305,659 | $330,928 | $307,170 | $275,460 | $231,938 | $259,970 | $273,944 | $239,485 | $284,231 | $289,339 | $295,442 | $279,203 |
| **Expenses** | $127,711 | $132,467 | $123,354 | $156,960 | $387,163 | $245,587 | $399,420 | $207,789 | $85,688 | $68,323 | $41,762 | $284,854 | $22,562 |
| **Profit (Loss)[2]** | $180,820 | $173,192 | $193,325 | $150,209 | <$111,703>[3] | $13,649 | <$139,450> | $66,154 | $153,798 | $215,908 | $247,577 | $10.587 | $256,641 |

[1] Complete copies of the monthly operating reports filed by the Debtor with the Bankruptcy Court may be obtained from the Court's PACER system for those who have PACER log-in credentials, or may be obtained by making a written request to counsel for the Secured Lender at bruce.zabarauskas@hklaw.com.
[2] Expenses and Profit and Loss do not include the payment of real estate taxes, which were made by the Secured Lender and its predecessor, and debt service, which was not paid by the Debtor.
[3] This was erroneously reported as a $22,066 profit in the Debtor's January 2023 operating report.